IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CINTAS CORPORATION, a Washington
Corporation,

               Petitioner,

   vs.

CHARLES LEROY GRAY, DAVID W.
REED, and NEAL CAPUCHINO,
individuals,

               Respondents.

Case No. 06-162

**NOTICE OF LODGMENT BY PETITIONER CINTAS
CORPORATION OF COPY OF PAPERS FILED
WITH THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

Petitioner Cintas Corporation hereby lodges with this Court a copy set of the following

papers, which it has filed on April 27, 2006 with the Judicial Panel on Multidistrict Litigation:

1.     RESPONSE BRIEF BY CINTAS CORPORATION IN OPPOSITION TO
MOTION TO TRANSFER AND CONSOLIDATE PURSUANT TO 28 U.S.C.
§1407;

2.     RESPONSE BY CINTAS CORPORATION TO AVERMENTS IN MOTION TO
TRANSFER AND CONSOLIDATE PURSUANT TO 28 U.S.C. §1407;

3.     REQUEST FOR JUDICIAL NOTICE SUBMITTED WITH RESPONSE BY
CINTAS CORPORATION IN OPPOSITION TO MOTION TO TRANSFER
AND CONSOLIDATE PURSUANT TO 28 U.S.C. §1407;

4.     APPENDIX OF AUTHORITIES (LEGISLATIVE HISTORY MATERIALS)
SUBMITTED WITH RESPONSE BY CINTAS CORPORATION IN
OPPOSITION TO MOTION TO TRANSFER AND CONSOLIDATE
PURSUANT TO 28 U.S.C. §1407; and

5.     DECLARATION OF MARK C. DOSKER SUBMITTED WITH RESPONSE
BY CINTAS CORPORATION IN OPPOSITION TO MOTION TO TRANSFER
AND CONSOLIDATE PURSUANT TO 28 U.S.C. §1407.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

_____

Martin P. Tully (#465)
Jon E. Abramczyk (#2432)
Jason A. Cincilla (#4232)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
    Attorneys for Cintas Corporation

OF COUNSEL:

SQUIRE, SANDERS & DEMPSEY L.L.P.
Mark C. Dosker (CA Bar # 114789)
Michael W. Kelly (CA Bar # 214038)
Joseph A. Meckes (CA Bar # 190279)
One Maritime Plaza, Third Floor
San Francisco, CA  94111-3492
(415) 954-0200

May 1, 2006

517973

# BEFORE THE
# JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

In re Cintas Corp.
Overtime Pay Arbitration Litigation

MDL Docket No. 1781

## RESPONSE BRIEF BY CINTAS CORPORATION IN OPPOSITION TO MOTION TO TRANSFER AND CONSOLIDATE PURSUANT TO 28 U.S.C. § 1407



# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND SUMMARY ........................................................................ 1

II.    FACTUAL BACKGROUND ................................................................................ 2

III.    ARGUMENT ...................................................................................................... 7

    A.    The Panel Must First Decide Whether it Has Subject Matter Jurisdiction To Do That Which The Pending Motion Seeks ...................................... 7

    B.    The Jurisdictional Reach Of Section 1407 .................................................. 8

    C.    Summary Proceedings Under Section 4 Of The FAA Are Not Civil Actions Subject To Transfer ...................................................................... 9

        1.    The Text and Structure Of The FAA Demonstrates That Section 4 Proceedings Are Unique Summary Proceedings, Not Civil Actions ......... 9

        2.    The Legislative History Of The FAA Further Shows That Section 4 Proceedings Are Unique Summary Proceedings, Not Civil Actions ...................................................................................... 11

        3.    Rule 81(a)(3) Demonstrates That Section 4 Proceedings Are Unique Summary Proceedings, Not Civil Actions ................................... 14

    D.    Proceedings Under Section 4 Of The FAA Do Not Have Pretrial Proceedings Capable Of Coordination Or Consolidation By The Panel ............. 15

    E.    The Requirements For Transfer Under Section 1407 Are Not Met ..................... 17

    F.    In the Alternative, If The Panel Decides That it Has Subject Matter Jurisdiction and If The Panel Decides That The Requirements For Transfer Under Section 1407 Are Met, then Certainly The Transferee Court Should Be That of The Honorable Saundra Brown Armstrong of the Northern District of California .......................................................................... 19

IV.    CONCLUSION .................................................................................................... 20

# TABLE OF AUTHORITIES

## FEDERAL CASES

**Page**

*Arbaugh v. Y & H Corp.*,
 __ U.S. __, 126 S. Ct. 1235 (2006)..................................................................7

*Ex parte McCardle*,
 74 U.S. 506 (1869)..........................................................................................8

*Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*,
 456 U.S. 694 (1982)........................................................................................7

*Mansfield, Coldwater & Lake Michigan R. Co. v. Swan*,
 111 U.S. 379 (1984)........................................................................................8

*Moses H. Cone Memorial Hospital v. Mercury Const. Corp.*,
 460 U.S. 1 (1983)..........................................................................................11

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
 388 U.S. 395 (1967)........................................................................................9

*Steel Co. v. Citizens for a Better Env't*,
 523 U.S. 83 (1998).......................................................................................7, 8

*United States v. Ceja-Prado*,
 333 F.3d 1046 (9th Cir. 2003).........................................................................7

*Yakus v. United States*,
 321 U.S. 414 (1944).........................................................................................7

## FEDERAL STATUTES AND RULES

9 U.S.C. § 2....................................................................................................9

9 U.S.C. § 3.................................................................................................3, 9

9 U.S.C. § 4........................................................................................... *passim*

9 U.S.C. § 6..................................................................................................11

28 U.S.C. § 1407.................................................................................1, 8, 19

29 U.S.C. § 201 *et seq*.................................................................................2

## TABLE OF AUTHORITIES (cont'd)

## FEDERAL STATUTES AND RULES (cont'd)

**Page**

29 U.S.C. §1001 *et seq.*...........................................................................................2

29 U.S.C. § 216................................................................................................2

Act of Feb. 12, 1925, c.213, 43 Stat. 883 .................................................11

Fed. R. Civ. P. 1.............................................................................................14

Fed. R. Civ. P. 2.............................................................................................14

Fed. R. Civ. P. 3.............................................................................................14

Fed. R. Civ. P. 81(a)(3)...........................................................................1, 14

Fed. R. Evid. 803(3).........................................................................................6

## STATE STATUTES

Cal. Bus. & Prof. Code § 17200 *et seq.* ........................................................2

## LEGISLATIVE HISTORY

House Report, H.R. Rep. No. 90-1130 (1968), *reprinted in* 1968
        U.S.C.C.A.N. 1898, 1900 ................................................................17

House Report, H.R. Rep. No. 68-96 (1924)..........................................11, 12

Joint Hearings before the Subcommittees of the Committees on the Judiciary on
S.1005 and H.R.646, *Bills to Make Valid and Enforceable Written Provisions or
Agreements for Arbitration of Disputes Arising Out of Contracts, Maritime
Transactions, or Commerce Among the States or Territories or with Foreign
Nations*, 68th Cong., First Sess. at 33-41 (January 9, 1924).......................12, 14

Senate Report, S. Rep. No. 68-536 (1924) .............................................11, 12

## I.     INTRODUCTION AND SUMMARY

In their motion to the Panel seeking transfer of 70 Petition proceedings to compel arbitration filed in 70 District Courts by Cintas Corporation ("Cintas"), the self-described "Veliz Plaintiffs" urge this Panel to transfer those proceedings to the Northern District of California for consolidation with a civil action pending in that District ("the Veliz Action"). Cintas opposes this motion because the statute granting this Panel its jurisdiction and authorizing the Panel to transfer civil actions to a single district for consolidated pretrial proceedings does not extend jurisdiction to, or authorize the transfer of, Petition proceedings to compel arbitration and because, even if there were jurisdiction and even if transfer were authorized, the conditions for transfer have not been met in this matter.

There are three main reasons why, as the analysis herein shows, 28 U.S.C. § 1407 does not apply to summary proceedings to compel arbitration under Section 4 of the Federal Arbitration Act ("FAA") 9 U.S.C. § 4.

First, as confirmed by the FAA's text, the FAA's structure, the FAA's legislative history and the Federal Rules of Civil Procedure -- especially Rule 81(a)(3) -- summary proceedings under Section 4 of the FAA are not "civil actions" subject to this Panel's jurisdiction for possible transfer within the meaning of Section 1407. Second, Section 4 admits of no pretrial proceedings that could meaningfully be consolidated even if transfer were jurisdictionally authorized. Third, in the circumstances of this case, transfer would not be authorized or appropriate because there are no common issues of fact to be determined, but only individual issues that are undisputed and/or have already been decided.

Finally, however, Cintas states that if the Panel decides that the reasons summarized above and addressed in detail below do not preclude the Panel from transferring the Petition proceedings and that the requirements of Section 1407 are met, then certainly the transferee court

should be that of the Honorable Saundra Brown Armstrong of the United States District Court for the Northern District of California. In so stating, however, Cintas emphasizes that under any circumstances the ultimate outcome on each of the 70 Petition proceedings will and by statute must be the same -- because under Section 4 of the FAA, the arbitration(s) by the Respondents in each such Petition proceeding must, by statute, take place within the District where each such Petition was "filed." 9 U.S.C. § 4 (emphasis added). The 70 Petition proceedings were filed in the 70 respective Districts.

## II.    FACTUAL BACKGROUND

On March 19, 2003, certain individuals -- who are not Respondents in any of the 70 Petition proceedings -- filed a lawsuit against Cintas in the United States District Court for the Northern District of California alleging claims for relief under the Fair Labor Standards Act ("FLSA") (29 U.S.C. § 201 *et seq.*), the Employee Retirement Income Safety Act ("ERISA") (29 U.S.C. § 1001 *et seq.*), certain state wage and hour laws, and the California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 *et seq.*) styled as <u>Veliz et al v. Cintas Corporation etc.</u>, Case No. C-03-01180 (SBA) (N.D. Cal.) (hereinafter "the Veliz Action"). The gravamen of plaintiffs' claims in the Veliz Action was that they were improperly characterized as "exempt" employees and were not paid overtime compensation.

Certain plaintiffs in the Veliz Action purported to act as representatives of a putative "opt-in" collective action under Section 16(b) of the Fair Labor Standards Act (29 U.S.C. § 216(b)), as representatives of a putative nationwide Rule 23 class action under ERISA, and as representatives of certain putative state sub-classes under Rule 23.

Subsequently, each of the persons who are now Respondents to the 70 Petition proceedings filed with the Court in the Veliz Action "Consents to Sue" and purported to opt-in to the Veliz Action and assert claims for "unpaid overtime premiums under the federal Fair Labor Standards Act ('FLSA') 29 U.S.C. § 216(b)" and also purported to designate Altshuler, Berzon,

Nussbaum, Rubin & Demain, Traber & Voorhees, and Lerach, Coughlin, Stoia & Robbins, LLP, to represent him or her in the Veliz Action.

Each Respondent to the 70 Petition proceedings is party to an individual employment agreement with Cintas that provides for binding arbitration of all disputes with Cintas, including statutory claims such as the FLSA claims asserted by Respondents in the Veliz Action. A copy of each Respondent's employment agreement is submitted in the appropriate one of the 70 Petition proceedings, as an Exhibit to the Declaration of Jenice Clendening submitted therein.

The employment agreement of each Respondent to the 70 Petition proceedings requires that such arbitration between him or her and Cintas be "conducted in accordance with the American Arbitration Association's National Rules for the Resolution of Employment Disputes and [that it be] held in the county and state where [the Respondent] currently works for [Cintas] or most recently worked for [Cintas]."

On June 3, 2005, Cintas moved to stay further proceedings in the Veliz Action by the persons who are now Respondents in the 70 Petition proceedings, pursuant to Section 3 of the Federal Arbitration Act (9 U.S.C. § 3). The plaintiffs in the Veliz Action (including persons who are now the Respondents in the 70 Petition proceedings) did not deny that they were required to arbitrate their FLSA claims against Cintas. Instead, through their counsel in the Veliz Action they filed a cross-motion requesting that the Court deem Cintas' motion to stay under Section 3 of the FAA to be, in effect, a petition to compel under Section 4 of the FAA.

In so moving, their counsel in the Veliz Action were seeking preemptively to nullify each of the individuals' express place-of-arbitration terms, by trying to themselves invoke Section 4's requirement that a district court can compel arbitration only in the district where the petition is filed. Previously, in motion proceedings that did not apply on this point to the persons who are now Respondents in the 70 Petition proceedings, the District Court in the Veliz Action had ruled that Section 4 of the FAA dictates that the arbitral hearing and any other arbitral proceedings be held in the judicial district where the petition under Section 4 is filed, even if the petition under Section 4 is filed by a defendant in an action filed by plaintiffs who are subject to place-of-

arbitration provisions that would ordinarily require arbitration elsewhere. In so ruling, however, the Northern California District Court expressly limited the scope of its ruling to the 56 plaintiffs who had been the subject of Cintas' Motion to Compel in the Veliz Action, which does not include any of the persons who are now Respondents in the 70 Petition proceedings.

In this context, as to the persons who are now Respondents in the 70 Petition proceedings, Cintas expressly chose not to move or petition the Northern California District Court to compel arbitration under Section 4, but instead expressly moved in that Court only for a stay of litigation under Section 3. Previously, Cintas had expressly reserved -- including in but not limited to submissions on the record in the Veliz Action on December 14, 2004 and September 6, 2005 -- its right to petition in the 70 District Courts under Section 4, although Cintas continued to have that right regardless whether or not it reserved that right.

Prior to the hearing on the relevant motions, the Northern California District Court ordered the parties to complete a meet and confer process and submit a joint stipulation identifying: (a) which of the plaintiffs in the Veliz Action may litigate their claims before the Northern California District Court, (b) which of the plaintiffs are required to arbitrate their claims, and (c) which plaintiffs the parties are unable to agree fall in either of the two categories.[1] The order further directed that the joint stipulation specifically reference plaintiffs by name, by applicable Employment Agreement (the enforceability of which the Northern California District Court had previously ruled upon or was called on to rule upon in the then-pending motions) and any other identifying information the parties believed would be helpful. Exhibit 1 to Request for Judicial Notice submitted herewith ("RJN") [Docket No. 500 in Veliz Action].

---

[1] Out of about 1900 persons whose individual agreements were at issue, only six challenged the enforceability of their individual arbitration agreements. The Veliz Court considered the two sides' evidence about each of those six persons, and ruled in the individual's favor on three of the challenges and in Cintas' favor on three of the challenges. Exhibit 5 to Request for Judicial Notice submitted herewith, at pages 7-9. [Docket No. 516 in Veliz Action].

The parties submitted their joint stipulation on September 29, 2005. Exhibit 2 to RJN [Docket No. 501 in Veliz Action].

Thereafter, on the record of a hearing on the motions then-pending before the Northern California District Court, the persons who are now Respondents in the 70 Petition proceedings stated unequivocally through their counsel in the Veliz Action -- Michael Rubin of Altshuler, Berzon, Nussbaum, Rubin & Demain -- that they do not intend to arbitrate in accordance with the terms of their enforceable agreements with Cintas in that they will not observe the place-of-arbitration terms in their agreements but will instead seek to proceed in a single arbitration in San Francisco. Exhibit 3 to RJN at 87:15-18 [Docket No. 512 in Veliz Action]; Dosker Decl. at paragraph 3.

By Order filed on February 14, 2006, the Northern California District Court granted Cintas' motion to stay under Section 3 and rejected all of the arguments by the opt-in plaintiffs (including the persons who are now Respondents in the 70 Petition proceedings) that the Court should allow Respondents hereto to proceed in arbitration in Northern California. On the record of the hearings on those motions, the Northern California District Court stated that the arguments by the opt-in plaintiffs in the Veliz Action (including the persons who are now Respondents in the 70 Petition proceedings) were without any basis in fact or law and that the opt-in plaintiffs (including the persons who are now Respondents in the 70 Petition proceedings) had no statutory or case authorities or even factual support for their motion, and that plaintiffs' counsel had no answer -- as to why the opt-in plaintiffs (the persons who are now Respondents in the 70 Petition proceedings) were disregarding what each of the opt-in plaintiffs (the persons who are now Respondents in the 70 Petition proceedings) had agreed to in his or her enforceable arbitration agreement -- other than the strategic desire of their counsel to have all such persons in one location.[2] Exhibit 3 to RJN at 14:15-19, 16:15-17, 97:9-17; and Exhibit 4 to RJN, at 4:3-14, 7:5-

---

[2] That burning desire of their counsel arose and continues because counsel brought the Veliz Action as a pressure tactic as part of an overall "corporate campaign" against Cintas by certain labor unions, acting in concert with the unions' lawyers, who are the plaintiffs' lawyers in the Veliz Action. Examples of evidence of the state of mind and the intent, plan, motive, and design

10 and 25:2-28:24 [Docket No. 518 in Veliz Action].

A copy of the Northern California District Court's Order filed on February 14, 2006 is attached hereto as Exhibit 5 to RJN [Docket No. 516 in Veliz Action]. That Order adopts the reasons the Court stated on the record at the hearings on those motions. *Id.*, at 1:25-27. Repeatedly at those hearings, the Court stated that the arbitration agreements are enforceable. *See, e.g.*, Exhibit 3 to RJN, at 5:4-6:2, 8:22-9:18, 10:18 and 12:19; and Exhibit 4 to RJN, at 6:23. The Order lists by name each of the persons who are now Respondents in the 70 Petition proceedings. Exhibit 5 to RJN [Docket No. 516 in Veliz Action].

Despite the Northern California District Court's Order that litigation be stayed until each of the persons listed therein have arbitrated in accordance with the terms of his or her individual employment agreements, however, each of those persons has failed or neglected or refused, and continues to fail or neglect or refuse, to arbitrate in accordance with the terms of his or her agreement and continues to fail or neglect or refuse to comply with his or her agreement. Indeed, counsel for plaintiffs in the Veliz Action (including the persons who are now Respondents in the 70 Petition proceedings) stated on the record in the Veliz Action that they would seek to have the claims heard in arbitration in Northern California. Exhibit 3 to RJN at 87:15-18; Dosker Decl. at paragraph 3

Meanwhile, earlier in the Veliz Action, the Northern California District Court has already held as a matter of federal law that the persons who are now Respondents in the 70 Petition proceedings have no substantive right to proceed collectively or as a class in arbitration. Exhibit 6 to RJN at pp. 4-7 [Docket No. 426 in Veliz Action].

In a teleconference on March 1, 2006, plaintiffs' counsel in the Veliz Action -- Michael

---

-- see Fed. R. Evid. 803(3) -- which has caused the Veliz plaintiffs' counsel to cause the individuals to fail, refuse and neglect to arbitrate in the manner provided for in each individual's admittedly enforceable arbitration agreement are, among other things, multiple statements by those unions and by their lawyers who filed the Veliz Action and are handling it. Exhibit 1 to Declaration of Mark C. Dosker ("Dosker Decl.") submitted herewith [Docket No. 292 in Veliz Action]; and Dosker Decl. at paragraphs 5-7 and Exhibits 2-4 thereto.

- 6 -

Rubin of Altshuler, Berzon, Nussbaum, Rubin & Demain -- again stated that the Veliz Plaintiffs do not intend to arbitrate in accordance with the terms of their enforceable agreements with Cintas in that they will not observe the place-of-arbitration terms in their agreements but will instead seek to proceed in a single arbitration in San Francisco.  Dosker Decl. at paragraph 3.

       To date, none of the persons who are Respondents in the 70 Petition proceedings has initiated arbitration against Cintas in the county where he or she currently works for Cintas or last worked for Cintas.

## III.     ARGUMENT

### A.     The Panel Must First Decide Whether it Has Subject Matter Jurisdiction To Do That Which The Pending Motion Seeks

       The Panel must first decide whether it has subject matter jurisdiction to do that which the pending motion seeks.  The objection that a federal court lacks subject-matter jurisdiction "may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." *Arbaugh v. Y & H Corp.*, __ U.S. __, 126 S. Ct. 1235, 1240 (2006).  "Commonly it is said that 'jurisdictional' questions, particularly concerning the court's power to deal with the subject matter, may be raised at any stage or in a collateral attack." *Yakus v. United States*, 321 U.S. 414, 473 (1944).  "No action of the parties can confer subject matter jurisdiction upon a federal court.  Thus the consent of the parties is irrelevant." *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).  "The parties' agreement, however, cannot create subject matter jurisdiction nor waive its absence." *United States v. Ceja-Prado*, 333 F.3d 1046, 1049 (9th Cir. 2003).

       In *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998), the United States Supreme Court adhered to the rule that a federal court may not hypothesize subject matter jurisdiction for the purpose of otherwise proceeding on the matter before the court.  The

Supreme Court rejected a doctrine, once approved by several Courts of Appeals, that allowed federal tribunals to pretermit jurisdictional objections "where (1) the merits question is more readily resolved, and (2) the prevailing party on the merits would be the same as the prevailing party were jurisdiction denied." 523 U.S. at 93. Recalling "a long and venerable line of our cases", the Supreme Court stated that: "The requirement that jurisdiction be established as a threshold matter . . . is 'inflexible and without exception'" because "'jurisdiction is power to declare the law,'" and "'<u>without jurisdiction the court cannot proceed at all in any cause</u>.'" *Id.* at 94-95 (quoting *Ex parte McCardle*, 74 U.S. 506, 514 (1869) (emphasis added) and *Mansfield, Coldwater & Lake Michigan R. Co. v. Swan*, 111 U.S. 379, 382 (1984)).

Mindful of these bedrock rules of law, Cintas respectfully submits that the Panel must first decide whether it has subject matter jurisdiction to do that which the pending motion seeks.

### B.    The Jurisdictional Reach Of Section 1407

The first sentence of Section 1407(a) sets forth the limits on the Panel's jurisdiction. That sentence provides:

> (a) When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings.

As the statute provides, only "*civil actions*" may be transferred. Those civil actions must involve "*one or more common questions of fact*" and they may only be transferred "*for coordinated or consolidated pretrial proceedings*." In the present circumstance, the arbitration proceedings are not subject to transfer because they are not "civil actions", they do not have any pretrial proceedings capable of coordination or consolidation and they do not involve any common issues of fact.

- 8 -

C.    **Summary Proceedings Under Section 4 Of The FAA Are Not Civil Actions Subject To Transfer**

1.    **The Text and Structure Of The FAA Demonstrates That Section 4 Proceedings Are Unique Summary Proceedings, Not Civil Actions**

The key provisions of the FAA are Sections 2, 3 and 4. Section 2 provides that arbitration agreements shall be valid and enforceable; Section 3 requires a court to stay actions brought on issues referable to arbitration; and Section 4 allows a party to an arbitration agreement to petition a district court to compel arbitration and requires the district court so petitioned to so compel once it is satisfied that an agreement for arbitration has been made and has not been honored. 9 U.S.C. §§ 2, 3, 4; *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 400 (1967). Each of the 70 proceedings sought to be transferred here is a Petition proceeding brought under Section 4 of the FAA.

Section 4 of the FAA vests in the district courts limited jurisdiction to issue orders summarily compelling arbitration. That section provides:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. Five days' notice in writing of such application shall be served upon the party in default. Service thereof shall be made in the manner provided by the Federal Rules of Civil Procedure. The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed. If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default, or if the matter in dispute is within admiralty jurisdiction, the court shall

- 9 -

hear and determine such issue. Where such an issue is raised, the party alleged to be in default may, except in cases of admiralty, on or before the return day of the notice of application, demand a jury trial of such issue, and upon such demand the court shall make an order referring the issue or issues to a jury in the manner provided by the Federal Rules of Civil Procedure, or may specially call a jury for that purpose. If the jury find that no agreement in writing for arbitration was made or that there is no default in proceeding thereunder, the proceeding shall be dismissed. If the jury find that an agreement for arbitration was made in writing and that there is a default in proceeding thereunder, the court shall make an order summarily directing the parties to proceed with the arbitration in accordance with the terms thereof.

9 U.S.C. § 4. The key aspects of Section 4 proceedings, which distinguish them from civil actions, are apparent from the text of the statute. Section 4 proceedings are commenced by petition, not complaint. The relief sought by the petition is not a judgment for damages or injunctive relief, but "an order directing that such arbitration proceed in the manner provided for in [the arbitration] agreement." *Id.* The statute provides for only five days notice to the party against whom the order is sought. The district court's role is limited to determining whether an arbitration agreement was made and not honored. If the making of the arbitration agreement or the failure to perform it is an issue, then "the court shall proceed *summarily* to the trial thereof." *Id.*

Section 4 contemplates no pretrial proceedings and has none of the other hallmarks of a civil action. Rather, it is carefully structured *to avoid* pretrial proceedings and the expense and complexity of a civil action governed by the Federal Rules of Civil Procedure.

Not only does the text and structure of Section 4 establish that proceedings under it are not to be considered "civil actions" with complex pretrial proceedings requiring coordination or consolidation, the jurisdictional language of the section distinguishes civil actions from summary proceedings to compel arbitration. Jurisdiction is given to district courts "which, save for [the arbitration] agreement, would have jurisdiction under Title 28, in *a civil action* . . . between the

- 10 -

parties . . . ." *Id.* (emphasis added). This express statutory grant of jurisdiction would be rendered surplusage if the proceeding under Section 4 were itself to be a "civil action".

Section 6 of the FAA likewise emphasizes the difference between civil actions and proceedings under the FAA. That section provides:

> Any application to the court hereunder shall be made and heard in the manner provided by law for the making and hearing of motions, except as otherwise expressly provided.

9 U.S.C. § 6. This section contemplates none of the normal pretrial proceedings involving initial disclosures, discovery, pretrial conferences, and the like that are the hallmarks of the civil actions to which this Panel's jurisdiction extends. As the United States Supreme Court has stated: "The Arbitration Act calls for a summary and speedy disposition of motions or petitions to enforce arbitration clauses." *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 29 (1983). This clear goal of the FAA could not be accomplished if the full panoply of pretrial proceedings were applicable to cases under Section 4 of the FAA.

### 2.  The Legislative History Of The FAA Further Shows That Section 4 Proceedings Are Unique Summary Proceedings, Not Civil Actions

The distinction between a full-blown civil action and the summary proceedings of Section 4 is further delineated by the legislative history of the FAA. The FAA was enacted on February 12, 1925. Act of Feb. 12, 1925, c.213, 43 Stat. 883. Its legislative history includes a House Report, H.R. Rep. No. 68-96 (1924) ("House Report"), a Senate Report, S. Rep. No. 68-536 (1924) ("Senate Report"), two separate reported hearings and limited floor debate.[3] This history further shows that the summary proceedings of Section 4 are not "civil actions" to which the Panel's jurisdiction extends.

---

[3] For the convenience of the Panel, and opposing counsel, copies of the legislative history materials cited herein are provided by Cintas in the Appendix of Authorities submitted with this Brief.

The House Report summarized the benefits of the summary procedures of Section 4 as follows:

> The bill declares simply that such agreements for arbitration shall be enforced, and provides a procedure in the Federal courts for their enforcement. The procedure is very simple, following the lines of ordinary motion procedure, reducing technicality, delay, and expense to a minimum and at the same time safeguarding the rights of the parties.

H.R. Rep. No. 68-96, at 2. The Senate Report is equally clear about the simplicity of the procedures of Section 4:

> Section 4 provides a simple method for securing the performance of an arbitration agreement. The aggrieved party may apply to the proper district court on five days' notice, and the court will order the party to proceed. The constitutional right to a jury trial is adequately safeguarded.

S. Rep. No. 68-536, at 3.

The summary observations of the two reports derived from more detailed submissions that were made part of the record in hearings on the relevant Senate and House bills. In particular, a chief proponent of the arbitration legislation, Mr. Julius Henry Cohen, who was a member of the American Bar Association committee which proposed the legislation and was general counsel for the New York State Chamber of Commerce, submitted a detailed briefing paper to the Senate and House subcommittees that held joint hearings on the bills. Joint Hearings before the Subcommittees of the Committees on the Judiciary on S.1005 and H.R.646, *Bills to Make Valid and Enforceable Written Provisions or Agreements for Arbitration of Disputes Arising Out of Contracts, Maritime Transactions, or Commerce Among the States or Territories or with Foreign Nations*, 68th Cong., First Sess. at 33-41 (January 9, 1924) ("Joint Hearings"). The briefing paper specified the evils to which arbitration agreements and the proposed arbitration law would be directed as follows:

- 12 -

The evils at which arbitration agreements in general are directed are three in number. (1) The long delay usually incident to a proceeding at law, in equity or in admiralty, especially in recent years in centers of commercial activity, where there has arisen great congestion of the court calendars. This delay arises not only from congestion of the calendars, which necessitates each case awaiting its turn for consideration, but also frequently from preliminary motions and other steps taken by litigants, appeals therefrom, which delay consideration of the merits and appeals from decisions upon the merits which commonly follow the decision of any case of real importance. (2) The expense of litigation. (3) The failure, through litigation, to reach a decision regarded as just when measured by the standards of the business world.

Joint Hearings at 34-35. Unfortunately, some of these perceived "evils" remain characteristic of the litigation of civil actions today.

The paper went on to endorse the bills at issue as the solution and described their essential characteristics as follows:

Where one party refuses to carry out the agreement, however, the other party now has a remedy formerly denied him. This remedy is not, as has been suggested, equally cumbersome with the old actions in the courts, nor is there any prospect that it will ever become so. At the outset the party who has refused to arbitrate because he believes in good faith that his agreement does not bind him to arbitrate, or that the agreement is not applicable to the controversy, is protected by the provision of the law which requires the court to examine into the merits of such a claim. Such examination is, however, made summarily, so there is a minimum of delay and expense.

*The procedure for the enforcement of arbitration agreements is very simple. It reduces technically and formality to a minimum. It follows the same course as do ordinary motions before the given District Court.* Reasonable notice to the adverse party is assured by the requirement that notice of the application be given as though it were summary process. Thereafter, however, except in the case where the existence and applicability of the arbitration agreement are in question, the question *whether arbitration should be ordered is decided upon motion papers, affidavits and such exhibits as the party chooses to submit, obviating the necessity of appearance in court, together with the calling of witnesses and the opportunity for other preliminary*

- 13 -

> *motions and proceedings.  The whole matter should be disposed*
> *of within a few days after the application is made.*

*Id.* at 35-36 (emphasis added).

The procedures contemplated by the FAA's proponents and reflected in Section 4 as

enacted are entirely incompatible with pretrial proceedings of the type that this Panel is

empowered with consolidating and coordinating.  As the legislative history of the FAA confirms,

Section 4 requires only summary action by the district court with no pretrial proceedings and so a

Section 4 proceeding is entirely distinct from a "civil action" subject to Section 1407.

### 3.    Rule 81(a)(3) Demonstrates That Section 4 Proceedings Are Unique Summary Proceedings, Not Civil Actions

The scope of the Federal Rules of Civil Procedure is set in Rule 1.  The rules "govern the

procedure in the United States district courts in all suits of a civil nature whether cognizable at

law or in equity or in admiralty, with the exceptions stated in Rule 81." (emphasis added).  Rule

2 provides:  "There shall be one form of action to be known as 'civil action'."  Rule 3 provides:

"A civil action is commenced by filing a complaint with the court."

Rule 81(a)(3) is directly relevant here.  That rule provides in pertinent part:  "In

proceedings under Title 9, U.S.C., relating to arbitration . . . these rules apply only to the extent

that matters of procedure are not provided for in those statutes."

Taken together, these rules further confirm that Petition proceedings under Section 4 of

the FAA are not "civil actions".

First, Rule 81 limits the application of the Federal Rules to matters not provided for in the

FAA and characterizes as "proceedings" and not "civil actions" the judicial activities

contemplated by the FAA.  As noted above, Section 4 provides a procedural framework and a

fast timetable for summary disposition of petitions to compel arbitration.  The different

- 14 -

requirements and time limits of the Federal Rules, including those related to pleadings, parties, pretrial conferences, case management, depositions and discovery, are all rendered inapplicable by the contrary provisions of Section 4.

Second, because no "complaint" is ever filed under Section 4, which provides for a "petition" to compel arbitration, no "civil action" could be commenced in a proceeding under Section 4, as Rule 3 makes clear.

The 70 Petition proceedings under Section 4 of the FAA are not "civil actions" subject to the various pretrial requirements of the Federal Rules of Civil Procedure and so are not within the jurisdiction of the Panel to coordinate or consolidate, either with other proceedings under Section 4 or with the civil action by the Veliz Plaintiffs in the Northern District of California.

### D.    Proceedings Under Section 4 Of The FAA Do Not Have Pretrial Proceedings Capable Of Coordination Or Consolidation By The Panel

As noted above, proceedings under Section 4 of the FAA are summary by statute. They contemplate no discovery. The only issues to be determined are whether the parties made an agreement in writing to arbitrate their dispute and, if so, whether the respondent has refused to comply with the arbitration agreement. If these issues are undisputed, arbitration will be ordered forthwith, and must take place in the district where the petition was filed. If there is a legitimate dispute about the existence of an arbitration agreement or compliance with it, then there must be a summary trial, either to the court or to a jury. In the language of Section 4: "If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof." This requirement makes no provision for pretrial proceedings, but requires the court to proceed immediately to the trial of the single issue

in dispute.[4]  If each of the Respondents in the Section 4 Petition proceedings has an arbitration agreement with Cintas (as everyone has admitted throughout the record in Veliz and as the Court in the Veliz Action held) and if a Respondent in a particular Petition proceeding nevertheless asserts that he or she has not refused to comply with his or her arbitration agreement in the manner provided for in such agreement, then this will be determined by the district court where the petition is filed on motion -- or if legitimate factual disputes exist, by summary jury trial. Neither such a dispositive motion nor a summary trial is a pretrial proceeding that can be meaningfully consolidated or coordinated, and none of the motions that the Veliz Plaintiffs threaten to bring is permissible under Section 4.

As is clear from the record in Veliz as stated in each of the 70 Petitions, there is no legitimate dispute but that there is an arbitration agreement between Cintas and each individual Respondent, and that each Respondent has failed to comply with it by failing to arbitrate in the manner provided for in such agreement, so each district court has only one option -- to compel arbitration in the district where the petition has been filed.  Section 4 explicitly so provides:

> The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.  The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed.

9 U.S.C. § 4.  Even assuming this simple judicial act is a "pretrial proceeding", it is not the sort that Section 1407 contemplates will be an appropriate basis for transfer.[5]

---

[4] The Veliz Plaintiffs assert that they will "move to dismiss, strike, stay, or abate" the Section 4 Petition proceedings at issue.  No such motion is permitted by Section 4.

[5] The legislative history of Section 1407 confirms the intent of Congress that the power of multidistrict coordination and consolidation be limited to cases with significant discovery to be managed.  "By the term 'pretrial proceedings' the committee has reference to the practice and

If a legitimate factual dispute could somehow arise about whether a particular Respondent has refused to arbitrate in the manner provided for in his or her agreement, then Section 4 requires a summary trial. Under no circumstances can a trial be considered a "pretrial proceeding", and the Veliz Plaintiffs do not appear to contend otherwise. Indeed, the existence of any legitimate factual issues would require the immediate remand of the transferred proceedings for summary trial.

In short, in these Section 4 summary arbitration matters, there are no pretrial proceedings to be consolidated or coordinated under Section 1407.

### E.    The Requirements For Transfer Under Section 1407 Are Not Met

Even if the Panel had jurisdiction to consider the pending motion to transfer (which respectfully it does not), a fundamental requirement for transfer is not met because the Section 4 arbitration proceedings do not involve common issues of fact. The only questions presented to a district court in a Section 4 proceeding are: (1) is there a written arbitration agreement and (2) has the respondent refused to perform that agreement as written.

The parties do not, and cannot, dispute that the written arbitration agreements exist and are enforceable. Each of the Respondents in each of the Petition proceedings has so admitted in the Veliz Action. The Court in the Veliz Action has determined that each of those individuals' arbitration agreement is enforceable.

---

procedure which precede the trial of an action. These generally involve deposition and discovery, and, of course, are governed by the Federal Rules of Civil Procedure." H.R. Rep. No. 90-1130. at 1900 (1968), *reprinted in* 1968 U.S.C.C.A.N. 1898, 1900. That report further notes: "It is expected that such transfer is to be ordered only where significant economy and efficiency in judicial administration may be obtained. The types of cases in which massive filings of multidistrict litigation are reasonably certain to occur include not only civil antitrust actions, but also, common disaster (air crash) actions, patent and trademark suits, products liability actions and securities law violations, among others." *Id.* These types of cases do not bear even a superficial resemblance to a Section 4 proceeding to compel arbitration.

The only arguably remaining potential factual question in any of the Section 4 proceedings is whether a particular Respondent has refused to perform his or her arbitration agreement as written.  Each of the arbitration agreements require in pertinent part that the arbitration be "held in the county and state where Employee currently works for Employer or most recently worked for Employer."  The Veliz Plaintiffs cannot legitimately dispute that each of the Respondents has failed, neglected or refused (which is the test under 9 U.S.C. § 4) to arbitrate in the locations provided for by their respective agreements.  The Veliz plaintiffs' motion is based on their counsel's ongoing (but thus far rejected) quest that all the individual Respondents should be permitted to arbitrate in San Francisco.  The pending Section 4 Petition proceedings thus raise no factual issues at all.

If there were factual issues about either the existence of an agreement to arbitrate or a particular Respondent's non-performance of it, in any event, any such issues would be unique to each individual and not common issues of fact which Section 1407 requires as a predicate for transfer.  Moreover, as soon as any such factual issues were identified by a transferee court, Section 4 would require their immediate resolution by summary trial, so remand would be required in accord with Section 1407(a).[6]

If the facts are undisputed, then transfer is not authorized by Section 1407.  If the facts are legitimately disputed as to any Respondent, they must be resolved by summary trial in the district where the Petition was filed against that Respondent.  There is no room for pretrial proceedings to be coordinated or consolidated.

---

[6] To the extent that the Veliz Plaintiffs seek to argue about the proper construction of the arbitration agreements at issue, those arguments are legal, not factual.

Because there are no common issues of fact in the various Section 4 proceedings, but only undisputed facts or questions of law, Section 1407 does not permit the transfer of the Section 4 proceedings.

>   **F.**    **In the Alternative, If The Panel Decides That it Has Subject Matter Jurisdiction and If The Panel Decides That The Requirements For Transfer Under Section 1407 Are Met, then Certainly the Transferee Court Should Be That of the Honorable Saundra Brown Armstrong of the Northern District of California**

If the Panel decides that the reasons addressed above do not preclude the Panel from transferring the Petition proceedings and that the requirements of Section 1407 are met, then certainly the transferee court should be that of the Honorable Saundra Brown Armstrong of the United States District Court for the Northern District of California. In so stating, however, Cintas emphasizes that under any circumstances the ultimate outcome on each of the 70 Petition proceedings will and by law must be the same either way -- because under Section 4 of the FAA, the arbitration(s) by the Respondents in each such Petition proceeding must, by statute, take place within the District where each such Petition was "filed." 9 U.S.C. § 4 (emphasis added). The 70 Petition proceedings were filed in the 70 respective Districts.[7]

---

[7] In stating what it does in this sub-section, and not laying out in detail here its underlying analysis, Cintas does not admit by silence any of the arguments made by the Veliz plaintiffs on their pending motion. Cintas observes that Judge Armstrong correctly made the rulings whose effect the Veliz plaintiffs are trying to avoid by using the pending motion. If the Panel decides it has subject matter jurisdiction to do what the pending motion seeks, and if the Panel decides that the requirements of 28 U.S.C. § 1407 are met, then Cintas readily states that the transferee Court should be that of Judge Armstrong. So Cintas sees no purpose in taking the Panel's time to further show in complete detail why and how many of the self-serving, incorrect and irrelevant characterizations in the Veliz plaintiffs' papers on the pending motion are just that.

## IV.    CONCLUSION

The Panel should conclude that it does not have subject matter jurisdiction to do that which the pending motion seeks, and that transfer is not authorized by Section 1407; but that even if there were jurisdiction and even if transfer were authorized, the statutory conditions for transfer have not been met in this matter.  In the alternative, however, if the Panel decides that it does have subject matter jurisdiction, that transfer is authorized and that the statutory conditions for transfer have been met in this matter, then certainly the transferee court should be that of the Honorable Saundra Brown Armstrong of the Northern District of California.

Dated: April 26, 2006                     Respectfully submitted,

                                          _____
                                          Mark C. Dosker

                                          SQUIRE, SANDERS & DEMPSEY L.L.P.
                                          Mark C. Dosker
                                          Nathan Lane III
                                          Michael W. Kelly
                                          Joseph A. Meckes
                                          Angela N. O'Rourke
                                          Y. Anna Suh
                                          Michelle M. Full
                                          One Maritime Plaza, Third Floor
                                          San Francisco, California  94111
                                          Telephone:  (415) 954-0200
                                          Facsimile:  (415) 393-9887

                                          Attorneys for
                                          CINTAS CORPORATION

# BEFORE THE
# JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

In re Cintas Corp.
Overtime Pay Arbitration Litigation

MDL Docket No. 1781

### RESPONSE BY CINTAS CORPORATION TO AVERMENTS IN MOTION TO
### TRANSFER AND CONSOLIDATE PURSUANT TO 28 U.S.C. §1407

Cintas Corporation ("Cintas") respectfully states that the Panel does not have subject matter jurisdiction to do that which the pending motion seeks. The reasons why this is so are set forth in Cintas' Brief submitted herewith.

Pursuant to the Panel's Rule 7.1(b), Cintas states as follows its responses to the averments in the motion, with reference to the same numbered paragraphs as used there:

1.    Admitted in part, except denied as to the exact number "2,400" and denied as to the phrase indicating that all such persons are "current and former Cintas employees" who "lawfully joined" the Veliz Action. Cintas avers that some such persons are persons who never worked for Cintas, that some such persons never worked for Cintas in a capacity that is the subject of the Veliz Action, that some such persons have denied signing a Consent to Sue form, and that one or more such person's signatures on such Consent to Sue form(s) was or were forged. Cintas' investigation into the foregoing points is ongoing.

2.    Cintas avers that the record of the Veliz Action speaks for itself and that no response should therefore be required of Cintas in response to this paragraph.

3.    Cintas avers that the Court in the Veliz Action (the Honorable Saundra Brown Armstrong) has thus far allowed the Veliz Action to proceed only as a "conditional" collective action under the FLSA as is stated on page 1 line 18-19 of the Court's Order dated May 25, 2004. Cintas also re-avers here as stated in paragraphs 1 and 2 above.

4.    Admitted in part, except denied insofar as it incorrectly describes as "mandatory" the arbitration agreements referred to in this paragraph if "mandatory" is meant to convey a lack of choice in signing the agreement. The record in the Veliz Action confirms that a significant

1

percentage of persons in positions such as the Veliz plaintiffs did not sign any such agreement, and that they did not suffer any negative consequence due to not having signed such an agreement. If by "mandatory", the motion means that once the agreement was signed then arbitration of disputes as set forth in it is mandatory, then Cintas so admits.

5.      Admitted in part, except denied insofar as it incorrectly describes Judge Armstrong's Order and insofar as it incorrectly describes what Section 4 of the Federal Arbitration Act is and says, and Cintas re-avers here as it has stated in paragraph 2 above.

6.      The first sentence is admitted in part, except that Cintas denies that there is any such recognized legal procedure as a "Collective Arbitration", neither under the rules of the American Arbitration Association nor otherwise. The second sentence is admitted only insofar as that is what the claimants' counsel alleged; but it is wrong as a matter of law and under the rules of the American Arbitration Association. Cintas avers that the Honorable Bruce Meyerson was selected not by Cintas and "the Veliz plaintiffs" as counsel in the Veliz Action is using that phrase in reference to nearly 1900 persons none of whom are named as claimants, but by Cintas and the few dozen specifically named individual claimants in the Demand for Arbitration. Cintas otherwise denies the averments of this paragraph.

7.      Denied; the referenced "supplements" are letters with no effect. As Arbitrator Meyerson has orally ruled at least twice, and subsequently confirmed by e-mail to counsel, the operative demand in the referenced arbitration is the original one, and claimants would have had to make a motion for leave to amend their demand to add claimants, they have not done so, Cintas would have an opportunity to oppose any such motion, and despite having been told of this point least three times by the Arbitrator, claimants' counsel have not made any such motion.

2

8.    Denied.  What counsel calls the "final list" in this paragraph has no effect in the referenced arbitration. As Arbitrator Meyerson has orally ruled at least twice, and subsequently confirmed by e-mail to counsel, the operative demand in the referenced arbitration is the original one, and claimants would have had to make a motion for leave to amend their demand to add claimants, they have not done so, Cintas would have an opportunity to oppose any such motion, and despite claimants' counsel having been told of this point at least three times by the Arbitrator (most recently on the evening of March 29, 2006 less than three hours after their communication of the purported "final list" referred to in this paragraph), claimants' counsel have not made any such motion. *See, e.g.,* Exhibit 5 to declaration of Mark C. Dosker submitted herewith.

9.    Admitted; except that as to the full details of the matters summarized in this paragraph, Cintas avers that the record of the Veliz Action speaks for itself and that no response should therefore be required of Cintas in response to this paragraph.

10.    Cintas avers that the AAA's Supplementary Rules for Class Arbitration speak for themselves, Cintas admits that the quoted portion is an accurate quotation of a portion of the rules, and Cintas denies any remaining averments in this paragraph.

11.    Denied. Cintas avers that it is important to note that in this paragraph, the moving counsel shift to a different term ("Veliz Arbitration claimants" rather than "Veliz plaintiffs") without in fact defining the term they shift to here – and notably, the former is a few dozen persons while the latter is between 1850 and 2400 persons depending on context.  Cintas avers that no one can initiate a clause construction phase of arbitration on behalf of other person(s), especially when each of the 1850 or so other person(s) has already been the subject of an Order on the transcript of the record in open Court in October 2005 [Docket No. 518 in the Veliz

3

Action], which was already documented in a minute Order dated October 27, 2005 [Docket No. 514 in the Veliz Action] and which was more fully documented in the Court's full Order dated February 14, 2006 [Docket No. 516 in the Veliz Action] listing each person by name and staying the litigation of each person until each person arbitrates in accordance of the terms of the agreement into which he or she entered. Each such agreement requires the arbitration of each such person's claims to be held in the county and state where he or she last worked for Cintas. So while it is true that the document referenced in paragraph 11 was transmitted, it does not have the legal effect which the motion avers.

12.    Denied. The reasons why this paragraph is false are legion. But to summarize here for purposes of the Panel's rule 7.1(b), Cintas avers that the persons submitting the brief referenced in this paragraph did not demonstrate any such thing as is alleged in this paragraph.

13.    Denied; except admitted that the hearing date was set for May 9, 2006. In the referenced teleconference, Arbitrator Meyerson directed that Cintas would have until April 7, 2006 to file either (a) its opposition to the previously submitted clause construction brief, or (b) Cintas' own clause construction motion (which Cintas had previously indicated it was seriously considering submitting), and if Cintas filed its own clause construction motion then both sides would have until April 28, 2006 to file a response to the other side's clause construction motion.

14.    Cintas avers that its 70 Petitions were filed promptly after receipt of the full and final Order in the Veliz Action on February 14, 2006 which fully documented in the necessary detail the rulings made by the Court in the Veliz Action on October 27, 2005. Cintas further avers that it reserved to right to file such Petitions in the relevant district courts nationwide at least twice on the record in the Veliz Action – on December 14, 2004 and September 6, 2005 –

4

although Cintas continued to have that right regardless whether or not it reserved that right. Cintas further avers that the Veliz plaintiffs admitted in papers submitted to the Court in the record of the Veliz Action that Cintas could indeed file the very Petitions which it subsequently filed. Cintas denies the phrase in this paragraph stating "whose arbitrations are already underway before Arbitrator Meyerson." Cintas avers that no person who is a Respondent to any of the 70 Petition proceedings is also a party to the arbitration before Arbitrator Meyerson; and Cintas avers that no such person ever can be, due (among other reasons) to the terms of those persons' enforceable arbitration agreements and the Orders already entered in the Veliz Action. Cintas avers that it filed its 70 Petition proceedings before the transmittal on March 29, 2006 of the document from Michael Rubin to Arbitrator Meyerson (which is referred to in paragraph 8 of the motion), and Cintas avers that Arbitrator Meyerson in any event said that he would be taking no action on that document. Exhibit 5 to Declaration of Mark C. Dosker submitted herewith. Cintas admits the last sentence of this paragraph – indeed, that is the exemplar which the undersigned Cintas counsel promptly provided to the Veliz plaintiffs' counsel Michael Rubin as a courtesy at his request (though Mr. Rubin did not disclose that he wanted it for use in filing an MDL motion.) Cintas denies the averment contained (whether knowingly or not) by the defined phrase "Arbitration Actions" used in this paragraph. The 70 Petitions are not civil actions, as is more fully confirmed in Cintas' Brief submitted herewith.

15.     Cintas admits that the substantive text of its 70 Petitions is identical, but avers that the text speaks for itself. Otherwise, the averments in this paragraph are denied. Cintas avers that no person who is a Respondent to any of the 70 Petition proceedings is also a party to the arbitration before Arbitrator Meyerson, nor can someone else assert such claims before Arbitrator Meyerson for any such person; and Cintas avers that no such person ever can be a

party to the arbitration before Arbitrator Meyerson, due (among other reasons) to the terms of those persons' enforceable arbitration agreements and the Orders already entered in the Veliz Action.

16.     Denied as to the phrase "Arbitration Actions"; they are Petition proceedings and not civil actions. Denied as to the word "complaints"; they are Petitions. Denied as to the phrase "defendants in those actions"; they are Respondents in those Petition proceedings. Cintas admits that in mid-March 2006 it began to serve the Petitions on the Respondents in the 70 Petition proceedings.

17.     Denied as to the phrase "Arbitration Actions"; they are Petition proceedings and not civil actions. Denied for the reasons already averred herein, and for the reasons stated in Cintas' Brief submitted herewith and the other supporting papers submitted herewith. Cintas further avers that motions of the sort referred to in the last clause of this paragraph are not allowed by Section 4 of the Federal Arbitration Act (or otherwise).

18.     Denied as to the phrase "Arbitration Actions"; they are Petition proceedings. Otherwise, Cintas avers that this paragraph is a correct albeit very summary description but that this paragraph is irrelevant for the reasons set forth in Cintas' Brief submitted herewith.

19     Denied as to the phrase "each Arbitration Action"; each is a Petition proceeding. Denied as to the entire paragraph, as irrelevant, in that the circumstances noted about the ERISA claims would be exactly the same if the Respondents in the Petition proceedings had done at the outset what they agreed to do in their enforceable arbitration agreements and what Cintas is entitled to have occur pursuant to those enforceable arbitration agreements. Cintas re-avers here what it has averred in paragraph 2 above.

20.    Denied.  Cintas avers that the Veliz Action has been brought and pursued in the way it has been, rather than in arbitrations by those persons who had individual arbitration agreements, for the reasons of the intent, plan, motive and design by certain labor unions in order to use the Veliz litigation to pressure Cintas into unionization without the secret ballot election contemplated by applicable law.  The labor unions' goals and tactics in that regard – and specifically their state of mind, intent, plan, motive, and design -- are illustrated by their public statements, especially by UNITE (subsequently known as UNITE-HERE), and its President Bruce Raynor, as are shown in the Declaration of Jonnie Hogel (and Exhibits thereto) which is in turn submitted herewith as Exhibit 1 to the Declaration of Mark C. Dosker.  This intent, plan, motive, and design – especially the coordinated and ongoing effort to avoid that which each of the individuals who are Respondents to the 70 Petition proceedings has admitted is enforceable and which Judge Armstrong has ruled is enforceable  --  is being carried out here by the unions' counsel, who are the same counsel who brought the Veliz Action, and have been paid by the unions for legal services to the unions in the Veliz Action, as illustrated in Exhibits 2-4 to the Declaration of Mark C. Dosker submitted herewith.  Just because union-backed counsel (in the guise of representing the Veliz plaintiffs) undertook a plan designed and motivated to gain for the unions perceived leverage over Cintas, and just because that plan and design has thus far failed them, does not mean that Cintas is somehow not entitled to enforcement of its rights under Section 4 of the Federal Arbitration Act.  Cintas avers that either way (whether the motion before the Panel is granted or denied) -- as more fully stated in Cintas' Brief submitted herewith – each of the Respondents in the 70 Petition proceedings must arbitrate in the district in which such Petition was filed by Cintas as against each such Respondent.

7

21.      Denied for the reasons set forth in Cintas' Brief submitted herewith.  And indeed,

Cintas avers that – as Judge Armstrong has already ruled – if the persons who are Respondents in

the 70 Petition proceedings had initiated and pursued individual arbitrations against Cintas, they

could have done so at virtually no cost to themselves.  [Docket No. 426 in the Veliz Action].

22.      Denied as to the phrase "Arbitration Actions"; they are Petition proceedings and

not civil actions.  Denied as to the phrase "defendants in the Arbitration Actions"; they are

Respondents in those Petition proceedings.  Otherwise, Cintas avers here as is stated more fully

in its brief submitted herewith.

In conclusion, Cintas notes that silence here as to any remaining averment (if any) in the

motion is neither admission of it or acquiescence in it – and Cintas denies each and every

remaining averment (if any) in the motion.

Dated: April 26, 2006                    Respectfully submitted,

                                         _____
                                         Mark C. Dosker

                                         SQUIRE, SANDERS & DEMPSEY L.L.P.
                                         Mark C. Dosker
                                         Nathan Lane III
                                         Michael W. Kelly
                                         Joseph A. Meckes
                                         Angela N. O'Rourke
                                         Y. Anna Suh
                                         Michelle M. Full
                                         One Maritime Plaza, Third Floor
                                         San Francisco, California  94111
                                         Telephone:  (415) 954-0200
                                         Facsimile:  (415) 393-9887

                                         Attorneys for
                                         CINTAS CORPORATION

8

**BEFORE THE**
**JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

**In re Cintas Corp.**
**Overtime Pay Arbitration Litigation**                    **MDL Docket No. 1781**

**REQUEST FOR JUDICIAL NOTICE**
**SUBMITTED WITH RESPONSE BY CINTAS CORPORATION IN OPPOSITION TO**
**MOTION TO TRANSFER AND CONSOLIDATE PURSUANT TO 28 U.S.C. §1407**

In support of its Response Brief in the above-captioned matter, Cintas Corporation respectfully requests that the Panel take judicial notice of the following from the records of the action pending in the United States District Court for the Northern District of California entitled <u>Veliz et al v. Cintas Corporation etc</u>., Case No, C-03-01180 (SBA) (N.D.Cal.) (hereinafter the "Veliz Action"):

1.  Order filed September 26, 2005  [Docket No. 500 in the Veliz Action], a true and correct copy of which is attached hereto as Exhibit 1;

2.  Stipulation - Joint Statement of the Parties in Response to the Court's above-referenced Order [Docket No. 501 in the Veliz Action], a true and correct copy of which is attached hereto as Exhibit 2;

3.  Transcript excerpts – [portions of Docket No. 512 in the Veliz Action], a true and correct copy of which is attached hereto as Exhibit 3;

4.  Transcript excerpts – [portions of Docket No. 518 in the Veliz Action], a true and correct copy of which is attached hereto as Exhibit 4;

5.  Order filed February 14, 2006 [Docket No. 516 in the Veliz Action], a true and correct copy of which is attached hereto as Exhibit 5;

6.  Memorandum and Opinion Order filed May 4, 2005 [Docket No. 426 in the Veliz Action], a true and correct copy of which is attached hereto as Exhibit 6.

Dated: April 26, 2006

Respectfully submitted,

_____
Mark C. Dosker

SQUIRE, SANDERS & DEMPSEY L.L.P.
Attorneys for
CINTAS CORPORATION

- 1 -

SQUIRE, SANDERS & DEMPSEY L.L.P.
Mark C. Dosker
Nathan Lane III
Michael W. Kelly
Joseph A. Meckes
Angela N. O'Rourke
Y. Anna Suh
Michelle M. Full
One Maritime Plaza, Third Floor
San Francisco, California  94111
Telephone:  (415) 954-0200
Facsimile:   (415) 393-9887

Attorneys for
CINTAS CORPORATION

# <u>Exhibit 1</u>

United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PAUL VELIZ, et al.,                                          No. C 03-1180-SBA

        Plaintiffs,

                                     **ORDER**

v.

                                     [Docket Nos. 433, 445, 451, 460 & 474]

CINTAS CORPORATION, et al.,

        Defendants.

_____

      In an Order dated May 2, 2005, this Court ordered the parties to meet and confer regarding which plaintiffs are required by their Employment Agreements to arbitrate and which are allowed to litigate, and to the extent such further meet and confer discussions did not result in a comprehensive stipulation on that subject, to make a further motion to this Court. In light of that meet and confer process the parties were to have agreed: a) which plaintiffs may litigate their claims before this Court, b) which plaintiffs' are required to arbitrate their claims, and c) which plaintiffs the parties are unable to agree fall in either of the above categories.

      On June 3, 2005 Defendants filed a Motion to Dismiss As to Certain Opt-in Plaintiffs for Improper Venue, or In the Alternative, to Transfer for Improper Venue, or In the Alternative, to Transfer in the Interests of Justice and Convenience the following motions before this Court [Docket No. 433.] On June 6, 2005, Defendants also filed a Motion to Stay Proceedings Pursuant to 9 U.S.C. § 3 As to Certain Opt-in Plaintiffs Who Are Not Subject to the Court's April 5, 2004 Order {Docket No. 445.] On June 7, 2005 Plaintiffs filed a Motion Concerning Compliance With Court Orders Regarding Which Plaintiffs Must Arbitrate and Which Plaintiffs May Litigate Their Non-ERISA Overtime Wage Claims [Docket No. 451.]

**United States District Court**
For the Northern District of California

1   On August 23, 2005, Plaintiffs filed a Motion for Leave to File Second Amended Complaint [Docket No.

2   460.] On September 6, 2005, Defendants' filed Objections to and Motion to Strike Declaration of Steven

3   Pepich Submitted in Support of Plaintiffs' "Motion in Compliance With Court" [Docket No. 474.] The

4   parties have fully briefed all of the above motions, and oral arguments are scheduled to be held September

5   27, 2005 at 1:00 p.m.

6          The Court hereby GRANTS Defendants' Objections to and Motion to Strike Declaration of Steven

7   Pepich Submitted in Support of Plaintiffs' Motion in Compliance With Court Orders. In addition to lacking

8   foundation, the declaration is indisputably rife with error and not properly relied upon. In light of the lack of

9   clarity as to which plaintiffs the parties have reached agreement concerning whether they may proceed in

10  arbitration or before this Court, the Court finds it would benefit from supplemental briefing.

11         Accordingly,

12         IT IS HEREBY ORDERED THAT the parties are to submit a Joint Stipulation identifying: a) which

13  plaintiffs may litigate their claims before this Court, b) which plaintiffs are required to arbitrate their claims,

14  and c) which plaintiffs the parties are unable to agree fall in either of the two categories. The Joint

15  Stipulation must specifically reference plaintiffs by name, applicable Employment Agreement, and any other

16  identifying information the parties believe would be helpful.

17         This Joint Stipulation is to be filed no later than **September 29, 2005**. The hearing on the

18  remaining motions pending before this Court is continued from September 27, 2005 to **October 18, 2005**

19  **at 2:00 p.m.**

20         IT IS FURTHER ORDERED THAT the Case Management Conference in this matter is continued

21  from September 27, 2005 to **October 18, 2005** to immediately follow the hearing on the above motions.

22

23         IT IS SO ORDERED.

24                                              *Saundra B Armstrong*

25  Dated: 9-26-05                              ───────────────────────────
                                                SAUNDRA BROWN ARMSTRONG
26                                              United States District Judge

27

28

                                    2

# **<u>Exhibit 2</u>**

1  SQUIRE, SANDERS & DEMPSEY L.L.P.
   Mark C. Dosker (CA Bar #114789)
2  Michael W. Kelly (CA Bar #214038)
   Joseph A. Meckes (CA Bar # 190279)
3  Angela N. O'Rourke CA Bar #211912)
   Anna L. Endter (CA Bar #221610)
4  One Maritime Plaza, Third Floor
   San Francisco, CA  94111-3492
5  Telephone:     +1.415.954.0200
   Facsimile:     +1.415.393.9887
6
   Attorneys for Defendants
7  CINTAS CORPORATION and PLAN
   ADMINISTRATOR FOR THE CINTAS
8  PARTNERS' PLAN

9  LERACH COUGHLIN STOIA GELLER
   RUDMAN& ROBBINS LLP
10 Theodore J. Pintar (CA Bar # 131372)
   Steven W. Pepich (CA Bar # 116086)
11 James A. Caputo (CA Bar # 120485)
   Lawrence A. Abel (CA Bar # 129596)
12 Helen I. Zeldes (CA Bar # 220051)
   401 B Street, Suite 1600
13 San Diego, CA 92101
   Telephone:     +1.619.231.1058
14 Facsimile:     +1.619.213.7423

15 Attorneys for Plaintiffs

16                 UNITED STATES DISTRICT COURT

17             NORTHERN DISTRICT OF CALIFORNIA

18                      (Oakland Division)

19

20 PAUL VELIZ, et al, On behalf of           Case No. 03-01180 (SBA)
   Themselves and All Others Similarly
21 Situated.                                 **[E-FILING]**

22                Plaintiffs,                CLASS ACTION

23          vs.                              **JOINT STATEMENT OF THE PARTIES
                                             IN RESPONSE TO THE COURT'S
24 CINTAS CORPORATION, an Ohio               SEPTEMBER 27, 2005 ORDER**
   corporation; PLAN ADMINISTRATOR for
25 the Cintas Partners' Plan; and DOES 1-25, Date:      October 18, 2005
   inclusive,                                Time:      2:00 p.m.
26                                           Courtroom: 3
                  Defendants.
27

28

SQUIRE, SANDERS &
DEMPSEY L.L.P.
One Maritime Plaza, Suite 300
San Francisco, CA 94111-3492

JOINT STATEMENT IN RESPONSE TO COURT'S
SEPTEMBER 27. 2005 ORDER ~ CASE NO. 03-01180                         SF#162477

## I.    INTRODUCTION AND SCOPE OF STATEMENT

In its September 27, 2005 Order, the Court ordered the parties to meet and confer and "to submit a Joint Stipulation identifying: a) which plaintiffs may litigate their claims before this Court, b) which plaintiffs are required to arbitrate their claims, and c) which plaintiffs the parties are unable to agree fall in either of the two categories."

Without waiving or altering any of the parties' positions as previously set forth in the record and without waiving or altering any objections or arguments to the characterizations as phrased in the record, the parties submit this Joint Statement. To facilitate the Court's consideration of the record on the pending motions, this Joint Statement subdivides the list of "disputed" plaintiffs according to the nature of the pending dispute.

Nothing in this Joint Statement constitutes any agreement or consent by Cintas that the opt-in plaintiffs identified in Exhibits D through H hereto may be compelled to arbitrate under Section 4 of the Federal Arbitration Act "FAA") or that Cintas has somehow submitted that question to this Court. Cintas states that, as to those persons listed in Exhibit E through H, it has only moved to stay under Section 3 of the FAA. Plaintiffs disagree for the reasons stated in their briefs to this Court.

## II.    JOINT STATEMENT OF IDENTITY OF PLAINTIFFS BY GROUPS

### A.    PLAINTIFFS WHO MAY LITIGATE THEIR CLAIMS IN THIS COURT

Attached as Exhibit A is a list of those plaintiffs who the parties agree may pursue their claims in Court as opposed to in arbitration.

### B.    OPT-IN PLAINTIFFS WHO ARE REQUIRED TO ARBITRATE AND WHO MAY NOT LITIGATE

The arbitration agreements at issue in this case are described by the abbreviations used in the attached lists. A key to the abbreviations and citation to where the text of such agreement may be found in the record is attached as Exhibit B.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

 

**1.    Opt-in Plaintiffs Expressly Compelled to Arbitrate Under Court's April 5, 2004 Order**

Attached hereto as Exhibit C is a list of those plaintiffs expressly compelled to arbitrate in the Court's April 5, 2004 Order compelling arbitration.

**2.    Opt-in Plaintiffs Whom the Parties Agree are Within the Scope of the June 9, 2004 Stipulation and Order**

Attached hereto as Exhibit D is a list of those plaintiffs whom the parties agree are within the scope of the Court's June 9, 2004 Stipulation and Order compelling arbitration.  As set forth in the parties' respective papers, the parties dispute whether the June 9, 2004 Stipulation and Order compelled any other plaintiffs to arbitration and the legal effect of that Stipulation and Order.

**3.    Opt-in Plaintiffs Otherwise Subject to Enforceable Arbitration Agreements**

Without prejudice to and without waiving or altering any of the positions set forth in the parties' respective moving papers or responses thereto, the parties state that the plaintiffs listed in Exhibit E are subject to enforceable arbitration agreements under the guidelines previously established by this Court.

**C.    PLAINTIFFS AS TO WHOM THE PARTIES DISPUTE**

**1.    Louisiana Plaintiffs**

Attached hereto as Exhibit F is a list of opt-in plaintiffs as to whom Cintas contends that it has moved to stay only, and whose arbitration agreements plaintiffs contend are unenforceable under Louisiana law.

**2.    Arizona Plaintiffs**

Attached hereto as Exhibit G is a list of opt-in plaintiffs as to whom Cintas contends that it has moved to stay only, and whose arbitration agreements plaintiffs contend are unenforceable under Arizona law.

**3.    Pennsylvania Plaintiffs**

Attached hereto as Exhibit H is a list of opt-in plaintiffs as to whom Cintas contends that it has moved to stay only, and whose arbitration agreements plaintiffs contend are unenforceable under Pennsylvania law.

JOINT STATEMENT IN RESPONSE TO COURT'S
SEPTEMBER 27, 2005 ORDER – CASE NO. 03-01180          - 2 -

1    **4.    Last Place Worked / Law Governing Clause**

2    Attached hereto as Exhibit I is a list of plaintiffs as to whom the parties disagree as to the

3    applicable law-governing clause and the effect of state law on the enforceability of the arbitration

4    agreements. .

5    **5.    Plaintiffs Alleging Procedural Unconscionability**

6    Attached hereto as Exhibit J is a list of six (6) opt-in plaintiffs who have submitted

7    declarations in connection with Plaintiffs' Motion (Docket Nos. 451 and 443) challenging the

8    arbitration agreements between themselves and Cintas as procedurally unconscionable. Cintas

9    has opposed Plaintiffs' motion. (Docket Nos.463, 465-471).

10    **6.    Plaintiffs Subject to Venue Motion**

11    There are 36 plaintiffs who are subject to Cintas' Motion to Dismiss as to Certain Opt-in

12    Plaintiffs for Improper Venue, etc." (Docket Nos.433, 435). Plaintiffs oppose that motion

13    (Docket Nos. 478). Those 36 plaintiffs are listed in Exhibit K hereto.

14

15

16

17    Dated:    September 29, 2005          SQUIRE, SANDERS & DEMPSEY L.L.P.

18

19    By: _____/s/_____
                         Mark C. Dosker

20    Attorneys for Defendants CINTAS
      CORPORATION and PLAN ADMINISTRATOR
21    FOR THE CINTAS PARTNERS' PLAN

22
      Dated:    September 29, 2005          LERACH COUGHLIN STOIA GELLER
23                                          RUDMAN & ROBBINS LLP

24

25    By: _____/s/_____
                         Steven W. Pepich

26    Attorneys for Plaintiffs PAUL VELIZ, *et al.*

27

28

SQUIRE, SANDERS &
DEMPSEY L.L.P.
One Maritime Plaza, Suite 300
San Francisco, CA 94111-3492

JOINT STATEMENT IN RESPONSE TO COURT'S
SEPTEMBER 27, 2005 ORDER – CASE NO. 03-01180          - 3 -

## Exhibit A

| No. | Last Name | First Name | State |
|-----|-----------|------------|-------|
| 1 | Abdella | Karim | CA |
| 2 | Adams | Earnest Todd | CA |
| 3 | Adder | Thomas | MI |
| 4 | Albion | James W. | CA |
| 5 | Alexander | Tony | NC |
| 6 | Allen | Woody | TN |
| 7 | Alvis | Daniel H. | WV |
| 8 | Ament | W. Keith | TN |
| 9 | Andrade | Robert | AR |
| 10 | Andrzejewski | Robbie J | MI |
| 11 | Ankenbruck | Michael T. | IN |
| 12 | Ashcraft | John D | KY |
| 13 | Ashley | Steve | KY |
| 14 | Atencio Jr. | Claudio | CA |
| 15 | Aubrey | Darren | KY |
| 16 | Audet | Gary | FL |
| 17 | Axelson | Christopher Jon | MI |
| 18 | Azevedo | William | MA |
| 19 | Baldwin | Michael | NC |
| 20 | Ballesteros | Ron | CA |
| 21 | Barefield | James C. | CA |
| 22 | Barnaby | Frank T | TX |
| 23 | Barnard | James Lee | AR |
| 24 | Barnes | Jason | TN |
| 25 | Baskette | Matthew Scott | TN |
| 26 | Bates | Todd | IN |
| 27 | Baugher | Donald W. | PA |
| 28 | Bawahab | Samy | CA |
| 29 | Bedolla | Gabriel | IL |
| 30 | Benjamin | Scott | MI |
| 31 | Bernard | Mark | AR |
| 32 | Berry | Ronald Lynn | TN |
| 33 | Bicocchi | Frank | PA |
| 34 | Biddle | James A. | MI |
| 35 | Bipat | Leon | NY |
| 36 | Blackford | Denise Cecile | NJ |
| 37 | Boehm | Keith | PA |
| 38 | Bohn | Richard | IA |
| 39 | Bond Jr. | Joseph Arthur | |
| 40 | Bonnell | David R | MO |

| No. | Last Name | First Name | State |
|-----|-----------|------------|-------|
| 41 | Borden | Gary | WA |
| 42 | Boueherd | Christopher MIchael | MA |
| 43 | Bourbon | Stephen John | IL |
| 44 | Bowen | Terry | TN |
| 45 | Boyd | Frank | MI |
| 46 | Bradshaw | Doug | MD |
| 47 | Brandis | Dustin | PA |
| 48 | Brannon | Jeffrey | GA |
| 49 | Brauer | David | MI |
| 50 | Bright | Alan | TN |
| 51 | Bronger | Brian C | KY |
| 52 | Brooks | Jason | NV |
| 53 | Brown | Christopher | PA |
| 54 | Brown | Michael | MD |
| 55 | Brown | Rebecca | MD |
| 56 | Brown | Ricardo | MD |
| 57 | Bruening | Robert Odell, Sr. | MI |
| 58 | Brunson | Timothy | TN |
| 59 | Bryan | Shannon | TN |
| 60 | Buckholz | Robert A. | MI |
| 61 | Burns | Daniel P. | MI |
| 62 | Caesar | Frank L. | MI |
| 63 | Calderon | David MIchael | CA |
| 64 | Carlisle | Donna | FL |
| 65 | Cervantes Jr. | Asa | TX |
| 66 | Childs | Nathaniel | OH |
| 67 | Christison | Joel A. | CA |
| 68 | Claxton | Joel | GA |
| 69 | Clayton | Michael | WA |
| 70 | Clements II | Herbert | MI |
| 71 | Coffey | William | MI |
| 72 | Cogdell | Don | AR |
| 73 | Conley | Robert A. | GA |
| 74 | Costa | Mark | AR |
| 75 | Crane | James | MI |
| 76 | Crosby | Reginal | AR |
| 77 | Crow | David Alan | AR |
| 78 | Cruz | Rogelio Santa | CA |
| 79 | Cudney | Matthew | CA |
| 80 | Cullen | Daniel | MA |
| 81 | Cummings | Shawn | NJ |
| 82 | Curry | Randy Chris | MI |
| 83 | Curtis | Zack Hayes | TN |

| No. | Last Name | First Name | State |
|-----|-----------|------------|-------|
| 84 | Czekaj | Roger | NY |
| 85 | Dahringer | Robert | MI |
| 86 | Damewood | Ronald L. | NE |
| 87 | Davik | Alex | IL |
| 88 | Davis | Clinton E. | TN |
| 89 | Davis | Sean | AR |
| 90 | Davis | Todd | TN |
| 91 | Davis, Jr. | Kenneth | MI |
| 92 | Degue | David C. | IN |
| 93 | DeMoss | Samuel D. | MI |
| 94 | Diffie | Kevin Ross | AR |
| 95 | Diggin | Paul | MA |
| 96 | Dolce | Christopher G. | TX |
| 97 | Donegan Jr. | Thomas | TN |
| 98 | Edmisten | Jaydee | TN |
| 99 | Edwards | Joe Thomas | CA |
| 100 | Edwards | Wayne | NJ |
| 101 | Ehredt | Michael | MI |
| 102 | Eib | Larry | MI |
| 103 | Ellisor | Danny R. | SC |
| 104 | Embree | David | MI |
| 105 | English-Madison | Lillian | MI |
| 106 | Erbes | Gail | MI |
| 107 | Eubank | David | GA |
| 108 | Fedor | Dennis | MN |
| 109 | Fewox | Michael | TX |
| 110 | Fisher | Steven | AL |
| 111 | Flesch | Michael A. | OH |
| 112 | Fletcher | Stephen Shane | GA |
| 113 | Flockhart | Craig | MI |
| 114 | Flores | Israel | TX |
| 115 | Foldesi | Joseph F. | MI |
| 116 | Forsythe | Billy | CA |
| 117 | Fortner | Corey | TN |
| 118 | Fox | Franklin | MI |
| 119 | Fox | Steven L. | AR |
| 120 | Fraley | Kevin E. | IL |
| 121 | Franklin | Jessie L. | LA |
| 122 | Frankowski | Thomas S. | MI |
| 123 | Franks | Chris | TN |
| 124 | Frazier | Donald R. | NE |
| 125 | Fudge | Lloyd | MI |
| 126 | Fuehring | Drew | MO |

| No. | Last Name | First Name | State |
|-----|-----------|------------|-------|
| 127 | Gaddy | Kenneth | WV |
| 128 | Gamble | Brian A. | IN |
| 129 | Garcia | David | CA |
| 130 | Garman | Jim | IN |
| 131 | Gault | Robert | MI |
| 132 | Gawecki | Matthew | CA |
| 133 | Genslak | Frank | MI |
| 134 | Gholston | Erroll | MI |
| 135 | Gilliam Jr. | John | TN |
| 136 | Giordano | Mark Francis | MA |
| 137 | Goree | Douglas | AL |
| 138 | Gotham | Dale Matthew | MI |
| 139 | Gravitt | Jeffrey | TN |
| 140 | Green | Thomas | NE |
| 141 | Gregory | Dennis P. | NE |
| 142 | Guarjardo | Laureano, Sr. | TX |
| 143 | Guidry | Andre | CA |
| 144 | Gurganos | Charles Anthony, Jr. | FL |
| 145 | Guzzardo | Michael John | LA |
| 146 | Hahl | Dennis | OH |
| 147 | Hansel | William | FL |
| 148 | Hanson | Shawn Patrick | TN |
| 149 | Harp | Anthony | AR |
| 150 | Harrell | Charles | VA |
| 151 | Harthorn | Brian | OH |
| 152 | Hartle | Douglas | IN |
| 153 | Hatch | Erick | VA |
| 154 | Haycock | Brandon | NV |
| 155 | Heath | Russell | GA |
| 156 | Hebling | Mark | AR |
| 157 | Heemsoth | Jim | IN |
| 158 | Heilen | Richard | TX |
| 159 | Hendrick | Robert | TN |
| 160 | Hergenroedez | Alfred | MI |
| 161 | Herriman | James Lee | MI |
| 162 | Hingst | Brian D. | TN |
| 163 | Hinson | Ronald L. | TX |
| 164 | Hischeke | John | MO |
| 165 | Hoff | Lawrence | MI |
| 166 | Holloway | Clarence | IL |
| 167 | Holmes | Anthony | MI |
| 168 | Holmes | Bruce | TN |
| 169 | Hooper | Christopher | MI |

| No. | Last Name | First Name | State |
|-----|-----------|------------|-------|
| 170 | Hopper | Anthony | AR |
| 171 | Hord | Upshaw (Sonny) | CA |
| 172 | Howard | Gregory N | TN |
| 173 | Huber | Richard | MI |
| 174 | Huertas, Jr. | Wilfredo | NJ |
| 175 | Hunroe | Dominic | MI |
| 176 | Inscoe | Bryan | OH |
| 177 | Ireland | John | MI |
| 178 | Isherwood | Jason A. | DE |
| 179 | Jaffee | Sol | MI |
| 180 | Jaskela | Christopher M. | OH |
| 181 | Jessup | Mitchell | SC |
| 182 | Jeter | David | NY |
| 183 | Jiles | Bruce | MD |
| 184 | Johnson | Jackie | FL |
| 185 | Johnson | James | IL |
| 186 | Johnson | Ramon | TN |
| 187 | Jones | Bobby | MI |
| 188 | Jones | Curtis Allen | IN |
| 189 | Joseph | Arthur | MI |
| 190 | Josey | Christian | GA |
| 191 | Juarez | Morgan | CA |
| 192 | Kamrad | Steven Jay | MI |
| 193 | Kane | Craig | MA |
| 194 | Keeler | Tim | MI |
| 195 | Kellogg Jr. | Ronald | NE |
| 196 | Kemler | James R. | MI |
| 197 | Kilcrease | Phillip Wayne | TN |
| 198 | King | Joseph | WV |
| 199 | Kinman | John Brett | NE |
| 200 | Kivenas | Algie | IL |
| 201 | Kleinfeld | Thomas | TN |
| 202 | Klinghagen | Shawn | MN |
| 203 | Klocek | Steven | IL |
| 204 | Knudsen | Dennis F. | NE |
| 205 | Kraemer, Jr. | Donald E. | MI |
| 206 | Kramer | Robert | PA |
| 207 | Kraska | John | MI |
| 208 | Kuethe | Nathan | MO |
| 209 | Kuhl | Ervin J. | NE |
| 210 | Kushner | Paul | WV |
| 211 | La Drig | James M., Jr. | MI |
| 212 | LaPlant Sr. | John W. | IL |

| No. | Last Name | First Name | State |
|-----|-----------|------------|-------|
| 213 | Laucella | Michael | AZ |
| 214 | Lauvrak | Bruce | WA |
| 215 | Lay | Sherry | MI |
| 216 | Lee | Jeffery Darren | LA |
| 217 | Lee | Theodis | TX |
| 218 | Leggio | Vincent | MI |
| 219 | Lehr | Lyle | MI |
| 220 | Lennox | Michael | CA |
| 221 | Lepe | Salvador | CA |
| 222 | Lester Jr. | Ewell Farley | VA |
| 223 | Lewis | Christopher | TN |
| 224 | Liberatore | Rodney | AR |
| 225 | Lickliter | Matt | GA |
| 226 | Lightfoot | James | MI |
| 227 | Lineberger | Howard | TN |
| 228 | Linn | Matthew Robert | MI |
| 229 | Lipps | James E. | MI |
| 230 | Liss | John J. | IL |
| 231 | Lloyd | Noel | MI |
| 232 | Lombardo (Ferrari) | Kathleen | CA |
| 233 | Long | Richard | NY |
| 234 | Long | Russell | SC |
| 235 | Look Jr. | Howard | AZ |
| 236 | Lugo | Edgar A. II | CA |
| 237 | Luke | Kenneth | MI |
| 238 | Ly | Doug Nghiep | CA |
| 239 | Lyons | Billy | AR |
| 240 | Lyons | Kennith | WV |
| 241 | MacHala | Gregory W. | MI |
| 242 | Maddox | Raymond G. | TN |
| 243 | Magdaleno | Luis M. | CA |
| 244 | Martinez | John | CA |
| 245 | Martinez Jr. | Tony | TX |
| 246 | Massey | Richard Dean | TN |
| 247 | Matthews | Zachary | CA |
| 248 | Maxfield | Darold Lynn | AR |
| 249 | May | Lamar | AL |
| 250 | Maye | Stanler | TN |
| 251 | Mayton | Jeffrey Scott | NC |
| 252 | McAdams | Robert H. | TN |
| 253 | McAnally III | Garland | AR |
| 254 | McArdle | Chris Conlon | CA |
| 255 | McCoy | Jason O | AR |

| No. | Last Name | First Name | State |
|-----|-----------|------------|-------|
| 256 | McLeod | Terry L. | MN |
| 257 | McMaster | Michael Patrick | PA |
| 258 | McNail | Michael | MO |
| 259 | Medina | Jose | CA |
| 260 | Mendoza | Martin | NV |
| 261 | Meyer | John F. | IA |
| 262 | Michelfelder | Lawrence | NJ |
| 263 | Micho | Wilfred | MI |
| 264 | Millari | Paul Viray | CA |
| 265 | Miller | Randy | IN |
| 266 | Milligan | John | MI |
| 267 | Minnick | Linn | IN |
| 268 | Molette | James Robert | MI |
| 269 | Molo | Ron | CA |
| 270 | Monahan | Timothy | MA |
| 271 | Montgomery | Matthew | TN |
| 272 | Moore | David | CA |
| 273 | Mullis | Steven Michael | TN |
| 274 | Murray | Francis P. | MN |
| 275 | Murray | Lind | WV |
| 276 | Nall | Eric Dean | TN |
| 277 | Newvine | Gary T. | MI |
| 278 | Nichols | Douglas Todd | TN |
| 279 | Nichols | Jason | MI |
| 280 | Nijem | Hisham | CA |
| 281 | Nowak | Jared | IN |
| 282 | Ogle | Jesse | FL |
| 283 | Olinger | Travis | TN |
| 284 | Ordonez | Macbeth | CA |
| 285 | Orgill | Thomas | CA |
| 286 | Osborne | James | AR |
| 287 | Ott | Brandi | MI |
| 288 | Ott | Christopher | MI |
| 289 | Overstreet | Brandon | VA |
| 290 | Owens | John | AR |
| 291 | Pajares | Cesar | GA |
| 292 | Palacio | Armando | CA |
| 293 | Parent | Ronald D. | CA |
| 294 | Parenteau Sr. | Mark N. | MI |
| 295 | Parker | Brent | CA |
| 296 | Pawlowski | Dennis | MI |
| 297 | Pearson | Eric G. | MA |
| 298 | Pegues | Reginald Alan | TN |

| No. | Last Name | First Name | State |
|-----|-----------|-----------|-------|
| 299 | Peninger | Donald | NC |
| 300 | Pennington | Seth A. | AR |
| 301 | Pepper | Barney | TN |
| 302 | Perez | Miguel | CA |
| 303 | Perez | Ricardo | FL |
| 304 | Peske | Timothy E. | AR |
| 305 | Peters | Darrell | AR |
| 306 | Peterson | Daniel Craig | MN |
| 307 | Pettit | Duffy | IN |
| 308 | Phillips | Stanley | IN |
| 309 | Pianowski | John | MA |
| 310 | Pilcher | Scott | CA |
| 311 | Plascencia | Jose | IL |
| 312 | Pongchit | Sai | MD |
| 313 | Prosser | Eric | MI |
| 314 | Pullaro | Alan MIchael | FL |
| 315 | Pynchon | Mark T. | CA |
| 316 | Rahn | Douglas Robert | MI |
| 317 | Rainey | Gregory Todd | GA |
| 318 | Ramirez | Victor | CA |
| 319 | Raymond | Jeffrey | NE |
| 320 | Reaves | Keith | TN |
| 321 | Reynolds Jr. | Anthony | CA |
| 322 | Rios | Mark | CA |
| 323 | Rishavy | Raymond Richard | MN |
| 324 | Roam | Kevin | AR |
| 325 | Robertson | Sandra | TN |
| 326 | Robinson | John H. | WV |
| 327 | Robinson | Matt Robert | WV |
| 328 | Robinson | Michael Dewayne | MI |
| 329 | Rodriguez | Gilbert | CA |
| 330 | Rogers | Joel | NM |
| 331 | Romes, Jr. | Freddie | AR |
| 332 | Rowse | Mark D | DE |
| 333 | Runyan | Warren | CA |
| 334 | Rushford | Thomas E. | MI |
| 335 | Samuels | Derek/Derrick | NJ |
| 336 | Sanbento | Michael | MA |
| 337 | Santana | Joshua | MO |
| 338 | Santos | Michael Delos | CA |
| 339 | Sauceda | Reynaldo | TX |
| 340 | Schieber | Michael | IN |
| 341 | Schneider | Michael | NE |

| No. | Last Name | First Name | State |
|-----|-----------|------------|-------|
| 342 | Schultz | Dennis | MI |
| 343 | Schultz | Leslie | NE |
| 344 | Schwall | Jeffrey | MI |
| 345 | Schwall | Jonathan D. | MI |
| 346 | Scott | Derrick | NY |
| 347 | Scott-Outlaw | Carla | MD |
| 348 | Seath | Scott | MI |
| 349 | Serna | Rene | CA |
| 350 | Serrano | Lorenzo J. | TX |
| 351 | Sharp | Stephen | MI |
| 352 | Sherlund | James | MI |
| 353 | Sherman | Marvin S. | LA |
| 354 | Shimada | Jon | CA |
| 355 | Shrake | Randal | MI |
| 356 | Shropshire | Jerome | MS |
| 357 | Siewert | Gregory | IL |
| 358 | Sims | Scott A. | IN |
| 359 | Smith | Daniel C. | MI |
| 360 | Smith | James Alexander | MI |
| 361 | Smith | Kelly | MI |
| 362 | Smith | Ronald Lynne | MI |
| 363 | Smith Jr. | Roger | GA |
| 364 | Smulka | John M. | MI |
| 365 | Sorbicki | Richard C. | PA |
| 366 | Soria | Moses | CA |
| 367 | Sperota | Mark Anthony | NY |
| 368 | Spillner | Robert Eugene | IN |
| 369 | Stachnik | Leonard Joseph | MI |
| 370 | Stacy | Jerry W. | MI |
| 371 | Staton Jr. | Raymond | VA |
| 372 | Stemen | Jimmie Lynn | MI |
| 373 | Stoneman | John | MD |
| 374 | Sullivan | John | MI |
| 375 | Tarango | Jose | CA |
| 376 | Taylor | Dennis | KY |
| 377 | Taylor | William | MI |
| 378 | Teague | Michael | IN |
| 379 | Terrell | Johnny | TX |
| 380 | Tessier | Bruce | MI |
| 381 | Thomas | Dwight | MI |
| 382 | Thompson | Allen | CA |
| 383 | Thompson | Ezra | GA |
| 384 | Thrash | William Gregory | MO |

| No. | Last Name | First Name | State |
|-----|-----------|------------|-------|
| 385 | Tovar | Nicholas Luz | IA |
| 386 | Towne | Don Thomas | MI |
| 387 | Trapen | John | LA |
| 388 | Trevathan | Jerry W. | MI |
| 389 | Trinidad | Brett | TX |
| 390 | Tubergen | Jack | MI |
| 391 | Tully | Patrick | MI |
| 392 | Urdiales | Ryan | CA |
| 393 | Vaca | Rene | CA |
| 394 | Vasquez | Antonio | MA |
| 395 | Veitch | Luke Andrew | IL |
| 396 | Velazquez | Pedro | CA |
| 397 | Villarreal Jr. | Osvlado | CA |
| 398 | Vinson | Steven David | MD |
| 399 | Viramontes | Jesus Fernando | CA |
| 400 | Vowell | Dal K. | TN |
| 401 | Wagner | Randy | MI |
| 402 | Wait | Christine | MO |
| 403 | Walker | James | IN |
| 404 | Walker Jr. | John D | IN |
| 405 | Wallace | Steven P. | TN |
| 406 | Walsh | Paul | TN |
| 407 | Washington | A.J. | TX |
| 408 | Washkuhn | Eric | NE |
| 409 | Watkins | Randy | TN |
| 410 | Watson | Gene Carroll | NC |
| 411 | Watwood | Victor | TN |
| 412 | Weisflock | John B. | OH |
| 413 | Welch | Steven | TN |
| 414 | Wendt Jr. | Jesse Lee | MD |
| 415 | Wheatfill Jr. | Edward | CA |
| 416 | Wheeler-Robinson | Deborah | IL |
| 417 | White | James W. | AR |
| 418 | White | Kevin | TN |
| 419 | Whitlock | Leslie | KY |
| 420 | Whitlow | Corey | MI |
| 421 | Whitman | Brian | MO |
| 422 | Whitted | Richard | CA |
| 423 | Wiant | Gary Lynn | WV |
| 424 | Williams | Gary | CA |
| 425 | Williams | Ronald J. | MD |
| 426 | Williams | Russell | SC |
| 427 | Williams | Sidney | NE |

| No. | Last Name | First Name | State |
|-----|-----------|------------|-------|
| 428 | Williams Jr. | Johnnie L. | GA |
| 429 | Wilson | Carl Darren | AR |
| 430 | Wilson | Richard | AL |
| 431 | Wilson | Robert J. | MI |
| 432 | Wilson | Roland | MO |
| 433 | Wittersheim | Timothy | MI |
| 434 | Wojciechowski | Mark | TN |
| 435 | Wooten | Robert (Scott) | AR |
| 436 | Worful | Scott | OH |
| 437 | Wright | Gary Dewayne | TN |
| 438 | Wulff | James | OH |
| 439 | Yates | Kenneth Lynn | TN |
| 440 | Young | Matthew | AR |
| 441 | Young | Roger C. | MI |
| 442 | Yount | Terry | AR |
| 443 | Zoankowshi | Matthew | PA |
| 444 | Zobrist | Scott Dean | MO |

# Exhibit B

## Key to Agreement Versions

| Abbreviation | Description | Declaration of C. Randall (Docket Nos. 438-441 Exhibit No. |
|---|---|---|
| 96A | Employment Agreement for Sales, Service and Marketing Personnel Based in States Other Than Ohio, California, Georgia and Texas [Policy #C-105, 12/96, Agreement #6] | 2 |
| 96B | Employment Agreement For Sales, Service and Marketing Personnel Based in California, Georgia or Texas [Policy #C-105, 12/96, Agreement #7] | 3 |
| 96C | Employment Agreement For Ohio-Based Sales, Service and Marketing Personnel [Policy #C-105, 12/96, Agreement #5] | 4 |
| 96D | Employment Agreement For, Officers, Executives, General/Branch Managers, Professionals and Key Managers [Policy #C-105, 12/96, Agreement #1] | 5 |
| 96E | Employment Agreement For Other Employees [Policy #C-105, 12/96, Agreement #8] | 6 |
| 96F | Employment Agreement For Plant and Officer Managers, Supervisors and Engineers Based in States Other Than Ohio, California, Georgia and Texas [Policy #C-105, 12/96, Agreement #3] | 7 |
| FAS-A | Employment Agreement For Sales, Service and Marketing Personnel Employed at a Facility Formerly Operated By First Aid Plus, Inc. [2/97-C] | 8 |
| FAS-B | Employment Agreement For First Aid and Safety Division Sales and Sales Service Representatives Based in States Other Than Ohio, California, Georgia And Texas [3/98, Agreement #6 FAS] | 9 |
| FAS-C | Employment Agreement For First Aid and Safety Division Sales, Service and Marketing Personnel Based in States Other Than Ohio, California, Georgia and Texas [11/98, Agreement #6 FAS] | 10 |
| 99A | Employment Agreement For Sales, Service and Marketing Personnel Based in States Other Than California, Georgia and Texas [Corporate Policy #C-105, Exhibit E, 6/99, Agreement #4] | 11 |
| 99B | Employment Agreement For Sales, Service and Marketing Personnel Based in California, Georgia or Texas [Corporate Policy #C-105, Exhibit F, 6/99, Agreement #5] | 12 |

| Abbreviation | Description | Declaration of C. Randall (Docket Nos. 438-441 Exhibit No. |
|---|---|---|
| 99C | Employment Agreement For Other Confidential Employees [Corporate Policy #C-105, Exhibit G, 6/99, Agreement #6] | 13 |
| 99D | Employment Agreement For Plant Managers, Office Managers, Supervisors and Engineers Based in California, Georgia or Texas [Corporate Policy #C-105, Exhibit D, 6/99, Agreement #3] | 14 |
| 99E | Employment Agreement For Plant Managers, Office Managers, Supervisors and Engineers Based in States Other Than California, Georgia or Texas [Corporate Policy #C-105, Exhibit C, 6/99, Agreement #2] | 15 |
| 00A | Employment Agreement For Sales, Service and Marketing Personnel Based in States Other Than California, Georgia and Texas [Corporate Policy #C-105, Exhibit E, 10/00, Agreement #4] | 16 |
| 01A | Employment Agreement For Sales, Service and Marketing Personnel Based in States Other Than California, Georgia and Texas [Corporate Policy #C-105, Exhibit E, Revised August 16, 2001, Agreement #4] | 17 |
| 01B | Employment Agreement For Sales, Service and Marketing Personnel Based in California, Georgia and Texas [Corporate Policy #C-105, Exhibit F, Revised August 16, 2001, Agreement #5] | 18 |
| 01C | Employment Agreement For Plant Managers, Office Managers, Supervisors and Engineers Based in States Other Than California, Georgia and Texas [Corporate Policy #C-105, Exhibit C, Revised August 16, 2001, Agreement #2] | 19 |
| Feb-01 | Employment Agreement For Sales, Service and Marketing Personnel Based in States Other Than California, Georgia and Texas [Corporate Policy #C-105, Exhibit E, 2/01, Agreement #4] | 20 |
| 02A | Employment Agreement For Sales, Service and Marketing Personnel Based in States Other Than California, Colorado, Georgia, Louisiana, Nebraska, Oklahoma and Texas [Corporate Policy #C-105, Exhibit E, Revised June 12, 2002, Agreement #5] | 21 |
| 02B | Employment Agreement For Sales, Service and Marketing Personnel Based in California, Colorado or Georgia [Corporate Policy #C-105, Exhibit G, Revised June 12, 2002, Agreement #7] | 22 |
| 02C | Employment Agreement For Personnel Based in Texas [Corporate Policy #C-105, Exhibit F, Revised June 12, 2002, Agreement #6] | 23 |

| Abbreviation | Description | Declaration of C. Randall (Docket Nos. 438-441 Exhibit No. |
|---|---|---|
| 02D | Employment Agreement For Personnel Based in Louisiana [Corporate Policy #C-105, Exhibit H, Revised June 12, 2002, Agreement #8] | 24 |
| 02F | Employment Agreement For Personnel Based in Oklahoma [Corporate Policy #C-105, Exhibit J, Revised June 12, 2002, Agreement #10] | 25 |
| 02G | Employment Agreement For Other Confidential Employees Carlos T. Mendoza, Dated September 5, 2003 [Corporate Policy #C-105, Exhibit K, Revised May 15, 2003, Agreement #11] | 26 |
| 02H | Employment Agreement For Plant Managers, Office Managers, Supervisors and Engineers Based in States Other Than California, Colorado, Georgia, Louisiana, Nebraska, Oklahoma and Texas [Corporate Policy #C-105, Exhibit B, Revised June 12, 2002, Agreement #2] | 27 |
| 03A | Employment Agreement For Sales, Service and Marketing Personnel Based in States Other Than California, Colorado, Georgia, Louisiana, Nebraska, Oklahoma and Texas [Corporate Policy #C-105, Exhibit E, Revised May 15, 2003, Agreement #5] | 28 |
| 03B | Employment Agreement For Sales, Service and Marketing Personnel Based in California, Colorado or Georgia [Corporate Policy #C-105, Exhibit G, Revised May 15, 2003, Agreement #7] | 29 |
| 03C | Employment Agreement For Personnel Based in Texas [Corporate Policy #C-105, Exhibit F, Revised June 12, 2002, Agreement #6] | 30 |
| 03D | Employment Agreement For Personnel Based in Louisiana [Corporate Policy #C-105, Exhibit H, Revised May 15, 2003, Agreement #8] | 31 |
| 03H | Employment Agreement For Other Confidential Employees [Corporate Policy #C-105, Exhibit K, Revised May 15, 2003, Agreement #11] | 32 |
| 03I | Employment Agreement For Plant Managers, Office Managers, Supervisors and Engineers Based in States Other Than California, Colorado, Georgia, Louisiana, Nebraska, Oklahoma and Texas [Corporate Policy #C-105, Exhibit B, Revised May 15, 2003, Agreement #2] | 33 |
| 03TX – Plant Managers Agreement | Employment Agreement For Texas Employment Agreement for Plant Managers, Office Managers, Supervisors and Engineers [Corporate Policy #C-105, Exhibit B-TX, Agreement #2, Revised December 23, 2003] | 34 |

| Abbreviation | Description | Declaration of C. Randall (Docket Nos. 438-441 Exhibit No. |
|---|---|---|
| 03AL –Conf. | Employment Agreement For Alabama Employment Agreement for Confidential Employees [Corporate Policy #C-105, Exhibit D-AL, Agreement #4, Revised December 23, 2003] | 35 |
| 03CA – Conf. | Employment Agreement For California Employment Agreement for Confidential Employees [Corporate Policy #C-105, Exhibit D-CA, Agreement #4, Revised December 23, 2003] | 36 |
| 03LA – Conf. | Employment Agreement For Louisiana Employment Agreement For Confidential Employees [Corporate Policy #C-105, Exhibit D-LA, Agreement #4, Revised December 23, 2003] | 37 |
| 03AL | Employment Agreement For Alabama Employment Agreement For Sales, Service and Marketing Personnel Employees [Corporate Policy #C-105, Exhibit C-AL, Agreement #3, Revised December 23, 2003] | 38 |
| 03AZ | Employment Agreement For Arizona Employment Agreement For Sales, Service and Marketing Personnel Employees [Corporate Policy #C-105, Exhibit C-AZ, Agreement #3, Revised December 23, 2003] | 39 |
| 03CA | Employment Agreement For California Employment Agreement For Sales, Service and Marketing Personnel [Corporate Policy #C-105, Exhibit C-CA, Agreement #3, Revised December 23, 2003] | 40 |
| 03CO | Employment Agreement For Colorado Employment Agreement For Sales, Service and Marketing Personnel [Corporate Policy #C-105, Exhibit C-CO, Agreement #3, Revised December 23, 2003] | 41 |
| 03CT | Employment Agreement For Connecticut Employment Agreement For Sales, Service and Marketing Personnel [Corporate Policy #C-105, Exhibit C-CT, Agreement #3, Revised December 23, 2003] | 42 |
| 03DE | Employment Agreement For Delaware Employment Agreement For Sales, Service and Marketing Personnel [Corporate Policy #C-105, Exhibit C-DE, Agreement #3, Revised December 23, 2003] | 43 |
| 03FL | Employment Agreement For Florida Employment Agreement For Sales, Service and Marketing Personnel [Corporate Policy #C-105, Exhibit C-FL, Agreement #3, Revised December 23, 2003] | 44 |
| 03GA | Employment Agreement For Georgia Employment Agreement For Sales, Service and Marketing Personnel [Corporate Policy | 45 |

| Abbreviation | Description | Declaration of C. Randall (Docket Nos. 438-441 Exhibit No. |
|---|---|---|
| | #C-105, Exhibit C-GA, Agreement #3, Revised December 23, 2003] | |
| 03ID | Employment Agreement For Idaho Employment Agreement For Sales, Service and Marketing Personnel [Corporate Policy #C-105, Exhibit C-ID, Agreement #3, Revised December 23, 2003] | 46 |
| 03IL | Employment Agreement For Illinois Employment Agreement For Sales, Service and Marketing Personnel [Corporate Policy #C-105, Exhibit C-IL, Agreement #3, Revised December 23, 2003] | 47 |
| 03IN | Employment Agreement For Indiana Employment Agreement For Sales, Service and Marketing Personnel [Corporate Policy #C-105, Exhibit C-IN, Agreement #3, Revised December 23, 2003] | 48 |
| 03KS | Employment Agreement For Kansas Employment Agreement For Sales, Service and Marketing Personnel [Corporate Policy #C-105, Exhibit C-KS, Agreement #3, Revised December 23, 2003] | 49 |
| 03KY | Employment Agreement For Kentucky Employment Agreement For Sales, Service and Marketing Personnel [Corporate Policy #C-105, Exhibit C-KY, Agreement #3, Revised December 23, 2003] | 50 |
| 03LA | Employment Agreement For Louisiana Employment Agreement For Sales, Service and Marketing Personnel [Corporate Policy #C-105, Exhibit C-LA, Agreement #3, Revised December 23, 2003] | 51 |
| 03MD | Employment Agreement For Maryland Employment Agreement For Sales, Service and Marketing Personnel [Corporate Policy #C-105, Exhibit C-MD, Agreement #3, Revised December 23, 2003] | 52 |
| 03MA | Employment Agreement For Massachusetts Employment Agreement For Sales, Service and Marketing Personnel [Corporate Policy #C-105, Exhibit C-MA, Agreement #3, Revised December 23, 2003] | 53 |
| 03MI | Employment Agreement For Michigan Employment Agreement For Sales, Service and Marketing Personnel [Corporate Policy #C-105, Exhibit C-MI, Agreement #3, Revised December 23, 2003] | 54 |
| 03MN | Employment Agreement For Minnesota Employment Agreement For Sales, Service and Marketing Personnel [Corporate Policy #C-105, Exhibit C-MN, Agreement #3, Revised December 23, 2003] | 55 |

| Abbreviation | Description | Declaration of C. Randall (Docket Nos. 438-441 Exhibit No. |
|---|---|---|
| 03MS | Employment Agreement For Mississippi Employment Agreement For Sales, Service and Marketing Personnel [Corporate Policy #C-105, Exhibit C-MS, Agreement #3, Revised December 23, 2003] | 56 |
| 03MO | Employment Agreement For Missouri Employment Agreement For Sales, Service and Marketing Personnel [Corporate Policy #C-105, Exhibit C-MO, Agreement #3, Revised December 23, 2003] | 57 |
| 03NC | Employment Agreement For North Carolina Employment Agreement For Sales, Service and Marketing Personnel [Corporate Policy #C-105, Exhibit C-NC, Agreement #3, Revised December 23, 2003] | 58 |
| 03NJ | Employment Agreement For New Jersey Employment Agreement For Sales, Service and Marketing Personnel [Corporate Policy #C-105, Exhibit C-NJ, Agreement #3, Revised December 23, 2003] | 59 |
| 03NV | Employment Agreement For Nevada Employment Agreement For Sales, Service and Marketing Personnel [Corporate Policy #C-105, Exhibit C-NV, Agreement #3, Revised December 23, 2003] | 60 |
| 03NY | Employment Agreement For New York Employment Agreement For Sales, Service and Marketing Personnel [Corporate Policy #C-105, Exhibit C-NY, Agreement #3, Revised December 23, 2003] | 61 |
|  | Employment Agreement For Ohio Employment Agreement For Sales, Service and Marketing Personnel [Corporate Policy #C-105, Exhibit C-OH, Agreement #3, Revised December 23, 2003] | 62 |
| 03OK | Employment Agreement For Oklahoma Employment Agreement For Sales, Service and Marketing Personnel [Corporate Policy #C-105, Exhibit C-OK, Agreement #3, Revised December 23, 2003] | 63 |
| 03OR | Employment Agreement For Oregon Employment Agreement For Sales, Service and Marketing Personnel [Corporate Policy #C-105, Exhibit C-OR, Agreement #3, Revised December 23, 2003] | 64 |
| 03PA | Employment Agreement For Pennsylvania Employment Agreement For Sales, Service and Marketing Personnel [Corporate Policy #C-105, Exhibit C-PA, Agreement #3, Revised December 23, 2003] | 65 |
| 03RI | Employment Agreement For Rhode Island Employment Agreement For Sales, Service and Marketing Personnel | 66 |

| Abbreviation | Description | Declaration of C. Randall (Docket Nos. 438-441 Exhibit No. |
|---|---|---|
| | [Corporate Policy #C-105, Exhibit C-RI, Agreement #3, Revised December 23, 2003] | |
| 03SC | Employment Agreement For South Carolina Employment Agreement For Sales, Service and Marketing Personnel [Corporate Policy #C-105, Exhibit C-SC, Agreement #3, Revised December 23, 2003] | 67 |
| 03TX | Employment Agreement For Texas Employment Agreement For Sales, Service and Marketing Personnel [Corporate Policy #C-105, Exhibit C-TX, Agreement #3, Revised December 23, 2003] | 68 |
| 03UT | Employment Agreement For Utah Employment Agreement For Sales, Service and Marketing Personnel [Corporate Policy #C-105, Exhibit C-UT, Agreement #3, Revised December 23, 2003] | 69 |
| | Employment Agreement For Virginia Employment Agreement For Sales, Service and Marketing Personnel [Corporate Policy #C-105, Exhibit C-VA, Agreement #3, Revised December 23, 2003] | 70 |
| | Employment Agreement For Washington Employment Agreement For Sales, Service and Marketing Personnel [Corporate Policy #C-105, Exhibit C-WA, Agreement #3, Revised December 23, 2003] | 71 |
| | Employment Agreement For Wisconsin Employment Agreement For Sales, Service and Marketing Personnel [Corporate Policy #C-105, Exhibit C-WI, Agreement #3, Revised December 23, 2003] | 72 |

## Exhibit C

| No. | Last Name | First Name | State | Agreement Version |
|-----|-----------|------------|-------|-------------------|
| 1 | Abney | David | MI | 99A |
| 2 | Acker | Corwin | MD | 99A |
| 3 | Anderson | Eric | IL | 01A |
| 4 | Bailey | Derrick | MD | 99A |
| 5 | Brennan | Mike | MD | 99A |
| 6 | Bridges | Willie | MD | 99A |
| 7 | Broadnax | Rodney | MD | 99A |
| 8 | Brumfield | Ryan | MD | 99A |
| 9 | Carroll | Sterling | MD | 96A |
| 10 | Carson | Stephen | IL | 01A |
| 11 | Chainuck | Mark | IL | 99A |
| 12 | Charles | Dieunel | NJ | 01A |
| 13 | Coleman | Timothy | MD | 02A |
| 14 | Coomer | Richard/Pete | IN | 02A |
| 15 | Cruse | Bryan | MO | 99A |
| 16 | Cruz | John | IN | 02A |
| 17 | DeGraaf | Timothy | MI | 96A |
| 18 | Fragola | Mark | CT | 99A |
| 19 | Frederique | Gary | MD | 01A |
| 20 | Greene | Enoch | MD | 99A |
| 21 | Gumbs | Allan | MD | 99A |
| 22 | Handy | John | MD | 96A |
| 23 | Herrera | Miguel | CA | 99B |
| 24 | Hodge | Bobby | MI | 99A |
| 25 | Jaramillo | Tom | CO | 96A |
| 26 | Jay | Jeff | IL | 96A |
| 27 | Kelly | Amber | NJ | 01A |
| 28 | Krol | Jim | MI | 96A |
| 29 | Locke | Terrain | MD | 99A |
| 30 | Lovett | Wayne | CA | 99B |
| 31 | Mackall | Charles | MD | 01A |
| 32 | Madden, Jr. | Henry | MD | 99A |
| 33 | Mimms | Curtis | MD | 01A |
| 34 | Montanez | Raymond | CA | 02B |
| 35 | Murphy II | Ernest | MD | 99A |
| 36 | Nazareth | Julian | NY | 01A |
| 37 | O'Malley | Tim | CA | 99B |
| 38 | Perez | Edwin | NY | 01A |
| 39 | Qureshi | Norman | NJ | 96A |

1

| No. | Last Name | First Name | State | Agreement Version |
|-----|-----------|-----------|-------|-------------------|
| 40 | Ratcliff | Mike | MI | 96A |
| 41 | Roberts | Barry | MD | 99A |
| 42 | Rydman | Ronald | CA | 01B |
| 43 | Sullivan | Edwin | MD | 99A |
| 44 | Van Koevering | Allen | MI | 96A |
| 45 | Veliz | Paul | CA | 01B |
| 46 | Wasmer | Tade | IL | 96A |
| 47 | Watson, Sr. | Lawrence | MD | 99A |
| 48 | Weekes | Neville | MD | 01A |
| 49 | West | DeRon | MD | 99A |
| 50 | White | James | CA | 01B |
| 51 | Williams | Samuel | NJ | 96A |
| 52 | Wise | Michael | MI | 96A |
| 53 | Wood | Calvin | MD | 99A |
| 54 | Woods, Jr. | Earl | MI | 99A |
| 55 | Zadnick | Aaron | IL | 99A |

2

## Exhibit D

| Last Name | First Name | State | Agreement Version |
|---|---|---|---|
| Arwood, Jr. | Preston | AL | 03AL |
| Churchill | Tom | FL | 96A |
| Daniel | Jerry D. | AL | 03AL |
| Izquierdo | Oliden | FL | 99A |
| Mardini | Walberto | FL | 99A |
| Mayton, Jr. | Bernard | AL | 03AL |
| Meador | Jeff | NV | 96A |
| Nunez | Jonathan | NV | 99A |
| Paredes | Oscar | FL | 02A |
| Walker | Winston | AL | 02A |
| Wheeler | Ellick | KY | 96A |

## Exhibit E

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|------------|-------------------|
| 1 | Abrahamsen | David J. | 03FL |
| 2 | Ackerman | Nicholas | 03A |
| 3 | Adams | Randall | 01A |
| 4 | Adkins | Donald | 96C |
| 5 | Adolph | Joseph W. | 03MD |
| 6 | Agler | Bradley | 99A |
| 7 | Agostini | Jason | 01A |
| 8 | Agozzino | Vince | 03IL |
| 9 | Ainsworth | Daniel E. | 03CA |
| 10 | Albright | Ryan | 99A |
| 11 | Aldrete | Joel | 01B |
| 12 | Alegria | Roberto Carlos | 99B |
| 13 | Alert | Thomas Eugene | 99A |
| 14 | Alfred | Chad | 01A |
| 15 | Alioto | Brandon | 99A |
| 16 | Allen | Alice | 03FL |
| 17 | Allen | Joseph | 02A |
| 18 | Allen | Judd | 01B |
| 19 | Allen | Sean | 02B |
| 20 | Allred | Jonathan | 99A |
| 21 | Allshouse | Michael Lee | 99A |
| 22 | Allspach | Gary | 02A |
| 23 | Alves | Louis | 03NY |
| 24 | Ames | Christopher J | 03NC |
| 25 | Ammon | Ryan | 99A |
| 26 | Amott | Troy | 99A |
| 27 | Anaya | Issac | 99B |
| 28 | Anaya | John | 99B |
| 29 | Anderson | Darren Mitchell | 02A |
| 30 | Anderson | David | 03CA |
| 31 | Anderson | Jeffrey | 01A |
| 32 | Anderson | Matthew | 02A |
| 33 | Anderson | Michael (Chad) | 96A |
| 34 | Anderson | Randy | 99B |
| 35 | Anderson | Robert D. | 01A |
| 36 | Anderson | Zebulan (Zeb) | 96A |
| 37 | Andree | Nathan J | 02A |
| 38 | Andrews | Joe | 02A |
| 39 | Andrews | Robert | 96B |

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|------------|-------------------|
| 40 | Ansink, Jr. | John O. | 03VA |
| 41 | Aranegui | Gus | 96A |
| 42 | Arango | Rick | 99A |
| 43 | Arms | Rick | 99A |
| 44 | Armstrong | Bryan | 99B |
| 45 | Arroyo | Heriberto | 03CA |
| 46 | Arroyo | Sijifredo | 03B |
| 47 | Artley | Stephen Paul | 03VA |
| 48 | Arvin | Harold W. | 99A |
| 49 | Arvizu | Ronald | 99B |
| 50 | Ash | Brian | 01A |
| 51 | Atkins | James | 96A |
| 52 | Augustin | Matthew | 03LA |
| 53 | Ault | Travis M. | 02A |
| 54 | Avalos | Agustin | 99B |
| 55 | Avalos | Guillermo | 03CA |
| 56 | Avila | Hector | 02B |
| 57 | Aybar | Jeffrey | 96B |
| 58 | Bachman | Sean | 99B |
| 59 | Bachmann | Kenneth J. | 96A |
| 60 | Badgerow | Gary | 03CA |
| 61 | Bailey | Wayne C | 96A |
| 62 | Baker | Brian | 01A |
| 63 | Baker | Joshua | 99A |
| 64 | Baldwin | Daniel S. | 96A |
| 65 | Baldwin | David | 03MI |
| 66 | Banks | Joe L | 03GA |
| 67 | Barbarotta | Sam | 02A |
| 68 | Barfield | Donald Ray | 03TX |
| 69 | Barlow | Stephen | 01B |
| 70 | Barnes | Gregg | 99A |
| 71 | Barnes | Relton | 03MO |
| 72 | Barr | Jeff | 99A |
| 73 | Barrett | Jason | 96C |
| 74 | Bartz | Michael | 03A |
| 75 | Bass | Donnie | 02A |
| 76 | Bassett | Dennis | 99A |
| 77 | Batteate | Domenico | 99B |
| 78 | Baudier, Jr. | Ramon J.. | 96A |
| 79 | Bauer, Jr. | Harold D. | 99A |
| 80 | Baughman | Casey | 01B |
| 81 | Baumer | Christopher | 99A |

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|-----------|-------------------|
| 82 | Baxter | Aaron | 96A |
| 83 | Beal | Kevin | 99A |
| 84 | Bean | Robert W. | 02A |
| 85 | Beard | Everette G. | 03VA |
| 86 | Beard | Mitchell Aaron | 02A |
| 87 | Beck | Joseph | 96B |
| 88 | Beckham | Mark (Marshall) | 03GA |
| 89 | Bedard | Patricia | 03A |
| 90 | Bell | Wade | 03A |
| 91 | Bell | William | 96A |
| 92 | Bender | Daniel Lee | 02A |
| 93 | Benedict | Tyrone Charles | 96A |
| 94 | Benson | Josh | 02A |
| 95 | Bentley | Hank | 99B |
| 96 | Bereza | John | 99B |
| 97 | Berlage | Joseph E. | 02A |
| 98 | Berna | Brent | 03OK |
| 99 | Berry | Paul | 99B |
| 100 | Bersch | Warren | 99A |
| 101 | Bertram | Phillip | 02B |
| 102 | Bertrand | William | 01A |
| 103 | Biase | Joseph D. | 96A |
| 104 | Bickham | John D. | 99A |
| 105 | Bickmeyer | Warren | 99A |
| 106 | Bierach | Conrad | 99B |
| 107 | Bigbee | Gregory Cole | 03MS |
| 108 | Bigelow | Jason Scott | 03AL |
| 109 | Bippus | David W. | 02A |
| 110 | Bishop | Janice M. | 03MS |
| 111 | Bissin | Brooke A. | 99B |
| 112 | Bitz | William J. | 03FL |
| 113 | Bivins | Michael | 03FL |
| 114 | Blackman | Matthew L. | 99A |
| 115 | Blackmon | James Kurt | 01A |
| 116 | Blaha | Christopher | 96A |
| 117 | Blaisdell | Philip Daniel | 01A |
| 118 | Blake | Thomas FLynn | 99A |
| 119 | Blanchard | Bernard L | 03TX |
| 120 | Blanco | Noe | 02B |
| 121 | Blenden | Chad M. | 02A |
| 122 | Bobeck | Craig | 03MI |
| 123 | Bobo | Brian | 99A |

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|------------|-------------------|
| 124 | Bobola | Kenneth | 03FL |
| 125 | Bodenmiller | George | 99A |
| 126 | Bohn | David | 99A |
| 127 | Bolen, Jr. | Silas Ray "Bo" | 03NC |
| 128 | Boman | Jason | 99A |
| 129 | Bonacorsi | Daniel J. | 02A |
| 130 | Bonds, Jr. | Jackie Ray | 01B |
| 131 | Booker | Kathleen | 03A |
| 132 | Booth | Daniel | 01A |
| 133 | Borawski | Scott | 99A |
| 134 | Borrmann | Kevin | 99A |
| 135 | Boslaugh | Kevin | 02A |
| 136 | Bossett | Eric D. | 03CA |
| 137 | Bostick | Tony L. | FAS-B |
| 138 | Bostwick | Noah | 01B |
| 139 | Botelho | Troy | 99B |
| 140 | Bova | John S. Jr. | 01A |
| 141 | Bow | Jonathan James | 01A |
| 142 | Bowden | Robert | 99A |
| 143 | Bower | Kevin | 96A |
| 144 | Bowles | Randall | 99A |
| 145 | Bowles, Jr. | Robert F. | 03NY |
| 146 | Bowman | Daryl | 99B |
| 147 | Boyd | Ricko Lonnell | 99A |
| 148 | Boyle | Andrea | 02B |
| 149 | Boyle | Michael P. | 02A |
| 150 | Boynton | Kevin | 96A |
| 151 | Braaten | Bob | 03WA |
| 152 | Bracamontes | Ralph | 99B |
| 153 | Bradley | Tory | 96B |
| 154 | Branscome | Thomas Scott | 03NC |
| 155 | Brantley | Michael | 01A |
| 156 | Bray | Michael C | 99A |
| 157 | Bridges | Larry Daniel | 03GA |
| 158 | Bridges | Thomas Allan | 99A |
| 159 | Brien | Joseph | 02A |
| 160 | Brinlee | Robert | 99A |
| 161 | Brinning | Brandon | 99B |
| 162 | Briseno | Leonel | 96B |
| 163 | Bristow | Mark | 99A |
| 164 | Brite | Bobby | 02C |
| 165 | Brock | Stephen | 96A |

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|------------|-------------------|
| 166 | Brooks | Antoine Alonzo | 01A |
| 167 | Brooks | Chris | 03CA |
| 168 | Brooks | Dezmon | 99B |
| 169 | Brooks | Stephen | 02B |
| 170 | Brown | Chris | 99A |
| 171 | Brown | Christopher | 03A |
| 172 | Brown | Danny L. | 03KY |
| 173 | Brown | Jonathan | 99B |
| 174 | Brown | Michelle | 99A |
| 175 | Brown | Wayne | 99A |
| 176 | Brown Jr. | James | 96A |
| 177 | Brown-Donald | Cory | 03MO |
| 178 | Browning | Jennifer (Jenny) | 99B |
| 179 | Browning | Stuart | 99A |
| 180 | Brown-Phillips | Mary E. | 99A |
| 181 | Bruno | Stuart | 03NJ |
| 182 | Brunson | Gregory | 96A |
| 183 | Bryant | Gregory S. | 96A |
| 184 | Buddie | Brian | 99A |
| 185 | Buen | Brian | 96A |
| 186 | Bullard | Brandon Eugene | 02A |
| 187 | Bunderson | Jason | 02A |
| 188 | Burch | Jeffrey | 02B |
| 189 | Burcke | Robert | 99A |
| 190 | Burgess | Scott | 01A |
| 191 | Burghart | Vince McClain | 99A |
| 192 | Burke | Christopher | 01B |
| 193 | Burke | Donald | 96C |
| 194 | Burke | Michael | 02A |
| 195 | Burress | James Allen | 03IL |
| 196 | Burt | Steven Jonathan | 99A |
| 197 | Burton | Crezone | 96A |
| 198 | Bush | David J. | 03OH |
| 199 | Butler | Dustin Lee | 96A |
| 200 | Butler | Jeffrey A. | 99A |
| 201 | Buuck | Greg M. | 99A |
| 202 | Byram | Jason Albert | 03A |
| 203 | Cabrera | Jorge | 03B |
| 204 | Cabrera | Luis | 01B |
| 205 | Cady | Chad Jason | 03A |
| 206 | Cagle | Lucas Hunter | 99A |
| 207 | Cala | Peter James | 99A |

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|------------|-------------------|
| 208 | Caldwell | Scott Patrick | 99A |
| 209 | Callahan | John | FAS-B |
| 210 | Calvin | Dean | 99A |
| 211 | Camden | Christopher | 03CA |
| 212 | Cameron | Bruce | 01A |
| 213 | Cameron | Chris | 99A |
| 214 | Campion | Michael H. | 03TX |
| 215 | Campos | Gustovo G. | 03CA |
| 216 | Cantu III | Leonel | 99B |
| 217 | Capuchino | Neal | 03DE |
| 218 | Carelock | Bryan | 01B |
| 219 | Carney Sr. | Eric | 99A |
| 220 | Carr | Boyd | 99A |
| 221 | Carr | Ray Anthony | 99A |
| 222 | Carrera | Gerardo | 96A |
| 223 | Carrillo | Javier | 03CA |
| 224 | Carter | Charlie | 03MO |
| 225 | Carter | Kevin | 96A |
| 226 | Carter | Matthew S. | 03CA |
| 227 | Carter | Stephen W. | 03GA |
| 228 | Carter | Terry | 96A |
| 229 | Carter Jr. | Nelson | 02A |
| 230 | Carthon | Rickey | 96B |
| 231 | Caruso | Kenneth | 03A |
| 232 | Cash | Jason | 96A |
| 233 | Casselman | Dana | 03SC |
| 234 | Cassens | Everett W. | 01A |
| 235 | Castens | Richard | 99A |
| 236 | Castleberry | Don | 02C |
| 237 | Caton | Clinton | 96B |
| 238 | Caudill | Michael | 03A |
| 239 | Cavanaugh | Craig Robert | 99B |
| 240 | Cavazos | Jesse | 03TX |
| 241 | Cervantes | Marcos | 02B |
| 242 | Chalmers | Scott | 99A |
| 243 | Chambers | Veronica | 03AL-Conf. |
| 244 | Chambers Sr | Broderick | 02C |
| 245 | Chapman | Brent | 99A |
| 246 | Chapman | David | 96B |
| 247 | Chappell | Chad | 01A |
| 248 | Charatin | Daniel | 99A |
| 249 | Chavez | William | 03CA |

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|------------|-------------------|
| 250 | Chesser | Larry D. | 03MI |
| 251 | Chirino | Humberto | 96A |
| 252 | Choate | Doug | 01A |
| 253 | Christensen | Eugene | 03CT |
| 254 | Churches | Dennis L. | 99A |
| 255 | Cingel | Timothy | 02A |
| 256 | Citrano | Chris | 03A |
| 257 | Clark | Arnie | 99A |
| 258 | Clark | Brian | 99A |
| 259 | Clark | Michael D. | 99A |
| 260 | Clark | Shon D. | 03A |
| 261 | Clark Jr. | Gerald | 02A |
| 262 | Clayton | William W. | 03NY |
| 263 | Cleaves, Sr | Jason | 02A |
| 264 | Cobble | James | 03KY |
| 265 | Cockreham | Colin | 99A |
| 266 | Coe | Steven M. | 02A |
| 267 | Colavito | Marc | 02B |
| 268 | Colby | Jeffrey | 02A |
| 269 | Colca | Keith | 02A |
| 270 | Cole | Dennis | 99A |
| 271 | Collazo | Edwin Upeano | 03VA |
| 272 | Collins | Aaron | 99A |
| 273 | Collins | Bobby | 03TX |
| 274 | Collins | French | 03IN |
| 275 | Colunga | Edward | 99B |
| 276 | Colunga | Orlando | 03NV |
| 277 | Comaty | Kevin | 99A |
| 278 | Combs | Gary | 99A |
| 279 | Comiso | Mike | 96A |
| 280 | Conigland | James W. | 96A |
| 281 | Conley | Marty D. | 03KY |
| 282 | Connelly | James | 03B |
| 283 | Conner | Michael | 02B |
| 284 | Conti | Matthew | 99A |
| 285 | Contreras | Carlos Javier | 03CA |
| 286 | Contreras | Javier | 03CA |
| 287 | Contreras | Ricardo | 02G |
| 288 | Conway | Merle | 03FL |
| 289 | Cook | David | 99A |
| 290 | Coombs | Jason M | 03FL |
| 291 | Cooper | Daniel B. III | 02A |

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|------------|-------------------|
| 292 | Cooper | Erinn | 02B |
| 293 | Cooper | Leon Allen | 03MO |
| 294 | Cooper | Shirlene | 03A |
| 295 | Cope Jr. | James Andrew | 96A |
| 296 | Coppock II | Lonnie | 96B |
| 297 | Corelli | Charles | 96A |
| 298 | Cornelius | Randall M. | 03AL |
| 299 | Cornett | Michael | 01B |
| 300 | Cortes | Gustavo | 99B |
| 301 | Cortes Jr. | Juventino | 99B |
| 302 | Cortez | Sonny | 99B |
| 303 | Cothran | Matthew | 96A |
| 304 | Cothran | Robert A. | 03FL |
| 305 | Cotter | Bruce | 03MN |
| 306 | Cottini | Jeffrey Louis | 02B |
| 307 | Cottrell | Michael | 01A |
| 308 | Cottun | Jon-mikal | 02A |
| 309 | Coulon | Kevin | 99A |
| 310 | Coulson | Jeffrey M. | 99A |
| 311 | Cousins | Willie | 03MS |
| 312 | Cowles | Barbara | 02A |
| 313 | Cox | Michael | 99C |
| 314 | Coy | Aaron | 01A |
| 315 | Craig | John | 99B |
| 316 | Craig | John Maurice | 02B |
| 317 | Crandle | Tom | 96A |
| 318 | Crawford | James Ryan | 99A |
| 319 | Crawford | Nathaniel T. | 96A |
| 320 | Crawford | Wesley | 99A |
| 321 | Crews | Chad | 03NC |
| 322 | Crismond | Jeff | 01A |
| 323 | Crivello | Tony | 99B |
| 324 | Croft | Virgil Lee, III | 99B |
| 325 | Crook | Robert | 03A |
| 326 | Crosby | Germain | 96A |
| 327 | Crumley | Timothy | 96A |
| 328 | Cruz | Carlos R | 03B |
| 329 | Cruz | Rene | 03A |
| 330 | Culley | Donna J. | 99A |
| 331 | Cumley | Michael | 99A |
| 332 | Czamara | Jamie | 99A |
| 333 | D'Amato | Pasquale | 02A |

| Last Name | Last Name | First Name | Agreement Version |
|---|---|---|---|
| 29 | Randall | Kyle Richard | 99A |
| 30 | Sandoval | Manuel | 99A |
| 31 | Schaper | Matt | 03AZ |
| 32 | Shepherd | Rebecca | 02A |
| 33 | Sigl | Jonathan | 01A |
| 34 | Snell | Richard | 02A |
| 35 | Stokes | Bryan | 02A |
| 36 | Thomas III | George | 02A |
| 37 | Thompson | Robert | 02A |
| 38 | Vesey | Brena | 02A |
| 39 | Whitener | Jessy | 02A |
| 40 | Young Jr. | John W. | 01A |

2

# Exhibit H
# Pennsylvania

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|-----------|-------------------|
| 1 | Baptist | Kenneth W. | 99A |
| 2 | Benecke | Stephen C | 01A |
| 3 | Blackburn | Jessica Lynn | 99A |
| 4 | Brandt | Dean | 96A |
| 5 | Brewster | James | 01A |
| 6 | Buttner | Christopher C. | 03PA |
| 7 | Checchia | Davide | 96A |
| 8 | Chew | William | 03A |
| 9 | Cintron | Michael S. | 02A |
| 10 | Cruz | Samuel | 03PA |
| 11 | Dauria | Philip | 99A |
| 12 | DeRenzo | Christopher | 01A |
| 13 | Dickson | Kevin | 99A |
| 14 | Dodson | Shirley | 03A |
| 15 | East | Joel | 99A |
| 16 | Eperthener | Andrew W. | 99A |
| 17 | Erickson | Daniel | 01A |
| 18 | Ericson | Robert | 01A |
| 19 | Faux | Jaime A. | 99A |
| 20 | Fellin | Paul Lewis | FAS-C |
| 21 | Folsom | James | 99A |
| 22 | Freeman | Scott | 01A |
| 23 | Geissinger | Michael B. | 02A |
| 24 | Gilbert | Brian | 01A |
| 25 | Gilchrist | Joe | 99A |
| 26 | Goida | Jeffrey | 99A |
| 27 | Gonzalez | Ivan | 99A |
| 28 | Gordineer | Donald | 99A |

1

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|-----------|-------------------|
| 29 | Greene | Les | 03PA |
| 30 | Gula | Jon | 99A |
| 31 | Hall | Renee | 99A |
| 32 | Henning | William D., II | 03PA |
| 33 | James | Joseph | 99A |
| 34 | Klutch | Thomas | 03PA |
| 35 | Kuba | Daniel | 99A |
| 36 | Laskowski Jr. | Thomas M. | 02A |
| 37 | Lauer | Mark | 99A |
| 38 | Leazier | Linda | 03A |
| 39 | Lipscomb III | Leonard | 99A |
| 40 | Loranger | Matt | 99A |
| 41 | Marsicano | Angelo | 99A |
| 42 | Martell Jr. | Charles | 96A |
| 43 | Martin | Douglas | 02A |
| 44 | Maule | John | 99A |
| 45 | McCue, Jr. | Edward | 01A |
| 46 | Mecum | Andrew O. | 03PA |
| 47 | Mertens | James | 96A |
| 48 | Michelfelder | John | 99A |
| 49 | Mikulski | Zenard W. | 02A |
| 50 | Miller | Josh | 02A |
| 51 | Mullin | John | 01A |
| 52 | Munn | Brian | 96A |
| 53 | Murphy | Matthew | 02A |
| 54 | Nicotero III | Ross | 99A |
| 55 | Novatnak | Robert | 99A |
| 56 | Nye | Timothy | 02A |
| 57 | O'Connell | Stephen | 02A |
| 58 | Olli | Mark, Jr. | 99A |
| 59 | Orsini | Chris | 99A |

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|------------|-------------------|
| 60 | Ortiz | Andres | 02A |
| 61 | Osman | Michael | 03PA |
| 62 | Overman | Alonzo K. | 99A |
| 63 | Phillips | Jason | 02A |
| 64 | Potechko | Carl | 01A |
| 65 | Pottichen Jr. | William F. | 96A |
| 66 | Primerano | David | 96A |
| 67 | Quinn | Michael | 01A |
| 68 | Raymond | Thomas | 99A |
| 69 | Reedy Jr. | Robert | 99A |
| 70 | Riley | Brian | 99A |
| 71 | Santana | Victor | 99A |
| 72 | Schwartz | Glenn | 03A |
| 73 | Scialanca | David | 02A |
| 74 | Sciscio | Jesse Paul | 02A |
| 75 | Secora | Jason | 01A |
| 76 | Shortencarrier | Daniel | 02A |
| 77 | Smith | Michael S. | 03PA |
| 78 | Sossong | Thomas | 02A |
| 79 | Staggs | James Ervin | 96A |
| 80 | Stefani | John | 01A |
| 81 | Stefanick | Jared | 99A |
| 82 | Stillfield | Miguel | 96A |
| 83 | Tokish | Nicholas | 02A |
| 84 | Torris III | Leonard R | 99A |
| 85 | Vallette | Charles | 96A |
| 86 | Vickless | Dave | 99A |
| 87 | Wiggins | Raiford F. | 99A |

## Exhibit I

| No. | Last Name | First Name | Disputed States | Agreement Version |
|-----|-----------|------------|-----------------|-------------------|
| 1 | Gentry | David Lewis | GA, TN | 96A |
| 2 | Lackey | Christopher Alan | GA, TN | 99A |

## Exhibit J

| Last Name | First Name | State | Agreement Version |
|---|---|---|---|
| Bradley | Thomas | MO | 96A |
| Bruck | Louise | OH | 99A |
| Gumbs | Allan | MD | 99A |
| Johnson | Douglas | KS | 99A |
| Olson | Andrew | CA | 02B |
| Stewart | Clarence | CA | 03CA |

Note: Plaintiff Gumbs was compelled to arbitrate as part of the Court's April 5, 2004 Order.  Plaintiffs nonetheless assert a challenge on his behalf.

1

## Exhibit K

| No. | Last Name | First Name | State | Agreement Version |
|-----|-----------|------------|-------|-------------------|
| 1 | Beil | Ronald | AZ | 2B |
| 2 | Boone | Henry L. | MA | 2B |
| 3 | Brice | Gregory | MD | 2B |
| 4 | Brieva | William | FL | 2B |
| 5 | Evans | William | MD | 2B |
| 6 | Gorman | Friedrich | PA | 2B |
| 7 | Hamilton | Anthony | MD | 2B |
| 8 | Kelly, Jr. | Donald Hugh | SC | 2B |
| 9 | Metcalf | James P. | KY | 2B |
| 10 | Milligan | Michael | NC | 2B |
| 11 | Milz | Patrick | IL | 2B |
| 12 | Nislar | Oscar | VA | 2B |
| 13 | Ramirez | Robert | NV | 2B |
| 14 | Ray | Richard T. | SC | 2B |
| 15 | Standley | Robert K. | MI | 2B |
| 16 | Stephens | Charles | MI | 2B |
| 17 | Van Williams II | Ryal | SC | 2B |
| 18 | Vergara | Jesus | FL | 2B |
| 19 | Wrightson | William | MD | 2B |
| 20 | Anslinger | Gary | IN | MLS |
| 21 | Atkins | Thomas | IN | MLS |
| 22 | Bockelman | Jerome | IN | MLS |
| 23 | Brandt | Bruce | IN | MLS |
| 24 | Bullard | Edward | MI | MLS |
| 25 | Fivecoate | Todd M. | IN | MLS |
| 26 | Frisch | John T. | IN | MLS |
| 27 | Gilmore | Robert | IN | MLS |
| 28 | Herndon | Kenneth R. | IN | MLS |
| 29 | Hill | Randall C. | MI | MLS |
| 30 | Hunsinger | Dan | IN | MLS |
| 31 | Kelly | Kirby R. | IN | MLS |
| 32 | Pilon | Michael S. | MI | MLS |
| 33 | Reed | Larky | IN | MLS |
| 34 | Schroeder | Christopher A | IN | MLS |
| 35 | Stumpf | Kevin L. | IN | MLS |
| 36 | Walker | Brad A. | IN | MLS |

# **Exhibit 3**

Original 1
FILED

NOV 1 0 2005

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1               UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

3   DEPARTMENT 3, FOURTH FLOOR SAUNDRA BROWN ARMSTRONG, JUDGE

4                    -oOo-

5   VELIZ                   ) C-03-01180E SBA

6       PLAINTIFF,         )

7   V.                   ) TUESDAY, **OCTOBER 18, 2005**

8   CINTAS CORPORATION,      ) OAKLAND, CALIFORNIA

9       DEFENDANT.         ) **PLAINTIFF/DEFENDANTS MOTIONS**

10  _____)

11          REPORTER'S TRANSCRIPT OF PROCEEDINGS

12  **APPEARANCES:**

13  FOR THE PLAINTIFF:

14  ALTSHULER, BERZON, NUSSBAUM, RUBIN & DEMAIN
     BY:  MICHAEL RUBIN,

15        EILEEN B. GOLDSMITH,
        ATTORNEYS AT LAW

16  177 POST STREET, SUITE 300
    SAN FRANCISCO, CALIFORNIA  94108

17  TEL (415) 421-7151
    FAX (415) 362-8064

18  MRUBIN@ALTSHULERBERZON.COM

19  FOR THE DEFENDANT:

20  LERACH, COUGHLIN, STOIA GELLER RUDMAN ROBBINS, LLP
     BY:  STEVEN W. PEPICH,

21        ATTORNEY AT LAW
    655 WEST BROADWAY, SUITE 1900

22  SAN DIEGO, CALIFORNIA  92101-3301
    TEL (619) 231-1058

23  FAX (619) 231-7423
    WWW.LERACHLAW.COM, SPEPICH@LERACHLAW.COM

24

25  (MORE APPEARANCES ON THE NEXT PAGE)

2

```
 1   SQUIRE, SANDERS & DEMPSEY, LLP
     BY:  MARK C. DOSKER,
 2        ATTORNEY AT LAW
     ONE MARITIME PLAZA, SUITE 300
 3   SAN FRANCISCO, CALIFORNIA  94111-3492
     TEL (415) 954-0200
 4   DIRECT (415) 954-0210
     FAX (415) 393-9887
 5   MDOSKER@SSD.COM

 6   REPORTED BY:  STARR A. WILSON, CSR 2462

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1    OAKLAND, CALIFORNIA; TUESDAY, OCTOBER 18, 2005; 3:00 P.M.,

 2    DEPARTMENT THREE, THIRD FLOOR; SAUNDRA BROWN ARMSTRONG,

 3    JUDGE

 4                          -OOO-

 5              THE CLERK:    ALL RISE.   THIS COURT IS NOW IN

 6    SESSION.   THE HONORABLE SAUNDRA BROWN ARMSTRONG PRESIDING.

 7    PLEASE BE SEATED.

 8              CALLING CIVIL 03-1180, VELIZ VS. CINTAS

 9    CORPORATION.

10              MR. RUBIN:   GOOD AFTERNOON, YOUR HONOR.   MICHAEL

11    --

12              THE COURT:   GOOD AFTERNOON.

13              MR. RUBIN:    GOOD AFTERNOON, YOUR HONOR.   MICHAEL

14    RUBIN FOR THE PLAINTIFFS.

15              THE COURT:   GOOD AFTERNOON, MR. RUBIN.

16              MR. PEPICH:   GOOD AFTERNOON, YOUR HONOR.   STEVEN

17    PEPICH FOR CINTAS.

18              THE COURT:   STEPHEN PEPICH, GOOD AFTERNOON.

19              MR. PEPICH:   GOOD AFTERNOON.

20              MS. GOLDSMITH:   EILEEN GOLDSMITH FOR CINTAS.

21              THE COURT:   EILEEN GOLDSMITH.   GOOD AFTERNOON, MS.

22    GOLDSMITH.

23              MR. DOSKER:   GOOD AFTERNOON, YOUR HONOR.   MARK

24    DOSKER FOR CINTAS.

25              MS. O'ROURKE:   OKAY.   GOOD AFTERNOON, YOUR HONOR.
```

4

1    ANGELA O'ROURKE ALSO APPEARING FOR CINTAS.

2        THE COURT:  OKAY.  GOOD AFTERNOON.

3        OKAY.  I APPRECIATE YOUR BEING AVAILABLE THIS

4    AFTERNOON.  I NEEDED A LITTLE MORE TIME TO KIND OF GO

5    THROUGH AND SORT OUT SOME OF THE MATERIAL THAT YOU ALL HAVE

6    SUBMITTED SINCE THERE IS QUITE A BIT.

7        WHAT I THOUGHT I WOULD DO TODAY IS TO KIND OF GO

8    THROUGH WITH YOU WHAT MY INCLINATIONS ARE WITH RESPECT TO

9    SOME OF THESE ISSUES, AND -- AND WHAT MY RULINGS ARE WITH

10   RESPECT TO OTHERS.  AND THEN TELL YOU WHAT MY QUESTIONS ARE

11   WITH RESPECT TO OTHERS.  AND THAT WAY YOU ALL CAN FOCUS YOUR

12   ORAL ARGUMENT ON -- ON ANY OR ALL OF THAT.

13       UM, FIRST OF ALL, FOR THE RECORD, IF THIS MATTER

14   COMES BEFORE THE COURT ON -- ON DEFENDANT'S MOTION TO STAY

15   PROCEEDINGS PURSUANT TO TITLE NINE, UNITED STATES CODE,

16   SECTION THREE, AS TO CERTAIN OPT-IN PLAINTIFFS WHO ARE NOT

17   SUBJECT TO THE COURT'S APRIL 5, 2004 ORDER.

18       SECOND, PLAINTIFF'S MOTION CONCERNING COMPLIANCE

19   WITH COURT ORDERS REGARDING WHICH PLAINTIFFS MUST ARBITRATE

20   AND WHICH PLAINTIFFS MAY LITIGATE THEIR NON-ERISA OVERTIME

21   WAGE CLAIMS.

22       THIRD, DEFENDANT'S MOTION TO DISMISS AS TO CERTAIN

23   OPT-IN PLAINTIFFS FOR IMPROPER VENUE.  OR, IN THE

24   ALTERNATIVE, TO TRANSFER FOR IMPROPER VENUE OR, IN THE

25   ALTERNATIVE, TO TRANSFER IN THE INTERESTS OF JUSTICE AND

5

1    CONVENIENCE.

2          AND, FOURTH, PLAINTIFF'S MOTION FOR LEAVE TO FILE

3    A SECOND AMENDED COMPLAINT.

4          NOW, BASED UPON THE BRIEFING SUBMITTED BY THE

5    PARTIES, THE JOINT STATEMENT FILED IN SEPTEMBER, THE COURT

6    SUMMARIZES THE PERTINENT ISSUE AS FOLLOWS:

7          FIRST OF ALL, THE PARTIES, THE COURT'S

8    UNDERSTANDING IS, THE PARTIES HAVE REACHED AGREEMENT

9    REGARDING WHICH PLAINTIFFS MAY LITIGATE AND WHICH ARE

10    SUBJECT TO ENFORCEABLE ARBITRARY PROVISIONS; SPECIFICALLY,

11    (1), THE PARTIES HAVE AGREED THAT 444 PLAINTIFFS MAY

12    LITIGATE THEIR CLAIM BEFORE THIS COURT.  THAT'S IN THE JOINT

13    STATEMENT.

14          WELL, IF THERE'S A DISPUTE, WE CAN SPEAK TO THAT.

15    I WANT TO SUMMARIZE MY UNDERSTANDING SO YOU ALL CAN TELL ME

16    IF THAT'S CORRECT.

17          SECOND, PURSUANT TO THE COURT'S APRIL 5, 2004

18    ORDER, 55 PLAINTIFFS ARE COMPELLED TO ARBITRATE THEIR

19    CLAIMS.

20          THIRD, PURSUANT TO THE COURT'S JUNE 9, 2004 ORDER,

21    STIPULATION AND ORDER -- EXCUSE ME -- THE COURT'S JUNE 9,

22    2004 STIPULATION AND ORDER COMPELLING ARBITRATION OF OPT-IN

23    PLAINTIFFS FROM ALABAMA, FLORIDA, KENTUCKY AND NEVADA, THE

24    PARTIES AGREED, 11 PLAINTIFFS ARE COMPELLED TO ARBITRATE

25    THEIR CLAIMS.

6

1       NEXT, THE PARTIES AGREE THAT 1,700 PLAINTIFFS ARE

2   SUBJECT TO ENFORCEABLE ARBITRATION AGREEMENTS.

3       AND THOSE ARE THE ISSUES THAT THE PARTIES HAVE

4   REACHED AGREEMENT REGARDING SO FAR; IS THAT CORRECT?

5       MR. DOSKER:  YOUR HONOR, ON THE LAST ONE, THE

6   17200 -- THE 1700 --

7       THE COURT:  YES.

8       MR. DOSKER:  -- WHICH IS, I BELIEVE, YOUR HONOR'S

9   REFERRING TO EXHIBIT E TO THE JOINT STATEMENT.

10      THE COURT:  RIGHT.

11      MR. DOSKER:  I WANT TO JUST EMPHASIZE --

12      THE COURT:  JOINT STATEMENT IS ON PAGE TWO, 12 TO

13  15 AND EXHIBIT E.

14      MR. DOSKER:  YES, YOUR HONOR.  I JUST WANT TO

15  EMPHASIZE AS IS SET FORTH ON PAGE ONE OF THE JOINT

16  STATEMENT, THAT THAT LIST, WHILE THE PARTIES AGREE THAT THEY

17  HAVE ENFORCEABLE ARBITRATION AGREEMENTS UNDER SECTION TWO OF

18  THE FEDERAL ARBITRATION ACT, CINTAS VERY STRONGLY SUBMITS

19  THAT IT HAS MOVED ONLY TO STAY AS TO THEM, NOT AS TO COMPEL

20  UNDER SECTION FOUR; AND THAT, THEREFORE, THEY CAN ONLY BE

21  STAYED, NOT COMPELLED, BY THIS COURT.  THE PLAINTIFFS HAVE A

22  DIFFERENT VIEW AS SET FORTH IN THEIR BRIEF.

23      THE COURT:  RIGHT.  WELL, WHAT I'M READING IS

24  BASICALLY WHAT YOU HAVE IN HERE, IN YOUR JOINT STATEMENT

25  THAT YOU AGREE THAT 1700 PLAINTIFFS ARE SUBJECT "TO

7

1  ENFORCEABLE ARBITRATION AGREEMENTS".

2      I'LL GET INTO THE LEGAL ISSUES IN TERMS IF YOU

3  HAVE AN ISSUE.  BUT IS THAT WHAT YOU HAVE IN YOUR JOINT

4  STATEMENT NOT CORRECT?

5      MR. DOSKER:  NO, THAT IS CORRECT.

6      THE COURT:  OKAY.  WELL, THEN THAT'S ALL I KNOW IF

7  IT IS CORRECT.

8      MR. DOSKER:  BUT IT IS MODIFIED BY WHAT IS IN THE

9  JOINT STATEMENT, PAGE ONE, LINES 11 TO 16.  AND THAT HAS THE

10 FUNDAMENTAL QUESTION OF WHAT'S THE LEGAL OUTCOME?

11     THE COURT:  WHAT IS THE PURPOSE OF WHAT YOU HAVE

12 AT PARAGRAPH -- AT PAGE TWO LINES 12 TO 15 IN EXHIBIT E?

13     MR. DOSKER:  THE PURPOSE OF PAGE -- OF THAT --

14     THE COURT:  PAGE TWO, LINES 12 TO 15.

15     MR. DOSKER:  YES, YOUR HONOR.  THAT IS TO CONVEY

16 TO YOUR HONOR THAT THE PARTIES AGREE THAT THERE ARE

17 ENFORCEABLE ARBITRATION AGREEMENTS SENT TO THOSE PEOPLE BUT

18 THE DISPUTE IS OVER.

19     THE COURT:  RIGHT.  AND THAT'S ALL I SAID.  THAT'S

20 ALL I SAID.  I DON'T WANT TO GET INTO A DISCUSSION OF

21 SEMANTICS.  I'M JUST READING WHAT YOU ALL HAVE PROVIDED ME

22 IN YOUR JOINT STATEMENT AND SAYING THAT'S WHAT YOU ALL HAVE

23 AT LEAST REPRESENTED TO ME THAT YOU AGREE.

24     MR. DOSKER:  YES, YOUR HONOR.

25     THE COURT:  I'M NOT -- I'VE NOT IDENTIFIED ALL THE

8

1   ISSUES YET.  I HAVEN'T EVEN GOT INTO THE BEGINNING YET.  I

2   JUST GOT INTO THE WHAT I CONSIDER THE AGREEMENT BASED ON

3   WHAT YOU HAVE ALL HAVE TOLD ME IN YOUR -- IN THIS JOINT

4   STATEMENT.  AND SO, UM, AS I UNDERSTAND IT, THAT THAT --

5   THOSE ARE THE AGREEMENTS; IS THAT CORRECT?

6           MR. DOSKER:  YES.

7           THE COURT:  AS SET FORTH ARE THE PARTICULAR

8   AGREEMENTS UNDER WHAT YOU HAVE HERE AS YOU STATED ON PAGE

9   TWO --

10          MR. DOSKER:  CORRECT.

11          THE COURT:  -- LINES 12 TO 15.

12          MR. DOSKER:  YES.  SUBJECT TO WHAT WE HAVE SAID ON

13  PAGE ONE, LINES 11 TO 16, YES, YOUR HONOR.

14          THE COURT:  YOU DON'T HAVE THAT IN PARAGRAPH ON

15  PAGE TWO, LINES 12 TO 15.  I'M JUST READING WHAT YOU HAVE ON

16  PAGE TWO, LINES 12 TO 15, IN TERMS OF WHAT YOU'VE AGREED TO.

17  THAT'S WHAT I TOLD YOU ALL TO SUBMIT.  THAT'S WHAT YOU

18  SUBMITTED.  AND THAT'S WHAT YOU SAID.  AND THAT'S WHAT I'M

19  SAYING NOW.  OKAY.

20          ANYTHING ELSE THAT -- THAT YOU DIDN'T STATE

21  CORRECTLY?

22          MR. RUBIN:  YOUR HONOR, PLAINTIFF'S AGREE THAT

23  YOUR STATEMENT OF THE AGREEMENT IS ACCURATE AND CORRECT.

24          THE COURT:  OKAY.  THANK YOU.

25          NOW, THE PARTIES REMAIN IN DISPUTE TO SOME EXTENT

9

1   REGARDING WHICH PLAINTIFFS MAY LITIGATE AND WHICH ARE

2   SUBJECT TO ENFORCEABLE ARBITRATION PROVISIONS; SPECIFICALLY,

3   FIRST, PLAINTIFF'S ARGUE THE ARBITRATION AGREEMENTS ARE

4   UNENFORCEABLE UNDER ARIZONA, LOUISIANA AND PENNSYLVANIA LAW;

5   THUS PLAINTIFFS CONTEND PLAINTIFFS FROM THOSE STATES WHICH

6   ARE, I THINK 196 PLAINTIFFS, MUST LITIGATE THEIR CLAIMS.

7          NEXT, THE PARTIES DISPUTE THE APPLICABLE LAW

8   GOVERNING CLAUSE, AND THE EFFECT OF STATE LAW ON THE

9   ENFORCEABILITY OF THE ARBITRATION AGREEMENTS AS TO TWO

10  PLAINTIFFS.

11         THIRD, PLAINTIFFS ALLEGE PROCEDURAL

12  UNCONSCIONABILITY AS TO SIX PLAINTIFFS.

13         AND THEN NEXT, DEFENDANTS SEEK TO DISMISS OR

14  TRANSFER 36 PLAINTIFFS FOR IMPROPER VENUE.

15         IS THAT CORRECT SO FAR?

16         MR. DOSKER:  YES, YOUR HONOR.

17         MR. RUBIN:  FROM PLAINTIFF'S PERSPECTIVE, YOUR

18  HONOR, THAT IS CORRECT.  MY NOTES HAD 170 LOUISIANA, ARIZONA

19  AND PENNSYLVANIA PLAINTIFFS.  BUT YOU ARE PROBABLY RIGHT.

20         THE COURT:  I HAVE 196.  LET ME JUST SEE.  AND I'M

21  LOOKING AT PAGE TWO, YOUR JOINT STATEMENT, PAGE TWO, LINES

22  17 TO 28, AND EXHIBITS F, G AND H.

23         MR. RUBIN:  I'M SURE I ADDED THEM INCORRECTLY.

24  BUT THOSE -- THOSE ARE THE LISTS.  AND THEY'RE IDENTIFIED.

25  AND IF THAT'S WHAT THEY ADDED UP TO.

1      THE COURT:  OKAY.

2      MR. RUBIN:  IT'S WHATEVER THEY ADD UP TO.

3      THE COURT:  OKAY.  THANK YOU.  AND SO THE

4   COURT IS, UM, --

5      MR. RUBIN:  JUST DOUBLE CHECK.

6      THE COURT:  MR. DOSKER?

7      MR. DOSKER:  WE'LL DOUBLECHECK THE NUMBERS.

8      THE COURT:  OKAY.  GOOD.  THANK YOU.  BECAUSE

9   THAT'S ALL WE DID WAS JUST ADDED IT UP.  SO IF OUR ADDITION

10  IS INCORRECT, WE'LL CORRECT THE RECORD AFTER THE RECESS.

11     MR. RUBIN:  IT'S PROBABLY INCORRECT.

12     MR. DOSKER:  WE'LL AGREE IT'S WHATEVER THOSE

13  EXHIBITS ADD UP TO.

14     THE COURT:  AND SO FROM MY PERSPECTIVE, THE COURT

15  IS FACED WITH THE FOLLOWING SIX DISPUTED ISSUES BY THE

16  PARTIES:  THE FIRST ISSUE IS WHETHER THE 1700 PLAINTIFFS

17  LISTED IN EXHIBIT E OF THE JOINT STATEMENT, WHICH THE

18  PARTIES AGREE ARE SUBJECT TO ENFORCEABLE ARBITRATION

19  AGREEMENTS, MUST BE COMPELLED TO ARBITRATE OR WHERE THEIR

20  CLAIMS MAY BE STAYED BY THIS COURT.

21     THE SECOND ISSUE IS WHETHER THE ARBITRATION

22  AGREEMENTS ARE ENFORCEABLE UNDER THE LAWS OF LOUISIANA,

23  ARIZONA AND PENNSYLVANIA.

24     THE THIRD ISSUE IS WHETHER THERE WAS PROCEDURAL

25  UNCONSCIONABILITY AS TO SIX PLAINTIFFS.

11

1    THE FOURTH ISSUE, WHETHER THE DEFENDANTS MAY

2 EITHER DISMISS OR TRANSFER THE CLAIMS OF 36 PLAINTIFFS.

3    THE FIFTH ISSUE IS WHETHER PLAINTIFFS MAY BE

4 GRANTED LEAVE TO AMEND THEIR FIRST AMENDED COMPLAINT.

5    AND THEN THE SIXTH ISSUE IS WHAT THE APPLICABLE

6 LAW GOVERNING CLAUSE IS REGARDING THE TWO PLAINTIFFS LISTED

7 IN EXHIBIT ONE OF THE JOINT STATEMENT.

8    WITH RESPECT TO THE SIXTH ISSUE, I WILL SAY THERE

9 IS NO BRIEFING BEFORE THE COURT ON THIS ISSUE.  THE ONLY

10 EVIDENCE SUBMITTED TO THE COURT ON THE ISSUE ARE THE

11 DECLARATIONS OF MANAGER OF ACCOUNTING SERVICES FOR CINTAS

12 CORPORATION, STEVEN CHRISTENSON.

13    FROM PAYROLL RECORDS MAINTAINED BY CINTAS IN THE

14 REGULAR AND ORDINARY CASE OF ITS BUSINESS, MR. CHRISTENSON

15 HAS DETERMINED THE STATE WHERE EACH EMPLOYEE WAS WORKING

16 WHEN HE OR SHE RECEIVED HIS OR HER LAST PAYCHECK FROM

17 CINTAS.  AND THAT STAGE IS GEORGIA FOR BOTH PLAINTIFFS IN

18 EXHIBIT ONE.

19    SO IT'S NOT CLEAR ON WHAT BASIS PLAINTIFFS ARE

20 DISPUTING THE DETERMINATION THAT GEORGIA IS THE APPLICABLE

21 STATE, BUT YOU MAY ADDRESS THIS IN YOUR ORAL ARGUMENT IF YOU

22 CHOOSE TO.  IF NOT, UM, I WILL STATE THAT IT'S MY

23 INCLINATION WITH REGARD TO THAT ISSUE TO FIND, BASED UPON

24 WHAT I HAVE, THAT GEORGIA WILL BE THE STATE FOR THOSE

25 PERSONS IN THE ABSENCE OF YOUR ADDRESSING THE ISSUE.

12

1          MR. RUBIN:  THANK YOU, YOUR HONOR.

2          THE COURT:  NOW, I WILL STATE NOW, AND SO WITH

3    RESPECT TO THE ISSUES THAT I HAVE IDENTIFIED, THOSE ARE ALL

4    THE ISSUES THAT ARE BEFORE ME AT THIS POINT; IS THAT

5    CORRECT?

6          MR. RUBIN:  THAT IS CORRECT, YOUR HONOR.

7          MR. DOSKER:  I BELIEVE SO, YOUR HONOR, YES.

8          THE COURT:  SO I WILL NOW GO THROUGH AND STATE MY

9    INCLINATION WITH REGARD TO ISSUES NUMBER ONE THROUGH FIVE

10   SINCE I'VE ALREADY GIVEN YOU MY INCLINATION WITH RESPECT TO

11   NUMBER SIX.  AND IN THE CONTEXT OF THE MOTION, FOR THE FOUR

12   MOTIONS THAT ARE PENDING BEFORE THIS COURT, AND I WILL

13   INDICATE SPECIFIC QUESTIONS AS I INDICATE THEM AS I GO ALONG

14   IF I HAVE SPECIFIC QUESTIONS, WHICH QUESTIONS THAT YOU MAY

15   WANT TO INCORPORATE INTO YOUR DISCUSSION.

16          WITH RESPECT TO THE MOTION TO STAY, I AM INCLINED

17   TO GRANT THE DEFENDANT'S MOTION TO STAY.  THE COURT HAS NO

18   QUESTIONS REGARDING THIS MOTION AS THE PARTIES HAVE AGREED

19   THAT 1700 PLAINTIFFS ARE "SUBJECT TO ENFORCEABLE ARBITRATION

20   AGREEMENTS".  AND SINCE SECTION THREE OF THE FEDERAL

21   ARBITRATION ACT REQUIRES THIS COURT TO STATE FURTHER

22   PROCEEDINGS ONCE IT IS SATISFIED THAT PLAINTIFF'S CLAIMS ARE

23   REFERRABLE TO ARBITRATION, THE COURT IS INCLINED TO STATE

24   THE CLAIMS OF THOSE 1700 PLAINTIFFS.

25          SECTION THREE OF THE FAA STATES, "IN ANY SUIT OR

13

1    PROCEEDING BROUGHT -- IN ANY OF THE COURTS OF THE UNITED

2    STATES UPON ANY ISSUE".  I'M SORRY.  THERE IS A

3    TYPOGRAPHICAL ERROR HERE.  OKAY.

4            OKAY.  "IF ANY SUIT OR PROCEEDING BE BROUGHT IN

5    ANY OF THE COURTS OF THE UNITED STATES UPON ANY ISSUE

6    REPARABLE TO ARBITRATION UNDER AN AGREEMENT IN WRITING, FOR

7    SUCH ARBITRATION, THE COURT IN WHICH SUCH SUIT IS PENDING

8    UPON BEING SATISFIED THAT THE ISSUE INVOLVED IN SUCH SUIT OR

9    PROCEEDING IS REFERRABLE TO ARBITRATION UNDER SUCH AN

10   AGREEMENT, SHALL, ON APPLICATION BY ONE OF THE PARTIES, STAY

11   THE TRIAL OF THE ACTION UNTIL SUCH ARBITRATION HAS BEEN HAD

12   IN ACCORDANCE WITH THE TERMS OF THE AGREEMENT, PROVIDING THE

13   APPLICANT FOR THE STAY IS NOT IN DEFAULT IN PROCEEDING WITH

14   SUCH ARBITRATION.  THERE IS NO ISSUE WITH RESPECT TO

15   DEFAULT".

16           SO THEREFORE THE APPROPRIATE INQUIRY FOR MOTION TO

17   STAY UNDER THE FAA IS WHETHER THE COURT IS SATISFIED THAT

18   THE ISSUE INVOLVED IN SUCH SUIT OR PROCEEDING IS REFERABLE

19   TO ARBITRATION UNDER AN ARBITRATION AGREEMENT.

20           AND, UM, WITHOUT GOING INTO ALL OF THE PROVISIONS,

21   THE COURT IS EMPOWERED TO SEVER THE PROVISIONS FOUND TO BE

22   UNCONSCIONABLE FROM AN EMPLOYMENT AGREEMENT AND ENFORCED

23   REMAINDER.

24           AND THE DEFENDANTS IN THIS CASE CONCEDE THAT SINCE

25   THE COURT HAS PREVIOUSLY FOUND UNCONSCIONABLE, THE COURT

14

1   RULES THE PAINES PROVISION THAT THEY WILL CONSENT TO AN

2   ORDER BY THIS COURT SEVERING THAT PROVISION FROM THE

3   EMPLOYMENT AGREEMENT; AND SECOND, SINCE THE COURT HAS ALSO

4   FOUND UNCONSCIONABLE THE TIME LIMITATION WITHIN WHICH AN

5   EMPLOYEE MUST BRING A CLAIM AS WELL AS THE PROVISIONS NOT

6   GUARANTEEING ATTORNEYS' FEES AND COSTS AS GOVERNED BY THE

7   LAWS OF CALIFORNIA, COLORADO, CONNECTICUT, MARYLAND,

8   MICHIGAN, NEW JERSEY, NEW YORK AND NORTH CAROLINA.

9       THE DEFENDANTS HAVE ALSO INDICATED THEY'RE WILLING

10  TO CONSENT TO ALSO SEVERING THOSE PROVISIONS AS WELL.

11      THIRD, THROUGH THE MEET AND CONFER PROCESS, THE

12  PARTIES HAVE AGREED THAT DEFENDANTS WILL NOT SEEK TO STAY

13  THE PROCEEDINGS AS TO OPT-IN PLAINTIFFS FROM TENNESSEE OR

14  WEST VIRGINIA.

15      NOW, WITHOUT CITATION TO ANY AUTHORITY, PLAINTIFFS

16  ARE ARGUING THAT ANY PLAINTIFF WHOSE CLAIMS ARE ARGUABLE

17  UNDER THIS COURT'S OPPORTUNITY ANALYSIS MUST BE COMPELLED TO

18  ARBITRATE AND ONLY THEN MAY THOSE PLAINTIFFS CLAIMS IN COURT

19  BE STATED UNDER SECTION THREE OF THE FAA.

20      BY THIS ARGUMENT, MY POSITION IS THE PLAINTIFFS

21  SEEM TO BE CONTEMPLATING THE OPPORTUNITY TO MAKE A

22  DETERMINATION THAT THE COURT'S AUTHORITY TO COMPEL

23  ARBITRATION PURSUANT TO SECTION FOUR OF THE FAA.

24      THE SUPREME COURT HAS HELD THAT "THE POWER TO

25  GRANT A STAY IS ENOUGH WITHOUT THE POWER TO ORDER THAT THE

15

1    ARBITRATION PROCEED FOR IF A STAY BE GRANTED, THE DEFENDANT

2    CAN NEVER GET RELIEF UNLESS HE PROCEEDS TO ARBITRATION".

3    AND THAT'S THE ANACONDA CASE AT 322 US 42.

4             ADDITIONALLY, THIS COURT HAS PREVIOUSLY STATED,

5    "NOTHING IN THE TEXT OF SECTION THREE SUGGESTS THAT THE

6    COURT CAN COMPEL ARBITRATION UNDER THAT SECTION".  AND

7    THAT'S IN MY ORDER, APRIL 5, 2004 ORDER, PAGE 13.

8             PERSUASIVE AUTHORITY ON THIS MATTER CAN BE FOUND

9    FROM THOSE COURTS THAT GRANTED A DEFENDANT'S MOTION TO STAY

10   WITHOUT ALSO COMPELLING ARBITRATION.  THE SIMS V. MARCEL

11   CHRYSLER CASE IS DIRECTLY ON POINT WITH THE CIRCUMSTANCES

12   PRESENTED IN THIS CASE.  AND I FOUND THAT CASE VERY

13   PERSUASIVE.

14            IN GRANTING DEFENDANT'S MOTION TO STAY, THE

15   DISTRICT COURT HELD "THE COURT RESPECTFULLY REJECTS THE

16   PLAINTIFF'S SUGGESTION THAT, IN THIS CASE, SEVENTH CIRCUIT

17   PRECEDENT, MANDATES THAT A STATE PENDING ARBITRATION NEVER

18   CAN BE GRANTED UNLESS AND UNTIL THE DEFENDANT MOVES TO

19   COMPEL UNDER SECTION FOUR OR OTHERWISE COMMENCES ARBITRATION

20   PROCEEDINGS AGAINST ITSELF.  NOTHING IN THE TEXT OF SECTION

21   THREE DIRECTS THAT RESULT.  AND PLAINTIFF HAS CITED NO

22   LEGISLATIVE HISTORY IN SUPPORT OF THAT INTERPRETATION.

23            LIKEWISE, SEVENTH CIRCUIT PRECEDENT DIRECTS THAT

24   THE FILING OF A MOTION TO STAY IS A PROPER METHOD FOR THE

25   INITIAL ASSERTION OF ARBITRATION RIGHTS.  SEVENTH CIRCUIT

1    TEACHING EXPRESSLY ACKNOWLEDGES THAT A LITIGANT SUCH AS

2    DEFENDANT IS OFTEN CONTENT WITH A STAY ALONE PURSUANT TO

3    SECTION THREE BECAUSE THE CASE AGAINST A DEFENDANT WILL THEN

4    BE STYMIED UNLESS THE PLAINTIFF PUSHES THE LITIGATION

5    FORWARD IN ARBITRATION.

6         AND AT LEAST FROM THE COURT'S RESEARCH ON THE

7    ISSUE, THE PARTIES BREACH ARE RATHER ABBREVIATED.  IT

8    APPEARS THAT EVERY COURT THAT HAS PASSED ON THE ISSUE HAS

9    FOUND THAT A DEFENDANT NEED NOT PUSH LITIGATION FORWARD

10   AGAINST ITSELF BY ACTUALLY COMMENCING ARBITRATION TO WARRANT

11   AN OTHERWISE LEGITIMATE STAY UNDER SECTION THREE OF THE FAA.

12        AND THAT'S THE -- FOUND AT PAGE 317, FED SUP 2ND

13   838, SPECIFICALLY AT PAGE 843.

14        AND THERE ARE A NUMBER OF OTHER CASES THAT I ALSO

15   FOUND PERSUASIVE.  BUT MORE IMPORTANTLY, PLAINTIFFS DO NOT

16   POINT TO ANY AUTHORITY THAT MANDATES A SIMULTANEOUS ORDER

17   COMPELLING ARBITRATION IN THE CONTEXT OF A MOTION TO STAY.

18   AND SO LONG AS THE EMPLOYMENT AGREEMENTS OF THE OPT-IN

19   PLAINTIFFS ARE ENFORCEABLE PURSUANT TO LOCAL STATE LAWS, THE

20   COURT IS INCLINED TO GRANT DEFENDANT'S MOTION TO STAY.

21        THAT'S MY INCLINATION WITH RESPECT TO THE MOTION

22   TO STAY.

23        WITH RESPECT TO THE MOTION CONCERNING COMPLIANCE,

24   THE COURT HAS THREE GLOBAL QUESTIONS IT WISHES THE PARTIES

25   TO ADDRESS IN THEIR ORAL ARGUMENTS CONCERNING PLAINTIFF'S

1          THE COURT:  SO A FACILITATIVE NOTICE HAS SAID THAT

2    IF THESE PEOPLE ARE ALL GOING TO BE COMPELLED TO ARBITRATION

3    SO WHY -- HOW WOULD I RELY ON IT WHEN I ISSUE A FACILITATIVE

4    NOTICE THAT DIDN'T SAY THAT?

5          MR. RUBIN:  BECAUSE THE PARAGRAPH SIX THAT I

6    QUOTED THAT DISCUSSED THE PROCEDURE WHERE THE ARBITRATORS'

7    DECISIONS ON CLASS CERTIFICATION WILL COME BACK TO YOU.

8          THE COURT:  ALL RIGHT.

9          MR. RUBIN:  OCCUR WHEN, AS THE PARTIES UNDERSTOOD

10   AT THE TIME, THE ARBITRATOR IS ONE WHO GOT THE CASES

11   PURSUANT TO AN ORDER COMPELLING ARBITRATION.  OTHERWISE, IF

12   SOME OTHER COURT COMPELLED ARBITRATION, AN ARBITRABLE

13   DECISION WOULD GO TO THAT COURT.  IF PLAINTIFFS FILED

14   ELSEWHERE, IT'S NOT CLEAR WHICH COURT IT WOULD GO TO.

15         WE WILL FILE THE ARBITRATION CLAIMS BEFORE JUSTICE

16   MYERSON.  AND WE WILL TRY TO HAVE THEM CONSOLIDATED AND

17   HEARD TOGETHER.  WE'RE TRYING TO AVOID UNNECESSARY

18   LITIGATION OVER ARBITRATION VENUE.

19         BUT YOUR STATEMENT, YOUR APPROVAL OF THE STATEMENT

20   THAT YOU WILL DECIDE CLASS CERTIFICATION ON REVIEW OF THE

21   ARBITRATOR'S DECISION NECESSARILY REFLECTED YOUR

22   UNDERSTANDING THAT YOU WOULD BE COMPELLING THE PLAINTIFFS'

23   NON-ERISA CLAIMS TO THE ARBITRATION THAT IS COMING BACK TO

24   YOU.  OTHERWISE, IT WOULD BE COMING BACK --

25         THE COURT:  THE ONES THAT I COMPEL ARBITRATION OF.

1    NOW, HAVING MOVED FOR RECONSIDERATION AND CHANGED THE GROUND

2    RULES, PLAINTIFF IS TRYING TO CONCOCT AN ARGUMENT BASED ON A

3    CMC, AN ILLUSION OF A CMC STATEMENT THAT SOMEHOW CINTAS GAVE

4    UP A CLEAR STATUTORY RIGHT TO MAKE THE MOTION THAT IT HAS

5    MADE AND WHICH IS PENDING BEFORE YOU NOW.  SO FOR THAT

6    ADDITIONAL REASON, YOUR HONOR, YOUR HONOR'S ADDITIONAL YOUR

7    HONOR'S ORIGINAL ASSESSMENT WHEN YOU TOOK THE BENCH THIS

8    AFTERNOON IS CORRECT.

9            THE COURT:  MR. RUBIN, IS THERE ANY AUTHORITY THAT

10   YOU CAN CITE TO WHERE A COURT CAN COMPEL ARBITRATION WITHOUT

11   A MOTION TO COMPEL UNDER SECTION FOUR?  IF SO, I'M GOING TO

12   GIVE YOU THE OPPORTUNITY TO PROVIDE IT TO ME AND LET MR. --

13   UM, COUNSEL.

14           MR. DOSKER:  DOSKER.  THANK YOU.

15           THE COURT:  I'M SORRY -- RESPOND TO IT BECAUSE IT

16   JUST SEEMS TO ME THAT YOU'RE ASKING FOR A NOVEL APPLICATION

17   OF SECTION THREE.  AND I, AND I HONESTLY AND IT COULD BE

18   THAT IT'S THE LATENESS OF THE HOUR.  WE'VE BEEN IN COURT ALL

19   DAY.  BUT I -- I'M JUST NOT -- I UNDERSTAND WHAT YOU'RE

20   ARGUING BUT WHAT YOU'RE POINTING ME TO, I'M NOT PERSUADED

21   SAYS THAT.

22           MR. RUBIN:  YOUR HONOR --

23           THE COURT:  I DON'T.  I, UM, AND I GUESS MAYBE THE

24   HEART OF THIS ALL THIS FOR ME, TOO, THAT'S MOST TROUBLING IS

25   THAT YOU ALL ARE THE ONES THAT SUBMITTED THE STIPULATION.

1  OUR HEARING.

2          MR. RUBIN:  THANK YOU, YOUR HONOR.

3          AND THANK YOU ALSO TO THE COURT REPORTER FOR

4  STICKING AROUND AND TO YOUR CLERK.  I KNOW IT'S LATE.  I

5  APPRECIATE IT.

6          THE COURT:  IT IS LATE.  OKAY.  YOU ALL HAVE A

7  NICE EVENING.

8          MR. DOSKER:  THANK YOU, YOUR HONOR.

9          MR. RUBIN:  THANK YOU, YOUR HONOR.

10         MR. DOSKER:  YOU, TOO.

11     (WHEREUPON, AT 5:45 P.M. THE PROCEEDINGS CONCLUDED.)

12             COURT REPORTER'S CERTIFICATE

13         I, STARR A. WILSON, CSR NO. 2462, UNITED STATES

14  DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, DO HEREBY

15  CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

16  RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

17         I CERTIFY THAT THE TRANSCRIPT FEES AND FORMAT

18  COMPLY WITH THOSE PRESCRIBED BY THE COURT AND JUDICIAL

19  CONFERENCE OF THE UNITED STATES.

20

21         _____

22             STARR A. WILSON, CSR NO. 2462

23

24

25

# Exhibit 4

PAGES 1 - 87

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE SAUNDRA BROWN ARMSTRONG, JUDGE

PAUL VELIZ, ET AL.,            )
                               )
            PLAINTIFFS,        )
                               )
  VS.                          )       NO. C 03-01180 SBA
                               )
CINTAS CORPORATION, ET AL.,    )       THURSDAY, OCTOBER 27, 2005
                               )
                               )       OAKLAND, CALIFORNIA
            DEFENDANTS.        )
_____)

COPY

REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

FOR PLAINTIFFS:          ALTSHULER, BERZON, NUSSBUAM
                         RUBIN & DEMAIN
                         177 POST STREET - SUITE 300
                         SAN FRANCISCO, CALIFORNIA  94108
                    BY:  MICHAEL RUBIN, ESQUIRE
                         EILEEN B. GOLDSMITH, ESQUIRE

                         LERACH COUGHLIN STOIA GELLER
                         RUDMAN & ROBBINS
                         401 B STREET, SUITE 1700
                         SAN DIEGO, CALIFORNIA 92101
                    BY:  STEVEN W. PEPICH, ESQUIRE


FOR DEFENDANTS:          SQUIRE, SANDERS & DEMPSEY
                         ONE MARITIME PLAZA, THIRD FLOOR
                         SAN FRANCISCO, CALIFORNIA  94111
                    BY:  MARK C. DOSKER, ESQUIRE
                         ANGELA N. O'ROURKE, ESQUIRE
                         Y. ANNA SUH, ESQUIRE


REPORTED BY:             DIANE E. SKILLMAN, CSR #4909, RPR, FCRR
                         OFFICIAL COURT REPORTER


DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

2

THURSDAY, OCTOBER 27, 2005                          12:10 P.M.

1

2

3          THE CLERK:   CALLING CIVIL 03-1180 VELIZ VERSUS

4    CINTAS CORPORATION.

5          THE COURT:   GOOD MORNING -- GOOD AFTERNOON, I SHOULD

6    SAY.

7          MR. RUBIN:   MICHAEL RUBIN OF ALTSHULER BERZON FOR

8    PLAINTIFFS.

9          THE COURT:   GOOD AFTERNOON.

10         MR. RUBIN:   WITH ME IS EILEEN GOLDSMITH OF ALTSHULER

11   BERZON AND OUR COLLEAGUE STEVEN PEPICH FROM THE LERACH LAW

12   FIRM.

13         THE COURT:   GOOD AFTERNOON.

14         MR. DOSKER:   GOOD AFTERNOON, YOUR HONOR, MARK DOSKER

15   FROM SQUIRE, SANDERS & DEMPSEY ON BEHALF OF CINTAS.   WITH ME

16   ARE MY COLLEAGUES ANGELA O'ROURKE --

17         THE COURT:   ANGELA O'ROURKE, OKAY.

18         MR. DOSKER:   -- AND ANNA SUH.

19         THE COURT:   ANNA WHAT?

20         MR. DOSKER:   SUH, S-U-H.

21         THE COURT:   S-U-H.   OKAY, GOOD AFTERNOON.

22         OKAY.   WE'RE IN CONTINUATION OF THE HEARING THAT WE

23   STARTED ON OCTOBER 18TH FOR ORAL ARGUMENTS ON THE MOTIONS,

24   DEFENDANTS' MOTION TO STAY PROCEEDINGS, PLAINTIFFS' MOTION TO

25   STAY IN COMPLIANCE WITH COURT ORDERS, DEFENDANTS' MOTION TO

3

1   DISMISS AS TO CERTAIN OPERATIVE PLAINTIFFS AND PLAINTIFFS'

2   MOTION TO FILE SECOND AMENDED COMPLAINT.

3           AT THE TIME THAT WE HAD THE LAST HEARING, WHICH

4   LASTED ABOUT TWO TO THREE HOURS, I GUESS, I HAD GIVEN YOU ALL

5   MY INCLINATIONS WITH RESPECT TO EACH OF THE MOTIONS, AND

6   ALTHOUGH THE ORAL ARGUMENT WAS FOCUSED EXCLUSIVELY ON THE

7   ISSUES RAISED BY DEFENDANTS' MOTION TO STAY, I HAD GIVEN YOU

8   SOME QUESTIONS WITH RESPECT TO THE OTHER MOTIONS THAT I WAS

9   INTERESTED IN HAVING YOU ADDRESS.

10          GIVEN THE TIME FRAME THAT WE SPENT DISCUSSING THE

11  MOTION TO STAY AND THE LATENESS OF THE HOUR, WE DECIDED THAT

12  COUNSEL FOR PLAINTIFFS' REQUEST TO CONTINUE THE HEARING TO

13  ALLOW YOU ALL TO SUBMIT SUPPLEMENTAL BRIEFING WITH RESPECT TO

14  THE ISSUE THAT YOU WERE ARGUING AND CONTINUE IT TILL TODAY, AND

15  I GRANTED THAT REQUEST.

16          I HAVE RECEIVED THE SUPPLEMENTAL BRIEFING THAT BOTH

17  OF YOU HAVE SUBMITTED, AND GIVEN THAT THE MOTION TO STAY IS BUT

18  ONE OF THE MOTIONS I HAVE TO RESOLVE TODAY, I AM ACTUALLY JUST

19  GOING TO RULE ON IT BASED ON WHAT YOU HAVE SUBMITTED.  I DON'T

20  REALLY HAVE A NEED FOR FURTHER ARGUMENT ON IT.  AND I WOULD

21  LIKE FOR YOU ALL -- I THINK YOU INDICATED YOU NEEDED A HALF AN

22  HOUR AND TAKE THE TIME THAT YOU HAVE TO FOCUS ON THE OTHER

23  ISSUES AS WELL.

24          NOW, WITH RESPECT TO THE DEFENDANTS' MOTION TO STAY,

25  THERE APPEARS TO BE NO DISAGREEMENT AS TO WHETHER THE COURT

4

1   SHOULD GRANT THE MOTION TO STAY.  SO THAT MOTION IS OBVIOUSLY

2   GOING TO BE GRANTED.

3           THE ONLY ISSUE IS WHETHER THE COURT MUST ALSO COMPEL

4   ARBITRATION.  AND I HAVE GONE THROUGH WHAT BOTH OF YOU HAVE

5   SUBMITTED, AND IT'S SOMEWHAT TROUBLING TO ME THAT PLAINTIFFS

6   CITE TO NO CASE WHERE THE COURT HAS COMPELLED ARBITRATION OF

7   PLAINTIFFS' CLAIMS IN THE ABSENCE OF A MOTION TO COMPEL.

8   PLAINTIFFS CITE TO NO CASE WHERE A COURT HAS FOUND THE

9   DEFENDANT HAS WAIVED HIS RIGHTS TO SEEK AND STATE PURSUANT TO

10  SECTION 3.  AND PLAINTIFFS ALSO CITE TO NO CASE WHERE A COURT

11  FOUND AN ADOPTION OF JUDICIAL ESTOPPEL PREVENTING A DEFENDANT

12  FROM ELECTING TO SEEK A STAY PURSUANT SECTION 3, WHILE AT THE

13  SAME TIME ELECTING NOT TO SEEK A MOTION TO COMPEL UNDER

14  SECTION 4.

15          THE EXCERPTS THAT WERE -- FIRST OF ALL, I WILL SAY

16  THAT I WAS ALSO TROUBLED BY THE -- I GAVE FIVE -- GAVE YOU ALL

17  LEAVE TO FILE A SELF-CONTAINING SUPPLEMENTAL IN FIVE PAGES, AND

18  I WAS NOT UNDER THE IMPRESSION AT ALL IN READING THESE PAPERS

19  THAT YOU ALL HAD INDEED RESTRICTED YOURSELVES TO THE FIVE

20  PAGES, BUT BY INCORPORATING BY REFERENCE AND THEN ARGUING ABOUT

21  DOCUMENTS THAT WERE NOT PART OF THE FIVE PAGES, AND I

22  INTERPRETED THAT AS BEING A DIRECT ATTEMPT TO CIRCUMVENT THE

23  COURT'S GRANTING YOU FIVE PAGES.  AND I FOUND THAT TROUBLING.

24          IN ANY EVENT, READ IN CONTEXT, THE EXCERPTS THAT

25  WERE PROVIDED TO THE COURT DO NOT DEMONSTRATE DEFENDANTS AGREED

5

1    TO PROSPECTIVELY COMPEL FUTURE PLAINTIFFS TO ARBITRATION.  MUCH

2    OF THE QUOTED TEXT PERTAINS TO 36 ADDITIONAL SSR'S FROM STATES

3    WHICH QUOTE "BECAUSE OF TIMING OF WHEN THEIR CONSENTS TO SUE

4    WERE FILED" WERE NOT ADDRESSED IN THE MOTION TO COMPEL

5    ARBITRATION.  BECAUSE THOSE STATES WERE NOT ADDRESSED IN THE

6    COURT'S APRIL 5TH ORDER, THE PARTIES AGREED TO MEET AND CONFER

7    AS TO WHETHER THE COURT WOULD OR WOULD NOT ENFORCE THE

8    ARBITRATION AGREEMENT IN THOSE STATES.

9         THAT IS NOT A STATEMENT AS TO FUTURE TREATMENT OF

10   PLAINTIFFS THAT HAVE NOT YET OPTED IN, BUT A WAY IN WHICH THE

11   PARTIES CAN AGREE AS TO WHICH PLAINTIFFS MUST PROCEED IN

12   ARBITRATION OR IN COURT, WITHOUT THIS COURT'S RULING ON THE

13   MOTION.

14        THE CITING OF THE LANGUAGE IN THE APRIL 23RD ORDER

15   IN TERMS OF THE MOTION TO COMPEL ALSO IS NOT AS PLAINTIFFS

16   APPARENTLY HAVE INTERPRETED IT.  THE LANGUAGE BASICALLY IS THAT

17   THE PARTIES WOULD BE, ONCE THEY RECEIVED THE NOTICE, THE THRUST

18   OF THE ORDER WAS TO INSTRUCT THE PARTIES AS TO THE FORM AND

19   PROCEDURE OF MAILING THE FACILITATED NOTICE, AND THAT THEY

20   WOULD BE COMPELLED IN THE SENSE OF THE INDIVIDUALS BEING

21   LEGALLY REQUIRED TO ARBITRATE IN ACCORDANCE WITH THE TERMS OF

22   WHATEVER AGREEMENTS THEY HAD AT THE TIME THAT GOVERN.

23        AND, FINALLY, THE JUNE 9TH, 2004 ORDER COMPELLING

24   ARBITRATION OF OPT-IN PLAINTIFFS FROM ALABAMA, FLORIDA,

25   KENTUCKY, NEVADA AND OHIO BASICALLY WAS PART OF AN AGREEMENT

6

1   THAT YOU ALL -- YOU CAME UP WITH.  AND THERE IS NOTHING IN THE

2   WORDING OF THAT ORDER THAT SUGGESTS THAT IT APPLIES TO ANY

3   PLAINTIFF OTHER THAN THOSE WHO SUBMITTED CONSENT-TO-SUE FORMS

4   AS OF THAT DATE AND ARE FROM THOSE STATES OF ALABAMA, FLORIDA,

5   KENTUCKY, NEVADA AND OHIO.

6              THE STIPULATION AND ORDER IS SPECIFICALLY TIED TO

7   BRING OF THE MOTION TO COMPEL.  THE STIPULATION STATES QUOTE,

8   "IF CINTAS FILED A MOTION TO COMPEL ARBITRATION OF THE CLAIMS

9   OF CINTAS EMPLOYEES FROM", AND GIVES THE STATES AND GOES ON.

10  AND THEN THE COURT HELD THAT IT WAS COMPELLING ARBITRATION

11  SUBJECT TO QUOTE "ALL RIGHTS OF JUDICIAL REVIEW, APPEAL AND

12  CHALLENGE THAT THE PARTIES WOULD HAVE IF THEY HAD FULLY

13  LITIGATED SAID MOTION TO COMPEL ARBITRATION OF CLAIMS FILED BY

14  CINTAS EMPLOYEES."

15             I SEE THAT AS BEING A SIGNIFICANT DISTINCTION.  IN

16  GENERAL, MY READING OF PLAINTIFFS' PAPERS IS THAT PLAINTIFFS

17  ARE BASICALLY IGNORING THE RATIONALE BEHIND SECTION 4.  WHERE A

18  PLAINTIFF WHO IS OTHERWISE SUBJECT TO AN ENFORCEABLE

19  ARBITRATION AGREEMENT INSTEAD FILES A COMPLAINT AGAINST A

20  DEFENDANT IN COURT, SECTION 4 EMPOWERS THE DEFENDANT TO BRING A

21  MOTION TO COMPEL ARBITRATION OF THAT PLAINTIFF'S CLAIM.

22             THERE IS NO SUCH DISPUTE HERE.  THE PARTIES AGREE

23  THAT 1700 PLAINTIFFS ARE SUBJECT TO ENFORCEABLE ARBITRATION

24  AGREEMENTS.  IF THOSE 1700 PLAINTIFFS WISH TO PURSUE THEIR

25  CLAIMS AGAINST DEFENDANT, THEY MUST, THEREFORE, PROCEED IN

7

1    ARBITRATION. AS A PRACTICAL MATTER, WHY SHOULD THIS COURT

2    COMPEL ARBITRATION OF PLAINTIFFS WHEN THEY KNOW AND THEY AGREE

3    THEY ARE SUBJECT TO ARBITRATION. I DON'T UNDERSTAND WHY IT'S

4    EVEN NECESSARY WHEN THERE IS NO DISPUTE IN THAT RESPECT.

5            BUT, ANYWAY, THERE IS A TOTAL ABSENCE OF AUTHORITY

6    SUPPORTING PLAINTIFFS' POSITION, AND THE FACTS ARE NOT EVEN

7    SUPPORTING IT. THE DEFENDANTS' MOTION TO STAY IS GRANTED. AND

8    TO THE EXTENT THAT PLAINTIFFS HAVE A MOTION TO COMPEL OR TO

9    HAVE THE COURT FIND THAT IT MUST ALSO SIMULTANEOUSLY GRANT A

10   MOTION TO COMPEL WITH A MOTION TO STAY, THAT IS DENIED.

11           NOW, THE MOTION CONCERNING COMPLIANCE, I HAD A

12   COUPLE OF QUESTIONS. THE FIRST QUESTION I HAD WAS WHETHER

13   THERE WAS ANY DISPUTE THAT THE IRREPARABLE HARM CLAUSE APPEARS

14   IN ALL YOUR AGREEMENTS WITH PLAINTIFFS.

15           MR. DOSKER: YOUR HONOR, WE DOUBLE-CHECKED THAT, AND

16   WE BELIEVE THAT IT DOES APPEAR IN THEM ALL.

17           THE COURT: IT DOES. OKAY.

18           MR. DOSKER: WE OBSERVE, YOUR HONOR, TO ANSWER THE

19   RELATED QUESTION YOUR HONOR HAD, WE THINK THAT, YES, YOUR HONOR

20   WAS RIGHT THAT THE BUSINESS PURPOSE FOR THE CLAUSE APPEARS IN

21   THE FACE OF IT, AND THAT IS THAT THE COURTS, OF COURSE, ARE

22   ALWAYS OPEN. AN ARBITRATOR DOESN'T GET SELECTED FOR A MONTH OR

23   MAYBE TWO OR THREE INTO A CASE --

24           THE COURT: RIGHT.

25           MR. DOSKER: -- SO IF A PARTY NEEDS A TRO, TEMPORARY

25

1    YOUR HONOR.

2         THE COURT:  OKAY.

3         I ALSO WONDER, EVEN THOUGH I HAVE ALREADY DENIED THE

4    MOTION TO COMPEL, WHY DO YOU ALL FEEL IT NECESSARY TO FILE FOR

5    A MOTION TO COMPEL ARBITRATION OF 1700 PEOPLE THAT YOU ALL

6    AGREE MUST ARBITRATE?  WHY IS ALL THIS ACTIVITY NECESSARY?

7         MR. RUBIN:  WHY IS IT IMPORTANT?

8         THE COURT:  TO HAVE A MOTION TO COMPEL PEOPLE WHO

9    HAVE KNOWLEDGE THAT THEY HAVE TO ARBITRATE.

10        MR. RUBIN:  BECAUSE IF YOUR HONOR COMPELS

11   ARBITRATION --

12        THE COURT:  I MEAN, OTHER THAN YOUR STRATEGIC

13   WANTING TO HAVE IT IN ONE PLACE; IS THAT IT?  YOU WANT ME TO

14   PUT THEM ALL IN ONE PLACE, BUT --

15        MR. PEPICH:  THERE IS A REASON, YOUR HONOR --

16        THE COURT:  THE THING THAT BOTHERS ME IS THIS IS A

17   LOT OF WORK THAT IS UNNECESSARY BECAUSE YOU ALL DON'T HAVE ANY

18   DISPUTE AS TO WHETHER THEY HAVE TO ARBITRATE, BUT YOU COME IN

19   HERE ARGUING OVER WHETHER I HAVE TO COMPEL IT, AND I REALLY

20   WOULD LIKE YOU TO ANSWER DIRECTLY MY QUESTION --

21        MR. PEPICH:  I WILL DO THAT, YOUR HONOR.

22        THE COURT:  -- WHY ARE YOU ASKING ME TO COMPEL

23   ARBITRATION FOR 1700 PEOPLE THAT THERE IS NO DISPUTE MUST

24   ARBITRATE OTHER THAN A STRATEGIC DESIRE TO HAVE THEM IN ONE

25   LOCATION, WHICH I DON'T CONSIDER THE COURT OBJECTIVE HERE.

26

1          MR. PEPICH:  BECAUSE, YOUR HONOR, WE WOULD NOT AGREE
2   WITH CINTAS THAT THESE PEOPLE HAVE TO ARBITRATE.
3          THE COURT:  I THOUGHT YOU ALREADY HAVE.
4          MR. PEPICH:  WE HAVE ONLY AGREED TO THAT BECAUSE WE
5   EARLIER STIPULATED THAT THE PROVISIONS OF THE APRIL 5 ORDER
6   COMPELLING THE FIRST 55 PEOPLE TO ARBITRATE WOULD EXTEND OUT TO
7   FUTURE PEOPLE.  BUT WE DON'T VOLUNTARILY --
8          THE COURT:  THAT'S NOT IN THERE.  I DIDN'T SEE
9   ANYTHING SUPPORTING THAT.
10         MR. PEPICH:  I APOLOGIZE, YOUR HONOR.  IT ACTUALLY
11  GOES ALL THE WAY BACK TO THE JOINT CMC STATEMENT THAT WAS
12  SUBMITTED IN APRIL 23 OF 2004, IN WHICH THE PARTIES -- CINTAS
13  CAME TO US AFTER IT WON THE MOTION TO COMPEL ARBITRATION AND
14  SAID, LOOK, WE DON'T WANT TO HAVE TO CONTINUE TO BRING MOTIONS
15  TO COMPEL ARBITRATION, WILL YOU AGREE THAT WE CAN EXTEND THE
16  PROVISIONS OF THE APRIL 5 ORDER TO THE NEW OPT-INS.
17         MR. DOSKER:  OBJECTION, YOUR HONOR.  NO SUCH
18  STATEMENT WAS MADE.
19         THE COURT:  I AM NOT GOING TO GET INTO --
20         MR. PEPICH:  I AM JUST TELLING YOU THAT'S THE REASON
21  WHY WE DON'T AGREE THAT THESE PEOPLE HAVE TO ARBITRATE.  WE
22  ONLY AGREE THAT THE APRIL 5TH ORDER AND THE REASONING OF THE
23  COURT'S ORDER EXTENDS TO THEM, AND IF CINTAS WERE TO BRING A
24  MOTION --
25         MR. RUBIN:  THERE IS A NONSTRATEGIC PRACTICAL

DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

1    REASON, YOUR HONOR.

2          THE COURT:  BECAUSE WHAT I HAVE IS THE PARTIES AGREE

3    TO 1700 PLAINTIFFS ARE SUBJECT TO ENFORCEABLE ARBITRATION

4    AGREEMENTS.

5          MR. RUBIN:  THAT'S SUBJECT -- BASED ON YOUR

6    ANALYSIS, WHICH WE HAVE DISPUTED, BUT WE RECOGNIZE IS YOUR

7    ANALYSIS.

8          THE COURT:  RIGHT.

9          MR. RUBIN:  THE REAL REASON AT THIS POINT THAT WE

10   ARE ARGUING OVER THIS MOTION TO COMPEL IS BECAUSE IF CINTAS

11   OPPOSES ALL PLAINTIFFS ARBITRATING IN ONE PLACE, AND TRIES TO

12   SPLIT THESE 700 (SIC) PEOPLE THROUGHOUT THE COUNTRY --

13         THE COURT:  1700 PEOPLE.

14         MR. RUBIN:  1700 PEOPLE THROUGHOUT THE COUNTRY --

15         THE COURT:  WHAT DO YOU MEAN "TRY TO SPLIT"?  THESE

16   PEOPLE HAVE AGREEMENTS.  I DON'T UNDERSTAND THIS.

17         PEOPLE -- AND THE ONES THAT ARE UNENFORCEABLE ARE

18   UNENFORCEABLE.  BUT THE ONES THAT ARE ENFORCEABLE, THESE ARE

19   ENFORCEABLE AGREEMENTS THAT THEY HAVE AGREED TO.

20         SO WHAT DO YOU MEAN THEY ARE TRYING TO SPLIT THEM?

21   THESE ARE AGREEMENTS THAT THEY HAVE AGREED TO.  SO WHAT YOU ARE

22   ASKING ME IS TO CONSIDER ENGAGING IN AN ANALYSIS THAT IS

23   DESIGNED TO OR LIKELY TO RESULT IN PROVIDING A RELIEF THAT THEY

24   HAVE NOT AGREED TO.

25         MR. RUBIN:  IT'S RELIEF THAT IS MANDATED BY STATUTE,

28

1    BY SECTION 4, AND SINCE YOU HAVE RETAINED JURISDICTION OVER

2    EACH OF THESE 1700 PEOPLE'S ERISA CLAIMS --

3             THE COURT:  NO.  NEVER MIND.  I THOUGHT YOU WERE

4    GOING TO ANSWER THE QUESTION, BUT I DON'T THINK YOU ARE.

5             LET'S GET TO THE NEXT ISSUE.  WITH RESPECT TO THE --

6    OKAY.

7             SO I INDICATED AT THE LAST HEARING THAT I WAS

8    INCLINED TO DENY PLAINTIFFS' MOTION THAT THE ARBITRATION

9    AGREEMENT IS UNENFORCEABLE UNDER LAWS OF ARIZONA, LOUISIANA AND

10   PENNSYLVANIA, AND I HAVEN'T HEARD ANYTHING THAT WOULD SUGGEST

11   OTHERWISE.  SO --

12            MR. RUBIN:  YOUR HONOR, WE HAVEN'T ARGUED THAT, AND

13   I HAVE JUST ONE BRIEF POINT I WOULD MAKE ON IT.

14            THE COURT:  OKAY.

15            MR. RUBIN:  THE -- WHAT YOU EXPLAINED IN YOUR

16   TENTATIVE IS THAT YOU LOOKED QUITE COMPREHENSIVELY AT THE

17   VARIOUS CASES, AND YOU CONCLUDED THAT THE BETTER REASONED

18   CASES -- AND LET'S START WITH LOUISIANA.  IN LOUISIANA, YOU

19   FOUND THAT THE BETTER REASONED CASE WAS A LOUISIANA FEDERAL

20   COURT DECISION.  THEREFORE, YOU CONCLUDED, APPLYING THE

21   REASONING OF THAT CASE, IN CONTRAST TO THE LOUISIANA STATE

22   CASES THAT WE CITED, LOUISIANA IS NOT LIKE ARKANSAS LAW.

23            SO THE POINT I AM MAKING IS SIMPLY THIS:  UNDER

24   SECTION 2 OF THE FEDERAL ARBITRATION ACT AND UNDER YOUR

25   APRIL 5TH, 2004 ORDER, THE ONLY ISSUE IS WHAT DOES THE STATE

<u>CERTIFICATE OF REPORTER</u>

I, DIANE E. SKILLMAN, OFFICIAL REPORTER FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN C-03-1180 SBA, PAUL VELIZ, ET AL. V. CINTAS CORPORATION, ET AL., PAGES NUMBERED 1 THROUGH 87, WERE REPORTED BY ME, A CERTIFIED SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AT THE TIME OF FILING.

**THE INTEGRITY OF THE REPORTER'S CERTIFICATION OF SAID TRANSCRIPT MAY BE VOID UPON REMOVAL FROM THE COURT FILE.**

*Diane E. Skillman*

DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930**

# Exhibit 5

1
2
3
4

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

(Oakland Division)

| | |
|---|---|
| PAUL VELIZ, et al, On behalf of Themselves and All Others Similarly Situated.<br><br>        Plaintiffs,<br><br>   vs.<br><br>CINTAS CORPORATION, an Ohio corporation; PLAN ADMINISTRATOR for the Cintas Partners' Plan; and DOES 1-25, inclusive,<br><br>        Defendants. | Case No. 03-01180 (SBA)<br><br>CLASS ACTION<br><br>ORDER<br><br>[Docket Nos. 433, 445, 451 & 460] |

## I.    INTRODUCTION

The following motions are before this Court:  (1) Defendant Cintas Corporation's ("Cintas") Motion to Stay Proceedings, Pursuant to 9 U.S.C. § 3, as to Certain Opt-in Plaintiffs Who are not Subject to the Court's April 5, 2004 Order [Docket No. 445],  (2) Defendants' Motion to Dismiss as to Certain Opt-In Plaintiffs for Improper Venue or, in the Alternative, to Transfer for Improper Venue or, in the Alternative, to Transfer in the Interests of Justice and Convenience [Docket No. 433],  (3) Plaintiffs' "Motion in Compliance with Court Orders Regarding Which Plaintiffs Must Arbitrate and Which Plaintiffs May Litigate Their Non-ERISA Overtime Wage Claims " [Docket No. 451], and  (4) Plaintiffs' Motion for Leave to File Second Amended Complaint [Docket No. 460].  Having read and considered the arguments presented by the parties in support of and in opposition to those motions in the papers submitted to the Court, and having heard and considered the arguments presented by counsel at the October 18, 2005 and October 27, 2005 hearings on those motions, the Court hereby enters the following Order, for the reasons stated herein and for the reasons as were more fully stated by the Court on the record at the hearings on October 18, 2005 and October 27, 2005.

II.    **CINTAS' MOTION TO STAY PROCEEDINGS, PURSUANT TO 9 U.S.C. § 3, AS TO CERTAIN OPT-IN PLAINTIFFS WHO ARE NOT SUBJECT TO THE COURT'S APRIL 5, 2004 ORDER**

Since Cintas filed its Motion to Compel Arbitration (Docket No. 45) as to certain plaintiffs in August 2003, approximately 2,400 persons have "opted in" to this case by filing consent-to-sue forms. Many of them signed individual employment agreements with arbitration terms. The parties have agreed that the plaintiffs to whom Cintas' Motion to Stay was directed consist of the persons listed on Exhibits E, F, G, H, I and J to the Joint Statement of the Parties in Response to the Court's September 27, 2005 Order [Docket No. 501]. A copy of those lists is attached as an Appendix hereto. The 1,884 persons on the lists attached as an Appendix hereto are referred to in this Order as the "Stay Motion Plaintiffs".[1]

This Court has held that none of the Stay Motion Plaintiffs is subject to Cintas' original Motion to Compel (and thus have not been compelled by this Court to arbitrate their claims). May 4, 2005 Order at 13 [Docket No. 426].

Cintas has now moved pursuant to Section 3 of the Federal Arbitration Act ("FAA") to stay further litigation of the claims asserted in this action by each of the Stay Motion Plaintiffs until "arbitration has been had in accordance with the terms of the agreement" into which each of the Stay Motion Plaintiffs entered. Under the FAA, if the Court determines that a party's claims are arbitrable, it must stay the litigation of those claims upon a party's request. 9 U.S.C. § 3.

Plaintiffs have asserted that the Court is also required to compel arbitration of the claims of the Stay Motion Plaintiffs on the theory advanced by plaintiffs -- that Cintas waived its statutory right under the FAA to move in this Court only to stay or should be estopped from arguing that the Stay Motion Plaintiffs should not be compelled by this Court based on prior statements to this Court. The Court has reviewed the parties' submissions and finds no authority, and plaintiffs have cited no case, where a court has compelled arbitration of plaintiffs' claims in

---

[1] The parties agreed at the hearing that, by virtue of this Court's Order of April 5, 2004 and the Stipulation and Order of June 9, 2004, all opt-in plaintiffs with arbitrable overtime claims, who had filed consents to sue prior to June 9, 2004 would be compelled to arbitrate their claims. Therefore, the Stay Motion Plaintiffs are those plaintiffs who filed consent-to-sue forms and opted into the litigation after June 9, 2004.

1    the absence of a motion or petition to compel arbitration under 9 U.S.C. § 4. Nor have plaintiffs

2    cited any authority where a court has found that a defendant has waived its rights to seek a stay of

3    proceedings pursuant to 9 U.S.C. § 3, or where a court found judicial estoppel preventing a

4    defendant from electing to seek a stay pursuant to 9 U.S.C. § 3, while at the same time electing

5    not to make a motion or petition to compel under 9 U.S.C. § 4. Nor have plaintiffs put forward

6    any facts that support their assertions. Based upon the parties' submissions and for the reasons

7    more fully stated on the record, Cintas' Motion is GRANTED and the Court hereby STAYS the

8    claims of each of the Stay Motion Plaintiffs[2] until arbitration of such Stay Motion Plaintiff's

9    FLSA and state law claims (if any) "has been had in accordance with the terms of the agreement"

10   into which such person entered. 9 U.S.C. § 3.

11

12   **III.    CINTAS' MOTION TO DISMISS AS TO CERTAIN OPT-IN PLAINTIFFS FOR**
         **IMPROPER VENUE OR, IN THE ALTERNATIVE, TO TRANSFER FOR**
13       **IMPROPER VENUE OR, IN THE ALTERNATIVE, TO TRANSFER IN THE**
         **INTERESTS OF JUSTICE AND CONVENIENCE**

14           Cintas moved to dismiss or transfer venue with respect to 36 opt-in plaintiffs who

15   executed employment agreements with Cintas or a predecessor company that contain forum

16   selection clauses ("Venue Motion Plaintiffs"). Cintas moved to dismiss the claims of the Venue

17   Motion Plaintiffs pursuant to Federal Rule of Civil Procedure 12(b)(3) or, alternatively, dismiss

18   or transfer venue either pursuant to 28 U.S.C. §1406(a) or §1404(a).

19           For the reasons more fully stated on the record, the Court finds that Cintas has waived any

20   right to move to dismiss these plaintiffs' claims by failing to timely raise any objection to venue.

21   28 U.S.C. § 1406(b). In its Answer to Plaintiffs' First Amended Complaint, filed July 9, 2004, at

22   a time when several venue plaintiffs had already opted into the litigation, Cintas admitted that

23   venue in this Court was proper. Moreover, Cintas failed to timely assert improper venue prior to

24   the instant motion without any credible justification for its failure and indicated by its course of

25

26   [2] This portion of the Court's Order does not apply to Plaintiffs Thomas Bradley of Missouri,
     Louise Bruck of Ohio, and Andrew M. Olson of California. These three plaintiffs are addressed
27   separately in Section IV below. Furthermore, it does not apply to those opt-in plaintiffs that had
     filed consents to sue by June 9, 2004, pursuant to the Stipulation and Order of June 9, 2004.

28

1    conduct over the two and a half years this matter has been in litigation that it had no objection to

2    venue. Therefore, the Court DENIES Cintas' requests under Federal Rule of Civil Procedure

3    12(b)(3) and under 28 U.S.C. § 1406(a). Further, after hearing, discussing and considering the

4    parties' arguments addressing the numerous factors that the Court is to consider in evaluating a 28

5    U.S.C. § 1404(a) motion, and for the reasons stated more fully on the record, the Court finds that

6    Cintas has not met its burden of demonstrating that a transfer of the action as to these plaintiffs

7    will enhance the convenience of the parties and witnesses, and serve the interests of justice. IT IS

8    HEREBY ORDERED that Cintas' Motion to Dismiss for Improper Venue Pursuant to Federal

9    Rule of Civil Procedure 12(b)(3), or to transfer the claims pursuant to 28 U.S.C. § 1406(a) or 28

10   U.S.C. § 1404(a) is DENIED.

11

12   **IV.    PLAINTIFFS' "MOTION IN COMPLIANCE WITH COURT ORDERS
            REGARDING WHICH PLAINTIFFS MUST ARBITRATE AND WHICH
13          PLAINTIFFS MAY LITIGATE THEIR NON-ERISA OVERTIME WAGE
            CLAIMS"**

14        Plaintiffs' Motion in Compliance with Court Orders Regarding Which Plaintiffs Must

15   Arbitrate and Which Plaintiffs May Litigate Their Non-ERISA Overtime Wage Claims seeks the

16   following relief: (1) an Order that the arbitration agreements between Cintas and opt-in plaintiffs

17   from Arizona, Louisiana and Pennsylvania are unenforceable under state law; (2) that the

18   arbitration agreements between Cintas and six opt-in plaintiffs -- Thomas Bradley, Louise Bruck,

19   Allan J. Gumbs, Douglas A. Johnson, Andrew M. Olson, and Clarence E. Stewart III -- are

20   unenforceable on the ground that they are procedurally unconscionable; and (3) that the Court

21   should deny Cintas' Motion to Stay Proceedings, Pursuant to 9 U.S.C. §3 as to Certain Opt-In

22   Plaintiffs Who Are Not Subject to the Court's April 5, 2004 Order [Docket No. 445]. Because

23   the Court has granted Cintas' Motion to Stay, the Court does not further consider here plaintiffs'

24   request in that regard.[3]

25   _____

26   [3] Plaintiffs' counsel also challenged the enforceability of agreements signed by two individuals,
     David Gentry and Christopher Lackey. The Court finds that Cintas' evidence, showing that
     Messrs. Gentry and Lackey last worked for Cintas in Georgia, is persuasive. While plaintiffs'
27   counsel contends that those two employees worked in Tennessee, the only admissible evidence
     offered on the point is the Christerson Declaration [Docket No. 431 at Exhibit A] showing that
28   the last place worked for these individuals was in Georgia. The Court finds that David Gentry

4

1          1.    The Laws of Arizona, Louisiana and Pennsylvania Do Not Render the
                   Arbitration Agreements Unconscionable

2

3          The parties dispute whether Cintas' arbitration agreements are enforceable under the laws

4      of Arizona, Louisiana, and Pennsylvania. For the reasons stated more fully on the record, Cintas'

5      arbitration agreements are enforceable under the laws of those three states because those laws do

6      not require bilaterality of promises to arbitrate. Even if Pennsylvania law requires such

7      bilaterality, absent a showing of "business realities" that would justify non-mutuality of promises,

8      Cintas has demonstrated sufficient business need for access to the courts to litigate claims against

9      employees who breach their confidentiality and non-compete covenants. *Lytle v. CitiFinancial*

10     *Servs., Inc.*, 810 A.2d 643 (Pa .Super. 2002). Therefore, opt-in plaintiffs who executed arbitration

11     agreements and who last worked for Cintas in Arizona, Louisiana, and Pennsylvania must

12     arbitrate their overtime claims.

13                   a.     Arizona

14         Under *Gates v. Ariz. Brewing Co.*, 95 P.2d 49, 52 (1939), mutuality exists where the

15     parties have exchanged mutual promises. Arizona courts do not require a special promise to be

16     directed to a particular obligation. *See Carroll v. Lee*, 712 P.2d 923, 926 (Ariz. Sup. Ct. 1986).

17     The Court further notes that plaintiffs have not directed the Court to any authorities suggesting

18     that bilaterality is a factor that must be considered under Arizona law. The Court finds that the

19     arbitration agreements between Cintas and the plaintiffs from Arizona are enforceable under state

20     law and under 9 U.S.C. § 2.

21                   b.     Louisiana

22         Louisiana courts will not uphold an arbitration agreement where a promise is illusory or

23     where there is no mutuality of obligation between the parties. Plaintiffs do not contend the

24     arbitration agreement here is illusory. While Cintas reserved the right to pursue in court certain

25     claims, that reservation does not negate their obligation to arbitrate claims brought by plaintiffs.

26     It is relevant to note that in *Gill v. Jim Walter Homes of La., Inc.*, 187 F.Supp.2d 618 (W.D. La.

27     and Christopher Lackey are subject to individual employment agreements with Georgia as the
governing state law.

28

                                                          5

1    2002), where, as here, only one party reserved the right to pursue certain claims in court, the court

2    found there was mutuality of obligation.  Given the presumption of arbitrability that the Louisiana

3    Supreme Court has imposed, and the adoption of a liberal policy favoring arbitration, *see*

4    *Aguillard v. Auction Mgmt. Corp.*, 908 So.2d 1 (2005), the Court finds the arbitration agreement

5    enforceable under Louisiana law.

6

7            c.    Pennsylvania

8            Plaintiffs argue that the Court should hold agreements between Cintas and plaintiffs from

9    Pennsylvania to be unenforceable as lacking mutuality, relying primarily on *Lytle v. CitiFinancial*

10   *Servs., Inc.*, 810 A.2d 643 (Pa. Super. Ct. 2002).  According to *Lytle*, the party that retained the

11   right to litigate in court must have a justification of business realities which compel the inclusion

12   of the right to litigate in the agreement; otherwise the agreement is void as unconscionable.  *Id.* at

13   665.  Plaintiffs do not dispute that there are business realities that would justify the inclusion of

14   the right to litigate in the Cintas agreements with respect to conduct identified under the

15   irreparable harm provision.  Thus, with respect to Cintas reserving for itself the right to go into

16   court to seek an injunction, for the purpose of that conduct that falls within the irreparable harm

17   clause, under *Lytle*, this Court finds that even assuming that *Lytle* were the only applicable state

18   law authority, the standard has been met.  The Court also finds that the weight of federal

19   authorities supports this conclusion.  *See, e.g., Aames Funding Corp. v. Sharpe*, No. 04-4337,

20   2004 WL 2418284, * 5 (E.D. Pa. Oct. 28, 2004) (citing *Harris v. Green Tree Fin. Corp.*, 183

21   F.3d 173, 183 (3d Cir. 1999), *vacated on other grounds*, 2004 WL 2980407 (E.D. Pa. Dec. 22,

22   2004); *In re Brown*, 311 B.R. 702, 709-10 (Bankr. E.D. Pa. 2004) (finding *Lytle* to be suspect

23   based on *Harris and Blair v. Scott Specialty Gases*, 283 F.3d 595, 603 (3d Cir. 2002)); *Choice v.*

24   *Option One Mortg. Corp.*, No. 02-6626, 2003 U.S. Dist. LEXIS 9714 (E.D. Pa. May 13, 2003

25   (same)); *Montgomery v. Decision One Fin. Network Inc.*, No. 04-4551, 2005 U.S. Dist. LEXIS

26   3031, *6-9 (E.D. Pa. Mar. 1, 2005).

27           The Court finds that the arbitration agreements between Cintas and plaintiffs from

28   Pennsylvania are enforceable under state law and 9 U.S.C. § 2.

1

2    2.  Six Plaintiffs' Declarations Regarding Procedural Unconscionability.

3

4   Plaintiffs contend that this Court should not enforce arbitration agreements between six

5 individual plaintiffs and Cintas because they were executed under procedurally unconscionable

6 circumstances. As more fully stated on the record, the Court has analyzed each of these

7 plaintiffs' declarations to determine whether they were executed under conditions of procedural

8 unconscionability as set forth in the laws of the states where they worked for Cintas. As to the six

9 plaintiffs, the Court finds as follows:

10      a.  *Thomas Bradley*

11   Under Missouri law, procedural unconscionability focuses on whether there is "high

12 pressure exerted on the parties, fine print of the contract, misrepresentation, or unequal bargaining

13 position." *Funding Systems Leasing Corp., v. King Louie Int'l, Inc.*, 597 S.W.2d 624, 634 (Mo.

14 Ct. App. 1979). Mr. Bradley, a Missouri plaintiff, declares that when he was shown his

15 employment agreement, he asked to take it home for review, but was not permitted to do so. He

16 also declares he had no opportunity to read the agreement and was pressured into signing it. For

17 the reasons stated at the hearing, and based on his declaration, the Court finds procedural

18 unconscionability rendering Mr. Bradley's arbitration agreement unenforceable.

19      b.  *Louise Bruck*

20   Under Ohio law, no formation of an agreement occurs when no voluntary agreement

21 existed. The Ohio courts consider the bargaining positions of the parties, whether the terms of the

22 agreement were explained to the weaker party, and whether the party claiming the provision is

23 unconscionable was represented by counsel. *Porpora v. Gatliff Bldg. Co.*, 828 N.E.2d 1081, 1084

24 (Oh. Ct. App. 2005). Ms. Bruck declares that she was not permitted to take the agreement home

25 or to have an attorney review it prior to her signing it. She declares that she was instructed to sign

26 the agreement immediately. For the reasons stated at the hearing, and based on her declaration,

27 the Court finds procedural unconscionability rendering Ms. Bruck's arbitration agreement

28 unenforceable.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

      c.    *Allan Jason Gumbs*

Under Maryland law, the courts' analyses of procedural unconscionability focuses on "whether the imposed-upon party had meaningful choice about whether and how to enter the transaction." *Walther v. Sovereign Bank*, 386 Md. 412, 426 (2005). Mr. Gumbs declares that he requested to take home "some materials", but his request was denied. Mr. Gumbs neglects to identify what "materials" he requested to take home or, more importantly, whether they included the employment agreement. He does not indicate that he was rushed in his review of the agreement or that he raised any issues or concerns with anyone, such that he was denied a meaningful choice about whether to execute the agreement. For the reasons stated at the hearing, and based on his declaration, the Court finds no procedural unconscionability under Maryland law.

      d.    *Douglas A. Johnson*

Under Kansas law, the state Supreme Court has identified the following factors to aid in the determination of unconscionability: (1) the use of printed form or boilerplate contracts drawn skillfully by the party in the strongest economic position, which establish industry wide standards offered on a take it or leave it basis to the party in a weaker economic position; (2) a significant cost-price disparity or excessive price; (3) a denial of basic rights and remedies to a buyer of consumer goods; (4) the inclusion of penalty clauses; (5) the circumstances surrounding the execution of the contract, including its commercial setting, its purpose and actual effect; (6) the hiding of clauses which are disadvantageous to one party in a mass of fine print trivia or in places which are inconspicuous to the party signing the contract; (7) phrasing clauses in language that is incomprehensible to a layman or that divert his attention from the problems raised by them or the rights given up through them; (8) an overall imbalance in the obligations and rights imposed by the bargain; (9) exploitation of the underprivileged, unsophisticated, uneducated and the illiterate; and (10) inequality of bargaining or economic power. *Willie v. Southwestern Bell Tel. Co.*, 219 Kan. 755, 758-59 (1976). Mr. Johnson declares that he requested to take the agreement home with him, but he does not specify that the request was denied. Moreover, he states that he read the agreement, but not thoroughly. It appears that Mr. Johnson was afforded an opportunity to

1   review the contract and may or may not have been denied the opportunity to review it at home.

2   While he asserts a lack of knowledge of the arbitration agreement provision, that failure can be

3   laid at his feet as he admits he failed to read the agreement thoroughly.  For the reasons stated at

4   the hearing, and based on his declaration, the Court finds no procedural unconscionability under

5   Kansas law.

6                    e.    *Andrew M. Olson*

7          Under California law, the courts have determined procedural unconscionability

8   encompasses the contract formation focusing on the "oppression or surprise due to unequal

9   bargaining power." *Little v. Auto Stiegler, Inc.*, 29 Cal.4th 1064, 1071 (2003).   Mr. Olson

10  declares that when he requested to review the employment agreement at home, he was told he had

11  to sign it immediately.  Further, he was specifically advised that there was nothing important in

12  the document.  For the reasons stated at the hearing, and based on his declaration, the Court finds

13  procedural unconscionability rendering Mr. Olson's arbitration agreement unenforceable.

14                   f.    *Clarence E. Stewart III*

15         The same California state law standard expressed above with respect to Mr. Olson applies

16  to Mr. Stewart as well.  Given the information contained in his declaration, the Court is unable to

17  assess the fairness of his execution of the agreement in context.  Although Mr. Stewart declares

18  that he was given the agreement to sign before leaving on the day the agreement was presented,

19  he does not indicate how much time he had to review his employment agreement.  Moreover, Mr.

20  Stewart had previously signed, without challenge, two other employment agreements containing

21  identical arbitration provisions.  No oppression or surprise has been shown.  For the reasons

22  stated at the hearing, and based upon his declaration, the Court finds no procedural

23  unconscionability under California law.

24         CONCLUSION

25         IT IS HEREBY ORDERED that plaintiffs' Motion [Docket No. 451] is DENIED in part

26  such that (1) the arbitration agreements between Cintas and opt-in plaintiffs from Arizona,

27  Louisiana and Pennsylvania are enforceable under the respective state laws and 9 U.S.C. § 2, and

28  (2) the arbitration agreements between Cintas and opt-in plaintiffs Allan J. Gumbs, Douglas A.

1    Johnson, and Clarence E. Stewart III are valid and enforceable under applicable state law and 9

2    U.S.C. § 2. Plaintiffs' Motion [Docket No. 451] is GRANTED in part such that the arbitration

3    agreements between Cintas and opt-in plaintiffs Thomas Bradley, Louise Bruck, and Andrew M.

4    Olson are held to be unenforceable on the ground that they are procedurally unconscionable under

5    applicable state law.

6

7    V.    PLAINTIFFS' MOTION FOR LEAVE TO FILE THEIR PROPOSED SECOND
           AMENDED COMPLAINT

8
           Plaintiffs have moved for leave to file a proposed Second Amended Complaint adding
9
     state-law overtime claims on behalf of plaintiffs from an additional
10
           15 states: Arkansas, Kansas, Kentucky, Maine, Maryland, Massachusetts, Minnesota,
11
     New Mexico, Ohio, Oregon, Pennsylvania, Rhode Island, Washington, West Virginia and
12
     Wisconsin. [Docket No. 460 at 3:1-19]. The Motion "also propose[d] to add class
13
     representatives for each state subclass on the additional overtime claims, see ¶¶ 9-10, 20-29, 34-
14
     35, 42, 44-54 [of the proposed Second Amended Complaint] and to name these same individuals
15
     as additional representatives of the national FLSA class. See ¶149" [of the proposed Second
16
     Amended Complaint]. [Docket No. 460 at 3:20-23.]
17

18         Cintas confirmed in the hearings that it does not oppose the Motion for leave to file the

19   proposed Second Amended Complaint to the extent that the Motion would add the claims

20   proposed therein of those proposed putative class representative plaintiffs who are permitted to

21   litigate their claims in this Court. However, Cintas has opposed the Motion on grounds that leave

22   to amend is improper because the claims as to many of the proposed named plaintiffs have

23   previously been stayed or have now been stayed by virtue of the Court having granted Cintas'

24   Motion to Stay. Cintas also opposes the Motion on the ground that leave to amend is improper as

25   to those proposed state-law subclass claims as to which the proposed representative plaintiffs are

26   persons who are stayed from litigating. Finally, Cintas opposes the Motion for leave to amend to

27   state an Arkansas law subclass claim on the ground that it would be futile to do so.

28

                                                   10

1    For the reasons stated more fully on the record, the motion is GRANTED IN PART and

2  DENIED IN PART.  The Court GRANTS the Motion for leave to file the proposed Second

3  Amended Complaint with respect to those putative class or subclass representative plaintiffs who

4  the parties agree may litigate their claims before this Court, and DENIES the Motion for leave to

5  amend with respect to those plaintiffs who have been previously compelled to arbitration or who

6  are subject to defendant's Motion to Stay which has been granted elsewhere in this Order.

7    Regarding plaintiffs' proposed Arkansas subclass claim, the Court DENIES the request to

8  amend the complaint to include such a claim without prejudice to later revisiting the issue, if

9  appropriate, should the legal posture of this case change and/or the applicability of the Arkansas

10  statute.

11    IT IS HEREBY ORDERED that plaintiffs' Motion [Docket No. 460] is DENIED in part.

12  Plaintiffs are DENIED leave to file an amended complaint as to the claims of any plaintiffs who

13  are compelled to arbitrate or who are stayed from litigating.  Plaintiffs are DENIED without

14  prejudice leave to file an amended complaint adding an Arkansas state minimum wage law claim

15  as a Fourth Claim for Relief or otherwise.  Plaintiffs' Motion [Docket No. 460] is GRANTED in

16  part in that they are granted leave to file a Second Amended Complaint with respect to those

17  putative class or subclass representative plaintiffs who the parties agree may litigate their claims

18  before this Court.  Plaintiffs shall have ten (10) days' leave to file their Second Amended

19  Complaint, to the extent that leave to do so has been granted by this Order.   Defendants shall

20  have ten (10) days after service of the Second Amended Complaint to respond to it.

21

22    **IT IS SO ORDERED.**

23

24  Dated: 2/13/06_____                    _____
                                                              SAUNDRA BROWN ARMSTRONG
25                                                            United States District Judge

26

27

28  _____

## Exhibit E

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|------------|-------------------|
| 1 | Abrahamsen | David J. | 03FL |
| 2 | Ackerman | Nicholas | 03A |
| 3 | Adams | Randall | 01A |
| 4 | Adkins | Donald | 96C |
| 5 | Adolph | Joseph W. | 03MD |
| 6 | Agler | Bradley | 99A |
| 7 | Agostini | Jason | 01A |
| 8 | Agozzino | Vince | 03IL |
| 9 | Ainsworth | Daniel E. | 03CA |
| 10 | Albright | Ryan | 99A |
| 11 | Aldrete | Joel | 01B |
| 12 | Alegria | Roberto Carlos | 99B |
| 13 | Alert | Thomas Eugene | 99A |
| 14 | Alfred | Chad | 01A |
| 15 | Alioto | Brandon | 99A |
| 16 | Allen | Alice | 03FL |
| 17 | Allen | Joseph | 02A |
| 18 | Allen | Judd | 01B |
| 19 | Allen | Sean | 02B |
| 20 | Allred | Jonathan | 99A |
| 21 | Allshouse | Michael Lee | 99A |
| 22 | Allspach | Gary | 02A |
| 23 | Alves | Louis | 03NY |
| 24 | Ames | Christopher J | 03NC |
| 25 | Ammon | Ryan | 99A |
| 26 | Amott | Troy | 99A |
| 27 | Anaya | Issac | 99B |
| 28 | Anaya | John | 99B |
| 29 | Anderson | Darren MItchell | 02A |
| 30 | Anderson | David | 03CA |
| 31 | Anderson | Jeffrey | 01A |
| 32 | Anderson | Matthew | 02A |
| 33 | Anderson | Michael (Chad) | 96A |
| 34 | Anderson | Randy | 99B |
| 35 | Anderson | Robert D. | 01A |
| 36 | Anderson | Zebulan (Zeb) | 96A |
| 37 | Andree | Nathan J | 02A |
| 38 | Andrews | Joe | 02A |
| 39 | Andrews | Robert | 96B |

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|-----------|-------------------|
| 40 | Ansink, Jr. | John O. | 03VA |
| 41 | Aranegui | Gus | 96A |
| 42 | Arango | Rick | 99A |
| 43 | Arms | Rick | 99A |
| 44 | Armstrong | Bryan | 99B |
| 45 | Arroyo | Heriberto | 03CA |
| 46 | Arroyo | Sijifredo | 03B |
| 47 | Artley | Stephen Paul | 03VA |
| 48 | Arvin | Harold W. | 99A |
| 49 | Arvizu | Ronald | 99B |
| 50 | Ash | Brian | 01A |
| 51 | Atkins | James | 96A |
| 52 | Augustin | Matthew | 03LA |
| 53 | Ault | Travis M. | 02A |
| 54 | Avalos | Agustin | 99B |
| 55 | Avalos | Guillermo | 03CA |
| 56 | Avila | Hector | 02B |
| 57 | Aybar | Jeffrey | 96B |
| 58 | Bachman | Sean | 99B |
| 59 | Bachmann | Kenneth J. | 96A |
| 60 | Badgerow | Gary | 03CA |
| 61 | Bailey | Wayne C | 96A |
| 62 | Baker | Brian | 01A |
| 63 | Baker | Joshua | 99A |
| 64 | Baldwin | Daniel S. | 96A |
| 65 | Baldwin | David | 03MI |
| 66 | Banks | Joe L | 03GA |
| 67 | Barbarotta | Sam | 02A |
| 68 | Barfield | Donald Ray | 03TX |
| 69 | Barlow | Stephen | 01B |
| 70 | Barnes | Gregg | 99A |
| 71 | Barnes | Relton | 03MO |
| 72 | Barr | Jeff | 99A |
| 73 | Barrett | Jason | 96C |
| 74 | Bartz | Michael | 03A |
| 75 | Bass | Donnie | 02A |
| 76 | Bassett | Dennis | 99A |
| 77 | Batteate | Domenico | 99B |
| 78 | Baudier, Jr. | Ramon J. | 96A |
| 79 | Bauer, Jr. | Harold D. | 99A |
| 80 | Baughman | Casey | 01B |
| 81 | Baumer | Christopher | 99A |

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|------------|-------------------|
| 82 | Baxter | Aaron | 96A |
| 83 | Beal | Kevin | 99A |
| 84 | Bean | Robert W. | 02A |
| 85 | Beard | Everette G. | 03VA |
| 86 | Beard | Mitchell Aaron | 02A |
| 87 | Beck | Joseph | 96B |
| 88 | Beckham | Mark (Marshall) | 03GA |
| 89 | Bedard | Patricia | 03A |
| 90 | Bell | Wade | 03A |
| 91 | Bell | William | 96A |
| 92 | Bender | Daniel Lee | 02A |
| 93 | Benedict | Tyrone Charles | 96A |
| 94 | Benson | Josh | 02A |
| 95 | Bentley | Hank | 99B |
| 96 | Bereza | John | 99B |
| 97 | Berlage | Joseph E. | 02A |
| 98 | Berna | Brent | 03OK |
| 99 | Berry | Paul | 99B |
| 100 | Bersch | Warren | 99A |
| 101 | Bertram | Phillip | 02B |
| 102 | Bertrand | William | 01A |
| 103 | Biase | Joseph D. | 96A |
| 104 | Bickham | John D. | 99A |
| 105 | Bickmeyer | Warren | 99A |
| 106 | Bierach | Conrad | 99B |
| 107 | Bigbee | Gregory Cole | 03MS |
| 108 | Bigelow | Jason Scott | 03AL |
| 109 | Bippus | David W. | 02A |
| 110 | Bishop | Janice M. | 03MS |
| 111 | Bissin | Brooke A. | 99B |
| 112 | Bitz | William J. | 03FL |
| 113 | Bivins | Michael | 03FL |
| 114 | Blackman | Matthew L. | 99A |
| 115 | Blackmon | James Kurt | 01A |
| 116 | Blaha | Christopher | 96A |
| 117 | Blaisdell | Philip Daniel | 01A |
| 118 | Blake | Thomas FLynn | 99A |
| 119 | Blanchard | Bernard L | 03TX |
| 120 | Blanco | Noe | 02B |
| 121 | Blenden | Chad M. | 02A |
| 122 | Bobeck | Craig | 03MI |
| 123 | Bobo | Brian | 99A |

3

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|------------|-------------------|
| 124 | Bobola | Kenneth | 03FL |
| 125 | Bodenmiller | George | 99A |
| 126 | Bohn | David | 99A |
| 127 | Bolen, Jr. | Silas Ray "Bo" | 03NC |
| 128 | Boman | Jason | 99A |
| 129 | Bonacorsi | Daniel J. | 02A |
| 130 | Bonds, Jr. | Jackie Ray | 01B |
| 131 | Booker | Kathleen | 03A |
| 132 | Booth | Daniel | 01A |
| 133 | Borawski | Scott | 99A |
| 134 | Borrmann | Kevin | 99A |
| 135 | Boslaugh | Kevin | 02A |
| 136 | Bossett | Eric D. | 03CA |
| 137 | Bostick | Tony L. | FAS-B |
| 138 | Bostwick | Noah | 01B |
| 139 | Botelho | Troy | 99B |
| 140 | Bova | John S. Jr. | 01A |
| 141 | Bow | Jonathan James | 01A |
| 142 | Bowden | Robert | 99A |
| 143 | Bower | Kevin | 96A |
| 144 | Bowles | Randall | 99A |
| 145 | Bowles, Jr. | Robert F. | 03NY |
| 146 | Bowman | Daryl | 99B |
| 147 | Boyd | Ricko Lonnell | 99A |
| 148 | Boyle | Andrea | 02B |
| 149 | Boyle | Michael P. | 02A |
| 150 | Boynton | Kevin | 96A |
| 151 | Braaten | Bob | 03WA |
| 152 | Bracamontes | Ralph | 99B |
| 153 | Bradley | Tory | 96B |
| 154 | Branscome | Thomas Scott | 03NC |
| 155 | Brantley | Michael | 01A |
| 156 | Bray | Michael C | 99A |
| 157 | Bridges | Larry Daniel | 03GA |
| 158 | Bridges | Thomas Allan | 99A |
| 159 | Brien | Joseph | 02A |
| 160 | Brinlee | Robert | 99A |
| 161 | Brinning | Brandon | 99B |
| 162 | Briseno | Leonel | 96B |
| 163 | Bristow | Mark | 99A |
| 164 | Brite | Bobby | 02C |
| 165 | Brock | Stephen | 96A |

4

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|------------|-------------------|
| 166 | Brooks | Antoine Alonzo | 01A |
| 167 | Brooks | Chris | 03CA |
| 168 | Brooks | Dezmon | 99B |
| 169 | Brooks | Stephen | 02B |
| 170 | Brown | Chris | 99A |
| 171 | Brown | Christopher | 03A |
| 172 | Brown | Danny L. | 03KY |
| 173 | Brown | Jonathan | 99B |
| 174 | Brown | Michelle | 99A |
| 175 | Brown | Wayne | 99A |
| 176 | Brown Jr. | James | 96A |
| 177 | Brown-Donald | Cory | 03MO |
| 178 | Browning | Jennifer (Jenny) | 99B |
| 179 | Browning | Stuart | 99A |
| 180 | Brown-Phillips | Mary E. | 99A |
| 181 | Bruno | Stuart | 03NJ |
| 182 | Brunson | Gregory | 96A |
| 183 | Bryant | Gregory S. | 96A |
| 184 | Buddie | Brian | 99A |
| 185 | Buen | Brian | 96A |
| 186 | Bullard | Brandon Eugene | 02A |
| 187 | Bunderson | Jason | 02A |
| 188 | Burch | Jeffrey | 02B |
| 189 | Burcke | Robert | 99A |
| 190 | Burgess | Scott | 01A |
| 191 | Burghart | Vince McClain | 99A |
| 192 | Burke | Christopher | 01B |
| 193 | Burke | Donald | 96C |
| 194 | Burke | Michael | 02A |
| 195 | Burress | James Allen | 03IL |
| 196 | Burt | Steven Jonathan | 99A |
| 197 | Burton | Crezone | 96A |
| 198 | Bush | David J. | 03OH |
| 199 | Butler | Dustin Lee | 96A |
| 200 | Butler | Jeffrey A. | 99A |
| 201 | Buuck | Greg M. | 99A |
| 202 | Byram | Jason Albert | 03A |
| 203 | Cabrera | Jorge | 03B |
| 204 | Cabrera | Luis | 01B |
| 205 | Cady | Chad Jason | 03A |
| 206 | Cagle | Lucas Hunter | 99A |
| 207 | Cala | Peter James | 99A |

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|------------|-------------------|
| 208 | Caldwell | Scott Patrick | 99A |
| 209 | Callahan | John | FAS-B |
| 210 | Calvin | Dean | 99A |
| 211 | Camden | Christopher | 03CA |
| 212 | Cameron | Bruce | 01A |
| 213 | Cameron | Chris | 99A |
| 214 | Campion | Michael H. | 03TX |
| 215 | Campos | Gustovo G. | 03CA |
| 216 | Cantu III | Leonel | 99B |
| 217 | Capuchino | Neal | 03DE |
| 218 | Carelock | Bryan | 01B |
| 219 | Carney Sr. | Eric | 99A |
| 220 | Carr | Boyd | 99A |
| 221 | Carr | Ray Anthony | 99A |
| 222 | Carrera | Gerardo | 96A |
| 223 | Carrillo | Javier | 03CA |
| 224 | Carter | Charlie | 03MO |
| 225 | Carter | Kevin | 96A |
| 226 | Carter | Matthew S. | 03CA |
| 227 | Carter | Stephen W. | 03GA |
| 228 | Carter | Terry | 96A |
| 229 | Carter Jr. | Nelson | 02A |
| 230 | Carthon | Rickey | 96B |
| 231 | Caruso | Kenneth | 03A |
| 232 | Cash | Jason | 96A |
| 233 | Casselman | Dana | 03SC |
| 234 | Cassens | Everett W. | 01A |
| 235 | Castens | Richard | 99A |
| 236 | Castleberry | Don | 02C |
| 237 | Caton | Clinton | 96B |
| 238 | Caudill | Michael | 03A |
| 239 | Cavanaugh | Craig Robert | 99B |
| 240 | Cavazos | Jesse | 03TX |
| 241 | Cervantes | Marcos | 02B |
| 242 | Chalmers | Scott | 99A |
| 243 | Chambers | Veronica | 03AL-Conf. |
| 244 | Chambers Sr | Broderick | 02C |
| 245 | Chapman | Brent | 99A |
| 246 | Chapman | David | 96B |
| 247 | Chappell | Chad | 01A |
| 248 | Charatin | Daniel | 99A |
| 249 | Chavez | William | 03CA |

6

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|------------|-------------------|
| 250 | Chesser | Larry D. | 03MI |
| 251 | Chirino | Humberto | 96A |
| 252 | Choate | Doug | 01A |
| 253 | Christensen | Eugene | 03CT |
| 254 | Churches | Dennis L. | 99A |
| 255 | Cingel | Timothy | 02A |
| 256 | Citrano | Chris | 03A |
| 257 | Clark | Arnie | 99A |
| 258 | Clark | Brian | 99A |
| 259 | Clark | Michael D. | 99A |
| 260 | Clark | Shon D. | 03A |
| 261 | Clark Jr. | Gerald | 02A |
| 262 | Clayton | William W. | 03NY |
| 263 | Cleaves, Sr | Jason | 02A |
| 264 | Cobble | James | 03KY |
| 265 | Cockreham | Colin | 99A |
| 266 | Coe | Steven M. | 02A |
| 267 | Colavito | Marc | 02B |
| 268 | Colby | Jeffrey | 02A |
| 269 | Colca | Keith | 02A |
| 270 | Cole | Dennis | 99A |
| 271 | Collazo | Edwin Upeano | 03VA |
| 272 | Collins | Aaron | 99A |
| 273 | Collins | Bobby | 03TX |
| 274 | Collins | French | 03IN |
| 275 | Colunga | Edward | 99B |
| 276 | Colunga | Orlando | 03NV |
| 277 | Comaty | Kevin | 99A |
| 278 | Combs | Gary | 99A |
| 279 | Comiso | Mike | 96A |
| 280 | Conigland | James W. | 96A |
| 281 | Conley | Marty D. | 03KY |
| 282 | Connelly | James | 03B |
| 283 | Conner | Michael | 02B |
| 284 | Conti | Matthew | 99A |
| 285 | Contreras | Carlos Javier | 03CA |
| 286 | Contreras | Javier | 03CA |
| 287 | Contreras | Ricardo | 02G |
| 288 | Conway | Merle | 03FL |
| 289 | Cook | David | 99A |
| 290 | Coombs | Jason M | 03FL |
| 291 | Cooper | Daniel B. III | 02A |

7

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|------------|-------------------|
| 292 | Cooper | Erinn | 02B |
| 293 | Cooper | Leon Allen | 03MO |
| 294 | Cooper | Shirlene | 03A |
| 295 | Cope Jr. | James Andrew | 96A |
| 296 | Coppock II | Lonnie | 96B |
| 297 | Corelli | Charles | 96A |
| 298 | Cornelius | Randall M. | 03AL |
| 299 | Cornett | Michael | 01B |
| 300 | Cortes | Gustavo | 99B |
| 301 | Cortes Jr. | Juventino | 99B |
| 302 | Cortez | Sonny | 99B |
| 303 | Cothran | Matthew | 96A |
| 304 | Cothran | Robert A. | 03FL |
| 305 | Cotter | Bruce | 03MN |
| 306 | Cottini | Jeffrey Louis | 02B |
| 307 | Cottrell | Michael | 01A |
| 308 | Cottun | Jon-mikal | 02A |
| 309 | Coulon | Kevin | 99A |
| 310 | Coulson | Jeffrey M. | 99A |
| 311 | Cousins | Willie | 03MS |
| 312 | Cowles | Barbara | 02A |
| 313 | Cox | Michael | 99C |
| 314 | Coy | Aaron | 01A |
| 315 | Craig | John | 99B |
| 316 | Craig | John Maurice | 02B |
| 317 | Crandle | Tom | 96A |
| 318 | Crawford | James Ryan | 99A |
| 319 | Crawford | Nathaniel T. | 96A |
| 320 | Crawford | Wesley | 99A |
| 321 | Crews | Chad | 03NC |
| 322 | Crismond | Jeff | 01A |
| 323 | Crivello | Tony | 99B |
| 324 | Croft | Virgil Lee, III | 99B |
| 325 | Crook | Robert | 03A |
| 326 | Crosby | Germain | 96A |
| 327 | Crumley | Timothy | 96A |
| 328 | Cruz | Carlos R | 03B |
| 329 | Cruz | Rene | 03A |
| 330 | Culley | Donna J. | 99A |
| 331 | Cumley | Michael | 99A |
| 332 | Czamara | Jamie | 99A |
| 333 | D'Amato | Pasquale | 02A |

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|------------|-------------------|
| 334 | Dahbu | Dahbu | 96A |
| 335 | Dahl | Shawn L. | 02A |
| 336 | Dahmke | Robert | 03I |
| 337 | Dailey | Thomas L | 99A |
| 338 | Dakos | Michael D. | 03CA |
| 339 | Dalsass | Mark | 96B |
| 340 | Damron | Dan II | 96A |
| 341 | Danelle | Dana | 03A |
| 342 | Dangerfield | Raymond L. | 96B |
| 343 | Daniel | Roger | 99A |
| 344 | Daniels | Jason | 03WA |
| 345 | Dardon | Jose | 02A |
| 346 | Davidson | Aaron Lindsay | 01B |
| 347 | Davis | Jason | 99A |
| 348 | Davis | Jeffrey C | 02B |
| 349 | Davis | Robert Samuel | 99B |
| 350 | Davis | Wayne | 02B |
| 351 | Davison | Dustin | 02A |
| 352 | Dawson | Dan | 96C |
| 353 | Dawson | Keith C. | 99B |
| 354 | Dawson | Timothy | 02B |
| 355 | Day | Jackie Nelson | 96A |
| 356 | Day | Patrick | 03CA |
| 357 | DeBano | Craig | 99B |
| 358 | DeBilzan | David | 96B |
| 359 | Deely | Daniel | 01A |
| 360 | Dees | Chris C. | 99B |
| 361 | DeFelix | Matthew J. | 02A |
| 362 | DeGroot | Robert J. | 99A |
| 363 | DeLaneo | David | 01B |
| 364 | DeLauro | Michael | 03CT |
| 365 | Delgado | Oscar R. | 03IL |
| 366 | Delort | John | 99A |
| 367 | DelSorbo | Frank | 99A |
| 368 | Dempsey | James | 96A |
| 369 | DeMulling | Douglas | 96A |
| 370 | Deneka | Michael | 99A |
| 371 | Denise | Matthew | 01A |
| 372 | Dennis | Marc | 01A |
| 373 | DeRosia | Troy L. | 02A |
| 374 | Dervin | John H | 01B |
| 375 | DeSantis | Michael E. | 03FL |

9

Case 4:03-cv-01800-SBA     Document 50-6     Filed 02/14/2005     Page 10 of 41

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|------------|-------------------|
| 376 | Devlin | Thomas | 03NJ |
| 377 | Diaz | Albert | 03FL |
| 378 | Diaz | Jorge | 03CA |
| 379 | Diazgranados | Humbert | 99A |
| 380 | Dickerson | Jimmy | 03TX |
| 381 | Diebler | Bryan | 99A |
| 382 | Dillard | Marcus | 99B |
| 383 | Dillon | Michael James | 99A |
| 384 | Dimac | Jasmin | 01A |
| 385 | DiPaolo | Derrick | 02A |
| 386 | DiSalvo | Carl | 99A |
| 387 | Dixon | Jean Lande | FAS-C |
| 388 | Dixon | Timothy A. | 99A |
| 389 | Dixon III | Roy | 96A |
| 390 | Dixon JR. | Billy Ray | 03AL |
| 391 | Dodson | Tommy | 99B |
| 392 | Doherty | John F., Jr. | 99A |
| 393 | Dolan | John | 96A |
| 394 | Doll | Russell | 01B |
| 395 | Dollhopf | Thomas Nile | 99A |
| 396 | Dompke | Alvin | 03WI |
| 397 | Donahue | Christopher | 03CA |
| 398 | Donegan | Michael | 96A |
| 399 | Dool | Mark E | 03CA |
| 400 | Dorris | Jermaine | 02C |
| 401 | Doss | Robert | 01B |
| 402 | Dossin | Ernest | 96A |
| 403 | Downey | George | 02A |
| 404 | Downey | James | 99A |
| 405 | Drahos | James | 99A |
| 406 | Dravland | David | 99A |
| 407 | Drenckhahn | Larry A. | 96D |
| 408 | Drendel | Lynn M. | 01A |
| 409 | Driggers | Ashley | 02B |
| 410 | Drought | Debra | 03IL |
| 411 | Drummond | Michael | 02A |
| 412 | Ducey | Kevin Edward | 02A |
| 413 | Duell | Clarence | 99A |
| 414 | Dulan | Nyjeri | 03CA |
| 415 | Dunham | Matthew H. | 96B |
| 416 | Dunlap | Travis | 99A |
| 417 | Duran | Jesse | 01B |

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|------------|-------------------|
| 418 | Durbin | Joseph Len | 99B |
| 419 | Durbin | Phillip | 96B |
| 420 | Durkin | R. Patrick | 99A |
| 421 | Dwarte | Mark Daniel | 02A |
| 422 | Dyer | John | 99A |
| 423 | Eagle | Ryan Daniel | 01A |
| 424 | Earl | Luis R. | 99A |
| 425 | Eastman III | John James | 96A |
| 426 | Eaton | Sean | 03A |
| 427 | Ecija | Allan | 03A |
| 428 | Edenfield | Samuel | 99B |
| 429 | Edney | Jeff | 03MI |
| 430 | Edwards | Anthony | 02A |
| 431 | Edwards | Douglas | 03NJ |
| 432 | Edwards | Joseph E. | 03RI |
| 433 | Edwards | Mark | 03CA |
| 434 | Eggebeen | John | 96A |
| 435 | Ehrman | Steve | 96C |
| 436 | Eldridge | Kendall | 02A |
| 437 | Elliott | William | 02A |
| 438 | Ellis | Sean | 99B |
| 439 | Ellsworth | Jeffrey | 99A |
| 440 | Emberland | Douglas Brian | 03CA |
| 441 | Emmerling | Robert | 99D |
| 442 | Enriquez | Jesus, Jr. | 99B |
| 443 | Erazo | Aliexer | 99C |
| 444 | Ernsperger | Jerry | 96B |
| 445 | Ernst | Gregory | 96A |
| 446 | Escovar | Jason | 99B |
| 447 | Esparaza | Pablo | 96B |
| 448 | Esparza | Edgar | 01A |
| 449 | Esparza | Paul | 03CA |
| 450 | Esparza, Jr | Sam | 03CA |
| 451 | Estrada | Richard | 03CA |
| 452 | Estrada | Robert | 03CA |
| 453 | Etzler | Michael | 01A |
| 454 | Evans | Edward | 99A |
| 455 | Evans | Randall | 96A |
| 456 | Evans | Terry C. | 03MS |
| 457 | Fabrizio | Samuel | 99A |
| 458 | Fadeff (Scruggs) | Jodi | 02B |
| 459 | Fairley | Reginald D. | 03PA |

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|------------|-------------------|
| 460 | Fancher | Thomas | 99A |
| 461 | Farris | Greg | 01A |
| 462 | Farthing | Kenneth | 99A |
| 463 | Fast | Randolph | 03WI |
| 464 | Faul | Karl | 96A |
| 465 | Faul | Shane | 99A |
| 466 | Favret | J. Milchael | 99A |
| 467 | Feagin | Mark Anthony | 03KS |
| 468 | Feehan | Scott | 96A |
| 469 | Feeney | Patrick | 03MI |
| 470 | Fenstemacher | Rick | 03CA |
| 471 | Ferguson | Ken | 99B |
| 472 | Ferreira | Carlton Manuel | 02A |
| 473 | Ferrell | Rick | 99A |
| 474 | Ferrer | Hector | 99B |
| 475 | Fielding | Scott | 02A |
| 476 | Fields | Rickey | 03MI |
| 477 | Fillingame | Alan | 99B |
| 478 | Finch | James | 99A |
| 479 | Fincham | Jon Curtis | 99A |
| 480 | Finnie | William D. (Bill) | 96B |
| 481 | Firer | Ruslan | 99A |
| 482 | Fisher | Alfred | 03NJ |
| 483 | Fisher | Nicholas | 01A |
| 484 | Flagg | James | 96B |
| 485 | Flanagan | Robert | 99A |
| 486 | Fleek | James | 01A |
| 487 | Flintom | Frank | 99A |
| 488 | Flores | Eduardo | 02B |
| 489 | Flores | Roger | 99B |
| 490 | Floyd | Ricky | 99A |
| 491 | Fogg Jr. | Norman | 02A |
| 492 | Follen | James | 03MI |
| 493 | Folz | Jason | 99C |
| 494 | Fonseca | Ricardo | 03CA |
| 495 | Forbes | Wanda | 02A |
| 496 | Ford | John E. | 02A |
| 497 | Ford | Robert C | 96B |
| 498 | Foreman | Michael E. | 03A |
| 499 | Fortune | Scott | 99A |
| 500 | Foster | H. Berk | 01A |
| 501 | Fourman | Julia | 03SC |

12

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|------------|-------------------|
| 502 | Fournier | Steven | 99A |
| 503 | Fragassi | Shawn | 03IL |
| 504 | Fraginals | Mauricio | 96A |
| 505 | France-Kelly | Timothy | 96B |
| 506 | Franklin | Henry | 99B |
| 507 | Franks | Glenn Mark | 99A |
| 508 | Franks | Jerome | 96A |
| 509 | Frashier | Dylan M. | 02A |
| 510 | Frazer | Joshua | 02A |
| 511 | Frazier | Joseph | 99A |
| 512 | Freeman | Nathan | 03B |
| 513 | Freier | Bruce | 99A |
| 514 | French | Derek | 96A |
| 515 | French | James David | 01B |
| 516 | French | Ronald | 99A |
| 517 | Fridley | Michael | 99B |
| 518 | Frierson | David M. | 03FL |
| 519 | Frierson | Jeremaine | 03TX |
| 520 | Fries | Rick | 01A |
| 521 | Frink | David | 99A |
| 522 | Fuentes | Michael Anthony | 03CA |
| 523 | Fuerst | Craig | 03A |
| 524 | Fulce Jr. | Raymond | 01B |
| 525 | Fuqua | William (Rob) | 02A |
| 526 | Gable | Jaymes | 96A |
| 527 | Gaeta Jr. | Steve | 02B |
| 528 | Gage | Mark | 99A |
| 529 | Gagne | William | 02A |
| 530 | Gaines | Ronnie | 99A |
| 531 | Galicia | Tomas | 99B |
| 532 | Galik | Grant | 01A |
| 533 | Gallo | Russ | 03CT |
| 534 | Gallop | Chris | 03CA |
| 535 | Galloway | Phillip R., Jr. | 96A |
| 536 | Gambill | Kevin W. | 99A |
| 537 | Gamez | Ruben | 99B |
| 538 | Garcia | Anthony | 99B |
| 539 | Garcia | Edmundo | 99B |
| 540 | Garcia | Edward P | FAS-B |
| 541 | Garcia | Jerry | 03CA |
| 542 | Garcia | Lossan | 03TX - Plant |
| 543 | Garcia | Tracy Ramos | 02B |

Case 4:03-cv-01180-SBA    Document 55-6    Filed 02/14/2005    Page 254 of 641

| No. | Last Name | First Name | Agreement Version |
|---|---|---|---|
| 544 | Garcia Jr. | Adan | 03TX |
| 545 | Gardner | Brian | 99A |
| 546 | Gardner | Paul J. II | 03GA |
| 547 | Gardner Jr. | Ronald | 01A |
| 548 | Garity | Thomas David | 01A |
| 549 | Garland | Kelby | 03A |
| 550 | Garrett | Ricky | 03A |
| 551 | Garrett | Shawn | 02A |
| 552 | Garrett-Webb | Melinda | 99A |
| 553 | Garrison | Lamont | 96B |
| 554 | Gartin | Chad | 03A |
| 555 | Gaskins | Stephen | 01A |
| 556 | Gastelum | Jesse | 03CA |
| 557 | Gates | Sammy | 99B |
| 558 | Gaul | Michael | 03MS |
| 559 | Gay | Michael Keith | 03AL |
| 560 | Gedinsky | Kevin | 96A |
| 561 | Geer | Robert L. | 99A |
| 562 | Geile | John | 99A |
| 563 | Gemmati | Michael | 03FL |
| 564 | Gemmati | Phillip J. | 03FL |
| 565 | Genther | Brandon | 99A |
| 566 | Gentry | David Lewis | 96A |
| 567 | Gentry | Joshua | 01B |
| 568 | Gentry | Lee Edward | 03CA |
| 569 | Gentry | Wyman | 99B |
| 570 | Giammusso | Carrie | 99B |
| 571 | Gibson | Tyler John | 02A |
| 572 | Gienapp | Dalero | 03CA |
| 573 | Gill | John | 01A |
| 574 | Gilliland | Brent | 96A |
| 575 | Gilmore | James | 99A |
| 576 | Gilmore | Josh | 01A |
| 577 | Gitmed | Kurt | 99B |
| 578 | Godoy | Karlo | 03CA |
| 579 | Goemaat | Anthony | 03B |
| 580 | Goines | Pamela | 03A |
| 581 | Golden | Daniel | 99B |
| 582 | Gomez | Jeffrey | 02B |
| 583 | Gomez | Vincent | 99A |
| 584 | Gonce | Raul Jose | 99A |
| 585 | Gonzales | Albert | 99B |

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|------------|-------------------|
| 586 | Gonzales | Charles R. | 01B |
| 587 | Gonzales | Jesus P. | 99B |
| 588 | Gonzalez | Yovani | 02B |
| 589 | Gordon | Todd | 99A |
| 590 | Goslau | Richard | 02A |
| 591 | Goveia | Eric S. | 99A |
| 592 | Graham | Luke D. | 02A |
| 593 | Grant | Bryan | 99A |
| 594 | Gray | Charles Leroy | 02A |
| 595 | Gray | Glenn E. | 03NC |
| 596 | Green | Wayne | 03AL |
| 597 | Greene | Jeff | 02A |
| 598 | Greene III | Tilmon C. | 96B |
| 599 | Greer | James R. | 99A |
| 600 | Greer | Russell | 03B |
| 601 | Gregor | Scott Patrick | 03TX |
| 602 | Gregory | Jonathan A. | 99B |
| 603 | Griffin | Donald Allen | 99A |
| 604 | Griffin | Michael | 03IN |
| 605 | Grigsby, Jr. | Vernon | 03CO |
| 606 | Grim | Matt | 99B |
| 607 | Griner | Joseph Lee | 02A |
| 608 | Gritsipis | Antonios | 99A |
| 609 | Groves | Jeffrey | 01A |
| 610 | Grucza | Troy D. | 99A |
| 611 | Guardado | Johnny | 03B |
| 612 | Gubala | Thomas | 02A |
| 613 | Gugino | David George | 99A |
| 614 | Gullett | Rickey L. | 03TX |
| 615 | Gunckle | Richard E. | 96A |
| 616 | Gurnee | Kimberly | 03WA |
| 617 | Guys Jr. | Ralph | 99A |
| 618 | Hagan | Bradley | 99B |
| 619 | Hager II | Thomas | 99A |
| 620 | Hale | Russell | 99A |
| 621 | Hall | Eric | 02A |
| 622 | Hall | Robert | 02F |
| 623 | Haloski | David M. | 96A |
| 624 | Hamby | Anthony Dean | 01A |
| 625 | Hamilton | David | 99A |
| 626 | Hamilton | Jason C. | 01B |
| 627 | Hammer | Bruce | 99A |

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|-----------|-------------------|
| 628 | Hammerberg | Tammy | 99A |
| 629 | Hammons | Cody A. | 03AL |
| 630 | Hanson | Dan | 02A |
| 631 | Hanson | Sarah | 03A |
| 632 | Hanson | Sheree | 03A |
| 633 | Hanthorn | Brian Scott | 99A |
| 634 | Hardin | Mark Lee | 99B |
| 635 | Harper | Kevin | 99A |
| 636 | Harper | Steven | 01A |
| 637 | Harris | Cheryl | 99A |
| 638 | Harris | Dwight | 96C |
| 639 | Harris | John MIchael | 03MS |
| 640 | Harris | Kim | 03B |
| 641 | Harris Jr. | Raymond Mac | 99A |
| 642 | Harrison | DeCarlo | 03A |
| 643 | Hart | Laurence | 96A |
| 644 | Hart | Mike | 96A |
| 645 | Hart | Scott | 03FL |
| 646 | Hartmire | Gordon | 03B |
| 647 | Hartwell | Joshua | 03MO |
| 648 | Hassan | Ghassan | 02A |
| 649 | Hauk | Walter | 03FL |
| 650 | Hawkins | Randal Kevin | 96A |
| 651 | Hawkins | Ryan | 03A |
| 652 | Hawthorne | DeLondon | 03IL |
| 653 | Hayes | Clyde | 03KY |
| 654 | Hayes | Jeremiah | 99B |
| 655 | Haynes | John A. | 96A |
| 656 | Hays | Alan | 99A |
| 657 | Heaney | Joseph | 03A |
| 658 | Heath | Caderis | 03NC |
| 659 | Hedgpeth | Kelly Chad | 99A |
| 660 | Hehr II | William W. | 03KY |
| 661 | Hein | Brandon K. | 02A |
| 662 | Heinrich | Eric | 03AL |
| 663 | Helbert | Matthew C. | 99A |
| 664 | Hellen | Richard | 99B |
| 665 | Helton | Daniel | 96B |
| 666 | Henderson | Stephen | 96A |
| 667 | Henderson | Stephen L. | 99B |
| 668 | Henderson | Toni | 99A |
| 669 | Hendry | Kami | 99A |

Case 4:03-cv-01180-SBA     Document 59-16     Filed 09/29/2005     Page 287 of 541

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|------------|-------------------|
| 670 | Hennigan | Jordan | 03TX |
| 671 | Hennon | Charles | 01A |
| 672 | Hermes | Darren M | 03PA |
| 673 | Hermiller | Chad | 03OH |
| 674 | Hernandez | Jorge | 99B |
| 675 | Hernandez | Victor Hugo | 03CA |
| 676 | Herndon, Jr. | James Grady | 96A |
| 677 | Herr | David | 01A |
| 678 | Herrera | Efrain | 99B |
| 679 | Herrington | Harvey | 96A |
| 680 | Herron | James | 99A |
| 681 | Herzog | Greg | 96B |
| 682 | Hess | Brian Keith | 03IN |
| 683 | Hewett | Robert | 01B |
| 684 | Hewitt | Joshua | 96A |
| 685 | Hickey | Charles Terry | 99A |
| 686 | Hildreth | Barrett | 99A |
| 687 | Hill | Brad Duane | 96A |
| 688 | Hill | Daniel | 03MN |
| 689 | Hill | Dustin L. | 01B |
| 690 | Hill Jr. | Steven | 01B |
| 691 | Hilliard | Michael | 01C |
| 692 | Hilyer | Donald Keith | 03FL |
| 693 | Hines | Bruce | 02A |
| 694 | Hipp | Randall S. | 96A |
| 695 | Hoaglund | Edward | 99A |
| 696 | Hoefle | H. David | 99A |
| 697 | Hoekman | Peiter | 03CO |
| 698 | Hoffman | Dana | 03B |
| 699 | Hoffman | Terry G | 99A |
| 700 | Hoffmann | Glenn | 99A |
| 701 | Hohenstein | Rodney | 01A |
| 702 | Holbrook | Ryan Scott | 02A |
| 703 | Holcombe | Lavatus | 99A |
| 704 | Holland | Daryl | 02A |
| 705 | Holland | Jason | 02A |
| 706 | Holloman | Carvell | 03TX |
| 707 | Holloway | Dayton | 99A |
| 708 | Holmes | Willie | 99A |
| 709 | Hood | Daniel | 02A |
| 710 | Horn | Ben | 99A |
| 711 | Horn | John | 01A |

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|------------|-------------------|
| 712 | Horne | Timothy | 01A |
| 713 | Horton | Thomas | 99A |
| 714 | Hosack | Richard | 03NV |
| 715 | Hoskins III | Joseph Wiley | 96B |
| 716 | Hotchkiss | Benjamin | 96A |
| 717 | Houha | Leonard | 99A |
| 718 | Householder | Chad | 02A |
| 719 | Howe | Ronald | 99A |
| 720 | Howe | Scott | 99A |
| 721 | Howe | Steven | 99A |
| 722 | Howell | Sidney | 03NC |
| 723 | Howell | Tracy | 96A |
| 724 | Hubbard | Tim | 96B |
| 725 | Huber | Peter James | 96A |
| 726 | Hughes | John M. | 03A |
| 727 | Hughes | Stephen | 01A |
| 728 | Hughes | Stephen Richard | 96B |
| 729 | Hulet | James | 00A |
| 730 | Hulse | Gregory D. | 99A |
| 731 | Humbles | Derrick | 02A |
| 732 | Humphrey | Alex | 99A |
| 733 | Hurst | Craig | 02A |
| 734 | Hurtado | Alex | 99B |
| 735 | Hurtado | Alvaro | 03CA |
| 736 | Hurtado | Daniel | 99A |
| 737 | Hussmann | Reuben John | 99C |
| 738 | Hutson | Nick | 96A |
| 739 | Indorf | Neal | 99B |
| 740 | Infante | Angel | 02B |
| 741 | Ingram | Brandon | 01B |
| 742 | Ingram | Rodney | 99A |
| 743 | Isaacs | William Keith | 99A |
| 744 | Jackson | Colby L. | 03OR |
| 745 | Jackson | James | 01A |
| 746 | Jackson | Marvin | 99A |
| 747 | Jackson | Michael David | 02A |
| 748 | Jackson | Rex O. | 96F |
| 749 | Jackson | Sergeo | 03NJ |
| 750 | Jacquez | Abel | 96B |
| 751 | James | Beau | 02B |
| 752 | James | Jack | 96A |
| 753 | James | Patricia | 99A |

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|------------|-------------------|
| 754 | Jamieson | Ronald | 03CA |
| 755 | Jamison | Matthew Leonard | 02A |
| 756 | Jansen | John | 01A |
| 757 | Jaseckas | Kenneth | 03MO |
| 758 | Jaslove | Jeremy | 03CA |
| 759 | Jedrysek | Erik Stephen | 96A |
| 760 | Jefferson | David K. | 02A |
| 761 | Jenks | Todd | 01A |
| 762 | Jennings | Timothy W. | 02A |
| 763 | Jewell | Marcus Angel | 99A |
| 764 | Jimenez | Ricardo | 02C |
| 765 | Jinings | Nick | 99A |
| 766 | Johanson | Sean M. | 96A |
| 767 | JohnLouis | Albert | 02B |
| 768 | Johnson | Courtney | 03A |
| 769 | Johnson | Darrin | 99A |
| 770 | Johnson | Deon | 96B |
| 771 | Johnson | Eric | 99A |
| 772 | Johnson | Jadarthia | 03TX |
| 773 | Johnson | James | 99A |
| 774 | Johnson | Jeff C. | 03NC |
| 775 | Johnson | John D. | 99A |
| 776 | Johnson | Kwan | 99A |
| 777 | Johnson | Lamont | 03AL |
| 778 | Johnson | Mark H | 03NC |
| 779 | Johnson | Martin F. | 03GA |
| 780 | Johnson | Orlando | 96A |
| 781 | Johnson | Stephanie | FAS-B |
| 782 | Johnson | Thomas S. | 02A |
| 783 | Johnson | Todd | 99A |
| 784 | Joiner | Robert | 99A |
| 785 | Jones | Brian | 99A |
| 786 | Jones | Clifford | 96C |
| 787 | Jones | Craig | 96A |
| 788 | Jones | David Darryl | 96A |
| 789 | Jones | Gerald N. | 03A |
| 790 | Jones | Greg | 02A |
| 791 | Jones | John Corey | 99A |
| 792 | Jones | Joshua | 99A |
| 793 | Jones | LaShawn | 99A |
| 794 | Jones | Paul | 99A |
| 795 | Jones | Paul R. | 03FL |

Case 4:03-cv-01180-SBA    Document 55-16    Filed 02/14/2005    Page 32 of 41

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|------------|-------------------|
| 796 | Jones | Shane M. | 01A |
| 797 | Jones | Thomas Roy | 01A |
| 798 | Jones I | Michael | 99A |
| 799 | Jordan | Albert | 99A |
| 800 | Judd | Randy | 96A |
| 801 | Kadilak | Ken | 99A |
| 802 | Kaeg | Silverio Ted | 03CA |
| 803 | Kandal | Donald | 96A |
| 804 | Karr | Brian | 96C |
| 805 | Kassen | Dale Allen | 01A |
| 806 | Kauscha | John | 03CA |
| 807 | Kelleher | Eugene | 99A |
| 808 | Kelley | Timothy James | 99A |
| 809 | Kelly | William | 02A |
| 810 | Kennedy | Glen | 99A |
| 811 | Kerlavage, Jr. | Joseph R. | 03KY |
| 812 | Kern | Jason | 99A |
| 813 | Kilby | Kevin | 01A |
| 814 | Kimball | Walter | 03B |
| 815 | Kincaid | Don | 01A |
| 816 | Kincaid | Eric R. | 99A |
| 817 | King | Thelenious James | 03TX |
| 818 | King | Willie A. | 01A |
| 819 | King III | Richie | 03CA |
| 820 | Kingsley | Hugh J | 01A |
| 821 | Kinkead | Michael | 96A |
| 822 | Kinser | Jason | 99B |
| 823 | Kintler | Joseph | 99A |
| 824 | Kinto | Thomas | 02B |
| 825 | Kirby | Jason | 01B |
| 826 | Kirksey | Joel L. | 99A |
| 827 | Kirwan | Thomas | 96A |
| 828 | Klement | Robert | 99A |
| 829 | Klimm | Robert W. | 03NY |
| 830 | Kloes | William | 03WA |
| 831 | Knapp | Jason | 99A |
| 832 | Kohl | David | 96B |
| 833 | Kolby | Randall | 99B |
| 834 | Koltys | Jason | 02A |
| 835 | Konieczny | Edward | 99A |
| 836 | Kormelink | Bret Michael | 99A |
| 837 | Koste | Brian | 99A |

Case 4:03-cv-01800-SBA    Document 55-16    Filed 02/14/2005    Page 32 of 41

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|------------|-------------------|
| 838 | Koste | Jason Lyle | 01A |
| 839 | Kostiuk | Adrian | 99A |
| 840 | Kougl | Alan F. | 03TX |
| 841 | Kozelisky | Zachary I. | 01A |
| 842 | Kraft | David | 03FL |
| 843 | Krause | Christopher | 02A |
| 844 | Kremer | Fred | 03KY |
| 845 | Kreutz | Patrick | 99A |
| 846 | Kropp | James J. | 02C |
| 847 | Krueger | Joshua | 99A |
| 848 | Kulessa | Gordon Scott | 99A |
| 849 | Kull | Christopher | 99A |
| 850 | Kunda | Matthew | 99B |
| 851 | Kunz | John | 99A |
| 852 | Kyser, Jr. | Hiram | 99A |
| 853 | Labastille | Sergio | 01A |
| 854 | Labrecque | Ronald | 03RI |
| 855 | Lackey | Christopher Alan | 99A |
| 856 | Ladd | Carl Louis, Jr. | 99A |
| 857 | Lafond | David | 99A |
| 858 | LaGreca | David | 02A |
| 859 | Lahey | Kevin M. | 96A |
| 860 | Laissle | Sean M. | 03TX |
| 861 | Lambert | Jeffrey | 96C |
| 862 | Lancaster | Kurt | 99A |
| 863 | Lanci | Edward | 99A |
| 864 | Landry | Anton (Tony) | 99B |
| 865 | Landry Jr. | Steve | 02F |
| 866 | Langdon | James Craig | 99B |
| 867 | Lange | John C. | 99A |
| 868 | Lanigan | Brian David | 99A |
| 869 | Lanning | Brian | 03CA |
| 870 | Lantrip | Shannan | 99A |
| 871 | Lapp | Mario T. | 02B |
| 872 | LaPrell | Bill | 03MI |
| 873 | Larque | Renee | 02A |
| 874 | Lassiter | Greg | 03GA |
| 875 | Laster | Michael | 99B |
| 876 | Laurain | Eric | 03MI |
| 877 | Lawrence | Sean Warren | 96A |
| 878 | Lawson | Brady | 99A |
| 879 | Leal | Elba Guadalupe | 96E |

Case 4:03-cv-01889-SBA    Document 50-16    Filed 02/24/2005    Page 322 of 641

| No. | Last Name | First Name | Agreement Version |
|---|---|---|---|
| 880 | Leben | Erik | 99A |
| 881 | Ledbetter Sr. | Thomas Jap | 02A |
| 882 | Ledsworth | Donald | 99A |
| 883 | Lee | Gregory M. | 02B |
| 884 | Lee | Kevin | 99B |
| 885 | Leeder | Christopher | 03MI |
| 886 | Leinberger | Robert Lee | 99A |
| 887 | Leite | Dennis M | 03CA |
| 888 | Lemanski | Frank | 96A |
| 889 | Lewis | James K | 02B |
| 890 | Lewis | Kelvin T | 01B |
| 891 | Lewis | Roger | 96F |
| 892 | Lewis | Ronald Dee | 99A |
| 893 | Lewis | Russell | 03TX |
| 894 | Lewman | Lori | 03MD |
| 895 | Lickliter | Charles (Andy) | 03GA |
| 896 | Liktor | William | 99A |
| 897 | Liles | Ron | 99B |
| 898 | Link | Timothy | 99B |
| 899 | Linn | Michael | 03MN |
| 900 | Lippold | Geoffry | 96A |
| 901 | Lishman | John | 01A |
| 902 | Lisiakowski | Jody | 99A |
| 903 | Litteral | Darrell R., Jr. | 01A |
| 904 | Litvack | Adam | 03A |
| 905 | Livernois | Michelle | 02A |
| 906 | Lizarraga | Enrique | 99B |
| 907 | Lodewyck | David | 99A |
| 908 | Lombardo | Jason | 03OH |
| 909 | Long | Ernest | 99A |
| 910 | Long | Philip | 96A |
| 911 | Long Jr. | Thomas | 96A |
| 912 | Longoria | Robert James | 99A |
| 913 | Longstaff | Gregory | 03MO |
| 914 | Looney Jr. | Ron | 03FL |
| 915 | Lopez | Adan | 99B |
| 916 | Lopez | David | 99B |
| 917 | Lopez | Gilbert | 03CA |
| 918 | Lopez | Juan Sanchez | 03CA |
| 919 | Lopez | Roberto | 99A |
| 920 | Lounsbury | Rodger | 01A |
| 921 | Lovatt | Bob | 99A |

Case 4:03-cv-01189-SBA     Document 55-16     Filed 02/14/2005     Page 33 of 41

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|------------|-------------------|
| 922 | Love | Sean P. | 02A |
| 923 | Lovett | Shannon | 02B |
| 924 | Lovins | Todd Alan | 99A |
| 925 | Lowell | Joseph | 02A |
| 926 | Lubrano | Anthony | 01A |
| 927 | Ludwig | Jeffrey | 96A |
| 928 | Lujan | David | 96B |
| 929 | Luna | Gilbert | 03CA |
| 930 | Lupo | Thomas | 01A |
| 931 | Lutz | James Patrick | 01A |
| 932 | Mackelburg | Kevin | 03B |
| 933 | MacLagan | Jeffrey Todd | 99A |
| 934 | MacMillan | Joseph | 02A |
| 935 | MacPetrie | Bonnie | 03A |
| 936 | Maddox | Jeffrey Heath | 01B |
| 937 | Madison (Newberry) | Brandi | 02C |
| 938 | Madrid | Isaac Casper | 99B |
| 939 | Magee | Charles Eric | 99A |
| 940 | Magee | Robert Glenn | 03AL |
| 941 | Maglosky | Ken | 03OH |
| 942 | Mahnken | Leon | 99B |
| 943 | Maldari | Joseph | 99A |
| 944 | Maldonado, Jr. | Donald J. | 02A |
| 945 | Manfre | Peter | 01A |
| 946 | Mangus | Ryan Edward | 99A |
| 947 | Manion | John | 99A |
| 948 | Manzano | Larry | 99B |
| 949 | Marcoux | Joseph | 96A |
| 950 | Marino | Joseph | 99A |
| 951 | Marks | Marcus | 99B |
| 952 | Marrufo | Gilbert | 02C |
| 953 | Martel | Chad J | 03TX |
| 954 | Martensen | Martin | 02A |
| 955 | Martin | Frederick LAmont | 03IN |
| 956 | Martin | Jeffrey S. | 03KY |
| 957 | Martin | Joe K. | 03NC |
| 958 | Martin Jr. | Richard Earl | 99A |
| 959 | Martinez | Jose | 99A |
| 960 | Martinez | Miguel | 99A |
| 961 | Mason | Christopher R. | 03CA |
| 962 | Mason | Joseph | 02A |
| 963 | Masoner | Jeffrey | 99B |

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|------------|-------------------|
| 964 | Mastin | Scott R. | 96C |
| 965 | Mathis | Antonio D. | 99A |
| 966 | Matthews | Duane | 99A |
| 967 | Matthews | Traco | 02A |
| 968 | Mauro | Michael | 99A |
| 969 | Maye | Charles | 99B |
| 970 | Mayweather | Victor | 03IL |
| 971 | McAfee | Noritaka Kevin | 01B |
| 972 | McAlister | Michael | 99B |
| 973 | McArdle | Thomas J. | 99B |
| 974 | McAshan | Craig E., Sr. | 99B |
| 975 | McBeth | Mike | 03UT |
| 976 | McCabe | Steven | 03NC |
| 977 | McCarney | Randy | 03ID |
| 978 | McCarthy | Carl | 96A |
| 979 | McClellan | Rogers | 03MS |
| 980 | McClendon | Stephen | 03TX |
| 981 | McCoin | Aaron R. | 99A |
| 982 | McComiskie | Sean | 01A |
| 983 | McCraw | Michael Anthony | 99A |
| 984 | McCune | Dave | 99A |
| 985 | McDaniel | David L | 96A |
| 986 | McDermott | Eric | 99A |
| 987 | McDermott | Kenneth | 96A |
| 988 | McEldowney | Wendell | 02A |
| 989 | McFadden | Eric | 96A |
| 990 | McFall | Jeffrey Wayne, Jr. | 99A |
| 991 | McGee Jr. | Richard | 01B |
| 992 | McGhee | Todd | 02H |
| 993 | McGinley | Eileen M. | FAS-A |
| 994 | McGuire | Tim | 02C |
| 995 | McKee | Bradley J. | 99B |
| 996 | McKee | Brian | 99A |
| 997 | McKinney | Duane | 99B |
| 998 | McKinney | Maurice | 99A |
| 999 | McKinney | Raymond Dale | 99A |
| 1000 | McLaughlin | Robert | 99B |
| 1001 | McMahon | Christopher | 03CA |
| 1002 | McNamara Sr. | Michael Lee | 99B |
| 1003 | McNeela | Tim | 96A |
| 1004 | McNemar | Sean P | 03CA |
| 1005 | McNiven | Steven | 01A |

| No. | Last Name | First Name | Agreement Version |
|---|---|---|---|
| 1006 | McQuigg | Anson | 99A |
| 1007 | McRoy | David Linton | 02A |
| 1008 | Medeiros | Michael | 03RI |
| 1009 | Medeiros IV | Joseph Camara | 03A |
| 1010 | Medina | Cesar | 99B |
| 1011 | Meeker | William A | 02B |
| 1012 | Mejia | Robert | 01A |
| 1013 | Mekionis | Leonardas | 03A |
| 1014 | Melendez | Edwin | 99A |
| 1015 | Melendez | Rudy | 03CA |
| 1016 | Memmott | Derek Johnson | 99A |
| 1017 | Mendoza | Adrian | 99B |
| 1018 | Mendoza | Carlos T. | 03H |
| 1019 | Mercado | Jonathan | 03NJ |
| 1020 | Mercado | Maria J. | 03CA |
| 1021 | Merchant | David | 96A |
| 1022 | Messick | Scott Jay | 02B |
| 1023 | Metheny II | Edward | 99A |
| 1024 | Meyer | David G | 03CA |
| 1025 | Meyer | John | 02A |
| 1026 | Meyers | Richard | 01A |
| 1027 | Migdol | Fred | 03NJ |
| 1028 | Miguel | Alexander | 99B |
| 1029 | Miller | Jeffery | 99A |
| 1030 | Miller | Lance A | 02A |
| 1031 | Miller | Randy | 99A |
| 1032 | Miller | Sherry(Harvey) | 03GA |
| 1033 | Miller | Troy A. | 01A |
| 1034 | Miller Jr. | Edward | 99A |
| 1035 | Milloy | Cameron Elias | 01B |
| 1036 | Mills | Vilera | 02A |
| 1037 | Miner | Stephen E | 03NY |
| 1038 | Minor | Jack Mclean | 99A |
| 1039 | Miranda Jr. | Alberto | 02G |
| 1040 | Misback | Mark | 03KY |
| 1041 | Mitchell | David Andrew | 99A |
| 1042 | Mitchell | Lawrence F | 03VA |
| 1043 | Mitchell | Walter | 03A |
| 1044 | Moch | Jeffrey | 99A |
| 1045 | Molero | Jorge | 99B |
| 1046 | Monroe | Kirk Lee | 02A |
| 1047 | Montanez | Christino S., Jr. | 01A |

| No. | Last Name | First Name | Agreement Version |
|---|---|---|---|
| 1048 | Monteith | Kevin Neil | 99A |
| 1049 | Montez | Eddie | 99B |
| 1050 | Montez | Tony | 99B |
| 1051 | Montgomery | Brian Edward | 99A |
| 1052 | Monzon | Jose R. | 03GA |
| 1053 | Moon | Jerry | 99A |
| 1054 | Moore | Brian | 02A |
| 1055 | Moore | Gary Brandon | 99C |
| 1056 | Moore | Mark | 99B |
| 1057 | Moore | Robert | 96A |
| 1058 | Moore II | Ronald Calvin | 03CA |
| 1059 | Moots | William Brian | 02A |
| 1060 | Moran | Kaile | 99A |
| 1061 | Moravitz | Ryan | 99A |
| 1062 | Morazan | Rodolfo | 02A |
| 1063 | Morell, Jr. | Carl T. | 03NC |
| 1064 | Moreno | Michael | 02G |
| 1065 | Moreno | Ramon | 99A |
| 1066 | Moreno | Rogelio (Roger) | 99B |
| 1067 | Morford | Edward (Al) | 99B |
| 1068 | Morgan | Dwayne | 02B |
| 1069 | Morgan | James | 03CA |
| 1070 | Moriarty | Patrick | 03MI |
| 1071 | Morris | Allen Louis | 99B |
| 1072 | Morris | Craig E | 03MI |
| 1073 | Morris | Dale | 96A |
| 1074 | Morrison | Lori Ann | 03A |
| 1075 | Moser | Michael Shane | 96A |
| 1076 | Moss | Darrell | 02A |
| 1077 | Moss | Lawrence | 96A |
| 1078 | Moss | Randall | 99C |
| 1079 | Moultrie | Pierre | 03CA-Conf. |
| 1080 | Mowry | Greg | 03B |
| 1081 | Moye Jr. | Ben | 03SC |
| 1082 | Mueller | Bryan Michael | 01A |
| 1083 | Muellner | Lee | 03MN |
| 1084 | Mullins | Michael | 99A |
| 1085 | Mullins | Tony F. | 03VA |
| 1086 | Munday | Stacie L. | 02A |
| 1087 | Muniz | Eloy Pedro | 03FL |
| 1088 | Munoz III | Juan | 03TX |
| 1089 | Murphy | Joe | 01A |

Case 4:03-cv-01180-SBA     Document 59-16     Filed 02/24/2006     Page 327 of 341

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|------------|-------------------|
| 1090 | Murphy | Michael | 96A |
| 1091 | Murphy II | Joseph | 96A |
| 1092 | Musselwhite | James | 03IL |
| 1093 | Myers | David | 03TX |
| 1094 | Napoli | Ross | 02A |
| 1095 | Narbone | James | 99A |
| 1096 | Narvaez | Eric | 99B |
| 1097 | Navarijo | Clint | 03TX |
| 1098 | Navarro | Stephen | 03CA |
| 1099 | Neboyskey | Christopher | 99A |
| 1100 | Negrete | Enrico | 99B |
| 1101 | Nelson | Mark N. | 03NJ |
| 1102 | Newcomb | Christopher | 99B |
| 1103 | Newton | Armon J. | 99B |
| 1104 | Nichols | Rusty N. | 03CA |
| 1105 | Nichols | Tracy | 03KY |
| 1106 | Nichols | Victor | 03KY |
| 1107 | Nichols (Burns) | Jennifer | 99B |
| 1108 | Nicholson III | Joseph | 99A |
| 1109 | Nicolai | Lowell R. | 96A |
| 1110 | Nieves Jr. | Julio | 99A |
| 1111 | Nordstrom | Kevin | 01A |
| 1112 | Norris | Leonard N | 02A |
| 1113 | Novak | Michael J. | 02A |
| 1114 | Nowlin | George | 99A |
| 1115 | Nucci | Lisa | 99A |
| 1116 | Nunez | Danny | 03CA |
| 1117 | Nunez | Javier | 96B |
| 1118 | Nuon | Sophanarith | 99B |
| 1119 | Nutall | Leman | 96A |
| 1120 | O'Nan | Kelly Leo | 99A |
| 1121 | O'Neill | Brian | 99A |
| 1122 | Oblinger | Chris | 03NC |
| 1123 | Oertel | Joseph MIchael | 99A |
| 1124 | Offenberger | Greg S. | 99A |
| 1125 | Ogden | Andrew | 01A |
| 1126 | Ohler | Chris | 99A |
| 1127 | O'Keefe | Michael B. | 02A |
| 1128 | Okolovitch | Richard | 03NJ |
| 1129 | Oliver | Richard | 03VA |
| 1130 | Olson | Christopher Todd | 01A |
| 1131 | Olson | Jamie | 99A |

Case 4:03-cv-01180-SBA     Document 55-16     Filed 09/29/2005     Page 26 of 41

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|------------|-------------------|
| 1132 | Orgeck | Daniel | 99A |
| 1133 | Orosco | Salvador | 03CA |
| 1134 | Ortega | Chris | 02C |
| 1135 | Ortega | Richard D. | 03CA |
| 1136 | Oscypala | Andrew | 01A |
| 1137 | Osman | Jack | 99A |
| 1138 | Ospina | Fabian | 01A |
| 1139 | Otis | Daniel | 99A |
| 1140 | Overton | Neil | 99A |
| 1141 | Owen | Steven | 99B |
| 1142 | Owens | Edward | 99A |
| 1143 | Pacyna | Glen | 99A |
| 1144 | Padgett | Jason | 99A |
| 1145 | Padron | Raymond | 99A |
| 1146 | Pagan | Michael Angel | 99A |
| 1147 | Pagani | John | 99A |
| 1148 | Palma | Harry | 02A |
| 1149 | Panebianco | Richard | 99A |
| 1150 | Paradis | Barry | 99B |
| 1151 | Parker | Scott | 99A |
| 1152 | Parker Jr. | Eddie Lee | 99B |
| 1153 | Parkins | Felipe | 03CA |
| 1154 | Parks | Daniel Lee II | 02B |
| 1155 | Parra | Raymond | 96B |
| 1156 | Parrish | Harry | 03NY |
| 1157 | Parson III | Barney | 03AL |
| 1158 | Parsons | Jeffrey D. | 03FL |
| 1159 | Partain | Phillip | 99A |
| 1160 | Parus | Blasé | 99A |
| 1161 | Pascual | Todd | 99A |
| 1162 | Paske | Brad L. | 99A |
| 1163 | Pate | Xzavier | 99B |
| 1164 | Patterson | Casey | 96B |
| 1165 | Patterson | Larry | 02B |
| 1166 | Patton | Darrin | 99A |
| 1167 | Pavia | Brian M. | 99A |
| 1168 | Payne | Vennie | 99C |
| 1169 | Pearson | Melvin | 96A |
| 1170 | Pedigo | Brent | 96B |
| 1171 | Peek | Michael W. | 99A |
| 1172 | Pellerito | Michael J. | 03MO |
| 1173 | Pelley | Jonathan | 99A |

| No. | Last Name | First Name | Agreement Version |
|---|---|---|---|
| 1174 | Pena Jr. | Daniel | 02B |
| 1175 | Penn | Charles | 02A |
| 1176 | Perdomo | Jose Anibal | 03CA |
| 1177 | Perez | Carlos E. | 03CA |
| 1178 | Perez | Fernando | 03CA |
| 1179 | Perez | Rick | 03CA |
| 1180 | Perreira | Hector Joseph | 02B |
| 1181 | Perry | Alfred | 99B |
| 1182 | Perry | Timothy | 03A |
| 1183 | Perry | Xavier | 96B |
| 1184 | Perzak | Theodore | 99A |
| 1185 | Petty | Keith | 02B |
| 1186 | Petty | Robert | 02C |
| 1187 | Phillips | Jeffrey | 01A |
| 1188 | Pianelli | Anthony | 03FL |
| 1189 | Pick Jr. | Theodore | 99A |
| 1190 | Pickett | John C. | 99A |
| 1191 | Pieper | Terry | 99A |
| 1192 | Pilling | David | 03B |
| 1193 | Pinkston | Brad | 99A |
| 1194 | Pirkey | Donald M. | 96A |
| 1195 | Plotino | Vincent | 99A |
| 1196 | Plummer | Gary | 02B |
| 1197 | Plush II | Donald Ray | 99A |
| 1198 | Podsiadlo | Andrew | 96C |
| 1199 | Poke | Jeffrey T. | 99B |
| 1200 | Polk | Gerald | 99B |
| 1201 | Polo Jr. | Omar | 03CA |
| 1202 | Pomales | Juan | 99A |
| 1203 | Popp | Richard | 99A |
| 1204 | Poquette | Gery D. | 03NV |
| 1205 | Porta | Jonathen | 99A |
| 1206 | Porta | Terry | 99A |
| 1207 | Porter | Christopher | 99A |
| 1208 | Porter | Robert Darrell | 99A |
| 1209 | Portugal | Jorge | 02B |
| 1210 | Postell | Dominique | 99A |
| 1211 | Potteiger | Robert | 03MN |
| 1212 | Powers | Juan | 99A |
| 1213 | Prewett | Jeff | 96A |
| 1214 | Price | James Alan | 96A |
| 1215 | Price II | Bobby Joel | 02F |

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|------------|-------------------|
| 1216 | Prieur | Michael | 99A |
| 1217 | Prince | Bobby L. | 96A |
| 1218 | Prohoroff | Kance | 99B |
| 1219 | Prosser | Michael | 99A |
| 1220 | Provance | Thomas | 02A |
| 1221 | Puckett | Rodney | 99A |
| 1222 | Purcell | Cecil | 01A |
| 1223 | Purdy | Russell Edward | 99A |
| 1224 | Puzzo | Natalie | 03A |
| 1225 | Quarrie | Thomas A. | 99A |
| 1226 | Quigley | James | Feb-01 |
| 1227 | Quinn | Steven | 02A |
| 1228 | Quiroz | J. Adam | 96A |
| 1229 | Rabine | David | 96A |
| 1230 | Rambo | Steven | 99B |
| 1231 | Ramirez | Andres | 99A |
| 1232 | Ramirez | Jeronimo | 02B |
| 1233 | Ramos | Richard | 02A |
| 1234 | Rapplean | Kurt | 99A |
| 1235 | Rasmussen | Glen | 03WA |
| 1236 | Rasmussen | Jon | 03UT |
| 1237 | Rasmussen | Russell | 99A |
| 1238 | Raulerson | Roy S. | 96A |
| 1239 | Reddick | Gerald I. | 03CA |
| 1240 | Redmon | Rolondo D. | 99A |
| 1241 | Reed | David W. | 03DE |
| 1242 | Reeder | James A. | 02A |
| 1243 | Reese Jr. | Charles | 96A |
| 1244 | Reid | James Kevin | 01B |
| 1245 | Reid | Randall A. | 99A |
| 1246 | Reid | Tracy | 99B |
| 1247 | Reinwald | Ken | 96A |
| 1248 | Reither | Matthew | 96C |
| 1249 | Remsburg | Aaron | 99A |
| 1250 | Reno | Roy T. | 96A |
| 1251 | Resta | Andrew Lee | 02C |
| 1252 | Rettke | Kevin | 01A |
| 1253 | Reveles | Atanacio | 01B |
| 1254 | Reyes | Joe MIchael | 99B |
| 1255 | Richards | Anthony | 96A |
| 1256 | Richards | Gerald A | 96A |
| 1257 | Richards | Hopeton | 96A |

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|------------|-------------------|
| 1258 | Richards | James | 03A |
| 1259 | Richardson | Ron | 02A |
| 1260 | Richardson | Ronald | 03GA |
| 1261 | Richie | David | 99A |
| 1262 | Ricketts | Michael | 99A |
| 1263 | Rieck | Anthony | FAS-C |
| 1264 | Rivas | Jeffrey E. | 01B |
| 1265 | Rivera | Carlos | 02A |
| 1266 | Rivera | Gabriel | 01B |
| 1267 | Rivera | Mark | 99A |
| 1268 | Rivera | Ramon | 99A |
| 1269 | Rivera | Richard A. | 99A |
| 1270 | Rivera Jr. | Ernesto | 03CA |
| 1271 | Rivero | Alberto L. | 99A |
| 1272 | Rizzo | Jason | 99A |
| 1273 | Rizzo Jr. | John | 03A |
| 1274 | Roberts | Mark D. | 03AL |
| 1275 | Roberts | Richard | 03IL |
| 1276 | Robertson | Andrew | 99A |
| 1277 | Robinette | Scott | 01A |
| 1278 | Robins | Sam | 03UT |
| 1279 | Robinson | Antonio | 03NC |
| 1280 | Robinson | Charles | 02A |
| 1281 | Robinson | Larry Keith | 96A |
| 1282 | Robinson | Patrick Dontae | 99A |
| 1283 | Robinson | Paul | 96A |
| 1284 | Robinson | Ryan M. | 03A |
| 1285 | Robinson | Von D. | 99B |
| 1286 | Rocha | Dominic | 03TX |
| 1287 | Rodarte | Richard | 03CA |
| 1288 | Rodela | Mario M. | 99B |
| 1289 | Rodriguez | Daniel | 03NV |
| 1290 | Rodriguez | Jose Luis | 99B |
| 1291 | Rodriguez | Richard | 96B |
| 1292 | Rodriguez III | Eluterio | 99D |
| 1293 | Rodriguez Jr. | Ricky Raymond | 03CA |
| 1294 | Roell | Daniel | 01A |
| 1295 | Rojas IV | Raymond A. | 03B |
| 1296 | Rolfe | William | 99A |
| 1297 | Rolko | Edward J. | 02A |
| 1298 | Roman | Pedro J. | 99B |
| 1299 | Romero | Jesus | 02A |

31

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|------------|-------------------|
| 1300 | Romero | Joe | 01B |
| 1301 | Romie | Anthony | 03MN |
| 1302 | Rorick | Michael | 01A |
| 1303 | Rosby Sr. | Damion | 02B |
| 1304 | Rose | David B. | 03KY |
| 1305 | Rose | Steve | 02A |
| 1306 | Rosenberger | Sherry L. | FAS-B |
| 1307 | Ross | Michael A. | 99A |
| 1308 | Ross | Ray | 01A |
| 1309 | Ross | Timothy | 99B |
| 1310 | Roston (McClellan) | Lisa | 99B |
| 1311 | Rouco | Lazaro A., Jr. | 99A |
| 1312 | Rousseau | William Henry | 03TX |
| 1313 | Rowan | Rodger L. | 99B |
| 1314 | Rowell (Schliep) | Ronda | 02A |
| 1315 | Roy | Larry | 03CA |
| 1316 | Rubens | René | 03FL |
| 1317 | Rucinski Jr. | Gary | 03A |
| 1318 | Rudd | James Daniel | 01A |
| 1319 | Rumpf | Michael | 02A |
| 1320 | Russell | Gregory | 03B |
| 1321 | Russell | Michael E. | 96A |
| 1322 | Russell Jr. | Carl Ralph | 02B |
| 1323 | Russo | Marc | 03NY |
| 1324 | Ruta | Charles | 02A |
| 1325 | Ryan | Christopher Scott | 02A |
| 1326 | Saaverdra | Roy | 01B |
| 1327 | Salazar | Horacio | 99B |
| 1328 | Salazar | Richard | 03CA |
| 1329 | Salerno | Ronald | 02A |
| 1330 | Salo | Timothy D. | 03MN |
| 1331 | Samuels | Michael Jerome | 99B |
| 1332 | San Juan | Larry | 96A |
| 1333 | Sanabria | Anthony | 96A |
| 1334 | Sanchez | Jesus R. | 03CA |
| 1335 | Sanderson | Michale | 99A |
| 1336 | Sandoval | Max | 96B |
| 1337 | Sandoval | Steven | 99B |
| 1338 | Santagati | Daniel | 99B |
| 1339 | Santiago | Genaro, Jr. | 99A |
| 1340 | Santos | Allen | 03CA |
| 1341 | Santos | Carl | 02A |

32

Case 4:03-cv-01180-SBA     Document 5166     Filed 02/24/2005     Page 43 of 61

| No. | Last Name | First Name | Agreement Version |
|---|---|---|---|
| 1342 | Santos | Daniel | 03CA |
| 1343 | Santos | David | 03MA |
| 1344 | Saucedo | Amanda | 02C |
| 1345 | Saulog | Mario B. | 96A |
| 1346 | Savage | Chris | 99A |
| 1347 | Savage | Roderick | 03C |
| 1348 | Savas | James | 03A |
| 1349 | Savino | Robert | 99A |
| 1350 | Sayles | Kevin M. | 03MO |
| 1351 | Schaal | Christopher | 02A |
| 1352 | Schaffer | Timothy | 03MI |
| 1353 | Schepers | Edwin | 99A |
| 1354 | Schlabach | Richard A. | 03VA |
| 1355 | Schlamp | Renee LAura | 02B |
| 1356 | Schneider | Anthony | 99B |
| 1357 | Schneiter | John A. | 99A |
| 1358 | Scholl | Michael | 99A |
| 1359 | Schomburg | James F. | 99A |
| 1360 | Schroeder | Doug | 02A |
| 1361 | Schubert | Robert D | 96A |
| 1362 | Schultz | Kent L. | 03OH |
| 1363 | Schumacher | Zachary P. | 99E |
| 1364 | Schwartz | Garry | 96A |
| 1365 | Schweiss | John | 01A |
| 1366 | Scott | Joshua | 99B |
| 1367 | Scott Jr. | Bobby Joe | 99A |
| 1368 | Seamons | Arthur Franklin | 99A |
| 1369 | Sebastiano | John | 01A |
| 1370 | Seech | Jason | 99A |
| 1371 | Seitz | John W. | 03CA |
| 1372 | Sepulveda | Vito | 02A |
| 1373 | Serrano | Ruben, Jr. | 99A |
| 1374 | Sessoms | John | 99A |
| 1375 | Sexton | Jerry | 03CA |
| 1376 | Seymour | Adam | 01A |
| 1377 | Shaw | Aaron | 01A |
| 1378 | Shaw | Brenda | 02A |
| 1379 | Shaw | Randy | 02A |
| 1380 | Sheahan | Daniel V. | 03RI |
| 1381 | Sheck | Troy P. | 02A |
| 1382 | Sheehy | Andrew | 96A |
| 1383 | Sheets | Scott | 02A |

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|-----------|-------------------|
| 1384 | Sheets | Steven | 03NC |
| 1385 | Sheipline | Richard | 96A |
| 1386 | Shelton | Brian James | 02A |
| 1387 | Shepard | Perry | 01A |
| 1388 | Shepherd | Dan | 03TX |
| 1389 | Shepherd | Michael | 99A |
| 1390 | Sheppard | Elton | 96A |
| 1391 | Sherfield | Robert Eric | 02A |
| 1392 | Sheridan | Timothy | 99A |
| 1393 | Shirey | Richard (Cres) | 01A |
| 1394 | Shonk | Jay Daniel | 99B |
| 1395 | Shook | Jared W. | 99A |
| 1396 | Shores | Wayne Matthew | 02A |
| 1397 | Shufford | Robert Lee, Jr. | 03A |
| 1398 | Siena | Michael A. | 03A |
| 1399 | Silva | Donald R. | 99B |
| 1400 | Silvas | David | 99B |
| 1401 | Simmons | Mario | 03FL |
| 1402 | Simmons | Robe | 03AL |
| 1403 | Simmons, Jr. | Elliott F. | 02A |
| 1404 | Simms | Garnet | 02A |
| 1405 | Simon | Jermaine | 02A |
| 1406 | Simpson | Harold | 99B |
| 1407 | Simpson | Heather L. | 01B |
| 1408 | Sipres | Joe C. | 02B |
| 1409 | Sizemore | Glenn Arthur | 99A |
| 1410 | Skuratovich | David | 99A |
| 1411 | Slade | William | 99B |
| 1412 | Slay | David | 99A |
| 1413 | Sledz | Steven | 99A |
| 1414 | Sloane | Richard | 03NY |
| 1415 | Slone Jr. | Ralph | 96A |
| 1416 | Smeltzer | Terry | 03A |
| 1417 | Smiley | Almond | 99B |
| 1418 | Smith | Barbara | FAS-B |
| 1419 | Smith | Benjamin N. | 02A |
| 1420 | Smith | Bruce P. | 96A |
| 1421 | Smith | Carll | 03NJ |
| 1422 | Smith | Carlton LAmar | 99A |
| 1423 | Smith | Clayton Robert | 96A |
| 1424 | Smith | Darrin | 96A |
| 1425 | Smith | Glenn | 99A |

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|-----------|-------------------|
| 1426 | Smith | James Earl | 02A |
| 1427 | Smith | Jonathan | 96C |
| 1428 | Smith | Michael | 99A |
| 1429 | Smith | Michael R. | 96A |
| 1430 | Smith | Michael W. | 03TX |
| 1431 | Smith | Patrick | 03MS |
| 1432 | Smith | Paul Douglas | 99A |
| 1433 | Smith | Phillip A. | 99A |
| 1434 | Smith | Scott Allen | 01B |
| 1435 | Smith | Vincent | 99B |
| 1436 | Smith | Walter | 99A |
| 1437 | Smith III | Sam | 03C |
| 1438 | Smith, Sr. | Terrence Y. | 96A |
| 1439 | Snyder | Greg | 99A |
| 1440 | Solano | Jaime | 99A |
| 1441 | Solorio | Juan | 99B |
| 1442 | Solorzano | Alvaro | 03FL |
| 1443 | Soroka | Allen | 99A |
| 1444 | Sothern | T. Gregory | 99A |
| 1445 | Southerland | Todd Daniel | 99A |
| 1446 | Spinale | James | 99A |
| 1447 | Spivey | Randy | 99B |
| 1448 | Springston | Jeff | 99A |
| 1449 | St. John | Barry | 99B |
| 1450 | Staggs | Kevin | 02A |
| 1451 | Stamper | Fred | 02C |
| 1452 | Stancil | Michael | 99A |
| 1453 | Staples | Shade | 02B |
| 1454 | Stark | Michael | 99A |
| 1455 | Starkey | Aaron | 99A |
| 1456 | Starnes | David | 99B |
| 1457 | Starr | Garett | 02A |
| 1458 | Stearns | Tommy | 03FL |
| 1459 | Steele | Donald Wayne | 96A |
| 1460 | Steele | Jesse L. | 99A |
| 1461 | Steiner | William | 03B |
| 1462 | Stellato | Eric | 01A |
| 1463 | Stephens | Jeff | 03KY |
| 1464 | Stephens | Randall | 03A |
| 1465 | Still | Dexter | 03B |
| 1466 | Stokes | LaVonzelle | 03A |
| 1467 | Stoklosa | Keith | 99A |

| No. | Last Name | First Name | Agreement Version |
|---|---|---|---|
| 1468 | Stoklosa | Michael | 99A |
| 1469 | Stone | John | 03CA |
| 1470 | Stoppel | Tracy | 99A |
| 1471 | Storie | Kenneth S. | 03OK |
| 1472 | Story | John | 99B |
| 1473 | Strader | Christopher | 03NC |
| 1474 | Straka | Chris | 03IL |
| 1475 | Streng | Derek | 96A |
| 1476 | Stroup | Carl D. | 99A |
| 1477 | Stuckey | Jarred D. | 03A |
| 1478 | Sturgis | Tom | 96B |
| 1479 | Sturkie | Rodney | 99A |
| 1480 | Stutz | Shiloh | 02A |
| 1481 | Sudol | Wes | 01B |
| 1482 | Sullivan | Robert | 96A |
| 1483 | Summers | Tony | 99B |
| 1484 | Sumpter III | Max | 96A |
| 1485 | Sumption | Trevor | 99A |
| 1486 | Sweet | Daniel T | 99B |
| 1487 | Swenson | Todd | 02A |
| 1488 | Swett, Jr. | Steven T. | 96A |
| 1489 | Sword | Richard | 03MI |
| 1490 | Sylvester I | George | 03AL |
| 1491 | Sylvia | Chris | 02A |
| 1492 | Tackett | David | 99A |
| 1493 | Talbert | Ralph E., Jr. | 99A |
| 1494 | Talo | Scott | 96A |
| 1495 | Tantillo | Stephen | 99A |
| 1496 | Tapia | Joseph | 99A |
| 1497 | Tarantola | Thomas | 96A |
| 1498 | Tatum | Christopher | 96A |
| 1499 | Taunton | John Logan | 03MO |
| 1500 | Taveras | Luis | 99A |
| 1501 | Taylor | Donald E. | 02B |
| 1502 | Taylor | Kurt H. | 03IL |
| 1503 | Teague | Eric D. | 02A |
| 1504 | Temple | Todd T. | 02B |
| 1505 | Tenney | Sandy | 01A |
| 1506 | Tepe | Jeffrey K. | 96B |
| 1507 | Terrell | Antwan | 96A |
| 1508 | Theis | Thomas | 03MN |
| 1509 | Theisman | John | 96A |

| No. | Last Name | First Name | Agreement Version |
|---|---|---|---|
| 1510 | Theriault | James | 96A |
| 1511 | Therrien | Bernard | 02A |
| 1512 | Thoma | Michael | 02A |
| 1513 | Thomas | Christopher W. | 99A |
| 1514 | Thomas | Ernest L. | 02A |
| 1515 | Thomas | Gerry | 99B |
| 1516 | Thomas | Theodore | 02B |
| 1517 | Thomas Jr. | James | 02A |
| 1518 | Thompson | A. Shapelle | 99A |
| 1519 | Thompson | Joe | 03A |
| 1520 | Thompson | Mark | 99A |
| 1521 | Thompson | Tommy | 03TX |
| 1522 | Thompson | Wayne | 99A |
| 1523 | Thornhill II | Larry | 96A |
| 1524 | Tiegen | Jason | 02A |
| 1525 | Tillison | Tony Demario | 99A |
| 1526 | Tilseth | Steven | 99A |
| 1527 | Tisdel | Edward E. | 99B |
| 1528 | Toledo | Alejandro | 99A |
| 1529 | Tomaszewski | Scott | 02A |
| 1530 | Tomkinson | John P. | 01A |
| 1531 | Tompkins | Brian | 99B |
| 1532 | Tooley | Jimmy Ray | 99A |
| 1533 | Toone | Marc A. | 99C |
| 1534 | Torres | Jose | 99A |
| 1535 | Torrez | Julian | 99B |
| 1536 | Tow | Christopher | 01B |
| 1537 | Travis | Jason | 02A |
| 1538 | Treft | Harold | 99A |
| 1539 | Trimble | Vassandral | 03C |
| 1540 | Truax | Keith | 02A |
| 1541 | Truman | Scott | 01B |
| 1542 | Trygg | Ken | 99B |
| 1543 | Tucker | Cary | 02A |
| 1544 | Turner | Daniel Scott | 02B |
| 1545 | Tusing | Troy | 03MO |
| 1546 | Tussey | John Rile | 96A |
| 1547 | Twitty | Derrel | 99C |
| 1548 | Tyrka | Peter | 99A |
| 1549 | Tzelepis | Anastasios | 99B |
| 1550 | Uballez | Aaron R. | 03B |
| 1551 | Uber | Gregory Steven | 02B |

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|------------|-------------------|
| 1552 | Ulloa | Hector | 03CA |
| 1553 | Underwood | Matthew | 96A |
| 1554 | Upshaw | Jobette T. | 03VA |
| 1555 | Urbanczyk | Kenneth | 99A |
| 1556 | Uschold | John E. | 03NY |
| 1557 | Vaitu'u Jr. | Ululalo | 99A |
| 1558 | Van Coppenolle | Greg | 96A |
| 1559 | Van Overloop | Trent | 03MI |
| 1560 | VanAuken | Ralph | 03NY |
| 1561 | Vance | Adam | 99A |
| 1562 | Vanderkuyl | Christopher John | 02A |
| 1563 | Vanderpool | William Ed | 99B |
| 1564 | Vandervort | Steve | 99B |
| 1565 | Vasquez | Juan | 99B |
| 1566 | Vasquez | Ruddy | 96A |
| 1567 | Vassau | Jeff | 99A |
| 1568 | Vazquez | Fabian | 02A |
| 1569 | Vega | Jaime | 99B |
| 1570 | Venable | Gary | 99B |
| 1571 | Venable | Kevin | 02B |
| 1572 | Vera | Hiram | 99A |
| 1573 | Vergara | Gerardo | 96A |
| 1574 | Vernille | Stephen | 99A |
| 1575 | Verucchi | Keith | 03MS |
| 1576 | Vetsch | Todd | 02A |
| 1577 | Vick | Johnnie Lee | 99A |
| 1578 | Villapudua | Bernard | 99B |
| 1579 | Villegas | Ignacio | 99B |
| 1580 | Villias | Ann-Marie | 03CA |
| 1581 | Vo | Tuan Phi | 96A |
| 1582 | Voss | Todd | 99A |
| 1583 | Vulaj | Victor | 02A |
| 1584 | Wakefield | Keith | 99A |
| 1585 | Waldorf | Michael | 99A |
| 1586 | Waldschmidt | Jeffrey R. | 02A |
| 1587 | Walker | Anthony S. | 99A |
| 1588 | Walker | Frank Thomas | 96B |
| 1589 | Walker | Willie | 02A |
| 1590 | Wallace | Andrew | 02A |
| 1591 | Wallace | Jacob | 96A |
| 1592 | Wallace | Jason | 01A |
| 1593 | Walston | Jeff | 01A |

Case 4:03-cv-01180-SBA     Document 55-16     Filed 02/14/2005     Page 539 of 641

| No. | Last Name | First Name | Agreement Version |
|------|-----------|-----------|-------------------|
| 1594 | Walters | Lynn Dee | FAS-B |
| 1595 | Ward | Edwin | 96B |
| 1596 | Warner | Andre L. | 03SC |
| 1597 | Washington | Monte | 02A |
| 1598 | Washington | Sharmane | 99A |
| 1599 | Washington | Valtorian Evander | 96B |
| 1600 | Wasylik | Thomas | 03MN |
| 1601 | Watkins | Bradley Steven | 02A |
| 1602 | Watson | Demond | 02B |
| 1603 | Webb | Thomas | 03A |
| 1604 | Weeks | Matthew Jason | 01A |
| 1605 | Weinert | Fred K. | 03FL |
| 1606 | Weisbecker | Stephen | 02A |
| 1607 | Weiss | Matthew | 03MO |
| 1608 | Wells | John | 02C |
| 1609 | Wenner | Cade T | 02B |
| 1610 | West | Clint | 03OH |
| 1611 | West | Michael | 02B |
| 1612 | Westover | Steve | 01A |
| 1613 | Wetoszke | Douglas | 99A |
| 1614 | Whalen | Jeremy Edward | 03TX |
| 1615 | Wheaton | David | 02A |
| 1616 | Wheeler | James Richard | 99B |
| 1617 | Whitcomb | Frederick D | 03KS |
| 1618 | White | 0 | 03CA |
| 1619 | White | Anthony | 99A |
| 1620 | White | Franklin Delano | 99B |
| 1621 | White | Lonnie | 96A |
| 1622 | White | Matthew | 01B |
| 1623 | White | Philip Joel | 01B |
| 1624 | White Jr. | Richard Allen | 02A |
| 1625 | Whiteoak | Jay R. | 03MN |
| 1626 | Whitfield | Charles Lee | 96B |
| 1627 | Wick | Matthew | 01A |
| 1628 | Wickman | Steve | 03MO |
| 1629 | Wiehl | Steven | 03RI |
| 1630 | Wierzbicki | Dariusz | 99A |
| 1631 | Wight | Jerry | 99A |
| 1632 | Wildeman | James | 96A |
| 1633 | Williams | Andre | 01A |
| 1634 | Williams | Barry C. | 99B |
| 1635 | Williams | Candice | 01A |

Case 4:03-cv-01880-SBA    Document 50-16    Filed 09/29/2005    Page 54 of 61

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|------------|-------------------|
| 1636 | Williams | Charles Anthony | 96B |
| 1637 | Williams | Christopher | 99A |
| 1638 | Williams | Damon | 99A |
| 1639 | Williams | Edward | 03B |
| 1640 | Williams | James | 03CA |
| 1641 | Williams | Jeffrey Lee | 99A |
| 1642 | Williams | Joel | 99B |
| 1643 | Williams | Kelan L | 03TX |
| 1644 | Williams | Larry James | 99A |
| 1645 | Williams | Michael | 99A |
| 1646 | Williams | Paul | 99A |
| 1647 | Williams | Robert C./Heather | 96A |
| 1648 | Williams | Shannon Lee | 01A |
| 1649 | Williams Jr. | Clarence | 96B |
| 1650 | Willis | Rufus L. | 03FL |
| 1651 | Wilmoth | Brandon | 03CA |
| 1652 | Wilson | David | 03CO |
| 1653 | Wilson | Jason L. | 02C |
| 1654 | Wilson | Robert N. | 99B |
| 1655 | Wilson | Robert Reed | 01A |
| 1656 | Wilson | Ronald Joseph | 02A |
| 1657 | Wilson | William A. | 02A |
| 1658 | Wilson Jr. | Ronald | 03CA |
| 1659 | Wilton | Jeffrey Dean | 99A |
| 1660 | Winans Sr. | Ronald | 99B |
| 1661 | Winberry | John | 02B |
| 1662 | Windom | Randy L. | 99B |
| 1663 | Wingo | Ryan Glenn | 01B |
| 1664 | Witkoske | Richard | 99A |
| 1665 | Wobbrock | Jeffrey Craig | 02A |
| 1666 | Wolf | Erik | 99B |
| 1667 | Wolf | Joann M. | 02A |
| 1668 | Wolfe | Jay Christopher | 99B |
| 1669 | Wolner | Timothy | 01A |
| 1670 | Wood | Lendon | 02F |
| 1671 | Wood | Michael Lane | 99A |
| 1672 | Wood | Robert | 99B |
| 1673 | Wood | Robert Lane | 03AL |
| 1674 | Woodfin | Kenneth E. | 03TX |
| 1675 | Woodson | Mark William | 02B |
| 1676 | Woody | Ronald | 01B |
| 1677 | Wookey | Gene | 99B |

Case 4:03-cv-01180-SBA   Document 50-16   Filed 02/14/2005   Page 52 of 61

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|-----------|-------------------|
| 1678 | Woolwine | Eric | 99A |
| 1679 | Wragg | Mark Richard | 01A |
| 1680 | Wright | Terry | 99A |
| 1681 | Xaros | Arthur | 99A |
| 1682 | Yates | Charles B. | 99A |
| 1683 | Ybarra | Louis | 99B |
| 1684 | Yim | Simon | 03CA |
| 1685 | Ymaya | Cesar | 02A |
| 1686 | Yontz | Robert | 96C |
| 1687 | Young | Richard | 99B |
| 1688 | Youngbrandt | Stefan | 99E |
| 1689 | Yowell | William | 03NC |
| 1690 | Zacharias | Michael | 03MN |
| 1691 | Zall | Bradley | 03CO |
| 1692 | Zapata | Fernando | 99A |
| 1693 | Zarbaugh | Ruth Ann | 03A |
| 1694 | Zavala | Edwin | 99B |
| 1695 | Zayas Jr. | Hector | 99A |
| 1696 | Zeda | Moises | 03I |
| 1697 | Zermeno | Oscar | 99A |
| 1698 | Zigler | Ryan L. | 99A |
| 1699 | Zygarlicke | Sarah R. | 03WI |
| 1700 | Zytkowicz | Michael | 99A |

## Exhibit F
## Louisiana

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|------------|-------------------|
| 1 | Addison | Jack | 03LA |
| 2 | Avery | Ivan Edward | 99E |
| 3 | Blessing | Jay | 03LA |
| 4 | Bolden | Alfonso | 03LA |
| 5 | Britt | Tony | 99A |
| 6 | Brown, Jr. | Gregory | 03LA |
| 7 | DeBose | Erroll A. | 96A |
| 8 | Fontenot Jr. | Gustave | 03LA - Conf. |
| 9 | Foto | Jacob J. | 99A |
| 10 | Galloway | Robert C. | 03LA |
| 11 | Giamalva, Jr. | Frank | 99A |
| 12 | Green | Steven | 02D |
| 13 | Gremillion | John Alex | 01A |
| 14 | Guthrie | Terrance P. | 03LA |
| 15 | Hutto | Herman | 99A |
| 16 | Jeansonne | Joel | 03LA |
| 17 | Johnson | Eugene | 96A |
| 18 | Lanclos | Joseph | 03LA |
| 19 | Lavergne IV | Theodore J. | 01A |
| 20 | Lewis | Donald | 99A |
| 21 | Livingston | Daniel | 03LA - Conf. |
| 22 | Maloch | Andrew | 03D |
| 23 | Manale III | Ted | 03LA |
| 24 | Massey | Jason K. | 03D |
| 25 | McCain | Kenny P. | 03LA |
| 26 | McCain | Barry Preston | 03LA |
| 27 | McDaniel | Chester | 02D |
| 28 | Nelson | Tyrick D. | 03LA |

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|------------|-------------------|
| 29 | Parker | Benny | 96A |
| 30 | Pierce | Glen H. | 02D |
| 31 | Prejean | Barney | 96A |
| 32 | Prescia | Salvador | 03LA |
| 33 | Price | Jason | 03LA |
| 34 | Ramirez | Brett | 99A |
| 35 | Rauch | Darren | 03LA |
| 36 | Richard | Dennis M | 03LA |
| 37 | Salazar | Gregory M. | 03LA |
| 38 | Santalucito | Vincent | 03LA |
| 39 | Siekkinen | John Davin | 96A |
| 40 | Slocum | Ray | 99A |
| 41 | Smith | Richard | 99A |
| 42 | Smith | Daniel | 03LA |
| 43 | Sutter | John Michael | 99A |
| 44 | Thomas | Jack Darren | 03LA |
| 45 | Tully, Jr. | John | 99A |
| 46 | White Jr. | Joseph | 99A |
| 47 | Witty | Aaron Paul | 03LA |
| 48 | Wood | Mark Dolton | 03LA |
| 49 | Yarbrough | Gary | 01A |

2

# Exhibit G
## Arizona

| Last Name | Last Name | First Name | Agreement Version |
|---|---|---|---|
| 1 | Abel | Robert J. | 02A |
| 2 | Barnard | Justin | 01A |
| 3 | Bustamante | Esequiel | 99A |
| 4 | Cavagnaro | Tina A. | 02A |
| 5 | Clouse | Daniel | 99A |
| 6 | Colihan | Robert | 02A |
| 7 | Covert | Roderick | 03AZ |
| 8 | Cox | Shane A | 03AZ |
| 9 | Dominguez | Frank Christopher | 99A |
| 10 | Doone | Benjamin | 99A |
| 11 | Glover | Robert | 02A |
| 12 | Goodman | Stuart S. | 01A |
| 13 | Green | Jason Warren | 02A |
| 14 | Held | David | 99A |
| 15 | Ivins | Justin | 03A |
| 16 | Jones | David E. | 02A |
| 17 | Line | Larry L. | 03AZ |
| 18 | Linkey | James Joseph | 02A |
| 19 | Maldonado | Daniel | 02A |
| 20 | Maser | Richard | 03AZ |
| 21 | Mason, Jr. | Charles E. | 02A |
| 22 | Maves | Cynthia | 99A |
| 23 | McCoy | Michael Eric | 99A |
| 24 | Otero | Joseph Scott | 99A |
| 25 | Pain | Eugene R. | 03AZ |
| 26 | Peace | Jarrod | 02A |
| 27 | Pettit | Douglas | 02A |
| 28 | Pilgrim | Todd | 99A |

1

| Last Name | Last Name | First Name | Agreement Version |
|-----------|-----------|------------|-------------------|
| 29 | Randall | Kyle Richard | 99A |
| 30 | Sandoval | Manuel | 99A |
| 31 | Schaper | Matt | 03AZ |
| 32 | Shepherd | Rebecca | 02A |
| 33 | Sigl | Jonathan | 01A |
| 34 | Snell | Richard | 02A |
| 35 | Stokes | Bryan | 02A |
| 36 | Thomas III | George | 02A |
| 37 | Thompson | Robert | 02A |
| 38 | Vesey | Brena | 02A |
| 39 | Whitener | Jessy | 02A |
| 40 | Young Jr. | John W. | 01A |

## Exhibit H
## Pennsylvania

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|------------|-------------------|
| 1 | Baptist | Kenneth W. | 99A |
| 2 | Benecke | Stephen C | 01A |
| 3 | Blackburn | Jessica Lynn | 99A |
| 4 | Brandt | Dean | 96A |
| 5 | Brewster | James | 01A |
| 6 | Buttner | Christopher C. | 03PA |
| 7 | Checchia | Davide | 96A |
| 8 | Chew | William | 03A |
| 9 | Cintron | Michael S. | 02A |
| 10 | Cruz | Samuel | 03PA |
| 11 | Dauria | Philip | 99A |
| 12 | DeRenzo | Christopher | 01A |
| 13 | Dickson | Kevin | 99A |
| 14 | Dodson | Shirley | 03A |
| 15 | East | Joel | 99A |
| 16 | Eperthener | Andrew W. | 99A |
| 17 | Erickson | Daniel | 01A |
| 18 | Ericson | Robert | 01A |
| 19 | Faux | Jaime A. | 99A |
| 20 | Fellin | Paul Lewis | FAS-C |
| 21 | Folsom | James | 99A |
| 22 | Freeman | Scott | 01A |
| 23 | Geissinger | Michael B. | 02A |
| 24 | Gilbert | Brian | 01A |
| 25 | Gilchrist | Joe | 99A |
| 26 | Goida | Jeffrey | 99A |
| 27 | Gonzalez | Ivan | 99A |
| 28 | Gordineer | Donald | 99A |

1

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|-----------|-------------------|
| 29 | Greene | Les | 03PA |
| 30 | Gula | Jon | 99A |
| 31 | Hall | Renee | 99A |
| 32 | Henning | William D., II | 03PA |
| 33 | James | Joseph | 99A |
| 34 | Klutch | Thomas | 03PA |
| 35 | Kuba | Daniel | 99A |
| 36 | Laskowski Jr. | Thomas M. | 02A |
| 37 | Lauer | Mark | 99A |
| 38 | Leazier | Linda | 03A |
| 39 | Lipscomb III | Leonard | 99A |
| 40 | Loranger | Matt | 99A |
| 41 | Marsicano | Angelo | 99A |
| 42 | Martell Jr. | Charles | 96A |
| 43 | Martin | Douglas | 02A |
| 44 | Maule | John | 99A |
| 45 | McCue, Jr. | Edward | 01A |
| 46 | Mecum | Andrew O. | 03PA |
| 47 | Mertens | James | 96A |
| 48 | Michelfelder | John | 99A |
| 49 | Mikulski | Zenard W. | 02A |
| 50 | Miller | Josh | 02A |
| 51 | Mullin | John | 01A |
| 52 | Munn | Brian | 96A |
| 53 | Murphy | Matthew | 02A |
| 54 | Nicotero III | Ross | 99A |
| 55 | Novatnak | Robert | 99A |
| 56 | Nye | Timothy | 02A |
| 57 | O'Connell | Stephen | 02A |
| 58 | Olli | Mark, Jr. | 99A |
| 59 | Orsini | Chris | 99A |

2

| No. | Last Name | First Name | Agreement Version |
|-----|-----------|------------|-------------------|
| 60 | Ortiz | Andres | 02A |
| 61 | Osman | Michael | 03PA |
| 62 | Overman | Alonzo K. | 99A |
| 63 | Phillips | Jason | 02A |
| 64 | Potechko | Carl | 01A |
| 65 | Pottichen Jr. | William F. | 96A |
| 66 | Primerano | David | 96A |
| 67 | Quinn | Michael | 01A |
| 68 | Raymond | Thomas | 99A |
| 69 | Reedy Jr. | Robert | 99A |
| 70 | Riley | Brian | 99A |
| 71 | Santana | Victor | 99A |
| 72 | Schwartz | Glenn | 03A |
| 73 | Scialanca | David | 02A |
| 74 | Sciscio | Jesse Paul | 02A |
| 75 | Secora | Jason | 01A |
| 76 | Shortencarrier | Daniel | 02A |
| 77 | Smith | Michael S. | 03PA |
| 78 | Sossong | Thomas | 02A |
| 79 | Staggs | James Ervin | 96A |
| 80 | Stefani | John | 01A |
| 81 | Stefanick | Jared | 99A |
| 82 | Stillfield | Miguel | 96A |
| 83 | Tokish | Nicholas | 02A |
| 84 | Torris III | Leonard R | 99A |
| 85 | Vallette | Charles | 96A |
| 86 | Vickless | Dave | 99A |
| 87 | Wiggins | Raiford F. | 99A |

## Exhibit I

| No. | Last Name | First Name | Disputed States | Agreement Version |
|-----|-----------|------------|-----------------|-------------------|
| 1 | Gentry | David Lewis | GA, TN | 96A |
| 2 | Lackey | Christopher Alan | GA, TN | 99A |

## Exhibit J

| Last Name | First Name | State | Agreement Version |
|-----------|------------|-------|-------------------|
| Bradley | Thomas | MO | 96A |
| Bruck | Louise | OH | 99A |
| Gumbs | Allan | MD | 99A |
| Johnson | Douglas | KS | 99A |
| Olson | Andrew | CA | 02B |
| Stewart | Clarence | CA | 03CA |

Note: Plaintiff Gumbs was compelled to arbitrate as part of the Court's April 5, 2004 Order. Plaintiffs nonetheless assert a challenge on his behalf.

1

# <u>Exhibit 6</u>

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

(Oakland Division)

| | |
|---|---|
| PAUL VELIZ, et al., on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>vs.<br><br>CINTAS CORPORATION, an Ohio corporation; PLAN ADMINISTRATOR for the Cintas Partners' Plan; and DOES 1-25, inclusive,<br><br>        Defendants.<br>_____/ | Case No.  03-01180 (SBA)<br><br>CLASS ACTION<br><br>E-FILING<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO RECONSIDER ORDER GRANTING IN PART DEFENDANT'S MOTION TO COMPEL ARBITRATION** |

Plaintiffs' Motion to Reconsider Order Granting in Part Defendant's Motion to Compel

Arbitration [Docket No. 377] and Cintas' opposition thereto came before this Court, and was submitted

on the papers without oral argument.  Having considered the papers presented, and the argument of

counsel set forth therein, the Court GRANTS IN PART and DENIES IN PART plaintiffs' Motion.

## I.    RELIEF REQUESTED BY PLAINTIFFS' MOTION

In its Order dated April 5, 2004 [Docket No.140], the Court granted in part Cintas' Motion

to Compel Arbitration and Stay Proceedings, finding that 56 of the original 65 plaintiffs were subject to

enforceable agreements to arbitrate their claims against Cintas before the American Arbitration

1

Association ("AAA"). Applying the respective governing law at issue as to those 56 persons, the Court determined that some of the terms of the arbitration agreements were unconscionable, such as a "loser-pays" provision in the parties' 1996 agreements, which the Court severed, all as is more fully stated in the April 5, 2004 Order.

Plaintiffs thereafter submitted to the AAA a Demand for Classwide Arbitration, seeking arbitration on a class and/or collective basis. Dosker Decl. Exh. A. [Docket No. 389].

In seeking reconsideration of the April 5, 2004 Order, plaintiffs claim that there are new facts that warrant the Court revisiting its April 5, 2004 Order to find that the arbitration agreements are unconscionable and, therefore, unenforceable. First, plaintiffs argue that the AAA intends to hold them responsible under its Supplementary Rules for Class Arbitration for one half of the costs of arbitration on a class or collective basis, including arbitrator compensation. Plaintiffs contend that the arbitration agreements (which incorporate the AAA's National Employment Rules), unconscionably interfere with their ability to vindicate their statutory rights through arbitration on a class or collective basis.

Second, plaintiffs argue that the Court should find the parties' arbitration agreements unconscionable because Cintas has taken the position *in the arbitration* that the specific arbitration (on a nationwide class or collective basis) demanded by plaintiffs is in breach of the various choice-of-law and place-of-arbitration provisions in the various individual arbitration agreements. Each of the individuals' arbitration agreements with Cintas provides that the AAA's National Employment Rules apply; they make no mention of the AAA Supplementary Rules for Class Arbitration. See e.g., Clendening Decl. Ex. B at paragraph 5 and at corresponding term in Exs C through III [Docket Nos. 50, 51]. The AAA applies its Supplementary Rules for Class Arbitration to all demands for arbitration in

2

which classwide relief is demanded. Dosker Decl. Exh. I at Rule 1(a) (page 1) [Docket No. 389].

Third, plaintiffs contend that a declaration submitted by Cintas employee Jenice Clendening in a different case provides new evidence of procedural unconscionability with regard to the California plaintiffs such that the Court should not enforce the California plaintiffs' arbitration agreements.

Finally, plaintiffs argue that the place-of-arbitration provision in the parties' arbitration agreements is unenforceable because: (1) the Court is not empowered to compel arbitration outside of this district pursuant to 9 U.S.C. § 4; and (2) enforcing the place-of-arbitration provision would result in fundamental unfairness.

## II.    DISCUSSION

The FAA establishes a "liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). The "primary purpose" of the FAA is to ensure that "private agreements to arbitrate are enforced according to their terms." *Volt Info. Scis. v. Bd. of Trs.*, 489 U.S. 468, 479 (1989). Any "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration" and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone*, 460 U.S. at 24. Thus, where one of the parties is resisting arbitration, the United States Supreme Court requires that party to "bear[] the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79, 91 (2000). In seeking reconsideration of the Court's April 5, 2004 Order, plaintiffs fail to satisfy this burden.

//

3

a.   **THE COSTS OF ARBITRATION AT ISSUE ARE NOT UNCONSCIONABLE BECAUSE PLAINTIFFS CAN VINDICATE THEIR STATUTORY RIGHTS IN INDIVIDUAL ARBITRATIONS, AND THE COSTS IN QUESTION ONLY APPLY TO ARBITRATION ON A CLASS OR COLLECTIVE BASIS**

Plaintiffs argue that the Court should not enforce their agreements to arbitrate because they believe that the AAA will hold them responsible for one half the costs of arbitration on a class or collective basis, which the plaintiffs estimate could exceed $25,000.  Rubin Decl. 33 [Docket No. 383]. Although plaintiffs acknowledge that they could pursue their claims through individual arbitrations at Cintas' expense,[1] they contend that requiring them to bear any expense for arbitration on a *class or collective basis* "impose[s] a substantial barrier to the vindication of their rights."  Plaintiffs' Memorandum of Points and Authorities ("Memo") at 11.  [Docket No. 384]. The Court finds that plaintiffs' arguments fail.

Precedent establishes that even an inability to proceed on a class or collective basis in arbitration has no impact on a plaintiff's ability to vindicate his or her substantive statutory rights.

The United States Supreme Court held in *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 32 (1991) that a party's inability to pursue class or collective relief in arbitration does not interfere with that party's ability to vindicate his statutory rights.  The *Gilmer* plaintiff argued that he should not be compelled to arbitrate his claims under the Age Discrimination in Employment Act ("ADEA") because he would be unable to pursue class or collective treatment in arbitration. *Id.*[2]   Rejecting this argument, the

---

[1]Plaintiffs' Memorandum of Points and Authorities at 2:12-14 [Docket No. 384]; Rubin Decl. ¶16 [Docket No. 383]; Dosker Decl.  Ex. D at p.2[Docket No. 389]; Docket No. 365; Docket No. 370 at 2:5-7; and items cited in note 6 below.

[2]The provision for class actions (collective actions) in the ADEA is the FLSA provision for class actions (collective actions), which the ADEA expressly adopts. 29 U.S.C. § 626(b); *Carter v.*

4

Court held that a party *can* vindicate statutory rights through individual arbitration and "does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Id.* at 26. In language directly relevant to the present motion, the Court in *Gilmer* stated that:

> [E]ven if the arbitration could *not go forward as a class action or class relief could not be granted by the arbitrator*, the fact that the [ADEA] provides for the possibility of bringing a collective action does not mean that individual attempts at conciliation were intended to be barred.

500 U.S. at 32 (emphasis added) (citation omitted).

In *Carter v. Countrywide Credit Indus., Inc.*, 362 F.3d 294, 298 (5th Cir. 2004), the Court of Appeals expressly rejected plaintiffs' argument that their "inability to proceed collectively [under the FLSA] deprives them of substantive rights under the FLSA." *Id.* So long as a plaintiff can pursue the substantive statutory rights through individual arbitration, a plaintiff's inability to proceed collectively or on behalf of a class is legally irrelevant. The Court of Appeals held that:

> we reject the Carter Appellants' claim that their inability to proceed collectively deprives them of substantive rights available under the FLSA. The Supreme Court rejected similar arguments concerning the ADEA in *Gilmer*, despite the fact that the ADEA, like the FLSA, explicitly provides for class action suits. 500 U.S. at 32. What is more, the provision for class actions in the ADEA is the FLSA class action provision, which the ADEA expressly adopts. 29 U.S.C. § 626(b). *Accordingly, Gilmer's conclusion in this respect applies with equal force to FLSA claims."*

*Id.* (emphasis added). Similarly, in *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 503 (4th Cir. 2002), the Court of Appeals held that there was "no suggestion in the text, legislative history, or purpose of the

---

*Countrywide Credit Indus., Inc.*, 362 F.3d 294, 298 (5th Cir. 2004); see 29 U.S.C. § 216(b).

FLSA that Congress intended to confer a nonwaivable right to a class action under that statute." The court held that the plaintiffs' "inability to bring a class action . . . cannot by itself suffice to defeat the strong congressional preference for an arbitral forum." *Id.*

In *Kuehner v. Dickinson & Co.*, 84 F.3d 316, 320 (9th Cir. 1996), the Ninth Circuit held that when an employee agrees to arbitrate, she forfeits any procedural rights arising from the FLSA, while retaining her substantive rights (e.g., the right to obtain substantive relief) in arbitration.

Because plaintiffs are able to pursue their statutory claims through individual arbitration at no substantial cost, the costs for pursuing arbitration on a class or collective basis are not a "condition of access to the arbitration forum" and are, therefore, not unconscionable. *Cf. Circuit City v. Adams*, 279 F.3d 889, 896 (9th Cir. 2001).[3]

Based on these authorities, it is apparent that enforcement of an arbitration agreement does not impact a plaintiff's ability to vindicate his or her statutory rights if such enforcement interferes with a plaintiff's ability to pursue arbitration on a class or collective basis, or indeed leads to a complete inability to pursue arbitration on a class or collective basis. Because plaintiffs have access to the arbitral forum in individual arbitrations for no substantial costs whatsoever, any costs imposed by the AAA based on plaintiffs' tactical choice to proceed by means of their demand for arbitration on a class or collective

---

[3]The Ninth Circuit says that courts have "interpreted *Gilmer* to require basic procedural and remedial protections so that claimants can effectively pursue their statutory rights", and cites the discussion of *Gilmer* in the case of *Cole v. Burns*, 105 F.3d 1465, 1482 (D.C.Cir. 1997) as listing the five basic requirements that an arbitral forum must meet. *Circuit City v. Adams*, 279 F.3d at 895; *Ting*, 319 F.3d 1126, 1151 (9th Cir. 2003). The ability to proceed as a class or collective is <u>not</u> one of them. *Cole*, 105 F.3d at 1482. Unlike in those cases, the availability here of the virtually no-cost individual arbitration forum means that the plaintiffs here "do not have to pay either unreasonable costs or any arbitrators' fees or expenses as a condition of access to the arbitration forum." *Cf. Circuit City v. Adams* 279 F.3d at 895; *cf. Ting v. AT&T*, 319 F.3d 1126, 1151.

basis cannot render the agreements to arbitrate unconscionable.

### b. PLAINTIFFS HAVE FAILED TO PRESENT EVIDENCE SUFFICIENT TO SHOW THAT COSTS WILL BE UNREASONABLY BURDENSOME

Even if the Court assumed that plaintiffs had a right to proceed collectively or as a class, their reconsideration motion is still deficient. In *Randolph*, the United States Supreme Court held that a party challenging an arbitration agreement as unconscionable on the ground that arbitration would be "prohibitively expensive . . . bears the burden of showing the likelihood of incurring such costs." 531 U.S. at 91-92. Given the "liberal federal policy favoring arbitration agreements," the party challenging arbitration must present an evidentiary record showing prohibitive costs will essentially "preclude a litigant . . . from effectively vindicating her federal statutory rights in the arbitral forum." *Id.* at 90-91.

Courts interpreting state law unconscionability standards in light of *Randolph* have held that a party seeking to invalidate an arbitration agreement must not only bear the burden of showing that it will incur high arbitration costs, it must also show that such costs will preclude them from seeking relief through arbitration. In *Bradford v. Rockwell Semiconductor Sys. Inc.*, 238 F.3d 549, 556 (4th Cir. 2001), for example, the Court of Appeals held that the determination of whether fee-splitting renders an agreement unenforceable must be examined in light of each individual plaintiff's ability to pay, on a case-by-case basis:

> [T]he appropriate inquiry is one that evaluates whether the arbitral forum in a particular case is an adequate and accessible substitute to litigation, i.e., a case-by-case analysis that focuses, among other things, upon the claimant's ability to pay the arbitration fees and costs, the expected cost differential between arbitration and litigation in court, and whether that cost differential is so

substantial as to deter the bringing of claims.[4]

The evidence submitted by plaintiffs is inadequate under *Randolph* to enable the Court to undertake a case-by-case analysis to determine whether costs that might be assessed by the AAA would preclude plaintiffs from pursuing their statutory claims.[5]  Although 56 plaintiffs seek reconsideration, only five of them claim that the costs of arbitration will be prohibitive.  On this evidence, the Court cannot find that the AAA's alleged cost-splitting policy for class arbitrations somehow renders the individual arbitration agreements between Cintas and each plaintiff unconscionable, even if there were some right to pursue arbitration on a class or collective basis.

Further, in determining whether an express cost splitting provision (which there is none here) would preclude a litigant from effectively vindicating statutory rights, the Court considers whether "the

---

[4]*See also, e.g., Blair v. Scott Specialty Gases,* 283 F.3d 595 (3rd Cir. 2002) (adopting *Bradford* case-by-case approach); *Morrison v. Circuit City Stores, Inc.,* 317 F.3d 646, 664 (6th Cir. 2003) (holding that the courts must evaluate on a case-by-case basis "whether the 'overall cost of arbitration,' from the perspective of the potential litigant, is greater than 'the cost of litigation in court."); *Livingston v. Assoc. Fin., Inc.,* 339 F.3d 553, 557 (7th Cir. 2003) (holding that "individualized evidence" of inability to pay costs required); *Faber v. Menard, Inc.,* 367 F.3d 1048, 1054 (8th Cir., 2004) (refusing to invalidate arbitration clause where plaintiff failed to show costs were prohibitive); *Rains v. Found. Health Sys. Life & Health,* 23 P.3d 1249 (Colo. Ct. App. 2001) (plaintiffs must provide evidence of an inability to pay).

[5] The Court further observes that the motion is premature since the AAA has not issued any invoices and has not demanded payment of any specific amounts.  Based on the evidence presented, it is unclear whether and to what extent plaintiffs will be subject to costs in the arbitration.  Because the dispute regarding payment of costs arises from what the plaintiffs contend is an incorrect interpretation of the AAA's rules (see Memo. at 14 n.11)[Docket No. 384], plaintiffs should have first addressed this issue to the appointed arbitrator. *Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 84 (2002) ("procedural questions which grow out of [a] dispute and bear on its final disposition are presumptively *not* for the judge, but for an arbitrator, to decide.").

8

Overall cost of arbitration, *from the perspective of the potential litigant*, is greater than the cost of litigation in court." *Morrison*, 317 F.3d at 664 (emphasis added). In so doing, the Court may consider whether prospective costs will not be borne by the plaintiffs' contingent-fee firms. *Id.* Plaintiffs, however, have offered no evidence that plaintiffs will be asked to bear any costs whatsoever. The Court will not speculate that the costs to plaintiffs would be greater in class arbitration than in litigation absent compelling proof to the contrary; but in any event, individual arbitration is available at no material cost.

Moreover, plaintiffs have cited no cases in which the arbitrator's compensation could be borne equally by the thousands of voluntary opt-in plaintiffs who eventually elect to take part in a collective arbitration. Based on the Consents-to-Sue filed by plaintiffs to date, there are now over 2,000 opt-in plaintiffs. Dosker Decl. 13 [Docket No. 389]. Until it is determined which of these plaintiffs will be required to arbitrate, it is impossible to even estimate how much of the arbitrator's compensation each plaintiff might have to bear in a classwide arbitration -- but it would be virtually nothing (i.e., $125 or less) in individual arbitrations.[6]

### c.  THE QUESTION OF WHETHER THE ARBITRATION AGREEMENTS PERMIT ARBITRATION ON A CLASS OR COLLECTIVE BASIS IS FOR THE ARBITRATOR, NOT THE COURT, TO DECIDE IN THE FIRST INSTANCE

The Court further rejects plaintiffs' argument that the Court can find an individual agreement to

---

[6]Absent the Supplementary Rules for Class Arbitrations, which would not apply in individual arbitrations, the National Employment Rules limit an employee's costs in an individual arbitration to an initial filing fee of $125; the employer must pay all arbitrator compensation and hearing room fees. National Employment Rules Fee Schedule (Dosker Decl. Ex. K)[Docket 389]. Moreover, most of the applicable arbitration agreements further protect the employee by capping individual arbitration costs yet lower. *See e.g.*, Clendening Decl. Ex. B at paragraph 5 and at corresponding term in Exs C through III (Docket Nos. 50, 51]. And National Employment Rule 38 offers yet less cost, in an appropriate situation, if even $100 or $125 is too much to bear. Dosker Decl. Ex. K [Docket 389].

9

arbitrate unconscionable simply because one of the parties contends in the arbitration that class or collective arbitration is precluded by the parties' arbitration agreement.[7]  As the Supreme Court plainly stated in *Green Tree Financial Corp. v. Bazzle*, 539 U.S. 444, 452-53 (2003), whether an otherwise valid agreement to arbitrate allows class or collective arbitration concerns "the kind of arbitration proceeding the parties agreed to" not "the validity of the arbitration clause." Thus, the determination of whether the arbitration agreements at issue allow for class arbitration or not is for the arbitrator, not the Court, to decide. *Id.* at 454.

> **d. PLAINTIFFS HAVE PRESENTED NO NEW GROUNDS FOR FINDING PROCEDURAL UNCONSCIONABILITY WITH RESPECT TO THE CALIFORNIA PLAINTIFFS**

Based on a declaration submitted by Cintas employee Jenice Clendening in a different case, plaintiffs ask the Court to revisit its April 5, 2004 ruling that the arbitration agreements between Cintas and the California plaintiffs were not procedurally unconscionable.  As the Court previously stated:

> While Plaintiffs proffered a number of declarations, they did not proffer any for the California plaintiffs.  Without being informed of the circumstances under which the California Plaintiffs signed these Agreements, the Court cannot assume that the Agreements were procedurally unconscionable.  The scant evidence in the record suggests that, in fact, they are not unconscionable.  At least 12 per cent of Cintas' SSRs have not signed arbitration agreements, yet are employed by Cintas.

April 5, 2004 Order at 26.  Plaintiffs offer no evidence to contradict the Court's previous finding.  Instead, plaintiffs rely solely on a declaration submitted by Cintas employee Jenice Clendening in another

---

[7] Plaintiffs contend that Cintas has asserted that the parties "arbitration agreements preclude class arbitration." Memo. at 19 [Docket No. 384].  Cintas, however, says that it "does not claim that any language in the arbitration agreements necessarily precludes all class arbitration." Opposition Memorandum at 17 [Docket No. 388].  Even if Cintas *had* argued that class or collective arbitration were precluded, *Bazzle* dictates that this Court defer to the decision of the arbitrator. *Bazzle*, 539 U.S. at 452-53.

case in which she states that Cintas SSRs are "required to sign an Employment Agreement that contains an agreement to arbitrate." Rubin Decl. Ex. 20 [Docket No. 383].

The Court, however, does not find this to be evidence that Cintas requires arbitration agreements as a "condition of employment" as now argued by plaintiffs. See Clendening Reply Declaration 23 [Docket No. 103]. Indeed, in any event, Cintas' interrogatory responses verified under oath by Ms. Clendening, confirm that there have been no employment consequences to anyone for declining to sign an arbitration agreement.

> There have been no employment consequences for prospective Cintas drivers who chose not to sign an employment agreement containing an arbitration agreement. Likewise, there have been no employment consequences for former Cintas drivers who chose not to sign. Current employees who have not signed an employment agreement containing an arbitration agreement and who decline to sign one at the time of being offered additional consideration are subject to having withdrawn from them the offer of the additional consideration being offered in exchange for executing the agreement.

Dosker Decl. Ex. L at 5:3-18 [Docket No. 389]. Further, plaintiffs have not provided a single declaration from a single California plaintiff to support their claim that they were required to sign the agreements as a "condition of their employment." The Court finds that the Clendening declaration submitted in a different case does not merit reconsideration of the Court's April 5, 2004 Order.

### e. THE PLACE OF ARBITRATION PROVISIONS

Plaintiffs also assert that the place-of-arbitration provision in the parties' arbitration agreements is unenforceable because: (1) the Court is not empowered to compel arbitration outside of this district pursuant to 9 U.S.C. § 4; and (2) enforcing the place-of-arbitration provision would result in fundamental unfairness. (Memo at 21).

Plaintiffs first assert that the Court cannot, as a matter of law, order arbitration to proceed

11

outside of this judicial district. (Motion, 21-22.)[8]  9 U.S.C. § 4 provides that "[t]he court shall hear the

parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply

therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in

accordance with the terms of the agreement.  The hearing and proceedings, under such agreement, *shall

be within the district in which the petition for an order directing such arbitration is filed*."  9

U.S.C. § 4 (emphasis added).  The Ninth Circuit has interpreted this provision of 9 U.S.C. § 4 to

require a district court compelling arbitration to order the arbitration to proceed within the district in

which the petition to compel arbitration has been filed.  *Continental Grain Co. v. Dant & Russell*, 118

F.2d 967, 968-69 (9th Cir. 1941); *Homestead Lead Co. of Missouri v. Doe Run Resources Corp.*,

282 F.Supp.2d 1131, 1143-1144 (N.D. Cal. 2003) ("The Ninth Circuit's 1941 decision in *Continental

Grain Co. v. Dant & Russell* remains the controlling authority" for determining where a court can

properly compel arbitration).

In the instant case, Defendant moved this Court to compel arbitration for 65 of the plaintiffs.  In

the April 5 Order, the Court ordered 56 of them to arbitration.  The Court's April 5, 2004 Order did not

designate where the arbitration was to take place.  However, the law is clear that the Court was, and is,

only permitted to compel arbitration in this district.

Defendant's argument that it did not bring its motion to compel arbitration under 9 U.S.C. § 4,

but instead brought it under 9 U.S.C. § 3, is unavailing.  9 U.S.C. § 4 is the provision allowing a party to

---

[8]Plaintiffs did not assert that the place-of-arbitration provisions of the arbitration agreement were unenforceable in briefing on Defendant's Motion to Compel Arbitration, nor did Plaintiffs raise it as a grounds for relief in its Motion for Reconsideration pursuant to Civ. L.R. 7-9. Accordingly, to the extent plaintiffs argue that these provisions are unfair, they have waived those arguments.

move to compel arbitration, while 9 U.S.C. § 3 is the provision allowing a party to seek a stay of

litigation where arbitration is appropriate. *See Sink v. Aden Enters.*, 352 F.3d 1197, 1201 (9th Cir.,

2003). Nothing in the text of § 3 suggests that the Court can compel arbitration under that section.

Thus, to the extent that the arbitration agreements of the 56 plaintiffs compelled to arbitrate by

the April 5, 2004 Order require arbitration to proceed outside of this judicial district, the Court cannot

enforce those provisions. Accordingly, the Court modifies its April 5, 2004 Order to clarify that the

plaintiffs compelled to arbitrate must do so in this judicial district.[9]

## III.    CONCLUSION

For the foregoing reasons, plaintiffs' Motion [Docket No. 377] is GRANTED IN PART and

DENIED IN PART.

IT IS SO ORDERED.


Dated: May 4, 2005                              /s/ Saundra Brown Armstrong
                                                SAUNDRA BROWN ARMSTRONG
                                                United States District Judge


---

[9]Thus far, the Court has only compelled 56 plaintiffs to arbitration, and it is these 56 plaintiffs to
arbitration, and it is these 56 plaintiffs who are compelled to arbitrate in this judicial district.

13



**BEFORE THE**
**JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

In re Cintas Corp.
Overtime Pay Arbitration Litigation                    MDL Docket No. 1781

**APPENDIX OF AUTHORITIES (LEGISLATIVE HISTORY MATERIALS)**
**SUBMITTED WITH RESPONSE BY CINTAS CORPORATION IN OPPOSITION TO**
**MOTION TO TRANSFER AND CONSOLIDATE PURSUANT TO 28 U.S.C. §1407**

# TABLE OF AUTHORITIES ATTACHED

House Report, H.R.Rep. No. 68-96 (1924)................................................................... Tab 1

Senate Report, S.Rep. No. 68-536 (1924) ................................................................ Tab 2

Joint Hearings before the Subcommittees of the Committees on the Judiciary on
   S.1005 and H.R.646, *Bills to Make Valid and Enforceable Written Provisions
   or Agreements for Arbitration of Disputes Arising Out of Contracts,
   Maritime Transactions, or Commerce Among the States or Territories or with
   Foreign Nations*, 68th Cong., First Sess. at 33-41 (January 9, 1924)..................... Tab 3

House Report, H.R. Rep. No. 90-1130 (1968), *reprinted in* 1968
   U.S.C.C.A.N. 1898, 1900 ...................................................................................... Tab 4

Dated: April 26, 2006                    Respectfully submitted,

                                         _____
                                         Mark C. Dosker

                                         SQUIRE, SANDERS & DEMPSEY L.L.P.
                                         Mark C. Dosker
                                         Nathan Lane III
                                         Michael W. Kelly
                                         Joseph A. Meckes
                                         Angela N. O'Rourke
                                         Y. Anna Suh
                                         Michelle M. Full
                                         One Maritime Plaza, Third Floor
                                         San Francisco, California  94111
                                         Telephone:  (415) 954-0200
                                         Facsimile:   (415) 393-9887

                                         Attorneys for
                                         CINTAS CORPORATION

# **<u>Tab 1</u>**

# HOUSE REPORTS

## 68th Congress, 1st Session

(December 3, 1923 – June 7, 1924)

▷

## PUBLIC

## VOL. 1

WASHINGTON
GOVERNMENT PRINTING OFFICE
1924

Case 1:06-cv-00162-JJF    Document 12-14    Filed 05/01/2006    Page 5 of 25

68th Congress, } HOUSE OF REPRESENTATIVES. { Report
1st Session. }                                   No. 95.

## BRIDGE ACROSS COLUMBIA RIVER.

JANUARY 24, 1924.—Referred to the House Calendar and ordered to be printed

Mr. BURTNESS, from the Committee on Interstate and Foreign Commerce, submitted the following

## REPORT.

[To accompany H. R. 4120.]

The Committee on Interstate and Foreign Commerce, to whom was referred the bill (H. R. 4120), having considered the same, report thereon with a recommendation that it pass.

The bill has the approval of the War and Agriculture Departments, as will appear by the letters attached and which is made a part of this report.

WAR DEPARTMENT, January 11, 1924.

Respectfully returned to the chairman Committee on Interstate and Foreign Commerce, House of Representatives.

So far as the interests committed to this department are concerned, I know of no objection to the favorable consideration by Congress of the accompanying bill (H. R. 4120, 68th Cong., 1st sess.) granting the consent of Congress to the Greater Wenatchee Irrigation district to construct, maintain, and operate a bridge across the Columbia River.

JOHN W. WEEKS, Secretary of War.

DEPARTMENT OF AGRICULTURE,
Washington, January 5, 1924.

Hon. SAMUEL E. WINSLOW,
Chairman Committee on Interstate and Foreign Commerce,
House of Representatives.

DEAR MR. WINSLOW: Careful consideration has been given to the bill H. R. 4120, transmitted with your letter of December 31, with request for a report thereon and such views relative thereto as the department might deem to communicate.

This bill (H. R. 4120) would authorize the Greater Wenatchee Irrigation District, a corporation organized and existing under the laws of the State of Washington, to construct and operate a bridge and approaches thereto across the Columbia River within or near section 15, township 20 north, range 23 east, Willamette meridian, State of Washington. The system of Federal-aid highways approved for the State of Washington does not cross the Columbia River in the vicinity of the site indicated for the proposed bridge, which the department's information indicates is to be about 5 miles above the city of Wenatchee. This department, therefore, can see no objections to granting the authorization for constructing the bridge.

Sincerely,
HENRY C. WALLACE, Secretary.

---

68th Congress, } HOUSE OF REPRESENTATIVES. { Report
1st Session. }                                   No. 96.

## TO VALIDATE CERTAIN AGREEMENTS FOR ARBITRATION.

JANUARY 24, 1924.—Referred to the House Calendar and ordered to be printed.

Mr. GRAHAM of Pennsylvania, from the Committee on the Judiciary, submitted the following

## REPORT.

[To accompany H. R. 646.]

The purpose of this bill is to make valid and enforcible agreements for arbitration contained in contracts involving interstate commerce or within the jurisdiction or admiralty, or which may be the subject of litigation in the Federal courts. It was drafted by a committee of the American Bar Association and is sponsored by that association and by a large number of trade bodies whose representatives appeared before the committee on the hearing. There was no opposition to the bill before the committee.

Two matter is properly the subject of Federal action. Whether an agreement for arbitration shall be enforced or not is a question of procedure to be determined by the law court in which the proceeding is brought and not one of substantive law to be determined by the law of the forum in which the contract is made. Before such contracts could be enforced in the Federal courts, therefore, this law is essential. The bill declares that such agreements shall be recognized and enforced by the courts of the United States. The remedy is founded also upon the Federal control over interstate commerce and over admiralty. The control over interstate commerce reaches not only the actual physical interstate shipment of goods but also contracts relating to interstate commerce.

Arbitration agreements are purely matters of contract, and the effect of the bill is simply to make the contracting party live up to his agreement. He can no longer refuse to perform his contract when it becomes disadvantageous to him. An arbitration agreement is placed upon the same footing as other contracts, where it belongs.

The need for the law arises from an anachronism of our American law. Some centuries ago, because of the jealousy of the English courts for their own jurisdiction, they refused to enforce specific agreements to arbitrate upon the ground that the courts were thereby

Case 1:06-cv-00162-JJF    Document 12-14    Filed 05/01/2006    Page 6 of 25

ounsel from their jurisdiction. This jealousy survived for so long a period that the principle became firmly embedded in the English common law and was adopted with it by the American courts. The courts have felt that due precedent was too strongly fixed to be overturned without legislative enactment, although they have frequently criticized the rule and recognized its illogical nature and the injustice which results from it. The bill declares simply that such agreements for arbitration shall be enforced, and provides a procedure in the Federal courts for their enforcement. The procedure is very simple, following the lines of ordinary motion procedure, reducing technicality, delay, and expense to a minimum and at the same time safeguarding the rights of the parties. There is provided a method for the summary trial of any claim that no arbitration agreement ever was made, and there is also provided a hearing if the defendant party contends that the award was secured by fraud or other corruption or undue influence, or that some evident mistake not affecting the merits exists in the award. If the parties are not willing to proceed under it, they need not resort to the courts at all. If one party is recalcitrant he can no longer escape his agreement, but his rights are simply protected. At the same time the party willing to perform his contract for arbitration is not subjected to the delay and cost of litigation. Machinery is provided for the prompt determination of his claim for arbitration and the award may then be entered as a judgment, subject to attack by the other party for fraud and corruption and similar undue influence, or for palpable error in form.

To secure jurisdiction for arbitration, however, service of process must be made personally, so that there is no danger that a defendant, having an honest defense, will be called upon to defend his case at a distance under a disadvantage. The proceeding will be commenced practically as any action is now commenced in the Federal courts.

In view of the strong support of commercial and legal bodies, the entire lack of opposition before the committee, the obvious justice of the result sought to be obtained, and the evident propriety and necessity of Federal action, we submit that the bill should become law. It is practically appropriate that the action should be taken at this time when there is so much agitation against the costliness and delays of litigation. These matters can be largely eliminated by agreements for arbitration, if arbitration agreements are made valid and enforceable.

---

68TH CONGRESS, 1st Session. } HOUSE OF REPRESENTATIVES. { REPORT No. 97.

## COMPLETION OF APPROACHES TO BRIDGE ACROSS THE MISSISSIPPI RIVER BETWEEN ST. LOUIS, MO., AND EAST ST. LOUIS, ILL.

JANUARY 24, 1924.—Referred to the House Calendar and ordered to be printed.

Mr. WINSLOW, from the Committee on Interstate and Foreign Commerce, submitted the following

## REPORT.

[To accompany H. R. 486.]

65406, Sp 7, fol 2, Rocho 61, Jan 24

The Committee on Interstate and Foreign Commerce, to whom was referred the bill H. R. 486, having considered the same, report thereon with amendment and recommend that it pass.

The bill as amended has the approval of the War Department, as will appear by the letter attached and which is made a part of this report. The report of the Department of Agriculture is also made a part of this report.

Amend the bill as follows:

At the end of section 2, to insert the following proviso:

*Provided*, That the city of St. Louis may construct approaches, additions, or extensions, in addition to those now existing, connecting said bridge with any railroad or highway within or through the city of East St. Louis, Ill.; but before constructing such approaches, additions, or extensions the location thereof shall first have been approved by, and a certificate of public convenience and necessity therefor shall first have been obtained from, the Interstate Commerce Commission, which shall have full jurisdiction and authority to consider and determine such questions is hereby conferred upon the Interstate Commerce Commission, in the same manner and to the same extent as in the case of other proceedings for certificates of public convenience and necessity under paragraphs (18), (19), and (20) of section 1 of the interstate commerce act.

This bill provides for the completion of the extension approaches to a municipal bridge crossing the Mississippi River between St. Louis, Mo., and East St. Louis, Ill.

The bridge proper was completed some 10 years ago, more or less, under the provisions of an act of Congress passed on June 25, 1906, and extended several times thereafter. The approach on the Illinois side was not completed because the city of St. Louis did not have the money with which to pay for the work.

# **<u>Tab 2</u>**

# SENATE REPORTS

68th Congress, 1st Session

(December 8, 1923 – June 7, 1924)

PUBLIC

VOL. 2

WASHINGTON
GOVERNMENT PRINTING OFFICE
1924

# Calendar No. 569

| 68TH CONGRESS<br>*1st Session* | SENATE | REPORT<br>No. 536 |
|---|---|---|

## TO MAKE VALID AND ENFORCEABLE CERTAIN AGREEMENTS FOR ARBITRATION

MAY 14, 1924.—Ordered to be printed

Mr. STERLING, from the Committee on the Judiciary, submitted the following

## REPORT

[To accompany S. 1005]

The Committee on the Judiciary, to whom was referred the bill (S. 1005) to make valid and enforceable written provisions or agreements for arbitration of disputes arising out of contracts, maritime transactions, or commerce among the States or Territories or with foreign nations, report the same back with certain amendments thereto and, as so amended, the committee recommend that the bill do pass.

The amendments are as follows:

In lines 6 and 7, page 1 of the bill, strike out the words "or interstate."

In line 6, section 2, page 2, strike out the words "contract or"; and in line 7, section 2, page 2, after the word "or" insert the words "a contract evidencing a"; and in line 9, on said page, strike out the words "between the parties."

In line 18, section 4, page 3, after the word "agreement" as it first occurs in said line, insert the following proviso:

*Provided,* That the hearing and proceedings under such agreement shall be within the district in which the petition for an order directing such arbitration is filed.

On page 6, strike out section 8 of the bill.

Beginning with the word "That," in line 21, section 10, page 6, strike out all down to and including the word "attorneys" in line 25.

On page 10, strike out section 14 of the bill.

On page 11, strike out section 16 of the bill.

Beginning with section 9, renumber the sections following as required by the striking out of certain designated sections.

★ 1-17-24

---

CONTRACT FOR MAIL MESSENGER SERVICE

offices for mail messenger service. It may be necessary to terminate those contracts from June 30, unless legislative authority be continued.

It will be understood that this authority under which we have been acting since 1917 and which it is proposed to continue is in the nature of an exception to section 3950 of the Revised Statutes which is as follows:

"No postmaster, assistant postmaster, or clerk employed in any post office shall be a contractor or concerned in any contract for carrying the mail."

With respect to that part of the bill authorizing special delivery messengers and permit an odenemy. I may cite a recent case of this kind where a bidder to contract for mail messenger service, that authority would facilitate the service offers to carry the mails to and from the railroad station as mail messenger at the rate of $964 a year, provided he be permitted to deliver special delivery letters and receive the fees therefor. Under the present law, he can not be permitted to perform both services. His bid for the mail messenger service without the privilege of delivering special delivery letters is at the rate of $1,150 a year. I consider favorable action on this bill very important.

Very truly yours,

HARRY S. NEW,
*Postmaster General.*

The committee believes that in view of the fact that this legislation is so urgently needed by the department and that it will result in great economies and more dependable service, that it should be enacted into law.

The purpose of the bill is clearly set forth in section 2, which, as proposed to be amended, reads as follows:

SEC. 2. That a written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

The "maritime transactions or contracts," to which the bill will apply, are defined in section 1. Likewise, the definition of "commerce," in the same section, shows to what contracts in interstate or foreign commerce this bill is to be applicable.

It is not contended that agreements to arbitrate have no validity whatever. A party may be liable in an action for damages for the breach of an executory agreement to arbitrate; or, if the agreement has been executed according to its terms and an award made, the appropriate action may be brought at law or in equity to enforce the award. Both maritime contracts or transactions and contracts involving interstate commerce are at least valid to this extent.

But it is very old law that the performance of a written agreement to arbitrate would not be enforced in equity, and that if an action at law were brought on the contract containing the agreement to arbitrate, such agreement could not be pleaded in bar of the action; nor would such an agreement be ground for a stay of proceedings in which arbitration was had. Further, the agreement was subject to revocation by either of the parties at any time before the award. With this as the state of the law, such agreements were in large part ineffectual, and the party aggrieved by the refusal of the other party to carry out the arbitration agreement was without adequate remedy.

Until recently in England (and up to the present time in nearly, if not quite, all, the States of the Union, such has been the law in regard to arbitration agreements. The Federal courts have in the main been governed by the same rules and, as a consequence, have denied relief to the parties seeking to compel the performance of executory agreements to settle and determine future disputes by arbitration. If the agreement to arbitrate is found in a maritime contract or transaction, no action in admiralty for specific performance will lie, for the simple reason that this court is without power to grant equitable relief.

Various reasons have been given for these ancient rules of English law, followed as they have been by our State and Federal courts. Among these reasons were, first, the expressed fear on the part of the courts that arbitration tribunals did not possess the means to do full or proper redress, and also the doubt they entertained as to their right to compel an unwilling party to submit his cause to the ordinary courts of justice for hearing and determination. Second, the jealousy of the courts of their rights as courts, coupled with the fear that if arbitration agreements were to prevail and be enforced, the courts would be ousted of much of their jurisdiction. To what extent, the second reason influenced the first may be difficult to say; but it is not unreasonable to suppose that a desire to retain, if not extend, their jurisdiction had much to do with inspiring the fear

that arbitration tribunals could not do justice between the parties. And third, established precedent has had its large part of course in perpetuating the old rules long after the courts themselves could no longer see that they were founded in reason or justice.

It has been said that "arrangements for avoiding the delay and expense of litigation and referring a dispute to friends or neutral persons are a natural practice of which traces may be found in any state of society." The desire to avoid the delay and expense of litigation persists. The desire grows with time and as delays and expenses increase. The settlement of disputes by arbitration appeals to big business and little business alike, to corporate interests as well as to individuals. The Arbitration Society of America, with offices in the city of New York, has, through its arbitration tribunal, settled more than 500 cases during its less than two years of existence. In the New York Times of May 11 is found a brief résumé of the work accomplished. We quote the following:

In contrast with the long time required by the court with their congested calendars in the adjustment of disputes and controversies, one of the arbitration required but a single hearing, and occupied but a few hours of time of disputants, counsel, and witnesses. The cost to the disputants was said to be trifling as compared with the cost of litigation.

Looking at another controversy involving a large amount of money, which, beyond a reasonable doubt, if taken to the courts would have been fought through years of costly litigation, have been legally determined in this tribunal whose only rule of procedure is the rule of common sense, in from two to three weeks, the report shows, and the expense—a thing that just as significant, as the saving of time and money—is but a fraction of what it would have resulted from the procedure. Winners and losers alike bear witness to the fairness of the efficiency of the society."

The record made under the supervision of this society shows not only the great value of voluntary arbitrations but the practical justice in the enforced arbitration of disputes where written agreements for that purpose have been voluntarily and solemnly entered into.

The bill, while relating to maritime transactions and to contracts in interstate and foreign commerce, follows the lines of the New York arbitration law enacted in 1920, amended in 1921, and sustained by the decision of the Supreme Court of the United States in the matter of the Red Cross Line v. Atlantic Fruit Co., rendered February 18, 1924.

Reference has been made herein to the definitions contained in the first section of the bill. The second section is set forth in full.

Section 3 provides for a stay of proceedings and arbitration in any suit where it appears that the issue involved is referable to arbitration under the contract.

Section 4 provides a simple method for securing the performance of an arbitration agreement. The aggrieved party may apply to the proper district court on five days' notice, and the court will order the party to proceed. The constitutional right to a jury trial is adequately safeguarded.

Section 5 provides for the manner of naming the arbitrators in case the parties have failed to name them.

Section 6 provides for expedition in the matter of the hearing of arbitration matters by the court.

Section 7 gives the arbitrators power to summon witnesses.

# Calendar No. 573

| 68TH CONGRESS | SENATE | REPORT |
|---|---|---|
| 1st Session | | No. 538 |

## INLAND WATERWAYS CORPORATION

MAY 14 (calendar day, MAY 15), 1924.—Ordered to be printed

Mr. RANSDELL, from the Committee on Commerce, submitted the following

## REPORT

[To accompany S. 3161]

The Committee on Commerce, to whom was referred the bill (S. 3161) to create the inland waterways corporation for the purpose of carrying out the mandate and purpose of Congress as expressed in sections 201 and 500 of the transportation act, and for other purposes, having considered the same, report favorably thereon and recommend that the bill do pass without amendment.

Under the terms of the transportation act of 1920 the Secretary of War is made the mandatory of Congress, as follows:

SEC. 201 (a). On the termination of Federal control, as provided in section 200, all boats, barges, tugs, and other transportation facilities, on the inland, canal, and coastwise waterway (hereinafter in this section called "transportation facilities") acquired by the United States in pursuance of the fourth paragraph of section 6 of the Federal control act (except the transportation facilities constituting parts of railroads or transportation systems over which Federal control was assumed) are transferred to the Secretary of War, who shall operate or cause to be operated such transportation facilities so that the lines of inland waterway transportation established by or through the President during Federal control shall be continued, and assume and carry out all contracts and agreements in relation thereto entered into by or through the President in pursuance of such paragraph prior to the time above fixed for such transfer.

These mandates refer to operations on the Mississippi River between St. Louis, Mo., and New Orleans, La., and to operations on the canals, lakes, and sound between New Orleans, La., and Mobile, Ala., thence via the Black Warrior to Birmingham; and, under certain conditions, to operations on the upper Mississippi between St. Louis and Minneapolis, as follows:

SEC. 201 (d). Any transportation facilities owned by the United States and included within any contract made by the United States for operation on the Mississippi River above Saint Louis, the possession of which reverts to the United States at or before the expiration of such contract, shall be operated by the Secretary of War so as to provide facilities for water carriage on the Mississippi River above Saint Louis.

---

4

TO MAKE VALID AGREEMENTS FOR ARBITRATION

Section 9 protects libels and seizures of vessels in admiralty proceedings.

Section 10 provides for the entry of a judgment where the parties have agreed thereto and for determining the appropriate court.

Section 11 provides that an award may be vacated where it was procured by corruption, fraud, or undue means, or where there was partiality or corruption on the part of the arbitrators, or where they have been guilty of misconduct or have refused to hear evidence pertinent and material to the controversy, or have been guilty of any other misbehavior prejudicial to the rights of either party, or where they have exceeded their powers.

Section 12 gives power to the court to modify or correct the award where there was evident material miscalculation of figures, or evident material mistake in the description of any person, thing, or property, or where the arbitrators have made an award upon a matter not submitted to them, or where the award is imperfect in matter of form.

O

# **<u>Tab 3</u>**

ARBITRATION OF INTERSTATE COMMERCIAL DISPUTES

U.S. Cong. Senate. Com. on the Judiciary

JOINT HEARINGS

BEFORE THE

SUBCOMMITTEES OF THE

COMMITTEES ON THE JUDICIARY

CONGRESS OF THE UNITED STATES

SIXTY-EIGHTH CONGRESS

FIRST SESSION

ON

S. 1005 and H. R. 646

BILLS TO MAKE VALID AND ENFORCEABLE WRITTEN
PROVISIONS OR AGREEMENTS FOR ARBITRATION OF
DISPUTES ARISING OUT OF CONTRACTS, MARITIME
TRANSACTIONS, OR COMMERCE AMONG THE STATES
OR TERRITORIES OR WITH FOREIGN NATIONS

JANUARY 9, 1924

Printed for the use of the Committee on the Judiciary

WASHINGTON
GOVERNMENT PRINTING OFFICE
1924

HE/2622
U5"A3
1924

## COMMITTEE ON THE JUDICIARY.

FRANK B. BRANDEGEE, Connecticut, Chairman.

| | |
|---|---|
| WILLIAM E. BORAH, Idaho. | LEE S. OVERMAN, North Carolina. |
| ALBERT B. CUMMINS, Iowa. | JAMES A. REED, Missouri. |
| LeBARON B. COLT, Rhode Island. | HENRY F. ASHURST, Arizona. |
| THOMAS STERLING, South Dakota. | JOHN K. SHIELDS, Tennessee. |
| GEORGE W. NORRIS, Nebraska. | THOMAS J. WALSH, Montana. |
| RICHARD P. ERNST, Kentucky. | AUGUSTUS O. STANLEY, Kentucky. |
| SAMUEL M. SHORTRIDGE, California. | THADDEUS H. CARAWAY, Arkansas. |
| SELDEN P. SPENCER, Missouri. | |

W. Don Linney, Clerk.
George Gordon Payne, Assistant Clerk.

### MEMBERS OF THE SUBCOMMITTEE.

THOMAS STERLING, South Dakota, Chairman.

RICHARD P. ERNST, Kentucky.     THOMAS J. WALSH, Montana.

## COMMITTEE ON THE JUDICIARY,
## HOUSE OF REPRESENTATIVES.

GEORGE S. GRAHAM, Pennsylvania, Chairman.

| | |
|---|---|
| LEONIDAS C. DYER, Missouri. | ROBERT Y. THOMAS, Jr., Kentucky. |
| WILLIAM D. BOIES, Iowa. | HATTON W. SUMNERS, Texas. |
| CHARLES A. CHRISTOPHERSON, South Dakota. | ANDREW J. MONTAGUE, Virginia. |
| RICHARD YATES, Illinois. | JAMES W. WISE, Georgia. |
| IRA G. HERSEY, Maine. | JOHN N. TILLMAN, Arkansas. |
| ISRAEL M. FOSTER, Ohio. | FRED H. DOMINICK, South Carolina. |
| EARL C. MICHENER, Michigan. | SAMUEL C. MAJOR, Missouri. |
| ANDREW J. HICKEY, Indiana. | ROYAL H. WELLER, New York. |
| NATHAN D. PERLMAN, New York. | PATRICK B. O'SULLIVAN, Connecticut. |
| OSCAR J. LARSON, Minnesota. | |
| J. BANKS KURTZ, Pennsylvania. | |

Guilford S. Jameson, Clerk.

### MEMBERS OF THE SUBCOMMITTEE.

LEONIDAS C. DYER, Missouri, Chairman.

| | |
|---|---|
| ISRAEL M. FOSTER, Ohio. | ANDREW J. MONTAGUE, Virginia. |
| ANDREW J. HICKEY, Indiana. | JAMES W. WISE, Georgia. |
| J. BANKS KURTZ, Pennsylvania. | FRED H. DOMINICK, South Carolina. |

II

## CONTENTS.

Statement of—

| | Page. |
|---|---|
| Charles I. Stengle | 1 |
| John B. Kendrick | 5 |
| Charles L. Barghelmer | 5 |
| W. H. H. Piatt | 10 |
| H. S. French | 11 |
| C. G. Woodbury | 12 |
| Julius Henry Cohen | 13 |
| Francis B. James | 13 |
| Alexander Rose | 19 |
| Henry Mone | 25 |
| Henry L. Eaton | 28 |
| Frank Carnahan | 28 |
| Wilson J. Vance | 30 |
| Thomas B. Paton | 30 |
| Bruce K. Wilmer | 81 |
| W. W. Nichols | 82 |

III

# ARBITRATION OF INTERSTATE COMMERCIAL DISPUTES.

## WEDNESDAY, JANUARY 9, 1924.

Congress of the United States,
Joint Committee of Subcommittees on the Judiciary,
United States Senate and
House of Representatives,
*Washington, D. C.*

The joint subcommittee met, pursuant to call of the chairman, at 2.30 o'clock p. m., Senator Thomas Sterling presiding.

Present: Representing Senate subcommittee, Senator Sterling (chairman). Representing House subcommittee, Representatives Dyer, Foster, Hickey, and Kurtz.

Present also: Senator Kendrick, of Wyoming, and Representatives Mills, Perlman, Stengle of New York, and Cleary of New York.

The Chairman. Gentlemen, I think we may as well proceed with our hearing. I regret that the other two members of the Senate subcommittee are not present at this time, but would like to explain that Senator Ernst, I am informed, is kept away owing to illness, and that Senator Walsh, of Montana, is detained at another hearing. Senator Walsh told me that he might be able to come a little later.

## STATEMENT OF HON. CHARLES I. STENGLE, A REPRESENTATIVE FROM THE STATE OF NEW YORK.

Mr. Stengle. Mr. Chairman and gentlemen of the committee, I simply want to note my appearance here in behalf of what is known as H. R. 646. I think on your side the bill is known as S. 1005, which, I understand, is identically the same bill as H. R. 646.

I am here this afternoon by request of the Brooklyn Chamber of Commerce, but owing to official business which calls me into another part of the building immediately, and knowing how kindly disposed this subcommittee is to the question of arbitration legislation, I think I can do more for my country elsewhere at this time, and therefore I simply want to note an appearance and express the hope that you gentlemen will report a bill out for action in Senate and House.

The Chairman. The hearing is upon S. 1005 and H. R. 646, being bills to make valid and enforceable written provisions or agreements for arbitration of disputes arising out of contracts, maritime transactions, or commerce among the State or Territories or with foreign nations.

The bill referred to is here printed in full, as follows:

[S. 1005, Sixty-eighth Congress, first session.]

A BILL To make valid and enforceable written provisions or agreements for arbitration of disputes arising out of contracts, maritime transactions, or commerce among the States or Territories or with foreign nations.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That "maritime transactions," as herein defined, means charter parties, bills of lading of water carriers, agreements relating to wharfage, supplies furnished vessels or repairs to vessels, collisions, or any other matters in foreign or interstate commerce which, if the subject of controversy, would be embraced within admiralty jurisdiction; "commerce," as herein defined, means commerce among the several States or with foreign nations, or in any Territory of the United States or in the District of Columbia, or between any such Territory and another State or Territory, and any such Territory and any State or foreign nation, or between the District of Columbia and any State or Territory or foreign nation, but nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce.

Sec. 2. That a written provision in any contract or maritime transaction or transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part of such contract or transaction, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

Sec. 3. That if any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

Sec. 4. That if any party aggrieved by the alleged failure, neglect, or refusal of another to perform under a written agreement for arbitration may petition any court of the United States which, save for such agreement, would have jurisdiction under the judicial code at law, in equity, or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. Service thereof shall be made upon the party in default. Service thereof shall be made in the manner provided by law for the service of summons in the jurisdiction in which the proceeding is brought. The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default, or if the matter in dispute is within admiralty jurisdiction, the court shall hear and determine such issue. Where such an issue is raised, the party alleged to be in default may, except in cases of admiralty, on or before the return day of the notice of application, demand a jury trial of such issue, and upon such demand the court shall make an order referring the issue or issues to a jury in the manner provided by law for referring to a jury issues in an equity action, or may specially call a jury therefor. If the jury find that no agreement in writing for arbitration was made or that there is no default in proceeding thereunder, the proceeding shall be dismissed. If the jury find that an agreement for arbitration was made in writing and that there is a default in proceeding thereunder, the court shall make an order summarily directing the parties to proceed with the arbitration in accordance with the terms thereof.

Sec. 5. That if in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be

followed; but if no method be provided therein, or if a method be provided and any party thereto shall fail to avail himself of such method, or if for any other reason there shall be a lapse in the naming of an arbitrator or arbitrators or umpire, or in filling a vacancy, then upon the application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators or umpire, as the case may require, who shall act under the said agreement with the same force and effect as if he or they had been specifically named therein; and unless otherwise provided in the agreement the arbitration shall be by a single arbitrator.

Sec. 6. That any application to the court hereunder shall be made and heard in the manner provided by law for the making and hearing of motions except as otherwise herein expressly provided.

Sec. 7. That the arbitrators selected either as prescribed in this act or otherwise, or a majority of them, may summon in writing any person to attend before them or any of them as a witness and in a proper case to bring with him or them any book, record, document, or paper which may be deemed material as evidence in the case. The fees for such attendance shall be the same as the fees of witnesses before masters of the United States courts. Said summons shall issue in the name of the arbitrator or arbitrators, or a majority of them, and shall be signed by the arbitrators, or a majority of them, and shall be directed to the said person and shall be served in the same manner as subpoenas to appear and testify before the court; if any person or persons so summoned to testify shall refuse or neglect to obey said summons, upon petition the United States court in and for the district in which such arbitrators, or a majority of them, are sitting may compel the attendance of such person or persons before said arbitrator or arbitrators, or punish said person or persons for contempt in the same manner now provided for securing the attendance of witnesses or their punishment for neglect or refusal to attend in the courts of the United States.

Sec. 8. That if the basis of jurisdiction be diversity of citizenship between citizens of several States or one of the parties be a foreign State, citizen, or subject, the district court or courts which would have jurisdiction if the matter in controversy exceeded, exclusive of interest and costs, the sum of three thousand dollars, in which a protest thereunder must have been filed, in the manner provided herein, shall be the court or courts to be determined by arbitration.

Sec. 9. That if the basis of jurisdiction be a cause of action otherwise justiciable in admiralty, then, notwithstanding anything herein to the contrary, the party claiming to be aggrieved may begin his proceeding hereunder by libel and seizure of the vessel or other property of the other party according to the usual course of admiralty proceedings, and the court shall then have jurisdiction to direct the parties to proceed with the arbitration and shall retain jurisdiction to enter its decree upon the award.

Sec. 10. That the award must be in writing and acknowledged or proved in like manner as a deed for the conveyance of real estate in the State or district where the award is made and delivered to the parties or their attorneys, if the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in the next two sections. If no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made. Notice of the application shall be served upon the adverse party, and thereupon the court shall have jurisdiction of such party as though he had appeared generally in the proceeding. If the adverse party is a resident of the district within which the award was made, such service shall be made upon the adverse party or his attorney as prescribed by law for service of notice of motion in an action in the same court. If the adverse party shall be a nonresident, then the notice of the application shall be served by the marshal of any district within which the adverse party may be found in like manner as other process of the court.

Sec. 11. That in either of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—

## 4 — ARBITRATION OF INTERSTATE COMMERCIAL DISPUTES.

(a) Where the award was procured by corruption, fraud, or undue means.

(b) Where there was evident partiality or corruption in the arbitrators, or either of them.

(c) Where the arbitrators were guilty of misconduct in refusing to post-pone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy, or of any other misbehavior by which the rights of any party have been prejudiced.

(d) Where the arbitrators exceeded their powers, or so imperfectly exe-cuted them that a mutual, final, and definite award upon the subject matter submitted was not made.

(e) Where an award is vacated and the time within which the agreement required the award to be made has not expired the court may, in its discre-tion, direct a rehearing by the arbitrators.

SEC. 12. That in either of the following cases the United States court in and for the district wherein the award was made may make an order modi-fying or correcting the award upon the application of any party to the ar-bitration—

(a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award.

(b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matters submitted.

(c) Where the award is imperfect in matter of form not affecting the merits of the controversy.

The order may modify and correct the award, so as to effect the intent thereof and promote justice between the parties.

SEC. 13. That notice of a motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within three months after the award is made. For the purposes of the motion any judge who might make an order to stay the proceedings in an action brought in like manner upon the award may make an order, to be served with the notice of motion, staying the proceedings of the adverse party to enforce the award.

SEC. 14. That upon the granting of an order confirming, modifying, or correct-ing an award, judgment may be entered in conformity therewith, no exceptions shall be taken, but an appeal may be taken from such order or judgment, as hereinafter set forth.

SEC. 15. That a party moving for an order confirming, modifying, or correcting an award shall, at the time such order is filed with the clerk for the entry of judgment thereon, also file the following papers with the clerk:

(a) The agreement; the selection or appointment, if any, of an additional arbitrator or umpire; and each written extension of the time, if any, within which to make the award.

(b) The award.

(c) Each notice, affidavit, or other paper used upon an application to confirm, modify, or correct the award, and a copy of each order of the court upon such an application.

The judgment shall be docketed as if it was rendered in an action.

The judgment so entered shall have the same force and effect, in all respects, as, and be subject to all the provisions of law relating to, a judgment in an action; and it may be enforced as if it had been rendered in an action in the court in which it is entered.

SEC. 16. That an appeal may be taken from an order vacating an award or from a judgment entered upon an award in the same manner or judgment in an action.

SEC. 17. That this Act may be referred to as "The United States Arbi-tration Act."

SEC. 18. That all Acts and parts of Acts inconsistent with this Act are hereby repealed, and this Act shall take effect on and after the 1st day of January next after its enactment, but shall not apply to contracts made prior to the taking effect of this Act.

## ARBITRATION OF INTERSTATE COMMERCIAL DISPUTES. — 5

(H. R. 646 is in the identical language as S. 1005.)

The CHAIRMAN. This is practically the same bill that was before the Congress at the last session, being known as S. 4214 and H. R. 13522. With some slight changes this bill, S. 1005, is the same.

Senator Kendrick of Wyoming is here, and according to the usual custom we will accord to him first place in addressing the committee.

### STATEMENT BY HON. JOHN B. KENDRICK, A SENATOR FROM THE STATE OF WYOMING.

Senator KENDRICK. Mr. Chairman and members of the committee, it is not my purpose to detain you more than just a moment to say that I have not had an opportunity or occasion to study this bill closely myself, but my people in the West have been writing and writing me indorsing the proposed legislation, and even a super-ficial study of it would indicate that there has been for some years not only a demand, but I might say a necessity, for some such legis-lation. I want only at this time, through the convictions drawn from less than a careful study on my own account but from the attitude of business men of my section of the West, to give my indorsement to the proposed legislation.

The CHAIRMAN. Your people in Wyoming are in favor of this bill, are they?

Senator KENDRICK. They are wiring and writing and asking me to indorse the proposed legislation, and even to appear before your subcommittee here and indicate to you their approval of the bill. From what I have heard about it, and from what little study I have given it, I am inclined to think there will be naturally very little opposition to the proposed legislation. I am sure that some such measure would go a long way toward harmonizing differences in connection with transactions not only as regards interstate com-merce, but between citizens of this country and foreign countries. I hope your committee will act favorably upon the bill, and I thank you.

The CHAIRMAN. The committee is very glad to have heard from Senator Kendrick.

Mr. Bernheimer, do you care to make a statement at this time?

Mr. BERNHEIMER. I will thank you if you will permit me to do so.

The CHAIRMAN. The committee will be glad to hear from Mr. Bernheimer.

### STATEMENT OF MR. CHARLES L. BERNHEIMER, CHAIRMAN COM-MITTEE ON ARBITRATION CHAMBER OF COMMERCE OF THE STATE OF NEW YORK, NEW YORK CITY.

Mr. BERNHEIMER. Mr. Chairman and gentlemen of the committee, it is from the business point of view that I will approach the subject of the reintroduced and slightly modified bill which is now before your committee.

Representative HICKEY. Whom do you represent?

Mr. BERNHEIMER. I represent the New York State Chamber of Commerce. I represent the Importers and Exporters' Association and the Merchants' Association of New York; and I have been, with-out definite appointment but so understood, representing the 73

business men's organizations that have added their names in formal indorsement of this bill.

The CHAIRMAN. You may state your connection with the Chamber of Commerce of the State of New York and how long you have been a member.

Mr. BERNHEIMER. I have been a member of the Chamber of Commerce of the State of New York for a little more than 20 years. I have been chairman of their committee on arbitration since the year 1911, being reelected each year by formal vote. In other words, the Chamber of Commerce had an opportunity each year to get rid of me. I have been elected in a formal way because this is not an appointive office at all.

The CHAIRMAN. You may proceed with your statement.

Mr. BERNHEIMER. I have made a study of the question of arbitration ever since the panic of 1907. The difficulties merchants then met with, that of having repudiations and other business troubles, resulting in much loss and expense outside of the costly and ruinous litigation, and the deeper I got into it the more I was convinced we should have legislation in State and Nation that would make arbitration a reality, that would cause an agreement or contract in writing providing for arbitration to be binding upon the parties and an irrevocable proposition.

The printed record of your hearings held last year, I believe January 31, 1923, will cover some of the details that I imagine I may omit at this time.

The CHAIRMAN. I think so.

Mr. BERNHEIMER. The most unprofitable thing that the merchant and business man, or anyone engaged in buying and selling, can have confront him is that of litigation. It is unprofitable to him and it is unprofitable to the State and it is unprofitable to the law office.

Representative FOSTER. Then do you think the bar associations indorse it?

Mr. BERNHEIMER. I think so. But I hope you will pardon me if I have answered too quickly and made any mistake about it.

The cheapest commodity that exists to-day is the fee that the lawyer charges the merchant, because in the numerous discussions with lawyers or heard by me while in the presence of lawyers, convinces me that the average legal case, involving say $3,000, or $4,000, does not allow the law office to recoup itself the overcharges for handling the case.

But that litigation is unprofitable to the State goes without saying I take it, because the State has to maintain courthouses, State and counties have to maintain court machinery in the form of judges, attendants, light, heat and power—and even ventilation in some courthouses, which is rather poor. I am familiar with that fact from experience.

The expense to the State and the counties in the final analysis, comes out of taxes. Taxes are paid by the consumer, big and little. I know there may be a difference of opinion on that subject but let me exemplify it: In the seller's market the seller has the advantage, and he is able to prorate his taxes into his products. He has control. In the buyer's market the reverse holds good.

The litigant's expenses—that is, whatever is necessary to cover the annual outlay for litigation or the fear of litigation, consultations with lawyers, the possibility of cancellations, and so forth, eventually creeps into the selling price as well. It is a part of the overhead of a business, and finds its reflection in the price of the articles sold, and consequently the prices of commodities involved are correspondingly increased.

The lawyer's work, as I stated before, is an economic wastage in the everyday commercial transactions. It does not benefit the lawyer and does not benefit the client.

There are four known methods based on long experience I have had by which to meet trade disputes, the ordinary everyday trade disputes, and it is for them that this legislation is proposed.

1. For the parties to settle between themselves, which is the usual method, an excellent method.

2. For the parties to settle by negotiation, with the assistance of a third party, a mutual friend in whom they have confidence. That is the next to the best way of doing it.

3. For the parties to enter into formal arbitration, which is the basis on which this bill is framed, namely, arbitration which has legal sanction, whereby arbitration once agreed upon must be seen through, so that the parties can not, as they can in the most of our States and certainly in connection with interstate business, back out at the last moment when they see the case is going against them. That should not be permitted. It is immoral, unfair, and untenable.

4. The last method is that of litigation, which is, of course, the worst method of them all.

Speaking for those engaged in buying and selling merchandise, what is usually called trading, whether that be the case of the farmer who buys his supplies, plows, and sells his produce, or the man who sells over the counter, or what not, it is all the same. It applies to all of them.

The CHAIRMAN. What you have in mind is that this proposed legislation relates to contracts arising in interstate commerce.

Mr. BERNHEIMER. Yes; entirely. To a farmer who will sell his carload of potatoes, from Wyoming, to a dealer in the State of New Jersey, for instance.

Speaking for those who have had experience and who are engaged in business, I may say this, that arbitration saves time, saves trouble, saves money. There is no question about that. We know it. It preserves business friendships. The usual court atmosphere does not get into the arbitration hearings. For instance, at our New York State hearings we do not permit any abuse by one side or the other. Friendliness is preserved in business. It raises business standards. It maintains business honor, prevents unnecessary litigation, and eliminates the law's delay by relieving our courts.

I would dwell upon the difficulties, particularly in our State, and probably they are duplicated in other States somewhat; at any rate, I make these statements based on many years of experience, and I would not make them were I not 100 per cent convinced that all these matters are helped by arbitration, yes, to a very marked extent. The statement I make is backed up by 73 commercial organizations in this country who have, by formal vote, approved of the

bill before you gentlemen. And to this testimony I can add—although it may be a little indirect—that I have in my files a list of the various countries of the world which maintain committees for the handling of arbitration. There are 33 different countries that have committees for that purpose. It has been published by the International Chamber of Commerce, which is located in Paris. I leave that at your disposal.

The CHAIRMAN. How are these committees constituted?

Mr. BERNHEIMER. They are merely clearing houses to whom trouble can be sent for the purpose of seeing whether they can handle disputed matters by means of arbitration—which they do, if legal sanctions are available, otherwise by conciliation or settlement, by negotiation.

The CHAIRMAN. The committees are voluntary committees?

Mr. BERNHEIMER. They are appointed by commercial bodies, chambers of commerce, and so forth. I have that list if you gentlemen desire it. It covers 33 different countries, and I think there are only 48 countries in all this world, the same as our States; so that it is a very substantial indication of the general demand for arbitration.

I might say here, fearing I may forget it later on, that during the time we have had formal arbitration in New York under the law, similar to the bill before this joint committee, we have not had a single failure by which I mean our merchants were satisfied and happy with the results of the arbitrations. We handled in 1921 about 150 cases between British merchants and New York merchants, the result of the slump of 1920, when every one tried his best to get out from under by putting his load on the other fellow's shoulders if he could.

The CHAIRMAN. In those cases were there agreements between the parties to arbitrate in case there were any controversies?

Mr. BERNHEIMER. Possibly one third of them had arbitration clauses, but the difficulty of enforcing them is evident at once. We had no means of forcing the issue.

To show how well arbitration works even when not provided with thanks to those who handled these cases in the New York Chamber of Commerce, from the Manchester, England, Chamber of Commerce and from the Bradford, England, Chamber of Commerce; in fact, I want to say that I have not either the secretaries or other men of firms were prevailed from going under by reason of the settlements obtained by this very weak weapon we had in our hands.

The CHAIRMAN. The arbitration was conducted through committees appointed by the chamber of commerce?

Mr. BERNHEIMER. It is a committee selected by vote of each annual election of the chamber of commerce.

The CHAIRMAN. It is the chamber of commerce's regular standing committee on arbitration?

Mr. BERNHEIMER. Yes; it is one of the 10 standing committees of our chamber of commerce.

Last year, and I may refer to this time before I forget it, the question was raised by Senator Walsh of Montana, and I take opportunity to speak of that again as he addressed me at the time.

## ARBITRATION OF INTERSTATE COMMERCIAL DISPUTES.

as to whether arbitration had increased since we had an enforceable arbitration law in our state or had decreased. I told him they had decreased, and of course as a layman I had difficulty to answer that great lawyer's questions. Now I am in a position to answer though I did not look for it, because of an interview that was granted the Manchester Guardian, one of the best English papers, by Mr. Raymond B. Street, the secretary of the Manchester Chamber of Commerce, in which he stated:

The number of arbitration clauses in our contracts is not at all in keeping with the few cases that come up for actual arbitration. The actual arbitration is done away with by the mere existence of these arbitration clauses.

This is at your disposal if you wish it.

Representative DYER. The point you wish to make is what?

Mr. BERNHEIMER. The point I wish to make is that the mere presence of an arbitration clause not only reduces controversies and litigation, but actually reduces the amount of arbitration that might otherwise take place. If I were not taking other people's time, I could tell you a very pretty story of a case where an arbitration agreement was lying on the table, and two parties were sitting by, and they had agreed to sign it, and the stenographer had just brought it in, but a few words spoken by our chairman settled the matter after arbitration had been agreed upon.

I have a letter I would be glad to introduce from the president of one of the largest wholesale dry goods stores in Richmond. He wrote:

I am personally very glad that you are making this movement, because in two instances quite recently where we had an arbitration clause in contracts, we did not have to resort to it.

I have here, but maybe it is too indirect, and yet it should be worth referring to, a reference to the fact that the United States Government, through its food administration, was encouraging during the war, during the great agricultural demands, arbitration in connection with the sale of food products. I have here in my file the instructions given by Rowland W. Boyden, food administrator, to the men engaged with him in the food line, which shows that there is nothing in our Government antagonistic to arbitration.

As a rule governments do not arbitrate, but in 1920 the French Government submitted to arbitration a matter between it and a party in New York City, which was arbitrated by our chamber of commerce. As the result of that the French Government permitted its commissioners to arbitrate 17 cases between itself and the British Government, and 2 cases between the French Government and their own merchants. This was a reversal of policy so far as the French Government was concerned.

And we had a case between the Greek Government and a corporation in the United States. And the Italian Government has not hesitated to settle matters by arbitration.

I am afraid I have taken too much time, and there are plenty more of us here who would like to be heard.

The CHAIRMAN. Any questions the members of the committee wish to ask Mr. Bernheimer? If not, who will be your next witness, Mr. Bernheimer?

Mr. BERNHEIMER. I would like to have Mr. Platt heard.

The CHAIRMAN. The committee will be glad to hear Mr. Platt.

10    ARBITRATION OF INTERSTATE COMMERCIAL DISPUTES.

## STATEMENT OF MR. W. H. PLATT, CHAIRMAN OF THE COMMITTEE ON COMMERCE, TRADE, AND COMMERCIAL LAW, AMERICAN BAR ASSOCIATION, KANSAS CITY, MO.

Mr. PLATT. Mr. Chairman and gentlemen of the committee, I am here in behalf of the American Bar Association, being chairman of the committee on commerce, trade, and commercial law of that body, before whom the subject matter of this bill has been a matter of study for something like five years, having originated in that organization at the 1018 meeting in Cleveland, where a subcommittee was appointed with direct instructions or mandate from the organization to study the subject.

Either that year or the year following an arbitration act was placed on the statutes of the State of New York, and following that a committee on commerce, trade, and commercial law, of which Francis B. James at that time was chairman, was appointed, and the first tentative draft of the measure was introduced in our committee, and later a uniform statute was recommended to the section of commissioners on uniform laws for consideration and adoption in the several States. In the meantime this committee was also directed to prepare a United States statute, and that was done, and Mr. Cohen, who is a member of my committee and a coaborer of mine, has had charge of the actual drafting of the work, in view of the fact that it is a New York statute. And since New York has enacted it a New Jersey act has been enacted. And a bill similar to this was before the Committee on the Judiciary of both the Senate and House last year, and certain hearings were held thereon. In view of questions by Senator Sterling, Senator Walsh of Montana, and other members, changes have been made, and the bill has been redrafted after being submitted to the American Bar Association meeting at Kansas City, and with the further suggestion that it be submitted to the Congress at this session.

The American Bar Association is very hopeful that the Senate and the House will see fit to enact a statute, as they believe this bill furnishes a constructive line for settling and disposing of disputes. We feel that the legislation already enacted has had the effect, not of increasing litigation, not of adding any burden to the courts, but rather of relieving the burden and of reducing controversies; that instead of creating controversies between those who might become litigants, it has created a spirit of conciliation and settlement. Men have found that if they must arbitrate at once they proceed to carry out their contracts. That we regard as morally a highly desirable thing; in fact, some of the advocates of the measure before the Bar Association have adverted to some of our modern ideas on rescission of contracts along the line that it is just as sacred to break a contract as to make it, that while that might stand a certain kind of moral philosophy, yet it will not stand for good morals generally. For that reason we favor the bill, and we hope you gentlemen will agree with us.

On behalf of the American Bar Association I want to thank you, Senator Sterling, for setting the hearing of this committee at a time when I personally could be here on other business and appear before you. The American Bar Association has no funds provided to send out members to hearings, either before the Congress or State legis-

ARBITRATION OF INTERSTATE COMMERCIAL DISPUTES.    11

latures. Our funds are limited, as you gentlemen know, to the slight dues we pay, $6 a year, and we represent in membership about one-sixth of the profession; and that money is taken up with furnishing the bar reports, and so forth, and we have no funds to come before congressional committees or committees of State legislatures will our committees to bring before those bodies matters we work but and send to you and ask to have considered. I very much appreciate your consideration.

I think Mr. Cohen and Mr. James, both co-laborers of mine and who have given this subject special study, should be heard, so I will refrain from taking up any more of your time in discussion.

Representative DYER. Mr. Platt, you have gone over the bill?

Mr. PLATT. Yes; we had this bill before last year. It was not a joint hearing, but a hearing was had before the Senate subcommittee. Because of the crowded conditions, we could not have a joint hearing at that time, but we were heard before the Senate subcommittee. And we made such changes in the bill as Senator Sterling and Senator Walsh at that time suggested.

Representative DYER. Has the bar association discussed this matter to any extent with the Chief Justice.

Mr. PLATT. Not, to my knowledge, specifically; no, I would not say that we have, or have not.

Representative FOSTER. Who opposed it, if anybody?

Mr. PLATT. I may say I am also a member of what is known as the Commercial Law League of America. A large number of its members give attention to the collection of small items. A proposition of this kind has been before that association for some years, and those gentlemen, some three or four years ago, took quite a decided exception to the principle—and to this bill, but to the principle—for the reason that I attended a convention of the association or league last summer, when they unanimously approved this measure. So that while they, three or four years, considered the matter and were opposed to it, they finally, last summer, approved this arbitration measure, and approved this bill unanimously at their meeting.

The CHAIRMAN. We thank you, Mr. Platt.

Who is your next witness, Mr. Bernheimer?

Mr. BERNHEIMER. The manner in which our friend from Kansas City speaks proves that the lawyers' services are the cheapest commodity that we can deal with.

Mr. Chairman, I know that the attorneys have something to say, but Mr. Silver has an appointment at half-past 4, and he asked me if he could make this statement earlier. Will you permit him to make a statement now?

The CHAIRMAN. Certainly.

## STATEMENT OF GRAY SILVER, OF THE AMERICAN FARM BUREAU FEDERATION, WASHINGTON, D. C.

Mr. SILVER. Mr. Chairman, my name is Gray Silver, and I represent the American Farm Bureau Federation.

Speaking not of the language of the bill before you, Mr. Chairman, but of the objectives of the bill, we are very much in favor

## 12    [ARBI]TRATION OF INTERSTATE COMMERCIAL DISPUTES.

of the motives of an arbitration in commercial matters, believing it will be helpful in speeding business generally.

I believe that is all I have to say, unless there are some questions.

Mr. BERNHEIMER. May I once more intrude, Mr. Chairman?

The CHAIRMAN. Yes.

Mr. BERNHEIMER. Mr. French also desires to get away early, and if he may, Mr. French will make his statement to the committee now.

The CHAIRMAN. We will be glad to hear from him.

### STATEMENT OF MR. R. S. FRENCH, REPRESENTING THE NATIONAL LEAGUE OF MARINE MERCHANTS OF THE UNITED STATES, THE WESTERN FRUIT JOBBERS' ASSOCIATION OF AMERICA, AND THE INTERNATIONAL APPLE SHIPPERS' ASSOCIATION OF AMERICA, WASHINGTON, D. C.

Mr. FRENCH. Mr. Chairman, my name is R. S. French, representing the National League of Marine Merchants of the United States, the Western Fruit Jobbers' Association of America, and the International Apple Shippers' Association of America.

The CHAIRMAN. Your address, Mr. French?

Mr. FRENCH. Washington, D. C. Gentlemen of the committee, I find that the principles of this arbitration bill are substantially in accord with those principles which were adopted and made a part of the constitutions and by-laws of these respective organizations at their inception 25 or 30 years ago; and naturally those organizations are in sympathy with and lend their approval to this measure which is before this committee to-day.

It has had consideration in a prior Congress, and these principles have been discussed by the committees of Congress. The bill then before the Congress was unanimously approved by the organizations. We have had an opportunity to check this bill with the amendments, and we find that it qualified the language and clarified the language without affecting the principles, and we are here again to-day in support of this measure.

I might say to you, gentlemen, that the interests I represent here are very much concerned in this matter, because the interests I represent are large exporters and importers of perishable goods. The matter we are interested in in our own organizations, is that disputes may arise in domestic as well as in foreign commerce. We handle at home and from abroad over 800,000 carloads of freight annually, and naturally the opportunity for dispute arises frequently; and I want to say that the opportunity to use this measure has been exemplified and sustained since we have been discussing this matter, more than at any time since its inception.

The CHAIRMAN. Are there any questions? (After a pause.) If not, Mr. Bernheimer, who is your next witness?

Mr. BERNHEIMER. Mr. Woodbury, of the National Canners' Association, and of the Canners' League of California. Mr. Woodbury also told me he had to leave early.

The CHAIRMAN. We will hear him.

## ARBITRATION OF INTERSTATE COMMERCIAL DISPUTES.    18

### STATEMENT OF MR. C. G. WOODBURY, WASHINGTON, D. C.

Mr. WOODBURY. The Canners' League of California is a trade organization, comprising most of the fruit and vegetable canners of that State, and has requested us to bring to your attention the interests of this organization in the passage of Senate bill 1005. The Canners' League has gone on record in favor of this measure as recorded in the hearing on January 31, 1923, before a subcommittee of the Committee on the Judiciary of the United States Senate on S. 4214.

The Canners' League has affirmed its indorsement of the measure, now pending as approved by the American Bar Association, and urges its enactment.

The CHAIRMAN. Are there any, questions? If not, who is your next witness, Mr. Bernheimer?

Mr. BERNHEIMER. Mr. Cohen.

The CHAIRMAN. We will hear Mr. Cohen.

### STATEMENT OF MR. JULIUS HENRY COHEN, NEW YORK CITY.

Mr. COHEN. Mr. Chairman, my name is Julius Henry Cohen; I am a member of the committee on commerce, trade, and commercial law of the American Bar Association and general counsel for the New York State Chamber of Commerce. I reside in New York and have my office there. I am a lawyer.

Mr. Chairman, the question was asked: Who opposes this bill? There is no open opposition anywhere. But there is prejudice, and there is query, and there is lack of information concerning the purposes and concerning the method of the legislation. My purpose is to aid you gentlemen in meeting that prejudice and in answering those queries as they come to you.

First of all, let me say that those of us who have been in the American Bar Association many years—and Mr. Piatt did not disclose that he was the chairman of the conference of delegates, which, next to the office of president of the American Bar Association, I deem the highest office in the association, as that conference represents every bar association in the country. And I have the honor to be the vice chairman of that conference. And it is a matter of great satisfaction that we find the bar associations of the country aligned with the processes of business, so as to make the disposition of business in the commercial world less expensive and more expeditious.

My good friend Mr. Bernheimer thinks we are not making any sacrifice of professional emolument when we are advocating this bill, and those of us who have had some experience in that regard in the busy centers think with him, because we know that the business of arbitration does not take away any of our business. In fact, we can handle an ordinary arbitration case in our offices and make more money out of it than we can if the case goes into litigation. But that would put this matter on a narrow plane. The other plane is the one that has been expressed by the Chief Justice and others, and that justice is to make it an instrument of justice indeed.

79400—24——2

14    ARBITRATION OF INTERSTATE COMMERCIAL DISPUTES.

Now, I think everybody to-day feels very strongly that the right of freedom of contract, which the Constitution guarantees to men, includes the right to dispose of any controversy which may arise out of the contract in their own fashion. Certainly no one would say that if anyone of the distinguished gentlemen who sit around this table had a controversy with me over a million dollars, or $500, that we could not sit down together and compromise that controversy freely, either by each giving something to the other or giving nothing. That right of the settlement of controversy is always recognized. Then what objection can there be, since we can not, perhaps, agree ourselves, to letting me pay you whatever Mr. Piatt says I owe you? You have confidence in him, and what is the use of taking the matter into court? I will leave it to him. Or we will leave it to Senator Sterling, we have confidence in his ability to understand complex commercial situations and in his sense of right and justice. In other words, we agree to settle on the terms that these gentlemen say is proper. And we sign a letter to that effect.

Now, nothing happens to you, except we go through the process of an agreement and an award is made; and we conform to it, being honorable men. This statute does not disturb us in the slightest degree. The difficulty is that men do enter into such agreements and then afterwards repudiate the agreement, and the difficulty has been that for over 300 years, for reasons which it would take me too long to undertake to explain at this time, the courts have said that that kind of an agreement was one that was revocable at any time. You go in and watch the expression on the face of your arbitrator and you have a "hunch" that he is against you, and you withdraw and say, "I do not believe in arbitration any more."

Now, that is an unfortunate situation in the law. But you will find, it is true, if you go into the history of it, and I have gone into that history, and I will not repeat the book here.

"The CHAIRMAN. I would like to have you state the reason for that rule, as you understand it, that a contract for arbitration is not enforceable in equity.

"Mr. COHEN. I will try to be very brief. There are several historical reasons for it. The decisions were misunderstood, I am sure. In a very early case, the Windgrant case, I am sure the decision of Lord Coke was misunderstood; the language was misunderstood. You could make an arbitration agreement away back in the seventeenth century which was binding; but the remedies you had were limited remedies. Now, in those days you could make the penalty in your agreement, and the court held that if I broke my agreement your remedy was to sue for the penalty. Then came a statute eliminating the penalties, and they said the statutes was ineffective because it was a question of damages. But what damages could I show, because the question is what you owe me, and all I could recover was what expenses I had incurred in the arbitration, because you had encouraged me to go on with the arbitration.

"And then came this ouster of jurisdiction. You could not oust the court of jurisdiction. We oust the courts of jurisdiction every day by settling, for example, a will contest. Just before I left New York my partner settled a will contest involving a large sum of money, thus ousting the court of jurisdiction and saving thousands

ARBITRATION OF INTERSTATE COMMERCIAL DISPUTES.    15

of dollars. That was in the surrogate's court, and we ousted the court of jurisdiction, and the surrogate thoroughly approved of the action. At the present time our surrogate in New York are complimenting themselves by disposing of will cases by getting the parties to settle them, even though there may be intricate questions of law to be settled in such cases. We oust the courts of jurisdiction every day.

"Of course, some of the justices have been unkind enough to their predecessors to say that there was a time when the judges were paid according to the cases they acted upon and the fees they got. I do not want to reflect on the judiciary in that way, although there is some historical basis for believing it.

"But the fundamental reason for it, when you come to dig into the history of it—the real fundamental cause was that at the time this rule was made people were not able to take care of themselves in making contracts, and the stronger men would take advantage of the weaker, and the courts had to come in and protect them. And the courts said, "If you let the people sign away their rights, the powerful people will come in and take away the rights of the weaker ones." And that still is true to a certain extent. A judge told me recently one who is in sympathy with this measure and who approves it, but in the privacy of his own chambers he told me recently—"Cohen, you understand what the difficulty in this matter is; when England is in possession of shipping, you can understand why your people do not want to go over there and arbitrate their differences over there.

"Now, I think I have answered your question, Mr. Chairman, as fully as it is possible in as brief a time as possible, and if I may be permitted, I will go on.

"The CHAIRMAN. I just want to say this, in answer to what you have last said: There are certain contracts to-day between the railroads and the shippers in which there is an agreement to arbitrate, and the representation is made to the shipper, "You can take it or leave it, just as you please; but unless you sign you can not ship."

"Mr. COHEN. There is nothing to that contention, Mr. Chairman, for this reason: In the first place, we have the bills of lading act, and the bills of lading act contains the terms of the bill of lading. And that is a protection to the shipper.

"And then we have the regulation of the Federal Government, through its regularly constituted bodies, and they protect everybody. Railroad contracts and express contracts and insurance contracts are provided for. You can not get a provision into an insurance contract to-day unless it is approved by the insurance department. In other words, people are protected to-day as never before. I would not take up your time in discussing this if there was any doubt whatever in the minds of lawyers that it would go through; but this has been taken up in the bar association and in various committees, and while Mr. Piatt gave me the credit for drafting it, and while it is true I made the first draft, there were many others who went over it. You went over it. We have had suggestions from the Secretary of Commerce, and you have found us reasonable, I think, in accepting such amendments as would not break down the backbone of the bill. So it can be said that this bill represents careful draftsmanship, and I can say this without immodesty, because it is not my work.

16    RATION OF INTERSTATE COMMERCIAL DISPUTES.

What does this bill do? It destroys the anachronism in the law. The very first sentence says if a man signs a contract for arbitration, it shall be irrevocable. It changes the law. Why do we do that in the Federal courts? We have it in New York State; the chamber of commerce and the other commercial bodies got together and got it through in New York. You have got it in New Jersey. The New Jersey Bar Association and the business men there got together and had it passed last year. Why do you have to have it in the Federal law? There are several reasons.

First of all, it was held that a State statute was not binding in admiralty, even in the Federal courts. Judge Mack was most sympathetic, but, he has had to follow the Federal law in admiralty. So in the case of the American Red Cross against the Fruit Co., he held—we filed a brief as amicus curiae—and he held that this statute did not help out when it came into the Federal court. And the Federal court will not be bound by any State statute. This is in three segments: The first is to get a State statute, and then to get a Federal law to cover interstate and foreign commerce and admiralty, and, third, to get a treaty with foreign countries. On that last score we have been encouraged tremendously, as the report of the committee will show, by what happened in the economic section of the League of Nations council. The most learned jurists and lawyers of France and England are at work on this matter, and it is believed that when we have this treaty we can make contracts between a merchant of that country and one in this country enforceable. Because, even though the statute says it is enforceable, as in the case of the Hongkong merchant, that it is enforceable, you can not go to China and enforce it; you can only enforce it against property you find in this country. But when we get the treaties between these countries, it will be like judgments; they will recognize our judgments and we will recognize theirs. And we will get it through.

But, the great field of business—why are these merchants and these fruit shippers and those who are represented here, why are they for this? Because of interstate business. And you know that commerce is mostly interstate now. So that this is a great tonic that is needed to strengthen this patient in the field of commercial activity, because when business men know that they do not have to get a lawyer in California to enforce a case that does not involve more than four or five hundred dollars they will do more business. That is why the business men are behind this thing.

Now, in the next place, this statute involves very simple machinery by which you get two things. You get simple machinery by which you make it effective. Now, the machinery of the New York law was not machinery to make arbitration effective. It was a valid agreement in certain divisions of the law, but never followed, because the equity courts refused to specifically enforce an arbitration agreement. There are some decisions—I think by Lord Elden—that you could not enforce it; but so far as equity is concerned our courts have refused it. Now, what is it your business man wants? He goes to his lawyer and he says, "If there is any dispute about this, it has got to go to the arbitration committee of the Silk Association." Now, what does he do about it? If this be the law in the Federal statutes, as it is in the New York statute and in the New Jersey

ARBITRATION OF INTERSTATE COMMERCIAL DISPUTES.    17

statute, you make a petition and ask the court to direct the parties to proceed with this matter and the court will direct it.

Now, there is a constitutional provision which we considered, in the case of Mecham against Jamestown, holding that the arbitration law was not a remedy. Judge Cardozo, who had written an opinion on the previous statute sustaining the constitutionality of the law. Now, how do we meet that? The one constitutional provision we have got is that you have a right of trial by jury. But you can waive that. And you can do that in advance. Ah, but the question whether you waive it or not depends on whether that is your signature to the paper, or whether you authorized that signature or whether the paper is a valid paper or not, whether it was delivered properly. So there is a question there which you have not waived the right of trial by jury on.

The CHAIRMAN. The issue there is whether there is an agreement to arbitrate or not.

Mr. COHEN. Exactly. Now, if you come in there you can demand a trial by jury, right away, summarily, and that is the issue that is passed upon. Now, there is no question about that under the New York law, because we have had administration of it, and the result is that inside of three or four days arbitration proceeds. It is rarely there is any question about it. It proceeds.

Now, what is the other difficulty? The provision here is that you name one arbitrator, and the other party names one, and those two name the third. Now, you do your job, and I do not do mine. What can we do about it? There can be no arbitration until the tribunal is provided. The legislation in New York provides, and this bill here provides, that if you do not name your arbitrator we go into the court and ask the court, and the court names the arbitrator. Or if one dies the court names another. There is the provision which gives protection to this thing. And if there has been fraud or real arbitrary action on the part of an arbitrator, the courts can set aside the award, or they can confirm it; and when it is confirmed it becomes a judgment. So what we have done, gentlemen, is that we have taken these defects which might have beset a criticism and we have made it a part of our judicial machinery. That is what we have done. But it can not be done under our constitutional form of government and cover the great fields of commerce until you gentlemen do it, in the exercise of your power to confer jurisdiction on the Federal courts. The theory on which you do this is that you have the right to tell the Federal courts how to proceed. And I say to the judge, "You used to say you did not have jurisdiction; now you have jurisdiction." That is all there is to it. The language is such as to make it clear. That polishing work has been done for two years. The bill has been approved twice by the American Bar Association; not a word of dissension anywhere. Just as Mr. Piatt did a great injustice to the Bar Association by saying that we are so impoverished that they could not even pay his fare here—but we hold hearings in the committee on commerce, trade, and commercial law of the American Bar Association, and the lawyers were called in when these hearings were held, and the business men came in, and never once has there been

## 18   ARBITRATION OF INTERSTATE COMMERCIAL DISPUTES.

a word of criticism of the principles of this legislation, but constructive suggestions in the way of improvement of the legislation. I thank you, gentlemen.

Representative HICKEY. Without a written agreement, Mr. Cohen, where would an arbitration be held?

Mr. COHEN. It would be held in accordance with the direction of the court; by direction of the court to which you apply.

Representative HICKEY. And the application would be made to the court where the party asking for the arbitration resides?

Mr. COHEN. You would have to get jurisdiction just as you do now in a Federal court; by personal service.

Representative HICKEY. Where the defendant lives?

Mr. COHEN. Where the defendant lives. That would mean practically that you have to go to the jurisdiction where the defendant is; or wait until he comes into your jurisdiction so that process may be served upon him. The process is exactly the same as in civil procedure in the Federal courts.

Representative DYER. Mr. Cohen has your committee estimated what would be the approximate saving? To admit, I think, all of us, that it would be a saving to the commercial and business interests of to have such a law; but what would be the saving in court-work? 

Mr. COHEN. Who could estimate that in dollars and cents?

Representative DYER. You could not.

Mr. COHEN. No; you can not, but, you can say this: that if you could get rid; in the New York calendars, both in the Federal courts and in the State courts, and in the congested centers through the country—if you could get rid of the litigation that these business concerns can prevent by their arbitration agreements—you and I would be able to get along with our important litigation without waiting for a year or two for it to be reached. In other words, you would take out all these matters of business and leave the courts free to handle the business that ought to be handled with dispatch.

Representative DYER. Which is taking a considerable part of the time now.

Mr. COHEN. Undoubtedly it is taking a considerable part of the time now.

Representative KURTZ. How far are they behind?

Mr. COHEN. Something like three years in the civil courts; on the civil side. Are there any questions?

The CHAIRMAN. I think not, Mr. Cohen.

Mr. COHEN. I could go on interminably on this matter, Mr. Chairman.

The CHAIRMAN. We thank you for your statement.

Here is the provision relating to that.

Representative HICKEY. The fourth section?

The CHAIRMAN. This is on page 7, section 10, beginning with line 8 [reading]:

If no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made. Notice of the application shall be served upon the adverse party.

Then this [continuing reading]:

"If the adverse party is a resident of the district within which the award was made, such service shall be made upon the adverse party or his attorney

## ARBITRATION OF INTERSTATE COMMERCIAL DISPUTES.   19

as prescribed by law for service of notice of motion in an action in the same court.

That makes it very clear.

Whom will you have next, Mr. Bernheimer?

Mr. BERNHEIMER. Commissioner James.

### STATEMENT OF MR. FRANCIS B. JAMES, WESTORY BUILDING, WASHINGTON, D. C.

Mr. JAMES. Mr. Chairman, I am a resident of Cincinnati, Ohio, with offices in Washington, D. C., and for a dozen or more years I have made a specialty of interstate commerce matters, and for about the same length of time I was a member of the committee on commerce, trade, and commercial law of the American Bar Association.

This matter came before this committee by proper resolution of the American Bar Association in the summer of 1920. The bill itself was held a public meeting in the rooms of the Merchants' Association in New York; it which they had present representatives produced the first draft of this bill; and the bill was thoroughly discussed before the committee. The committee reported the bill to the American Bar Association in the summer of 1921, with the recommendation that the matter go over for three years for further consideration. It ceased to be a member of that committee after 1921.

I may say that the bill received consideration by the committee from three points of view: First, from the point of view of the public interest; second, from an economic point of view; third, as a technical piece of Federal legislation.

It was the judgment of the committee that it was in the public interest; it was the judgment of the committee that from an economic point of view the measure was a sound one. With the exception of two amendments, which were suggested by two members of the Senate subcommittee, Mr. Sterling and Mr. Walsh, I believe the bill, from a technical point of view, is as perfect as a human being can make a piece of human legislation. Mr. Cohen, upon whom the burden fell of drafting the bill, devoted much time to it. He has explained the same in detail. There is nothing I can add to what he has said upon that subject.

The CHAIRMAN. At this point I think I will submit for the record some letters I have received.

The first to which I call attention is a letter addressed to the chairman of the Judiciary Committee of the Senate, Senator Brandegee, and it is from the Secretary of Commerce, Herbert Hoover, heartily indorsing the bill, and speaking of it as an emergency measure.

The second one is a letter addressed to myself, in which he calls attention to the New York Arbitration Act, on which this Federal legislation is based.

And I also submit a list of commercial organizations indorsing the United States Arbitration Act, the list being submitted by Mr. Charles L. Bernheimer.

20      ARBITRATION OF INTERSTATE COMMERCIAL DISPUTES.

Also a telegram from the secretary of the National Wholesale Grocers Association of the United States, heartily indorsing the bill.

Also a telegram from J. W. Davis, chairman of the legislative committee of the American Fruit and Vegetable Shippers Association, indorsing the bill.

Representative DYER. Where are they located, Mr. Chairman?

The CHAIRMAN. They are located at Chicago, Ill.

And a second telegram from the same association, the American Fruit and Vegetable Shippers' Association. The reason I offer both of them is that they are somewhat different in their terms.

And a letter, with a resolution accompanying it, from the general secretary of the executive committee of the Philadelphia Chamber of Commerce. The resolution is short and I will read it [reading]:

Resolved, That the executive committee of the Philadelphia Chamber of Commerce approves the amended draft of the Federal arbitration law (S. 1005, H. R. 646, and the draft of the amended bill therefore) heretofore adopted by the Chamber of Commerce of the State of New York, both of which have been unanimously approved by the American Bar Association.

Also a letter from Thomas B. Paton, general counsel of the American Bankers' Association.

And also a letter from the Converters' Association of New York, signed by the secretary of that association.

Representative CLEARY. May I add to that list, Mr. Chairman?

The CHAIRMAN. Yes.

Representative CLEARY. A letter from the New York Board of Trade and Transportation, and also one from the Brooklyn Chamber of Commerce, written to me.

The CHAIRMAN. Yes.

(The letters and telegrams referred to are as follows:)

DEPARTMENT OF COMMERCE,
OFFICE OF THE SECRETARY,
Washington, January 31, 1924.

Hon. FRANK B. BRANDEGEE,
Chairman Judiciary Committee, United States Senate, Washington, D. C.

MY DEAR SENATOR: On January 31, 1923, I addressed a letter to Senator Sterling, who is in Washington, hereto attached. This hundred me a list of the State of New York, and in which by my formal vote expressed their support of the several organizations which have here been introduced by Senator in support of the Federal arbitration bills as H. R. 646.

The chairman of the arbitration committee of the Chamber of Commerce of the State of New York, who is in Washington, has been introduced by Senator Sterling as S. 1005 and Representative Mills as H. R. 646.

The bills were drafted and approved by the American Bar Association and introduced by the Senate and House at my representative last year, but did not reach the floor. The present text contains some changes suggested by the judiciary subcommittee, which was last year composed of Senators Sterling, Walsh, and Ernst.

The emergency to which I referred in my letter to Senator Sterling and which prompted so many important commercial bodies to ask for the prompt consideration of this act in a very serious situation still exists, and I again express the earnest hope that this Congress may be given an opportunity to act promptly, and that to this end the Judiciary Committee will do what it can to speed it along.

I am inclosing a similar letter to Congressman Graham, chairman of the Judiciary Committee of the House.

Yours faithfully,
HERBERT HOOVER,
Secretary of Commerce.

---

ARBITRATION OF INTERSTATE COMMERCIAL DISPUTES.      21

[JANUARY 31, 1924.]

Hon. THOMAS STERLING,
United States Senate, Washington, D. C.

MY DEAR SENATOR: I have been, as you know, very strongly impressed with the urgent need of a Federal commercial arbitration act. The American Bar Association has now joined hands with the business men of this country to the same effect and unanimously approved, at its convention in San Francisco last August, a draft of a law prepared by its committee on commerce, trade and commercial law and approved of by a large number of associations of business men. It was introduced in the Senate by you as Senate bill 4214 and in the House of Representatives by Congressman Mills as House bill 13522.

The clogging of our courts is such that the delays amount to a virtual denial of justice. I append an excerpt of the American Bar Association report, which would seem to support that statement. I believe the emergency exists for prompt action and I sincerely hope that this Congress may be able to relieve the serious situation.

If objection appears to the inclusion of workers' contracts in the law's scheme, it might be well amended by stating "but nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in interstate or foreign commerce."

In that way the Federal arbitration act, in somewhat limited form, that we know most legislative measures do, it might meet with popular favor, and we know the emergency, be passed and amended later in the light of further experience.

The New York State arbitration act, on which the Federal law is based, has been in force since April, 1920, and but for it the court congestion there and delays would have been still worse in the two boroughs of Manhattan and the Bronx alone] would be still worse.

Yours faithfully,
HERBERT HOOVER,
Secretary of Commerce.

COMMERCIAL ORGANIZATIONS INDORSING UNITED STATES ARBITRATION ACT.

[List submitted by Mr. Charles L. Bernheimer.]

1. The Western Fruit Jobbers' Association of America, Chicago, Ill.
2. National Wholesale Grocers' Association, New York City.
3. San Francisco Chamber of Commerce, San Francisco, Calif.
4. Musical Supply Association, New York City.
5. Raisin Institute, Wellesley Hills, Mass.
6. Sun Maid Raisin Growers (formerly California Associated Raisin Co.), Fresno, Calif.
7. National Poultry, Butter, and Egg Association, Chicago, Ill.
8. Chamber of Commerce of Kansas City, Kansas City, Mo.
9. Minnesota Supply Association, New York City.
10. Canners' League of California, San Francisco, Calif.
11. Music Publishers' Protective Association, New York City.
12. Lake Charles Association of Commerce, Lake Charles, La.
13. American Chamber of Commerce of Philippine Island, Manila, P. I.
14. Atlantic Fruit Co., New York City.
15. Atlantic Fruit Co., New York City.
16. Live Poultry and Dairy Shippers' Traffic Association, Chicago, Ill.
17. Yakima Fruit Growers' Association, Yakima, Wash.
18. Fresh Fruit Growers, Pittsburgh, Pa.
19. Americus Fruit Growers, Pittsburgh, Pa.
20. California Packing Corporation, San Francisco, Calif.
21. Chamber of Commerce of State of New York, New York City.
22. Los Angeles Chamber of Commerce, Los Angeles, Calif.
23. New York State Board of Trade and Transportation, New York City.
24. National League of Commission Merchants of United States, Washington, D. C.
25. Converters' Association, New York City.
26. Philadelphia Association of Credit Men, Philadelphia, Pa.
27. Merchants' Association of Commerce, Philadelphia, Pa.
28. Rochester Association of Credit Men, Rochester, N. Y.
29. Broadway Board of Trade, Brooklyn, N. Y.
30. National Association of Credit Men, New York, N. Y.

22    ARBITRATION OF INTERSTATE COMMERCIAL DISPUTES.

31. Crockery Board of Trade of New York, New York, N. Y.
32. Arbitration Society of America, New York, N. Y.
33. International Apple Shippers Association, Rochester, N. Y.
34. American Manufacturers Export Association, New York, N. Y.
35. Central Mercantile Association, New York, N. Y.
36. Building Trades Employers' Association of the City of N. Y., New York, N. Y.
37. Federated Fruit and Vegetable Growers, (Inc.) (Cooperative non-National United States Service) New York, N. Y.
48. San Antonio Chamber of Commerce, San Antonio, Tex.
39. Music Industries Chamber of Commerce, New York, N. Y.
40. American Exporters' and Importers' Association, New York, N. Y.
41. The Merchants Association of New York, New York, N. Y.
42. Tri-Bore Chamber of Commerce, Baldwin, Pa.
43. The Baton Rouge Chamber of Commerce, Baton Rouge, La.
44. Merchants and Manufacturers Association of Baltimore, Baltimore, Md.
45. New York Coffee and Sugar Exchange (Inc.), New York, N. Y.
46. New York State Forestry Association (Inc.), Albany, N. Y.
47. American Fruit and Vegetable Shippers' Association, Chicago, Ill.
48. San Antonio Chamber of Commerce, San Antonio, Tex.
49. New Orleans Association of Commerce, New Orleans, La.
50. Commercial Law League of America, Chicago, Ill.
51. New Orleans Association of Commerce, New Orleans, La.
52. The Albany Chamber of Commerce, Albany, N. Y.
53. Chamber of Commerce at Haywood County, Brownsville, Tenn.
54. Portsmouth Chamber of Commerce, Portsmouth, N. H.
55. Chamber of Commerce and Business Men's Club, San Antonio, Tex.
56. Chamber of Commerce of Austin, Austin, Ga.
57. The Chamber of Commerce, Hazelton, Pa.
58. Hudson County Typothetae, Jersey City, N. J.
59. Association of Commerce (for Jackson and Madison County), Jackson, Tenn.
01. Chamber of Commerce of Michigan City (L. M.), Michigan City (L. M.), Ind.
01. The Rotary Club of Newark, N. J., Newark, N. J.
02. Massachusetts State Chamber of Commerce, Boston, Mass.
03. Winsted Chamber of Commerce, Winsted, Conn.
04. Chamber of Commerce, New Brunswick, New Brunswick, N. J.
05. Chamber of Commerce, Fort Smith, Ark.
06. New Jersey Lumbermen's Association, Newark, N. J.
07. Chamber of Commerce, Houston, Tex.

New York, N. Y., *January 8, 1924.*

Hon. Thomas Sterling,
*Senate Office Building, Washington, D. C.:*

National Wholesale Grocers' Association of United States heartily indorses principles involved in your bill 1005 and House 846, proposing United States arbitration act. In interstate commercial adjustment of trade disputes and elimination of expensive litigation. This association for many years has urged commercial arbitration. Respectfully urge favorable action these measures by your subcommittee at hearing to-morrow.

M. L. Toulme, *Secretary.*

Chicago, Ill., *January 7, 1924.*

Senator Sterling, Washington, D. C.:
Your committee meets Wednesday, January 9, on United States arbitration bill 1005. We urge favorable consideration of this measure, as it is legislation that is badly needed in order to cure certain trade evils; hope you will support it.

J. W. Davis,
*Chairman Legislative Committee
American Fruit and Vegetable Shippers' Association.*

ARBITRATION OF INTERSTATE COMMERCIAL DISPUTES.    23

Chicago, Ill., *January 7, 1924.*

Senator Sterling, *Washington, D. C.:*
Our association was very anxious to be represented at hearing Wednesday, January 9, in connection with Senate bill 1005, House bill 646; United States arbitration act, but owing to our convention now in session be impossible. We represent shippers from all sections of United States and are strongly in favor of this bill. Hope committee will give it favorable consideration.

American Fruit and Vegetable Shippers' Association.

Philadelphia Chamber of Commerce,
*January 8, 1924.*

Hon. Thomas Sterling,
*United States Senate, Washington, D. C.:*

My Dear Senator Sterling: The executive committee of the Philadelphia Chamber of Commerce begs that you will present the following resolution, in connection with the United States arbitration act to your committee on the Judiciary:

"*Resolved,* That the executive committee of the Philadelphia Chamber of Commerce approves the principle of the Federal arbitration law, S. 1005, H. R. 646, and the draft of the commercial arbitration treaty, as approved by the Chamber of Commerce of the State of New York, both of which have been, unanimously approved by the American Bar Association."

Yours very truly,

N. B. Kelly,
*General Secretary.*

The American Bankers Association,
*New York, N. Y., January 7, 1924.*

Hon. Thomas Sterling,
*Chairman Subcommittee Senate Committee on Judiciary, Washington, D. C.:*

Dear Sir: S. 1005, H. R. 646, Federal arbitration act. Referring to the above bills, we are advised that S. 1005 will be given a hearing on January 9 by the House Judiciary Committee, and that S. 1005 will be given a hearing on January 9 by a subcommittee of which you are chairman in which hearing a committee from the House Judiciary Committee will probably join.

The American Bankers Association with a membership of over 22,000 banks—National, State, savings, and trust companies—and as a banking body of such consideration of similar bills which were pending in the Sixty-seventh Congress, S. 13522; S. 4214) went on record as being thoroughly in accord with the efforts made to induce Federal legislation legalizing the settlement of commercial disputes and indorses the principle of the bills pending in the 67th Congress.

The above being a statement of our general study of these bills by the committee on commerce and marine commission of our association whose resolution indorsing them in principle was approved by the association.

It is impracticable on such short notice to send a delegate to personally represent our association at the hearing; therefore, by this letter, we desire to present the attitude of our association in support of these measures.

Very truly yours,

Thomas B. Paton,
*General Counsel.*

Contractors' Association,
*New York, January 7, 1924.*

Senator Thomas Sterling,
*United States Senate, Washington, D. C.*

Dear Sir: We are to-day in receipt of advice that sub-committee meeting will take place on the 9th instant for the purpose of conducting a hearing on bill S. 1005 referring to Federal arbitration.

It is a matter of great regret to us that the chairman of our association's committee on arbitration, who is fully familiar with this subject matter, is not at present in New York, and will not return until the 14th instant. It had been our hope that he would be able to appear before such subcommittee for the purpose of voicing our decided views in support of this proposed legislation.

Our association has had very large experience under the New York arbitration act and with arbitration generally and we most strongly feel that the

adoption of a Federal arbitration act such as is now proposed will be one of the most forward steps in commercial life. Our members have found arbitration to be expeditious, economical, and equitable, conserving business friendships and energy.

We trust that we will be granted the privilege of having our chairmen enlarge on this proposition upon his return.

Very respectfully yours,

SAMUEL M. FORBES, Secretary.

---

NEW YORK BOARD OF TRADE AND TRANSPORTATION,
New York, January 7, 1924.

Hon. WILLIAM E. OLEARY,
House of Representatives, Washington, D. C.

DEAR CONGRESSMAN: You will probably remember that this board was quite active in supporting the Sterling bill, S. 4214, last year, and we understand that it is favorably reported to succeed in the present session in the same measure.

Mr. Charles L. Bernheimer is our representative on the board; he represented at the hearing on Wednesday next, January 9, at 2.30 p. m., in the Senate Judiciary Committee room. As Wednesday is our board meeting day, none of us can go over. Will you be good enough to represent us in this matter? As a favor to our president and board of directors it would be quite suitable. Mr. Bernheimer would be delighted to hear of your acceptance.

I inclose some printed matter relating to bill of last year which is good as to present bill.

Very truly yours,

FRANK S. GARDNER, Secretary.

---

BROOKLYN CHAMBER OF COMMERCE,
Brooklyn, N. Y., January 8, 1924.

Hon. WILLIAM E. OLEARY,
House Office Building, Washington, D. C.

MY DEAR CONGRESSMAN OLEARY: The Brooklyn Chamber of Commerce has been very much interested in commercial arbitration, as it believes that it is often possible by arbitration to save time, trouble and money. We have established an arbitration court in the Brooklyn Chamber of Commerce and are successfully handling disputes.

You know, I feel sure, that there was an Arbitration Law passed in the State of New York, and it is the present time House bill No. 646 has been introduced to give a national law on arbitration to correspond with the New York State law.

The Brooklyn Chamber of Commerce believes that it would be a very good thing for the country at large, to have this arbitration legislation passed, and we are writing you as a Brooklyn Congressman, to urge that you use your influence in support of the Sterling bill No. 646.

There is a joint hearing on this bill at 2.30 p. m. Wednesday, January 8th in the office of the Senate Judiciary committee. Hope that you can be present.

Very truly yours,

ARWIN S. SOMERS.

The CHAIRMAN. Who is your next witness, Mr. Bernheimer?

Mr. BERNHEIMER. Mr. Alexander Rose, of the Arbitration Society of America.

Representative DYER. Is there anybody here in opposition to the bill.

The CHAIRMAN. No one that I know of.

Representative DYER. Is there anybody who has indicated any opposition in writing, or otherwise?

The CHAIRMAN. No; I knew of no real opposition when the bill was before the Senate subcommittee at the last session.

Representative DYER. There is no question of the authority of Congress to legislate on this subject as provided in the bill, is there?

The CHAIRMAN. I do not think there is.

Representative DYER. The authority and jurisdiction is ample?

The CHAIRMAN. Yes.

## STATEMENT OF MR. ALEXANDER ROSE, REPRESENTING THE ARBITRATION SOCIETY OF AMERICA, NEW YORK CITY.

Mr. ROSE. Mr. Chairman, in speaking on this matter before the committee I desire to express my thanks for the privilege, and, following as I do after Mr. Bernheimer and Mr. Julius Henry Cohen, of New York, I do not want to pass by the opportunity, on behalf of those of us from New York, to witness to their untiring efforts in for the efforts that Mr. Bernheimer has always exhibited and for the great learning and erudition that Mr. Cohen has brought to this matter of arbitration.

Representative DYER. Are you not going to include, in that, my constituent, Mr. Platt, in your eulogy?

Mr. ROSE. I thought Mr. Platt did not lay claim to residence in New York City.

I want to speak, first of all, as I think it will be illuminative, on the question with reference to the formation of this society known as the Arbitration Society of New York, and their functioning solely in the cause of arbitration.

That is not solely a trade organization, although it has some 60 trade organizations who affiliate with it and avail themselves of the service. That society arose out of the enactment of the law of 1920 by the New York State Legislature, which law I think Mr. Bernheimer and Mr. Cohen were primarily responsible for in that State. That law, as has been alluded to here and previously, I desire to point out, has two features by which it remedies two existing conditions in the law of arbitration. And it was due to the remedying of these two conditions which existed before that it had fallen into disuse.

Those two features consisted of the revocability of an arbitration, as has been pointed out, and to the fact that the courts held right along that it was not competent for parties to agree on an arbitration of an entire controversy. They could agree upon some incidental features—whether some work on a building contract had been properly performed; whether a payment was due, whether some matter of value was to be determined as an incident, whether some the question of liability under the whole contract was one which the courts assumed to take away from the parties. That is, it held that the parties had no right to oust the courts of jurisdiction and refused to enforce contracts of arbitration.

When those were taken out of the statute, those seeds of destruction, it remedied the things by which the statute had fallen into disuse.

In about two years thereafter, the statute still being on the books in its present form, it had not yet attracted public notice, until a project came up to organize a society to give vitality to this statute in the common estimation before the public had it. And so the society was organized, in which there were some 20 governors appointed, and among those governors we had a showing of the ability of this law from every point of view; that is, we had the deans of both of the great law schools of New York City, the Columbia University and New York University, sponsoring the project, and such public men as Mr. Charles M. Schwab, acting as chairman of the general committee. And we had the former chief

much more forcibly expressed by Chief Justice Taft, who expressed much more vigorously the same sentiment.

There is this advantage that appeals to the ordinary man: First of all, as Mr. Cohen pointed out, he leaves it to a man who is familiar with the subject of the controversy; he leaves it to a man who is the choice of the disputants who can hear it immediately and free from technicality. Let each man have his say unembarrassed by technicalities, so that the full truth may come out and so that no time will be lost in educating a man in the jury who is unfamiliar with the subject, and that on what may be doubtful testimony, that of the experts. So it is small wonder that arbitration is desired.

And I may say this to you, gentlemen: After our society was organized, and under the difficulties which still persist and hamper it—and which I shall point out in a moment or two, the weaknesses of it—notwithstanding that, the first six months having been devoted to missionary work, making the society known, and the statute known, that men may enter into arbitration by voluntary selection, a fact of which the community is ignorant—After those six months, in the next six months no less than 600 cases have been submitted to arbitration, and satisfactorily disposed of, and summarily disposed of, that is to say, with the least degree of delay. After you say that, it becomes apparent at once that arbitration has some tremendous advantages in this respect: Here we may select judges satisfactory to the parties. We have a list of some 3,000 bankers, merchants, architects, and men drawn from all walks of life who are only too happy to serve as arbitrators. Many of them work for nothing, for the mere honor of the position. There is sometimes a small charge, if the matter is complicated and takes too much time.

And I want to point this out, that it does not do away with the function of the lawyer. The lawyer is as necessary in arbitration as in a lawsuit. He may gather the facts, he may assist in the preparation of the case, and he may sit as an arbitrator. Indeed, I never knew of an arbitration where questions of law were not to be passed upon, and where some retired jurist, or a lawyer could not sit and pass on them.

So that you see you can have here a system of arbitration which is one that the people want; the public want it. They want speedy justice, and they want plain justice, in as simple terms as it can be reduced to.

Now, let me say this, however: We have a weakness in our system of arbitration. We need, and we must have the cooperation of the Federal courts. We must have the cooperation of the Federal statute, because while the dispute is a domestic one, we can well dispose of it. But when a merchant in New York sells his merchandise to some one in a foreign jurisdiction, his arbitration law is defended, not so much by the fact that the thing is not specific enough, but by the logic of the situation. He can not get jurisdiction in a foreign State, and if he does get jurisdiction, the law of that foreign State may be different from the law here and may not be recognized as we have it here. It may be impossible to enforce it to a judgment in that State. He may not have the power to summon witnesses there. In short, he needs the aid of the Federal law in such cases, where interstate commerce is

justice of the appellate division of New York, Judge Jenks, and judges also of the supreme bench now, and the heads of great commercial organizations taking part in it in order to propagate the idea of not settling their disputes by friendly arbitration.

Now, one of the primary causes that led up to the idea that there should be aid given—and here I answer a question that has been previously put—that there were pending on January 1, 1921, upon the Supreme Court calendar 21,380 cases untried. And I may add that in 1923 there are 23,000 cases pending and untried. And the courts are only able, as shown by the official records, to dispose of 8,000 cases, in round numbers, by all possible means. That is to say, by trial, discontinuance, and settlement, and every other way only 8,000 cases disappear from that calendar annually. So that you gentlemen can see that in the present state the courts are over three years behind. Nor can this well be remedied, at least in New York State, by the election of a large number of justices to aid in clearing up this congestion, because by a constitutional provision there may be only one justice of the supreme court elected to every 80,000 of the population.

Now, it would be interesting, perhaps, as showing the way in which the public at large, as represented by the trades, use arbitration, that on the day the society was launched, with its board of governors and with its officers organized, and when it held its first meeting on that day, as I show you [exhibiting reproduction of newspaper articles] there appeared in the New York papers, which we have gathered together here, all these editorials and news articles commendatory of the general idea of arbitration and how much the public favored it and how much they wanted it and how much good it could do if properly administered. And I may add that since that time there have been some 350 articles appeared, which we have gathered, in newspapers and magazines throughout the United States, all favoring the general idea of arbitration.

I may say that in the New York society alone almost 1,000 of the leading merchants and citizens of New York have come in as voluntary members to support this society and to aid in its work. I may supplement that by saying that the New Jersey statute followed and improved to a certain extent upon the New York statute in regard to having arbitration supplement the courts.

Arbitration, I may say to you gentlemen, does not by any means seek to supplant the courts or work in opposition to the courts, because after all it is a purely voluntary thing. It is only the idea that arbitration may now have the aid of the court to enforce these provisions which men voluntarily enter into.

As showing how far the idea is favored by the courts, I may add that at a dinner given at the home of Mrs. Vincent Astor there were 64 of our judges attending, representing the municipal courts, the county courts, the surrogate's courts, and the supreme courts, and the project was unanimously indorsed. And at a meeting held at which there were some 250 merchants also participating it was again unanimously indorsed by that other gathering. So that there is no question but the crying demand and the need of the hour is what? It is to simplify legal matters. They have become too burdensome in many respects. People are dissatisfied with the courts, I mean no disrespect to the courts, because what I may say has been very

affected, and where commerce with foreign nations is involved, or the subjects of foreign nations reside, gentlemen, for you to aid in this important work, and I am sure I could not here and now any more heartily indorse the work of our society and those affiliated with it than I do at the present time.

Now, there is this also to be said: There is one excellent result to be achieved in the enactment of this bill, apart from the enactment itself; it will set a standard throughout the United States. There are many States which have no arbitration law. We have one in New York and one in New Jersey. So far as I know, I think there is not now pending in some Western States a bill to have an arbitration statute substantially the same as in New York. The other States have no arbitration law whatever. In the others there is common-law arbitration. There is a good deal of confusion in the law on this subject. The difference between common law and statutory arbitration is largely unknown. The legal profession themselves are largely ignorant of the subject of arbitration and its benefits, because it has fallen so largely into disuse. And the enactment of this law, extending its effect all over the United States, will have an effect upon the cause of that much-desired thing—uniform legislation on subject of this character. I have no doubt all of the States would adopt it after it. There is nothing to be lost by this and what is everything to be gained.

I wish to say, just in closing, this one word: That I know I need hardly add to what has been said before as to the ethical importance of arbitration in avoiding bitterness. All that has been dwelt upon here and will undoubtedly be dwelt upon hereafter.

I want to thank the committee for their courtesy.

The CHAIRMAN. We are very much obliged to you for your statement. Who is next?

Mr. BERNHEIMER. I want to call on Mr. Henry Morse, of the Massachusetts State Chamber of Commerce.

STATEMENT OF MR. HENRY MORSE, REPRESENTING THE MASSACHUSETTS STATE CHAMBER OF COMMERCE.

Mr. MORSE. Mr. Chairman, I am a member of the Massachusetts State Chamber of Commerce, and am a director. My residence at the present time is in Washington. I have given this bill careful consideration, and the Massachusetts Chamber of Commerce has indorsed it, and its executive committee has indorsed it.

Mr. BERNHEIMER. Mr. Chairman, I introduce Mr. Eaton, of the American Fruit Growers.

STATEMENT OF MR. HENRY L. EATON, WASHINGTON, D. C.

Mr. EATON. Mr. Chairman, I appear for the American Fruit Growers (Inc.), of Pittsburgh, Pa. This company is a producer and shipper of vegetables and fruits in a large way; engaged in interstate commerce in almost every State in the Union. I am instructed by the officers of the association to appear and say that they are heartily in favor of the

passage of this bill, because they believe it to be of benefit not only in their own business but to the whole country.

The CHAIRMAN. As a practical question, do you make many agreements in which there is an agreement to arbitrate?

Mr. EATON. I think that outside of the States of New York and New Jersey it is a rare thing. In the State of Pennsylvania there is an old arbitration law which has been the law for a good many years, but I suspect it has largely fallen into disuse. It did not amount to much when it was in use. Now and then some one would take up something on appeal from a justice of the peace and then arbitrate it. It saved some litigation without a doubt.

The CHAIRMAN. I would like to ask Mr. Cohen this question: Do you think, Mr. Cohen, that the fact that there is this law—if it becomes a law—that that very fact would tend to prevent men from entering into agreements to arbitrate?

Mr. COHEN. Not at all, because this is the experience. Mr. Bernheimer is more expert on that than I am. The trade organizations to-day who are represented here by these various gentlemen have a tremendous interest and influence in establishing trade customs. That is nothing new in the economic history of the world. And one of the trade customs that has been established, one of the rules of the trade is that if you belong to a trade you shall arbitrate your differences with them. The effect is that if you are a member you arbitrate your differences, and if you are outside you are not bound by it. But a trade custom may be established, and it may establish a custom in the trade, and one is that they will arbitrate. The silk association has it; the fruit association has it, and the lumber association has it. Now, all that we get through this law is not that we increase the customs, but the custom has a legal force to it. It is enforceable against the refractory man who will not aid in the custom of the trade. So it will really encourage him instead of discouraging him. It will mean this, however, Mr. Chairman, in the drafting of partnership articles or in the drawing of contracts like the public service commission contract for the building of subway the arbitration agreement will be more carefully drawn by the lawyers for the parties.

If I may take a moment further, I can give you a concrete illustration fresh from my own practice. One of the leading members of the bar in New York, and now one of the justices of the supreme court, represented a banking concern, and I represented the other concern in a matter in which there was a large sum of money involved, and two men who were interested in the concern could not get along together. The business had to be wound up, and my law partner and myself got together and drew up a four-page document, and saved whatever there was to the parties without any court expenses at all. And then having some experience in that sort of thing we realized that we could not cover everything in that document, and we put in a clause that in case of any other difficulties, if any difficulties might arise between them, they should select these two lawyers as arbitrators, and if they could not agree the third man should be chosen. The ink was hardly dry on that agreement before five questions arose which required arbitration, and we are now settling those five questions.

30        ARBITRATION OF INTERSTATE COMMERCIAL DISPUTES.

Mr. BENHEIMER. I will introduce Mr. Carnahan, of the New Jersey Lumbermen's Association, who has just come in to bring the word of his association.

STATEMENT OF MR. FRANK CARNAHAN, MANAGER OF THE NATIONAL RETAIL LUMBER DEALERS' ASSOCIATION, WASHINGTON, D. C.

Mr. CARNAHAN. Mr. Chairman, my name is Frank Carnahan; I am manager of the National Retail Lumber Dealers' Association; and I also speak for the New Jersey Lumber Dealers' Association, with headquarters in Washington.

I can not think of anything that would be of more benefit to commerce than this proposed legislation, and our associations heartily indorse it.

Mr. BENHEIMER. Mr. Chairman, I will introduce Mr. Wilson J. Vance, of the New Jersey State Chamber of Commerce.

STATEMENT OF MR. WILSON J. VANCE, SECRETARY NEW JERSEY STATE CHAMBER OF COMMERCE, 20 CLINTON STREET, NEWARK, N. J.

Mr. VANCE. Mr. Chairman and gentlemen, I wish to leave something to the members of the committee, that some of the members of the committee may desire to look over at their leisure. I need not describe them. What I shall say will be very brief.

First, I want to say that Congressman Lehlbach, of New Jersey, appeared at this hearing, but found it impossible to remain, as he was called away before he was able to speak to your body. He desired me to say that he was heartily in favor of this measure, and that he would take occasion to evince his approval of it on the floor of the House when it comes up there.

Our legislature, at its last session, passed a bill which we modestly believe is a model, having secured the assistance of New York lawyers, and other lawyers in its preparation. That was the culmination of thee years of effort. When the question started in New Jersey it met, outside of the few who were informed, with opposition, to which Mr. Cohen alluded. And it took an elaborate system of education to convince even the business men that it was good for them. Now I think New Jersey is solidly for it. Almost every organization in the State, and every trade organization, have begun hearing of arbitration clauses into their constitution so that their members are bound by them.

The reasons for indorsing a Federal measure have been well put forward here, and I need not dwell upon them at length. But we are so enthusiastically in favor of it that we feel that we can ask in a modest way the Congress to extend this principle to the Federal jurisdiction. We believe that arbitration is a thing for honest men. We have seen some noticed already a diminution in the ordinary litigation that has come to the courts at the beginning of so far, but we have had... Our bill went into effect only on the 4th of July. We have reports from local bodies throughout the State to the effect

ARBITRATION OF INTERSTATE COMMERCIAL DISPUTES.        31

that whereas there are very few cases that have come actually to trial in the arbitration tribunals, business men have adopted the practice of getting together and settling their business differences. And we think that is a practical way of working out the matter better than in an arbitration tribunal; certainly less expensive.

With reference to the Federal legislation, we feel that if you enact a law in Congress you will at once disseminate the law of arbitration, and thus bring about the reign of peace and good will.

Mr. BENHEIMER. I have another witness, Mr. Thomas B. Paton.

The CHAIRMAN. We will hear Mr. Paton.

STATEMENT OF MR. THOMAS B. PATON, REPRESENTING THE AMERICAN BANKERS' ASSOCIATION.

Mr. PATON. Mr. Chairman, I represent the American Bankers Association, and to forestall any question as to how this bankers' feel about this matter, I will say that the American Bankers Association are heartily in favor of this bill. The association is composed of 22,000 banks, State, national, trust companies, and savings banks, and its committee on commerce and marine commission, headed by Fred J. Kenny, of New York, gave this matter careful study; and they have adopted a resolution which I would like to spread on the minutes. I will not take the time to read it.

The CHAIRMAN. It will be so ordered.

(The resolution is as follows:)

RESOLUTION OF AMERICAN BANKERS ASSOCIATION, ADOPTED JANUARY 30, 1923.

Whereas all merchants doing interstate and foreign business seek a method whereby disputes arising in their daily business transactions can be speedily, economically, and equitably disposed of; and

Whereas arbitration offers the best means yet devised for an efficient, expeditious, and inexpensive adjustment of such disputes; and

Whereas the arbitration laws of the various States of the Union are not in uniformity and often in conflict; and

Whereas the laws of any given State are not applicable in other States: Now, therefore, be it

Resolved, That the commerce and marine commission of the American Bankers Association is thoroughly in accord with the efforts being made to create Federal legislation legalizing the settlement of commercial disputes; and be it further

Resolved, That the commerce and marine commission of the American Bankers Association indorse in principle House bill No. 13522 and Senate bill No. 4214.

(The above was reported by the commerce and marine commission to the executive council April 27, 1923, and the report was accepted.)

Representative DYER. Would this legislation be of direct or indirect benefit to the Bankers Association?

Mr. PATON. I think it would be of indirect benefit, because their interests are linked up with the merchants and business men of the country, and later on it will probably be of direct benefit to the banks because it will put in their minds the idea of taking up their disputes through arbitration. Of course, the banks of the country have a great deal of business, and a great many business dealings with one another throughout the country in regard to those bank collections, and there is a great deal of conflict in regard to those bank collections, and there is a great deal of litigation, and I think this would be the best method of handling that litigation.

Mr. BERNHEIMER. That is all.

The CHAIRMAN. Is there anyone else who cares to be heard?

Mr. WIMER. I would like to be heard briefly.

The CHAIRMAN. We will hear you.

## STATEMENT OF MR. BRUCE K. WIMER, REPRESENTING THE PHILADELPHIA CHAMBER OF COMMERCE.

Mr. WIMER. Mr. Chairman, I represent the Philadelphia Chamber of Commerce, and was asked to appear here and tell your committee that the Philadelphia Chamber of Commerce approves this bill. You have received a letter from Mr. Kelly.

The CHAIRMAN. Yes; that goes into the record. Are there any others who care to be heard?

Mr. NICHOLS. Just a word, Mr. Chairman.

The CHAIRMAN. We will hear you.

## STATEMENT OF MR. W. W. NICHOLS, PRESIDENT OF THE AMERICAN MANUFACTURERS' EXPORT ASSOCIATION OF NEW YORK.

Mr. NICHOLS. Mr. Chairman, my name is W. W. Nichols; I am president of the American Manufacturers' Export Association of New York.

Mr. Chairman, my appearance here is partly accidental. I received a lengthy telegram from Mr. Bernheimer calling my attention to the holding of this hearing, and as I happened to be here on another matter I am very glad to appear on behalf of my association, which indorses very enthusiastically the principle of this legislation. It was done by formal vote of the board of directors last June. The matter was brought before us, and much has transpired since, to my mind, that the feeling is that belief is even more pronounced as a subsequent step it can not be undertaken until we get the Federal law which is urging the attention of you gentlemen.

Representative DYER. What is that, Mr. Nichols?

Mr. NICHOLS. Until you get this law on the statute books we can not hope for the extension internationally of this idea of arbitration.

May I be permitted to make a brief reflection on something in which I have been very much interested, which has a direct bearing on this? I am not at all surprised in what Mr. Bernheimer discloses of the condition he discovered in France. I hope Mr. Cohen can help me out on this. I wonder whether any debate we have had in regard to finding any difference of opinion as to the establishment of this principle of arbitration in this country can not be based perhaps on a national ignorance. France, unless I am very much mistaken, has exercised this principle for 360 years in their courts of commerce. That is practically the same thing.

Mr. COHEN. It is only recently that they have modified the law of revocability in France.

Mr. NICHOLS. That may be.

Mr. COHEN. They had the same law as in England.

Mr. NICHOLS. Some seven years ago a party of business men were visiting in France, at the behest of France, and we discovered at that time the courts of commerce. We were all students; and to our surprise it was stated that the courts had been functioning for 360 years. I became very much interested; and I have been studying the matter, and I have found that it was 360 years last October since the first court was held. Now, unless I am very much misinformed, the operation of that court is largely along the line of arbitration, because it has business men for settling disputes; it has business-men judges that may be people who are elected by the business community, and they serve as such. And the disputes are referred to that court.

Mr. ROSE. May I have the privilege, Mr. Chairman, as I have mentioned certain names in connection with the work of arbitration, to mention the name of Judge Moses H. Grossman, of New York, and say that I do not know how much good he has done by his untiring labors in this behalf.

Mr. BERNHEIMER. Mr. Chairman, to help Mr. Nichols in what his stated, I can say that the man who first introduced the principle of arbitration was Etienne Marcel in France, but he was murdered before he succeeded in carrying it through.

Mr. COHEN. That is not very encouraging, Mr. Chairman, for the Judiciary Committee.

The CHAIRMAN. Is there any other witness now that would like to be heard?

Mr. COHEN. I would like to put this in the record, Mr. Chairman, in view of Mr. Nichols's statement. My answer to him is not a complete disclosure of the situation. In the Galuser case the French arbitrators is binding and enforceable in the French courts, although they will not enforce every judgment of a court of a foreign jurisdiction. And their theory is most interesting. They say that since the parties themselves in selecting the arbitrator, it is just exactly the same as a compromise.

Representative DYER. Mr. Cohen, I wanted to ask you if you could cite us to a few concrete cases holding that agreements for arbitration are revocable.

Mr. COHEN. Yes; I can cite some cases. Some of the cases which hold, in the absence of a statute that agreements for arbitration are revocable, and that they are within the scope of proceedings of remedy, are the following: U. S. Asphalt Refining Co. v. Trinidad Lake Co., Atlanton, 222 Fed. Rep. 1006; Aldiseelskabet K. F. K. v. Rederiaktiebolaget Atlanton, 232 Fed. Rep. 403; affirmed with opinion, 250 Fed. 935; affirmed by United States Supreme Court March 22, 1920; Meacham v. Jamestown F. & C. R. Co., 211 N. Y. 343; Hamilton v. Home Ins. Co., 137 U. S. 370, 385; Decision of New York Court of Appeals N. Y. 261; C. 275, laws N. Y., 1920; New York law, c. 134, l. 1923.

I also submit a brief on the proposed Federal arbitration statute, Mr. Chairman.

The CHAIRMAN. It will be received and, without objection, made a part of the record.

(The brief is as follows:)

## THE PROPOSED FEDERAL ARBITRATION STATUTE.

At the last session of Congress, there was introduced a bill which would make valid, and enforceable by the Federal courts, certain agreements for

arbitration. This bill was prepared by the committee on commerce, trade, and commercial law of the American Bar Association and was approved by that association at its 1922 meeting in San Francisco. It was again approved at its 1923 meeting in Minneapolis.

By a bill a provision for arbitration contained in any contract which involved maritime transactions (matters which would be embraced within admiralty jurisdiction) and interstate commerce as generally defined is made valid, enforceable and irrevocable," except upon the grounds for which any contract may be revoked. The same rules apply to a submission to arbitration of an existing controversy.

The Federal courts are given jurisdiction to enforce such agreements whenever under the Judicial Code they would normally have jurisdiction of a controversy between the parties. (Although, if the basis of jurisdiction is diversity of citizenship, the usual limitation of $3,000 is removed.) (Sec. 8.) In arbitrating a party is still given the right to select the property at the commencement of his proceeding. (Sec. 4.)

In such enforcement. First, any suit commenced in a Federal court upon an issue referable to arbitration may be stayed until arbitration is had, unless the applicant for the stay is in default with the arbitration. (Sec. 3.) Secondly, the court may order that arbitration proceed in accordance with the agreement, appointing an arbitrator itself, if appointment under the agreement can not be had. (Secs. 4 and 5.)

The arbitrators are given powers governing these orders assure a prompt, speedy, and noncontentious determination. In the making of the application, the proceeding is commenced by service of notice of an application for an order. Where, as though it were Federal court in the district wherein the award was made. This must be granted as a matter of course, unless the award is vacated, modified, or corrected. (Sec. 10.)

If the award was made the arbitration agreement is summarily tried, either by jury or by the court, if no jury trial is demanded, or, if demanded, is within admiralty jurisdiction. If there is no such issue, the application is to be tried and determined as though it were a motion before the court. (Secs. 4 and 6.)

The arbitrators are given powers to secure the attendance of witnesses and to bring before them such documents as are necessary. (Sec. 7.)

The award must be in writing and acknowledged. Within one year after it is made, any party may apply to the court specified in the award, or to the Federal court in the district wherein the award was made, for an order confirming the award, and then only it may be modified or corrected. (Sec. 12.) Upon vacating an award, a rehearing may be ordered to promote justice. If the time within which the award was to be made has not expired.

The proceedings for vacating, modifying, or correcting an award follow the ordinary motion practice of the court, so that a prompt hearing is had. (Sec. 13, 14, 15.) The judgment entered upon an award is treated like any other judgment of the court, and an award is almost identically the lines of the New York statute (Secs. 16, 17.) The law follows reviewed by the New York Court of Appeals in matter of Berkovitz v. Arbib & Houlber (1921) (230 N. Y. 261, 130 N. E. 288), and the New Jersey statute (ch. 134, Laws of 1923.)

### THE EVIL TO BE CORRECTED.

"The evils it which arbitration agreements in general are directed are three in number, long delay usually incident to a proceeding at law, in equity or in admiralty, the expense of litigation. It follows the same course in activity, where there has arisen great congestion of the calendars. This delay arises not only from congestion of the calendars, which necessitates waiting in each awaiting its turn for consideration, but also frequently from preliminary motions and other steps taken by litigants, appeals therefrom, which delay

consideration of the merits, and appeals from decisions upon the merits which commonly follow the decisions. But any one of real importance. (2) The expense of litigation. (3) The failure, where it results just when measured by the standards of the business world. This is not only due to the failure of litigation, to reach a decision which may result either because the courts necessarily are compelled to a trial, the parties do not adjust in a specific case, and because, in the ordinary course of jury trial, with the peculiarities of the given benefit of the judgment of persons familiar with the mere working of an arbitration agreement, however, does not assure freedom from these evils. This is due to the fact that, following the mechanism in the English law, arbitration agreements have not been enforced by our courts in the United States. The result is that a party has been at absolute liberty to disregard his engagement, to enter into an arbitration at any time before the award actually is handed down. This impotency of the courts is due to the then prevailing practice, except within the States of New York and New Jersey, which have their statutes, except within the States of New York and New Jersey.

The refusal to proceed with such agreements valid and enforceable, throughout our entire membership. Where arbitration does any arise either because the party refusing believes, in good faith, that for one reason or another his agreement is not broad enough to cover the particular case, or because he sees no advantage to be gained from his obligation solemnly incurred, to enforce his rights through the courts, in which his opponent will be put in the wrong, that is he does it in either case that he may have the right on the merits of some technical objection which would shut him from answering on the merits of the controversy.

Because of the great importance in New York and New Jersey, in the United States and in many foreign countries with large commercial transactions, arbitration is recognized as though it were a large amount of commercial transactions, arbitration agreements are enforceable, while outside the United States they are not enforceable, while advantage connected with the recognizing arbitration agreements are at a disadvantage outside the jurisdictions where they are now enforceable. In most of the courts to respond to his agreement, and any class of jurisdictions is bound to contract, resting in the second class of jurisdictions, he may define as arbitrarily as he pleases to carry out his agreement, and his contract has no remedy against him, except through an ordinary action in the courts.

### THE REMEDY.

To meet the situation above, through dishonesty or mistake or otherwise; one party to an arbitration agreement refuses to perform it, statutes such as those adopted in New York and New Jersey are advocated and have met favor. To correct the same defect in the Federal courts it is proposed that the lines in a State not recognizing arbitration agreements, the present Federal statute be enacted.

The adoption of the arbitration does not mean that parties who have agreed to arbitrate and, after the controversy arises are still willing to arbitrate and abide by the results must come into court or submit to arbitrate and abide by the results, but where they are still willing to arbitrate and There is no intervention of the law which requires the statute were nonexistent.

Where one party refuses to come into the courts.

Now has a remedy formerly denied him, the agreement however, the other party prospect, equally cumbersome with the old actions in the court is not, as has been suggested, prospect, equally cumbersome with the old actions in the court is not, as has been suggested, arbitrate because justice is ever become so. At the outset the party who has invoked him to arbitrate, or that the party who has invoked the agreement does not mean in good faith that his agreement comes and blind protected by the provision of the law which requires the court to examine into so that there is no intervention of the law which requires the court to examine into so that there is no question of a claim. Such examination is, however, and summarily,

The procedure for enforcement of arbitration agreements is very simple. It reduces technically and government of arbitration agreements. It follows the same course to do ordinary motions before the given court obtains. If the other party is given an opportunity by the requirement that notice of the application be given. At the case where the existence or applicability of the arbitration agreement in question, the question whether arbitration should be ordered is decided upon

motion papers, affidavits and such exhibits as the party chooses to submit, obviating the necessity of appearance in court, together with the calling of witnesses and the opportunity for other preliminary motions and proceedings. The whole matter should be disposed of within a few days after the application is made.

The court then enters an order directing that the arbitration shall proceed. If the arbitrators are named in the agreement or a method for their selection is provided, this is followed. If, for any reason, there is a defect in the arbitration, the court corrects this by an appointment of its own. Thereafter the arbitration again proceeds without any formality and without interference from the court. All technicalities of legal procedure and requirements are removed. Except for the few days' delay while the court is deciding whether an order should be entered, the matter stands as though no recourse to court had been had.

The arbitrators are given powers to call witnesses and require the production of papers, to assure them a full and fair consideration of the controversy which may be had despite the possible recalcitrance of one or more parties to the dispute. They are required to execute their award with a certain formality, so that there can thereafter be no question with respect, either to its existence or its identity.

The award having been made, procedure to enforce it also is simplified. Lacking the statute, the only recourse of the successful party was to sue in a court of law upon the award. It is true that he was relieved from proof concerning the merits of the original controversy and that possible defeat upon technical grounds, but he was then concerned only with enforcing the award itself.

The motion to enforce may be opposed or an independent motion may be made to vacate, modify, or correct the award. There is no occasion to sue to vacation upon a technical ground. The courts are bound to accept and enforce the award of the arbitrators unless there is in it a defect so inherently vitiating as a matter of common morality, it ought not to be enforced. This exists only when some corruption, fraud or misconduct are present or when the arbitrators exceeded or imperfectly executed their powers or were influenced by other undue means—cases in which enforcement would obviously be unjust. There is no authority and no opportunity for the court, even when it is in disagreement with the award, to inject its own ideas of what the award should have been.

As to modification and correction, the grounds are equally limited. Evident miscalculations and mistakes are to be corrected. Where the arbitrators have awarded upon a matter not submitted to them, the award is to be modified. Where the arbitrators' award does not affect the merits of the controversy, there my be correction in modification of form. Provision is so to be made as to give effect the intent of the award and to promote justice. The fairness and necessity of these provisions are so obvious as to need no argument, and in no case do they act as a bar to informal and expert determination of the merits.

In all these proceedings there is no material expense or delay and no opportunity for technical procedure.

When the award has been entered as a judgment, an appeal may be taken in an ordinary judgment in an action, and similarly an appeal may be taken from an order vacating, modifying, or correcting the award. Any expectation that permission for such appeals is likely result practically in frustrating the technicality and delay of legal procedure, has been removed by the experience concerning such appeals. In the first place, the grounds of the appeal are necessarily limited to the same grounds as those allowed for vacating, modifying, or correcting an award. In the second place, the vast majority of questions with which appeals are usually concerned relate to the refusal of the courts to enforce arbitration agreements, they have been equally consistent in their refusal to upset the awards given by arbitrators when

arbitration had taken place. This insistence that the arbitrators' award should be acquiesced in... necessarily discourages an... only when the party is convinced in good faith that he has a meritorious ground of complaint.

On the other hand, obviously it would be unjust to deny the right of appeal altogether. If arbitrators' awards are subject to mistakes and other human frailties, as necessarily they must be, it is obvious that review solely by a judge sitting at a motion term will not suffice to safeguard the party whose rights have been substantially violated by the arbitrators. There should be given in exceptional occasions, be subject to the same improper influence as the arbitrators. To deny any right of appeal in all cases would be to take away a most important privilege and safeguard which every party forced to submit his dispute to some other jurisdiction ought to have.

These are the provisions of the statute result in delays which are not at present experienced. And the denomination has already been brought to the award. This delay is vindicated by the kind of the statute must be brought in to the courts upon the award. This delay is vindicated by the fact that always entered upon the award against a party, then that party always must have entered of course, as from any other judgment, and the grounds of the appeal have, of course, its own subject to any such proceeding. There was no limitation as there is under the proposed statute, of the grounds upon which an appeal might be taken. It is under the proposed law, therefore, not only that there is to be no delay, but, on the contrary, substantially a new field of delay has been eliminated.

"By the Constitution of the United States Congress is given power "to regulate commerce with foreign nations, and among the several States, and with the Indian tribes," and "to constitute tribunals inferior to the Supreme Court" (Art. I, sec. 8). "The judicial power of the United States shall be vested and establish" and extends "to all cases in law and equity arising under this Constitution, the laws of the United States" (Art. III, sec. 2). "To carry into execution the powers vested by the Government or any department or officer thereof. (Art. I, sec. 8). Powers not delegated to the United States are reserved to the States. (Tenth amendment).

It has been suggested that the proposed law depends for its validity upon the exercise of the control by the Government over... is not the fact.

The statute as drawn establishes a procedure in the Federal courts for the enforcement of arbitration agreements. It rests upon the constitution and the judicial power. Congress is authorized to establish and control inferior Federal courts, they are congressional acts relate to the procedure in the Federal courts, and so firmly established procedure is congressional power. This principle is so evident and so firmly established that it... not be seriously disputed.

A Federal statute providing for the enforcement of arbitration agreements does not relate solely to procedure of the Federal courts. It is no infringement upon the substantive law or the jurisdiction of the State courts of... exist under its laws, or... it cannot decide for itself what contracts shall or shall not of the substantive law of the jurisdiction wherein the contract was made. But whether or not an arbitration agreement is to be enforced in the manner of procedure and is determined by the law of the jurisdiction wherein the remedy is sought.

That the enforcement of arbitration contracts is within the law of procedure as distinguished from substantive law is well settled in... courts. (U. S. Asphalt R. Co. v. Trinidad Lake P. Co. 222 Fed. 1006, ... the opinion; 250 Fed. 85; Atlenten, 232 Fed. 403, affirmed with opinion; 250 Fed. 935; March 22, 1920; The Eros, 241 Fed. 186; Benson v. Eastern, ... Co., 211 N. Y. 346; Benson v. Jamestown P. & C. R. Co., ... P. Canal Co. v. Penn Coal Co., 50 N. Y. 250, 258...) "An agreement that all differences arising under a contract shall be submitted to arbitration relates to the law of remedies, and the law that governs remedies is the law of the forum."

Neither is it true that such a statute, when it declares arbitration agreements to be valid, declares their existence as a matter of substantive law. The courts have always recognized that such agreements existed but have refused to enforce them. It was often said loosely that arbitration agreements were void, even under the common-law rule. This statement was not accurate. While the courts refused to enforce arbitration agreements specifically, they recognized that the arbitration agreement itself existed. From the earliest times it was held that for a breach of arbitration agreement the aggrieved party was entitled to damages. (Hamilton v. Home Ins. Co., 137 U. S. 370, 385; Miller v. Gannt Co., 41 N. Y. 98; Union Ins. Co. v. Central Trust Co., 157 N. Y. 633; Haggart v. Morgan, 5 N. Y. 422, 427; Finucane Co. v. Board of Education, 190 N. Y. 76, 83.)

In no proper sense, therefore, was the arbitration agreement void. It was valid in the same sense that contracts are valid, i. e., while specific performance would not be given, a remedy for a breach existed in the right to recover damages.

So far as the present law declares simply the policy of recognizing and enforcing arbitration agreements in the Federal courts it does not encroach upon the province of the individual States. It seems probable, however, that Congress has ample power to declare that all arbitration agreements connected with interstate commerce or admiralty transactions shall be recognized as valid and enforcible even by the State courts. In both cases the Federal power is supreme. Congress may act at its will, and having acted, no law or regulation of a State inconsistent with the congressional act can be given effect even to such cases. They are not bound to question or doubt the validity of such a Federal statute. They are as much bound to carry out the provisions of such a Federal statute as they are to an act of their own legislature. This rule is so well settled that it is no longer subject to question or discussion. It has been enforced in innumerable instances. (Northern Securities Co. v. U. S., 193 U. S. 197, 332.)

It is not only the actual and physical interstate shipment of goods which is interstate commerce and commerce power of the Federal Government, but whether the failure to enforce an agreement for arbitration imposes such a direct burden upon interstate commerce as seriously to hamper it or whether the enforcement of such a clause is of material benefit. If either of these questions can be answered in the affirmative, we believe it to be beyond question that Congress can legislate concerning the matter.

If a State question is involved, there is, of course, no power to declare generally that in all contracts relating to interstate commerce arbitration agreements shall be valid, the present statute is not materially affected. The primary purpose of the statute is to make enforcible in the Federal courts such agreements for arbitration, and for this purpose Congress rests solely upon its power to prescribe the jurisdiction and duties of the Federal courts.

different plane? Why should one be entitled to legal sanction and the other to arbitration of opinion only? The treatment of arbitration agreements as extra legal and held by many jurists to be something not to be referred to law before. It leaves a broad path by which the dishonest party may escape from his obligations. Public policy, surely, does not require that this continue. Our own courts, declaring that arbitration agreements are unenforcible, have been most insistent that nevertheless the policy of arbitration was wise and should be encouraged. (D. & H. Canal Co. v. Penn Coal Co., 50 N. Y. 250; U. S. Asphalt Refining Co. v. Trinidad Lake Petroleum Co., 222 Fed. 1006.)

It may be asked why, if the courts were so certain that arbitration agreements ought to be enforced, they did not permit such enforcement. The explanation is to be found, in our English system of jurisprudence. For many centuries there has been established a rule, rooted originally in the jealousy of courts for their own jurisdiction, that parties might not, by their agreement, oust the jurisdiction of the courts. This rule was as firmly established that our American courts did not feel themselves free to change the rule, but declared it to be the duty of the legislature to make this change. When the change was first made in the United States by the New York Legislature (chap. 275, Laws of New York, 1920) the change was accepted whole-heartedly by the New York courts. (Matter of Berkovitz, 230 N. Y. 261.)

In speaking of the opinion for a unanimous court: "We are told that the change in arbitration was made by statute... [and] reading the law to form the statute, this was not wholly true. Public policy was thought to forbid that the promise be arbitrated. It was not illegal and a nullity without reference to the law in force when the promise was made. Since it is directed solely to the remedy, its validity is to be determined by the law of the forum." * * * A promise that differences will be arbitrated is not illegal and a nullity without reference to the law in force when the promise was made. Since it is directed solely to the remedy, its validity is to be determined by the law of the forum." * * * Of course, we exclude cases where the instrument is made illegal or in contravention of a statute. General contracts of arbitration were never subject to that reproach. In such circumstances as these, public policy does not speak as of the date of the promise that the parties shall have a remedy then unknown to the law. Public policy speaks as of the hour and occasion when the promise is repealed to, and the remedy invoked.

"We think there is no departure from constitutional restrictions in this legislative declaration of the public policy of the State. The ancient rule, with its exceptions and refinements, was criticized by many judges as anomalous and unjust. (D. & H. Co. v. Pa. Coal Co., supra, at p. 258; Pudicker v. Guardian Life Ins. Co., 62 N. Y. 392, 399; U. S. Asphalt Refining Co. v. Trinidad Lake Petroleum Co., 222 Fed. 1006.) It was abolished by statute, with even followed with frequent protest. In deference to early precedents it held even upon the common law was hesitating and feeble. We are now asked to declare it so embedded in the very foundations of our jurisprudence and the structure of our courts that nothing less than an amendment of the Constitution is needed for its overthrow. We will not do so. The judges might have changed the rule themselves, if they had been so inclined; they were not inclined to do it; they seemed inclined to do. They might have whittled it down to nothing, as was done, indeed, in England, by distinctions between promises that are collateral and those that are conditions. (Scott v. Avery, supra; London, Tramway Co. v. Bailey, 1 R. 3, Q. B. D. 217, 221; Spackman v. Plumstead Bd. of Works, 10 App. Cas. 229; Dawson v. Fitzgerald, 1 Exch. Div. 257, L. T. Rep. 825.) No one amongst those opposed to the change, in undermining a jurisdiction which the Constitution had changed them with a duty to preserve. Not different is the effect of like change when wrought by legislation. (Alexander v. Bennett, 60 N. Y. 204, 207.)

The United States Department of Commerce has recently made a most significant addition to the literature regarding the policy of arbitration in relation to arbitration. In its pamphlet, entitled "Trade Associations," at p. 96, it devotes an entire chapter (chap. VII, p. 96), to "Trade disputes and ethics." This entire chapter is largely a plea for arbitration and a suggestion of methods which trade bodies may follow to make their services more effective. Contributions to the discussion were made by men representative of widely different lines of activity, and it seems to be agreed by all.

Nor can it be said that the Congress of the United States, directing its own courts no longer to recognize this anachronism in the law, would infringe upon the province or prerogatives of the States. As we have already shown and as the Berkovitz case, supra, declares again, the question of the enforcement

Sound public policy demands the enforcement of arbitration agreements by the law. To argue that such agreements should receive only the sanction of business opinion and should remain extra-legal is unsound. An agreement for arbitration is in its essence a business contract. It differs in no material way from other commercial agreements. It should stand upon the same plane and be regarded by the law in the same light.

No one in this day of commercial activity could argue that the ordinary contract for sale or of commercial paper should not be recognized by the law and thus placed upon an equality with other agreements, and nothing if the obligor felt the force of business opinion. Such, indeed, was once the case. Before Lord Mansfield's day the courts of England were ignorant of the manner in which they should treat questions respecting the buying and selling of goods or of marine insurance or promissory notes or, indeed, any mercantile question.

If the contract for sale or promissory note is to be recognized and enforced by the courts, why should a contract for arbitration stand upon a

## 40   ARBITRATION OF INTERSTATE COMMERCIAL DISPUTES.

relates to the law of remedies and not to substantive law. The rule must be changed for it, for the jurisdiction in which the agreement is sought to be enforced, and a change in the law of the jurisdiction in which it was made is of no effect. Every one of the States in the Union, in which such agreement is to be valid and enforcible, and still in the Federal courts it would come to naught unless the Supreme Court of the United States felt at liberty to itself to reverse a rule recognized for centuries. This, in the absence of a congressional declaration, it has so far felt unable to do.

There is no disposition therefore to force an individual State into an unwilling submission to arbitration enforcement. The statute can not and does not have that effect. It is desired only that the Federal Government shall declare the validity of arbitration agreements in the field where necessarily it is supreme and where without this action no remedial action by the States ever can be effected. It is peculiarly within the province of the Federal Government, we submit, to insure that the citizens of different States shall stand upon an equal footing, and that if one of them is willing to abandon all his legal rights to arbitrarily abandon the arbitration agreements because he lives in a State enforcing moral right to arbitrarily abandon all his pledges he shall be bound and surely has no right to arbitrarily abandon all his pledges.

Nor would it be a sound objection to the proposed statute to urge that the adoption of such a law tends to relegate into business controversies between business men their arbitration difficulties, and details which they have sought to evade by their arbitration agreements. This argument we have answered at some length above. If both parties are willing to arbitrate, the arbitration proceeds without the interference of any court. If one party, on the other hand, refuses to repudiate his agreement, he is held to it, but the enforcement proceeds with a minimum of legal intervention and parties are thorough advantage of the same speedy and inexpensive arbitral forum which they originally desired.

Probably the best answer to the argument of possible hasher and weakness lies in the experience of those jurisdictions where such a statute already exists. The rule against the enforceability of such agreements was originally founded together with but both of the English by our American courts. Many years ago the English courts saw the error of their ways and gradually the doctrine was whittled away. (Matter of Berkovitz, supra.) At the end of the nineteenth century Parliament officially recognized the change and, by its statute validating and making enforcible arbitration agreements, it declared the new English policy. It may be said without fear of challenge that the administration of the English arbitration law has been eminently satisfactory and that, with the progress of education in its advantages, English business has taken thorough advantage of its provisions and has given it sincere support.

New York was the first American jurisdiction to adopt such a law. This statute (chap. 275, Laws of 1920) was drawn by a committee representing the New York State Bar Association and received active support of that association before the legislature.

Following the adoption and successful administration of the New York statute, the State of New Jersey passed a law almost in identical language. (Chap. 134, Laws of 1923.) This statute received the support both of the New Jersey State Chamber of Commerce and of the New Jersey State Bar Association.

The proposed Federal statute follows the form of the successful New York and New Jersey statutes with only such changes as seem necessary for the Federal statute.

The arbitration law has now been in effect in New York for three years. It has been highly satisfactory. It has not yet reached its highest usefulness only because the process of education is not yet complete. A novel remedy is offered to business houses with which they are not familiar, which is not impressed upon them by law as most remedies are, and which, to be available, they must select in advance of any controversies. Despite the inertia which had to be overcome before the statute could become properly effective, enormous progress has already resulted, and the attitude of the courts toward the new law and toward proceedings under it has been most encouraging. Almost without exception the courts have done their utmost to facilitate the procedure by the enforcement of the power of the parties to make such agreements, have recognized their duty to uphold it, have given it the strongest support to the powers of the arbitrators thereunder and given the finality of their awards, and have refused to permit the invasion of technicalities in the application of the law or the determination of rights under it.

## 41   ARBITRATION OF INTERSTATE COMMERCIAL DISPUTES.

There is no less reason to believe that the Federal courts will give equally sincere support in the application of a similar Federal statute. If business men desire to submit their disputes to speedy and expert decision, why should they not be enabled to do so? If one party is willing to abide by the agreement why should the other escape? In what respect does an arbitration agreement differ from any other commercial contract, and, if such agreements ought to be enforced, why should not the national power be exerted in their support in the provinces in which it alone is supreme? We submit that there is no single argument respecting either considerations of morality or policy which soundly can be urged against the proposed statute.

New York, December 29, 1923.

Mr. Bernheimer. Mr. Chairman, I would like to present a letter from Mr. Toulme, secretary of the National Wholesale Grocers' Association, which I would like to have made a part of the record.

The Chairman. It will be so ordered.

(The letter referred to is as follows:)

New York, December 29, 1923.

Mr. Charles L. Bernheimer,
Chairman Chamber of Commerce of the State of New York,
New York, N. Y.

My Dear Sir: I want to acknowledge receipt of your kind letter of December 27 regarding the proposed United States arbitration act. Our association is on record in favor of this legislation, and within the next few days we will send a circular to our members urging them, and through them the country urging them to express their favorable views to their Congressmen.

We have used the arbitration system in our industry for a number of years with complete success, and we are exceedingly anxious that everything possible be done to strengthen the results.

Yours very truly,
M. L. Toulme, Secretary.

(Thereupon the hearing on S. 1005 was concluded, and the committee proceeded to the consideration of other business.)

# **Tab 4**

LEGISLATIVE HISTORY

COURTS—MULTIDISTRICT LITIGATION—TRANSFER

*P.L. 90–296, see page 133*

Senate Report (Judiciary Committee) No. 454,
July 27, 1968 [To accompany S. 159]

House Report (Judiciary Committee) No. 1130,
Feb. 28, 1968 [To accompany S. 159]

Cong. Record Vol. 113 (1967)

Cong. Record Vol. 114 (1968)

DATES OF CONSIDERATION AND PASSAGE

Senate Aug. 9, 1967, Apr. 10, 1968

House Mar. 4, 1968

The House Report is set out.

## HOUSE REPORT NO. 1130

THE Committee on the Judiciary, to whom was referred the bill (S. 159) to provide for the temporary transfer to a single district for coordinated or consolidated pretrial proceedings of civil actions pending in different districts which involve one or more common questions of fact, and for other purposes, having considered the same, report favorably thereon without amendment and recommend that the bill do pass.

### PURPOSE

The bill adds a new section 1407 to title 28, United States Code, to provide judicial machinery to transfer, for coordinated or consolidated pretrial proceedings, civil actions, having one or more common questions of fact, pending in different judicial districts.

### LEGISLATIVE HISTORY

A predecessor measure, H.R. 8276, introduced upon the request of the Judicial Conference of the United States, was the subject of hearings in the last Congress ("Judicial Administration," hearings before Subcommittee No. 5 of the House Committee on the Judiciary, 89th Cong., second sess., Serial No. 21). Senate hearings were held on a similar measure, S. 3815, in the 89th Congress and on S. 159 in the present Congress ("Multidistrict Litigation," hearings before Subcommittee on Improvements in Judicial Machinery, Senate Committee on the Judiciary, 89th Cong., second sess.; 90th Cong., first sess., pts. 1 and 2). S. 159 passed the Senate on August 9, 1967, without objection.

# MULTIDISTRICT LITIGATION

## STATEMENT

S. 159 was originally drafted by the Coordinating Committee for Multiple Litigation of the U. S. District Courts, established by the Judicial Conference of the United States and its enactment is recommended by the Conference.

The bill is based on the experience of the Coordinating Committee in supervising nationwide discovery proceedings in the electrical equipment cases which flooded the Federal courts in the early 1960's.

Following the successful Government prosecution of electrical equipment manufacturers for antitrust law violations, more than 1,800 separate damage actions were filed in 33 Federal district courts. This wave of litigation threatened to engulf the courts. Unless coordinated action was undertaken it was feared that conflicting pretrial discovery demands for documents and witnesses would disrupt the functions of the Federal courts. Through the consent and cooperation of all parties and the numerous presiding judges and the labors of the Coordinating Committee joint pretrial proceedings were conducted. The procedures worked successfully and today all of the electrical cases have been finally disposed of. The steps taken by the Coordinating Committee to restore order to the litigation are outlined in the Senate Report on S. 159 (S.Rept. 454) as follows:

1. The Coordinating Committee recommended a schedule of pretrial discovery proceedings and a series of uniform pretrial and discovery orders covering common issues of fact. This recommended schedule was accepted by the district courts involved and, after consultation with the lawyers for the parties, the judges of the district courts entered the uniform orders.

2. National depositions were held, attended by large numbers of plaintiffs' and defendants' counsel. Lead counsel, chosen by the lawyers for the plaintiffs and defendants, propounded questions on behalf of all the parties. Other attorneys present, however, were given the opportunity to ask additional questions to protect their particular interests. Arrangements were made for the additional deposition of any witness if the need arose.

3. Central document depositories were established, one for plaintiffs and another for defendants. Close to 1 million documents were filed at the depositories, and made available for copying by the parties. This arrangement minimized inconvenience and expense.

The purpose of S. 159 is to furnish statutory authority for the kind of pretrial consolidation and coordination successfully implemented in the electrical cases but which, in that situation, entirely depended on the voluntary agreement of all the parties as well as presiding judges.

The objective of the legislation is to provide centralized management under court supervision of pretrial proceedings of multidistrict litigation to assure the "just and efficient conduct" of such actions. The committee believes that the possibility for conflict and duplication in discovery and

## LEGISLATIVE HISTORY

other pretrial procedures in related cases can be avoided or minimized by such centralized management. To accomplish this objective the bill provides for the transfer of venue of an action for the limited purpose of conducting coordinated pretrial proceedings. The proposed statute affects only the pretrial stages in multidistrict litigation. It would not affect the place of trial in any case or exclude the possibility of transfer under other Federal statutes.

Existing law is inadequate for such pretrial consolidation, since under 28 U.S.C. 1404(a) transfer is restricted to a district where the action "might have been brought." Moreover, the present statute does not permit or provide for transfer of related cases for pretrial purposes only. Under the Federal Rules of Civil Procedure (rule 42(a)), consolidation for pretrial purposes is authorized only when multiple actions are pending in a single district court.

The proposed new section 1407 establishes a Judicial Panel on Multidistrict Litigation which is empowered to: (i) initiate transfer proceedings and hold hearings thereon; (ii) transfer civil actions for consolidated pretrial proceedings; (iii) assign a judge or judges to conduct such proceedings and request the Chief Justice to make intercircuit assignments for this purpose; (iv) act as and designate other judges as deposition judges in any district, and (v) remand transferred actions to the districts from which they were transferred.

By the term "pretrial proceedings" the committee has reference to the practice and procedure which precede the trial of an action. These generally involve deposition and discovery, and, of course, are governed by the Federal Rules of Civil Procedure. See, e. g., rule 16 and rules 26–37. Under the Federal rules the transferee district court would have authority to render summary judgment, to control and limit pretrial proceedings, and to impose sanctions for failure to make discovery or comply with pretrial orders.

To qualify for pretrial transfer under the proposed section 1407, civil actions would have to meet certain general requirements: first, they must involve one or more common questions of fact; second, they must be pending in more than one district, and third, pretrial consolidation must promote the "just and efficient conduct" of such actions and be for "the convenience of parties and witnesses." It is expected that such transfer is to be ordered only where significant economy and efficiency in judicial administration may be obtained. The types of cases in which massive filings of multidistrict litigation are reasonably certain to occur include not only civil antitrust actions but also, common disaster (air crash) actions, patent and trademark suits, products liability actions and securities law violation actions, among others.

As noted earlier, the Judicial Conference of the United States recommends enactment of this legislation. The Department of Justice also supports the bill. At hearings in the 89th Congress on a predecessor measure, this committee was advised of the opposition of the section of antitrust law of the American Bar Association. Subsequently, however, the

## MULTIDISTRICT LITIGATION

section altered its position and now recommends enactment of S. 159. On February 20, 1968, the house of delegates of the American Bar Association adopted the recommendation and it now urges approval of the measure.

The committee believes that the legislation will provide desirable improvements in judicial administration and will assure uniform and expeditious treatment in the pretial procedures in multidistrict litigation. It accordingly recommends favorable consideration of S. 159.

### SECTIONAL ANALYSIS

The bill would add a new section 1407 to chapter 87 of title 28, United States Code.

**Subsection (a)** of the proposed section 1407 authorizes the transfer of civil actions, pending in different districts, that share one or more common questions of fact upon a determination by the Judicial Panel on Multidistrict Litigation, created by the bill, that transfer would be for the "convenience of the parties and witnesses" and will promote the "just and efficient conduct" of the actions transferred. If only one question of fact is common to two or three cases pending in different districts there probably will be no order for transfer, since it is doubtful that transfer would enhance the convenience of parties and witnesses, or promote judicial efficiency. It is possible, however, that a few exceptional cases may share unusually complex questions of fact, or that many complex cases may share a few questions of fact. In either of these instances substantial benefit may accrue to courts and litigants through consolidated or coordinated pretrial proceedings.

Likewise, a number of factors should be weighed in the selection of a transferee district: the state of its docket, the availability of counsel, sufficient courtroom facilities, etc. These factors do not lend themselves to precise measurement. Consequently, the committee believes that the informed discretion of the judiciary is the best method for resolving questions as to when and where cases should be transferred for pretrial.

The subsection further authorizes the panel to separate any claim, cross-claim, counterclaim, or third party claim unrelated to the questions common to the transferred actions and to remand such claims prior to the remand of the remainder of the action. The subsection requires that transferred cases be remanded to the originating district at the close of coordinated pretrial proceedings. The bill does not, therefore, include the trial of cases in the consolidated proceedings. The experience of the Coordinating Committee was limited to pretrial matters, and the committee consequently considers it desirable to keep this legislative proposal within the confines of that experience. Additionally, trial in the originating district is generally preferable from the standpoint of the parties and witnesses, and from the standpoint of the courts it may be impracticable to have all cases in mass litigation tried in one district. Additionally, the committee recognizes that in most cases there will be a need for local

1901

## LEGISLATIVE HISTORY

discovery proceedings to supplement coordinated discovery proceedings, and that consequently remand to the originating district for this purpose will be desirable. Of course, 28 U.S.C. 1404, providing for changes of venue generally, is available in those instances where transfer of a case for all purposes is desirable.

If proposed section 1407 should be enacted and future experience justifies extending it to include consolidation and coordination for trial purposes as well, only minor amendments to the present language of the bill will be necessary.

**Subsection (b)** provides for the conduct of the consolidated pretrial proceedings by a judge or judges assigned by the Judicial Panel on Multidistrict Litigation. It also authorizes temporary assignment of judges from one district or circuit to another to supervise the pretrial proceedings. This is designed to allow for the most efficient allocation of available judicial manpower.

**Subsection (c)** authorizes the initiation of proceedings for the transfer of any action by the Judicial Panel on Multidistrict Litigation itself or upon motion of a party and requires a hearing upon notice to all parties to determine whether a transfer shall be ordered. The experience of the Judicial Conference indicates that frequently it is the judges who are first aware of multidistrict litigation, but it also seems desirable to permit the parties to institute transfer proceedings as well.

**Subsection (d)** authorizes the Chief Justice of the United States to appoint the Judicial Panel on Multidistrict Litigation to be comprised of seven circuit and district judges, no two of whom can be from the same circuit. It provides that the concurrence of four of seven members shall be necessary to any panel action.

**Subsection (e)** limits review of transfer and subsequent decisions of the panel to mandamus in the Federal Court of Appeals for the transferee district. This procedure is more expeditious than appeal, and is consistent with the overall purposes of the proposed statute. The subsection makes clear that review is unavailable for an order of the panel denying transfer. Since such an order would not affect the ordinary course of legal proceedings, review is neither necessary nor desirable.

**Subsection (f)** authorizes the panel to prescribe rules for the conduct of its business not inconsistent with acts of Congress and the Federal Rules of Civil Procedure.

**Subsection (g)** excludes from the operation of the bill antitrust actions in which the United States is complainant. This limitation was requested by the Department of Justice and concurred in by the Coordinating Committee and the Judicial Conference of the United States, on the basis that consolidation might induce private plaintiffs to file actions merely to ride along on the Government's cases. Government suits would then almost certainly be delayed, often to the disadvantage of those injured competitors who would predicate damage actions on the outcome of the Gov-

**1902**

## MULTIDISTRICT LITIGATION

ernment's suit.  Furthermore, since section 5(b) of the Clayton Act (15 U.S.C. 16(b)) tolls the statute of limitations during the pendency of the Government's action, there is no need for injured competitors to join in the Government's suit.  However, the subsection does not exclude Government damage suits.  In such cases the Government is suing in a proprietary capacity and its posture is the same as a private party.

### COMMUNICATIONS

Attached hereto and made a part hereof is a letter from the Deputy Director of the Administrative Office of the United States Courts, dated April 12, 1965, to the Speaker of the House of Representatives requesting introduction of a predecessor measure on behalf of the Judicial Conference of the United States.

Also attached and made a part hereof is a letter, dated January 7, 1966, from the then Deputy Attorney General to the chairman of the House Committee on the Judiciary supporting the predecessor bill (H.R. 8276, 89th Cong.) and recommending amendments which have been incorporated in the instant measure.

ADMINISTRATIVE OFFICE OF THE U. S. COURTS,
SUPREME COURT BUILDING,
*Washington, D. C., April 12, 1965.*

Hon. JOHN W. MCCORMACK,
*Speaker, House of Representatives,*
*Washington, D. C.*

DEAR MR. SPEAKER:  On behalf of the Judicial Conference of the United States there is transmitted herewith a draft bill, approved by the Conference, to provide for the temporary transfer to a single district for coordinated or consolidated pretrial proceedings of civil actions pending in different districts which involve one or more common questions of fact, and for other purposes.

This proposed legislation would add a new section numbered 1407 to title 28, United States Code, to provide for the temporary transfer to a single district for coordinated or consolidated pretrial proceedings of civil actions pending in different districts which involve one or more common questions of fact.  Such transfer would be made by a judicial panel on multidistrict litigation consisting of seven circuit and district judges, each from a different circuit, to be designated by the Chief Justice.  The panel would have general supervision over such consolidated pretrial proceedings and would be empowered to request the temporary assignment under existing law of circuit or district judges to conduct the proceedings.  At or before the completion of the pretrial proceedings the panel would remand each case to the district from which it has originally been transferred, unless it had previously been terminated in the course of the pretrial proceeding.

This proposal has grown out of the practical experience of the Judicial Conference Co-Ordinating Committee for Multiple Litigation in conducting pretrial proceedings in the current electrical equipment antitrust litigation and would provide appropriate procedure to meet the problems involved in conducting pretrial deposition and discovery proceedings efficiently and economically in the event of the filing of similar connected actions in diverse districts in the future.  Under the express terms of the proposed legislation, the procedure would be invoked only if the judicial panel determined that its use would promote the just and efficient conduct of such actions.  A comment by the Co-Ordinating Committee for Multiple Litigation on this proposed legislation is appended hereto.

2 U.S.Cong. & Adm.News '68—21          **1903**

# LEGISLATIVE HISTORY

At its session on March 18–19, the Conference voted to submit the enclosed draft bill. We shall be glad to provide any additional information. Sincerely yours,

WILLIAM E. FOLEY,
*Deputy Director.*

———————

OFFICE OF THE DEPUTY ATTORNEY GENERAL,
*Washington, D. C.*

Hon. EMANUEL CELLER,
*Chairman, Committee on the Judiciary,*
*House of Representatives, Washington, D. C.*

DEAR MR. CHAIRMAN: This is in response to your request for the views of the Department of Justice concerning H.R. 8276, a bill to provide for the temporary transfer to a single district for coordinated or consolidated pretrial proceedings of civil actions pending in different districts which involve one or more common questions of fact, and for other purposes.

The bill would add a new section 1407 to title 28, United States Code, which would permit the transfer to a single district for coordinated or consolidated pretrial proceedings of civil actions pending in different districts which involve one or more common questions of fact. Such transfer shall be made by a judicial panel on multidistrict litigation, consisting of seven circuit and district judges appointed by the Chief Justice of the United States, upon determination by the panel that the transfer will promote justice and efficient conduct of such suits. The transfer requires the consent of the court in which the suit is pending, and each action so transferred shall be remanded by the panel at or before the conclusion of the pretrial proceedings to the district from which it was transferred. The panel may separate any claim, cross-claim, counterclaim, or third-party claim and remand any of such claims before the remainder of the action is remanded.

The coordinated or consolidated pretrial proceedings shall be conducted by a judge or judges assigned by the judicial panel. The panel may request, for this purpose, the temporary assignment of a circuit or district judge to the transferee district by the Chief Justice of the United States or the chief judge of the circuit. Proceedings for the transfer of an action may be initiated by the judicial panel by notice to the parties in all of the actions concerned of the manner, time, and place of the hearing to determine whether the transfer shall be made. The concurrence of four members of the panel shall be necessary to any action of the panel. When actions have been transferred by order of the panel, no district court refusing to consent to the transfer of related litigation may make any order for or permit discovery in conflict with the discovery proceedings in the transferred actions.

At present, there is no specific provision governing the conduct of discovery and pretrial proceedings on a consolidated basis. The massive national discovery program, which was established in response to the unprecedented number of electrical equipment treble damage actions, was instituted under the authority of Supreme Court rule-making power, which in turn resulted in a delegation of authority to a coordinating committee of judges for the purpose of working out an appropriate procedure for handling common discovery problems. The bill is an outgrowth of the experience gained under this national discovery program, and is an apparent attempt to codify some of the steps taken thereunder. (For a general discussion of the program, see Neal and Goldberg, "The Electrical Equipment Antitrust Cases; Novel Judicial Administration," 50 A.B.A.J. 621 (1964).)

This legislation was recommended by the Judicial Conference of the United States. The Department of Justice favors its enactment but suggests that it be amended in two respects.

**1904**

# BEFORE THE
## JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

**In re Cintas Corp.**
**Overtime Pay Arbitration Litigation**

**MDL Docket No. 1781**

**DECLARATION OF MARK C. DOSKER**
**SUBMITTED WITH RESPONSE BY CINTAS CORPORATION IN OPPOSITION TO**
**MOTION TO TRANSFER AND CONSOLIDATE PURSUANT TO 28 U.S.C. §1407**

I, MARK C. DOSKER, declare as follows:

1.     I am an attorney at law licensed to practice before all state and federal courts located in the State of California, before the Supreme Court of the United States of America and before various other federal appeals courts and federal district courts, and I am a partner in the law firm of Squire, Sanders & Dempsey L.L.P. I am lead counsel of record for Cintas Corporation ("Cintas") in the action entitled *Veliz et al v. Cintas Corporation*, Case No. C-03-1180 (N.D. Cal.) (hereinafter "the Veliz Action"). I am also lead counsel for Cintas in the 70 Petition proceedings which are the subject of the motion which is pending before this Panel, and I am also lead counsel for Cintas in the proceedings before this Panel. The matters set forth below are within my personal knowledge, and if called upon as a witness, I could and would testify competently thereto.

2.     Attached as Exhibit 3 to the Request for Judicial Notice submitted herewith is a true and correct copy of excerpts of the Reporter's Transcript of Proceedings of the October 18, 2005 hearing in the Veliz Action. The plaintiffs in the Veliz Action who are now Respondents in the 70 Petition proceedings which are the subject of the pending motion, through their counsel in the Veliz Action, announced at that hearing that they do not intend to arbitrate in accordance with the terms of their enforceable agreements with Cintas, in that they will not comply with the place-of-arbitration terms in their agreements, by announcing that they will instead seek to proceed in a single arbitration in San Francisco before an arbitrator in San Francisco (the Honorable Bruce Meyerson), rather than in the separate places required as to each Respondent in his or her arbitration agreement. Exhibit 3 to Request for Judicial Notice at 87:15-18.

- 1 -

3.     In a teleconference on March 1, 2006 in which I participated, those persons again stated unequivocally through an attorney who is their counsel in the Veliz Action -- Michael Rubin of Altshuler, Berzon, Nussbaum, Rubin & Demain -- that they do not intend to arbitrate in accordance with the terms of their enforceable agreements with Cintas, by stating that they will seek to proceed in a single arbitration in San Francisco, instead of complying with the place-of-arbitration terms in each of their individual agreements.

4.     Attached as Exhibit 1 hereto is a true and correct copy of the Declaration of Jonnie Hogel (including Exhibits thereto) which is a part of the record in the Veliz Action as Docket No. 292 in the Veliz Action ("Hogel Declaration"). Because the font of some of the exhibits to the Hogel Declaration is hard to read when printed from the Court's e-filing system, I have inserted after those exhibits a clean copy.

5.     Attached as Exhibit 2 hereto is a true and correct copy of a letter dated March 21, 2005 from Michael Rubin, of Altshuler, Berzon, Nussbaum, Rubin & Demain, to the counsel for the plaintiffs in a class action lawsuit entitled Pichler et al v. UNITE et al, which is pending in the United States District Court for the Eastern District of Pennsylvania, Case No. 04-cv-02841. In it, Michael Rubin (who is co-lead counsel for the plaintiffs in the Veliz Action) states, *inter alia*, that his "law firm has a long-standing attorney-client relationship with UNITE-HERE; and pursuant to that relationship, all communications with UNITE-HERE regarding the matters addressed in your subpoena are subject to the attorney-client privilege as well as work-product protection." Michael Rubin also states that "[i]n response to your previous request, we fully cooperated in providing redacted copies of our bills to UNITE-HERE pertaining to the *Veliz* litigation, which confirm that UNITE-HERE paid us to perform legal services in that litigation."

- 2 -

6.     Attached as Exhibit 3 hereto is a true and correct copy of a document served in Pichler et al v. UNITE et al, , signed by Michael Rubin, entitled "Objections to Subpoena Duces Tecum on Behalf of Altshuler, Berzon, Nussbaum, Rubin & Demain." In this document, consistent with what is stated in Exhibit 2 hereto, Michael Rubin's law firm objects on attorney-client privilege grounds to each of eight document requests relating to the connection -- in the bringing and handling and payment for the Veliz Action -- between UNITE and/or the International Brotherhood of Teamsters ("IBT") on the one hand, and on the other hand Michael Rubin's law firm Altshuler, Berzon, Nussbaum, Rubin & Demain (hereinafter "the Altshuler firm.")

7.     Attached as Exhibit 4 hereto is a true and correct copy of a document served in Pichler et al v. UNITE et al, , entitled "Objections on Behalf of Defendants UNITE and Raynor to Plaintiffs' Subpoena Duces Tecum Dated January 31, 2005." In this document, consistent with what is stated in Exhibit 2 hereto and Exhibit 3 hereto, each of UNITE and Bruce Raynor (the president of UNITE) objects on attorney-client privilege grounds to each of the eight document requests in the subpoena to the Altshuler firm relating to the connection -- in the bringing and handling and payment for the Veliz Action -- between UNITE and/or the International Brotherhood of Teamsters ("IBT") on the one hand, and on the other hand the Altshuler firm.

8.     Attached as Exhibit 5 hereto is a true and correct copy of the text (not including attachments) of three e-mails which were transmitted in the late afternoon and early evening of March 29, 2006. Starting with the earliest, at the bottom of the chain and reading upwards, they are as follows: (a) e-mail to Arbitrator Bruce Meyerson and me (and others) from Michael Rubin transmitting the document which is referred to in paragraph 8 of the motion pending

- 3 -

before this Panel; (b) e-mail from me to Arbitrator Bruce Meyerson and Michael Rubin (and others) and (c) Arbitrator Bruce Meyerson's e-mail to Michael Rubin and me (and others).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on April 26, 2006, at San Francisco, California.

_____

Mark C. Dosker

# **Exhibit 1**



1   SQUIRE, SANDERS & DEMPSEY L.L.P.
    Mark C. Dosker (CA Bar #114789)
2   Michael W. Kelly (CA Bar #214038)
    Joseph A. Meckes (CA Bar #190279)
3   Cheryl A. Hipp (OH Bar #0062959)
    Angela N. O'Rourke (CA Bar #211912)
4   Anna L. Endter (CA Bar #221610)
    Y. Anna Suh (CA Bar #228632)
5   One Maritime Plaza, Third Floor
    San Francisco, CA 94111-3492
6   Telephone:    +1.415.954.0200
    Facsimile:    +1.415.393.9887
7
    Attorneys for Defendants
8   CINTAS CORPORATION and
    PLAN ADMINISTRATOR FOR
9   THE CINTAS PARTNERS' PLAN

10

11                  UNITED STATES DISTRICT COURT

12                NORTHERN DISTRICT OF CALIFORNIA

13                      (OAKLAND DIVISION)

14
    PAUL VELIZ, et al, On behalf of          Case No. 03-01180 (SBA)
15  Themselves and All Others Similarly
    Situated.                                CLASS ACTION
16
              Plaintiffs,                    E-FILING
17
    v.                                       DECLARATION OF JONNIE HOGEL IN
18                                           SUPPORT OF CINTAS' OPPOSITION TO
    CINTAS CORPORATION, an Ohio              PLAINTIFFS' MOTION FOR
19  corporation; PLAN ADMINISTRATOR          ENFORCEMENT OF THE COURT'S
    for the Cintas Partners' Plan; and DOES 1- FACILITATED NOTICE ORDER
20  25, inclusive,
                                             Date:        October 19, 2004
21            Defendants.                    Time:        1:00 p.m.
                                             Courtroom:   3
22
                                             Complaint filed:  March 19, 2003
23                                           Judge:       Hon. Saundra B. Armstrong
24

25

26  ///

27  ///

28  ///

SQUIRE, SANDERS &
DEMPSEY L.L.P.
One Maritime Plaza, Suite 300
San Francisco, CA 94111

San Francisco/135394.2                       -1-                          59028.00002

1    I, JONNIE HOGEL, hereby declare as follows:

2    1.    The following statements are based on my personal knowledge and review of

3    business records including reports and data compiled in the course of Cintas' regular business

4    activities.  If called as a witness in this action, I could and would testify competently as to the

5    matters set forth herein.

6    2.    I am a Human Resources Analyst at Cintas' Corporate Headquarters in Mason,

7    Ohio.  I have been employed with Cintas since 1998.

8    3.    Cintas has a policy and procedure and regular practice for managers at locations

9    around the country to make immediate written reports regarding any union activity targeting their

10    location or their partners.  Any such written reports are transmitted via electronic mail, and

11    collateral written materials such as hand bills, flyers, articles, letters, etc. are transmitted via

12    facsimile.  In the course of my regular duties, I am a custodian who collects these written reports

13    as well as the collateral materials and maintains them for Cintas in the course of its regularly

14    conducted business activity, for use by Cintas regarding union activity targeting Cintas around the

15    country.  I am also familiar with and participate in maintaining other documents and

16    correspondence related to union activity targeting Cintas, and Cintas' response thereto including

17    certain correspondence with employees and collections of materials related to union activity.

18    4.    Among the articles collected as part of Cintas' regular practice of identifying and

19    saving information regarding union activities targeting Cintas, of which I am a custodian, are the

20    following:

21        a.    Attached hereto as Exhibit A is an article from the Daily Labor Report

22            published by the Bureau of National Affairs, 09 DLR C-1 (Jan. 14, 2003),

23            titled "AFL-CIO Convenes Organizing Summit to Find New Ways to Expand

24            Membership."  The article quotes the President of the Union of Needletrades,

25            Industrial and Textile Employees ("UNITE") that UNITE would launch a

26            national organizing campaign against Cintas, "to break the back of this

27            employer."

28

SQUIRE, SANDERS &
DEMPSEY L.L.P.
One Maritime Plaza, Suite 300
San Francisco, CA  94111

SanFrancisco/135394.2                    - 2 -                    59028.00002

DECLARATION OF JONNIE HOGEL IN SUPPORT OF CINTAS' OPPOSITION

1    b.  Attached hereto as Exhibit B is a press release from the PR Newswire

2        published on March 19, 2003.  The press release is UNITE's announcement of

3        this lawsuit giving the union credit for "assisting the drivers in filing the suit

4        and in forming a union."

5    c.  Attached hereto as Exhibit C is an article from the Daily Labor Report

6        published by the Bureau of National Affairs, 148 DLR A-11 (Aug. 1, 2003),

7        titled "UNITE Delegates Approve New Campaign to Grow Union Through

8        Increased Organizing."  The article states that on June 25, 2003, UNITE and

9        the Teamsters announced a joint effort to organize and represent Cintas

10       employees.

11   d.  Attached hereto as Exhibit D is an article from the Daily Labor Report

12       published by the Bureau of National Affairs, 54 DLR A-6 (March 20, 2003),

13       titled "Lawsuit Alleges Cintas Owes Pay for Overtime Worked by Delivery

14       Drivers."  The article characterizes this lawsuit against Cintas is "one volley

15       in an organizing drive spearheaded by UNITE."

16   e.  Attached hereto as Exhibit E is an article from the April 7, 2003 issue of

17       *Business Week* entitled "Labor's New Organization Man" describing a

18       conference call between UNITE President Bruce S. Raynor and the media

19       announcing "an ambitious, $100 million lawsuit against Cintas."

20   f.  Attached hereto as Exhibit F is a document which, as of October 1, 2003,

21       could be downloaded from the UNITE website,

22       www.uniformjustice.org/driver.php with an additional click on "A Message to

23       SSRs from UNITE President Bruce Raynor."    The document references the

24       assistance of UNITE in the above-captioned lawsuit against Cintas and

25       provides contact information "[f]or more information about the lawsuit or

26       about how you can become involved in UNITE."

27   g.  Attached hereto as Exhibit G is an article from The (Hayward, CA) Daily

28       Review in which attorney Eileen Goldsmith, with the firm of Altshuler,

SQUIRE, SANDERS &
DEMPSEY L.L.P.
One Maritime Plaza, Suite 300
San Francisco, CA  94111

SanFrancisco/135394.2                          - 3 -                          59028.00002

DECLARATION OF JONNIE HOGEL IN SUPPORT OF CINTAS' OPPOSITION

1    Berzon, Nussbaum, Rubin & Demain, is described as an attorney for

2    plaintiffs suing Cintas and also indicates that Ms. Goldsmith's firm represents

3    UNITE.

4    h.  Attached hereto as Exhibit H is an article dated August 11, 2003 from *In*

5    *These Times* in which UNITE President Raynor is quoted saying "I don't

6    know how long it will take to bring Cintas down, but mark my words: we

7    will."

8    i.  Attached hereto as Exhibit I is a press release issued by Uniform Justice, an

9    organization that refers to itself as "a joint effort of UNITE HERE and the

10    International Brotherhood of Teamsters." Cintas received this document on

11    October 6, 2004. The document references the above-captioned lawsuit

12    against Cintas and provides contact information "[f]or more information about

13    the lawsuit go to www.cintasovertime.com or call 1-800-851-7783."

14    j.  Attached hereto as Exhibit J is an article which as of October 7, 2004, was

15    posted on the eTrucker.com website,

16    www.etrucker.com/apps/news/article.asp?id=45142. The document refers to

17    the above-captioned lawsuit against Cintas as "assisted by UNITE HERE" and

18    also refers to Lerach, Coughlin, Stoia & Robbins as "one of three law firms

19    representing the case."

20    5.    Cintas employs drivers at 307 different geographical locations in 44 states.

21    Between March 10, 2004 and June 18, 2004, Cintas managers at 24 different locations reported

22    receiving more than 35 complaints from employees complaining about unions trying to get,

23    having, and/or using their personal addresses to visit them, call them, or mail materials to their

24    homes. One privacy related complaint even reported Teamsters representatives videotaping

25    Cintas partners in their personal vehicles arriving for work.

26    6.    From June 11, 2004 through June 18, 2004, 35 different Cintas location managers

27    submitted contemporaneous reports that union representatives from UNITE or the Teamsters

28    were present at their location on one or more occasions distributing flyers, posting signs and/or

SQUIRE, SANDERS &
DEMPSEY L.L.P.
One Maritime Plaza, Suite 300
San Francisco, CA 94111

SanFrancisco/135394.2    - 4 -    59028.00002

DECLARATION OF JONNIE HOGEL IN SUPPORT OF CINTAS' OPPOSITION

1  trying to speak to SSRs about joining this lawsuit.  From June 11, 2004 through October 1, 2004,

2  131 different Cintas locations across the country submitted contemporaneous reports that union

3  representatives from UNITE or the Teamsters were present at their location on one or more

4  occasions distributing flyers, posting signs and/or trying to speak to SSRs about joining this

5  lawsuit.  Exhibits K and L attached hereto are examples of two kinds of written materials

6  distributed by the union representatives to SSRs during this time period.

7          7.     From September 30, 2004 through October 8, 2004, 53 different Cintas location

8  managers nationwide submitted reports that employees had notified them of receiving a new

9  package of information about this lawsuit by mail from the unions to their homes.  Exhibit M

10  attached hereto is an example of the envelope and materials turned in by employees on and after

11  September 30, 2004.

12          8.     Exhibit N attached hereto is a copy of a letter dated June 18, 2004 from President

13  and CEO Scott Farmer which was mailed on June 19, 2004 to individuals consisting only of the

14  active drivers employed by Cintas at that time.  Working together with Barbara Strauss, a member

15  of Cintas Corporate MIS, I have compared the list of recipients of this letter with the list of

16  individuals on the Facilitated Notice mailing list and verified that only 2,840 of the individuals on

17  that mailing list also were mailed this Exhibit N.

18          I declare under penalty of perjury under the laws of the United States of America that the

19  foregoing is true and correct.  Executed on October 8, 2004, at Mason,

20  Ohio.

21

22

23                                                        JONNIE HOGEL

24

25

26

27

28

SQUIRE, SANDERS &
DEMPSEY L.L.P.
One Maritime Plaza, Suite 300
San Francisco, CA 94111

SanFrancisco/135394.2                    - 5 -                    59028.00002

DECLARATION OF JONNIE HOGEL IN SUPPORT OF CINTAS' OPPOSITION

**EXHIBIT A**

Copyright 2003 The Bureau of National Affairs, Inc.,

DAILY LABOR REPORT

January 14, 2003, Tuesday

09 DLR C-1 (2003)

LENGTH: 3272 words

SECTION: SPECIAL REPORT

TITLE: Organizing:

### AFL-CIO CONVENES ORGANIZING SUMMIT TO FIND NEW WAYS TO EXPAND MEMBERSHIP

AUTHOR: By Michelle Amber

TEXT:

Acknowledging that the labor movement will not survive unless it finds new, more successful strategies for organizing, labor leaders and key union organizers convened in Washington, D.C., Jan. 10-11 to brainstorm about ways to win more organizing campaigns and expand the labor movement.

At the end of the day-and-a-half-long "organizing summit" convened by the AFL-CIO, Stewart Acuff, the federation's organizing director, told BNA that the top organizers in America were in "remarkable agreement" about some things that labor needs to do in order to organize at a faster pace. These actions include:

-- being "much more aggressive and indignant" about the erosion of the fundamental right to organize;

-- having a much more strategic approach to organizing;

-- being much more aggressive in efforts to persuade unions to change the way they operate in order to organize more successfully; and

-- "trying to figure out how to win together" through unions cooperating, not competing with each other.


The summit, attended by some 200 organizers and leaders from 39 of the AFL-CIO's 66 affiliated unions, was the first AFL-CIO-sponsored conference in more than 40 years to convene top organizers to discuss what they have been doing wrong and what needs to be changed, according to AFL-CIO President John J. Sweeney. The most recent similar gathering was called in 1959, when then-AFL-CIO President George Meany convened a meeting of union presidents and top organizers to discuss organizing, he said.

Labor Has Done Many Things Wrong.

In opening the summit, Sweeney acknowledged that the labor movement has been doing many things wrong in its organizing program. "We're not spending enough money on organizing, not near enough," he said. "We haven't retooled our organizations [international unions, local unions, central labor bodies, and state federations] from top to bottom to support organizing. We've been developing and implementing tactics, but not strategies. We've been practicing 'situational solidarity' -- developing our own initiatives, but not sharing and coordinating" to build a national program.

Although the AFL-CIO began a "Voice at Work" campaign several years ago to spotlight employer interference in organizing campaigns and involve community activists, religious leaders, and elected officials, Sweeney said that the labor movement hasn't been "working hard enough, if at all, at generating community and political support. The public has

no idea about what employers are doing to destroy the freedom to form and join unions, or, frankly what our unions do to make workers' lives better in the first place," he said. "Even our own members don't have a clue about how employers destroy workers' hopes and campaigns of organizing for a better life."

Sweeney called on the organizers to come up with ways to correct these deficiencies.

During the summit, participants heard from union leaders about ways that some unions have changed their approach to organizing as well as some broad strategies to be considered.

Terry O'Sullivan, the president of the 800,000-member Laborers International Union of North America, told the summit that in 1997 his union decided to decentralize the organizing program with the creation of regional organizing funds (ROF). The ROFs, which are funded through hourly membership contributions of between 5 cents and 15 cents per member, generated $18 million for organizing in 2002, with the international contributing another $11 million.

O'Sullivan said that LIUNA is focusing on expanding the union's market share in its organizing. He noted that at the union's convention in 2002, delegates approved an effort to increase market share 20 percent in every industry where LIUNA represents workers before its next convention in 2006. Each local is held accountable for obtaining its market share goal, which is what is driving the union's organizing. "We have to have significant market share in order to negotiate good wages and benefits," he asserted.

O'Sullivan said the market share focus has caused the ROFs to be more strategic in their organizing. Now, before a campaign is contemplated, the ROF must look at what its effect will be on market share.

Part of strategic organizing, O'Sullivan said, is using the structure of the AFL-CIO. "We never interacted with the state federations or the central labor councils to pull all of labor into our organizing campaigns," he said, nor did the union ask for support from other unions. Now there is a commitment from LIUNA to work with these other bodies in organizing, he said.

Tom Woodruff, executive vice president of the Service Employees International Union, the largest union in the AFL-CIO, said that prior to 1996 fewer than 10 SEIU locals had active organizing programs because they saw organizing as the job of the international union. That changed, he said, when at the union's 1996 convention locals were asked to commit at least 20 percent of their revenues to organizing. In 2000, delegates to the union's convention approved the creation of a special Unity Fund into which locals will pay $1 per member per month for organizing. This year that fund will generate between $45 million and $50 million. Added to what the international and the local unions will be spending on organizing, SEIU will be spending a total of $150 million on organizing in 2003, he said. The union will have some 1,000 full-time organizers and 5,000 member organizers, he added.

Unions Need to Pressure Employers.

The labor movement will not be able to organize workers unless it can find ways to pressure employers so employees don't put their jobs on the line when they try to organize, according to Bruce Raynor, president of the Union of Needletrades, Industrial and Textile Employees.

Politicians Receive Wellstone Award

To honor two politicians for their support of workers' rights to organize, the AFL-CIO presented the inaugural Wellstone award during the organizing summit to former Gov. Howard Dean (D-Vt.) and State Sen. John Burton (D-Calif.). The award is named in honor of the late Sen. Paul Wellstone (D-Minn.), who was killed in a plane crash last year.

Dean received the award for supporting nurses at Fletcher Allen Health Care in Burlington — Vermont's largest hospital system — when they were trying to join an affiliate of the American Federation of Teachers (194 DLR A-1, 10/7/02). According to the AFL-CIO, Dean wrote a letter to the nurses saying if he were a nurse he would vote to unionize. He also appeared at a rally with nurses and urged the hospital to honor their choice on whether to join a union. Dean worked as a physician at that hospital before becoming governor.

Burton was honored for his support of legislation in California that provides mediation to resolve contract disputes after a grower recognizes a union representing its workers (191 DLR C-1, 10/2/02). Burton is the president pro tem of the California Senate.

As an example, Raynor said that after a 16-month fight to organize some 1,000 workers of Brylane, a catalog company in Indianapolis, the parties reached an agreement to allow workers at the company's Indiana distribution centers to vote on representation by UNITE in a secret mail-in card/ballot procedure (see related story in this issue). If a majority sends in cards to a third-party neutral, the company will recognize the union, he said.

Raynor said that the only way UNITE was able to get this card-check recognition agreement was because of the pressure the union put on Brylane, which is owned by a French conglomerate. He said the union picketed Gucci stores in the United States, which are owned by the same conglomerate; recruited French unions to put pressure on the company; published a sweatshop catalog; and put on a sweatshop fashion show.

Raynor told the conference participants that labor's failure to organize workers is having a profound effect on America's working families -- "we're letting them down." He laid out a number of things unions need to do in order to grow.

Unions need to allocate resources to organizing, knowing that many projects never will be financially advantageous, he said. Raynor noted that UNITE spent 10 years organizing a group of 100 workers in Atlanta. What that says to employers, he said, is that unions do not make business decisions. What it says to workers is that labor will fight for them as long as it takes.

Labor also has to figure out how to be strategic, Raynor said. "We have failed to make the right to organize a national issue," he said, adding that labor needs to make the issue a "national disgrace." Unions also have to take on large fights with employers, he said, maintaining that there are "not enough fights going on."

UNITE to Begin Large Campaign.

In the next few days, Raynor said that UNITE would be launching a nationwide organizing drive among some 30,000 workers at Cintas Corp., a large supplier of corporate logo uniforms, based in Cincinnati. Raynor called the company the "largest, most anti-union employer" in the industry, adding that it has won 39 decertification elections against unions. UNITE has assigned 50 organizers to the coordinated campaign, he said, which will involve putting pressure on the company, suing them, getting sued, picketing them, and picketing their customers, he said. He added that UNITE would be asking other unions for help in persuading their employers not to use uniforms from Cintas.

The campaign could take many years and UNITE will spend millions of dollars, Raynor said, but the union will continue the campaign until at some point the company will agree to card-check recognition, he said.

"This will be a financial loser," he said, but added that it's the kind of fight unions have to take on. "It's the right thing to do for workers in that industry -- to break the back of this employer," he said.

"We've left alone the most vicious anti-union employers in the country," Raynor said. "Now we have to take on these companies," he added.

Raynor said that unions also have to change the way they operate. He said his union is laying off people in its headquarters as it hires organizers. By the end of the next 12 months, the union will be spending 50 percent of its budget on organizing. "Organizing will be the central theme of our union," he said.

He also said that unions need to develop a renewed sense of solidarity, and workers in one part of the country need to fight for those in other parts of the country. "We have to put our relationships at risk with our employers" in order to organize workers of the same employer in other parts of the country, he said. "We have to insist that our affiliates support each other when called upon to do so. We have to get back to that notion that if you take on one of us you fight all of us." If unions don't use their collective power, they won't have collective power not so many years down the road, he warned.

Collective Bargaining as a 'Public Good.'

Another idea for participants to consider was suggested by Larry Cohen, executive vice president of the Communications Workers of America, who said the labor movement needs to push collective bargaining as a "public good." Whenever people talk about health care or retirement security, labor needs to point out that unions fought for those benefits and won them through collective bargaining, he said. It was because unions fought for pensions that employers started providing them, he said. Twelve million workers have retirement plans at work because of collective bargaining, he added.

Unions need to communicate with their own members about this message that collective bargaining is a public good, Cohen said. Members need to know that because unions represent only 9 percent of the private sector and 35 percent of the public sector, unions are having to strike to protect their health care benefits. "We have to talk to the workers in the shops," he said, adding there is no way to reverse labor's decline unless it takes that message to every workplace.

Cohen recommended that labor select a day to shut down every regional office of the NLRB through civil disobedience, similar to what it did in 1993. On Feb. 11, 1993, several unions staged demonstrations and engaged in civil disobedience at several regional offices around the country. Labor needs to show the public that the NLRB is broken, he said. When employees try to organize, employers tie the cases up, appeal them to the board in Washington, and workers who vote for a union wait for years before they get any answer.

Meanwhile, he said, NLRB is sending letters to governors in New York and New Jersey telling them that recently enacted state laws and executive orders are preempted by federal labor law. New York Gov. George Pataki (R) Sept. 30, 2002, signed legislation prohibiting state funds from being used to discourage or encourage workers from organizing and seeking union representation. The bill was supported by the state AFL-CIO. Earlier, on June 11, 2002, New Jersey Gov. James McGreevey (D) issued an executive order that established the Apparel Procurement Board to regulate the purchase of uniforms for state employees. The order requires vendors and their contractors to adopt a neutrality position in union organizing as well as card check recognition if a majority of workers sign union authorization cards.

Last month, an NLRB official asked the labor commissioners of New York and New Jersey to explain how the states plan to enforce their newly enacted labor neutrality laws and why the state officials think the new laws are not preempted by the National Labor Relations Act (236 DLR A-1, 12/9/02).

Cohen said that labor needs to figure out a solution to fix the rights of workers to organize. One way would be for labor to work to end federal preemption, he said, so laws can be passed state by state. In Canada, he said, individual provinces have passed legislation on first contract arbitration and card-check recognition. "In this country we're banned from doing that." We need to keep pushing governors who have supported us to continue passing laws, not one, not two, but 300, he said.

Acuff told BNA that the point behind Cohen's call for shutting down the NLRB is that labor needs to do something "dramatic" to call attention to the failure of the law in the area of organizing. "It should be dramatic and militant, and should include civil disobedience," he said.

Paul Booth, the executive assistant to the president of AFSCME, told the summit that it is important for organizers from different unions to talk with each other. Unions have a strong interest as competitors and are reluctant to support each other in campaigns. That has to change, he said. Booth also said unions have to stop interfering with each other's organizing drives. "It is inexcusable for any union to try to grow at the expense of another union," he said.

Strategies to Reduce Employer Opposition.

One of several breakout sessions during the conference developed the following recommendations for reducing employer opposition to organizing drives:

-- Union members must be educated about what employers do when workers try to form unions.

-- Unions need to work with coalitions, including community, religious leaders, and organizations such as Jobs with Justice.

-- Unions need to force politicians to support the right to organize, to show up at rallies, and even agree to be arrested with workers.

Marilyn Sneiderman, director of the AFL-CIO's field mobilization department, told the participants they have "to build a strategy to build a movement. It has to be more than a short-term tactic around one campaign," she said. Everyone has to change the climate to build results in organizing. Unions have to build lasting ties with politicians and communities, she said, adding they can't wait until they are in the middle of a struggle to build these relationships.

Until Sweeney took over as president of the AFL-CIO, state federations and central labor councils were not directly involved in organizing campaigns. That is changing and it needs to continue to change, speakers said.

Miguel Contreras, executive secretary-treasurer of the Los Angeles County Federation of Labor, which consists of 350 locals, told the meeting how he changed his central labor council (CLC) to help support organizing in Los Angeles.

Contreras said about six years ago he convened a meeting of union leaders in Los Angeles to discuss the labor situation in the city. Many union leaders didn't know the leaders of other unions and had never worked together, he said. After the meeting, the leaders started working together creating committees for mobilization, organizing, and research, and the CLC assigned staff to the committees. The unions also began creating relationships with politicians -- including getting some of their own members elected -- and with religious leaders such as Cardinal Roger Mahony, the Archbishop of Los Angeles.

All this work paid off when the Service Employees International Union took some 8,000 janitors out on strike in April 2000, he said. The CLC marshaled all its resources, including all the relationships that had been built, adding that both Cardinal Mahony and the Republican mayor of Los Angeles marched with the strikers. Several councilmen that the union had helped get elected agreed to be arrested with the workers, he added.

When the employer threatened to bring in strikebreakers, all the unions pledged to mobilize thousands of members to "shut down downtown LA office buildings," he said. Also, the unions pledged to contribute $125,000 to the janitors because they didn't have a strike fund, he said. The strike was settled before the unions had to take any action.

Where to Go From Here.

In closing the summit, Sweeney said the meeting was just the start of creating a plan to grow the labor movement. "Now we have to figure out how to get the job done."

"We have to make the decision to work together. In many unions, things may have to be done differently. We have to commit to building relationships with our allies. We need to make every organizing campaign a referendum on human rights in America," he said.

Sweeney also said that unions have to challenge "every single politician in every election to support the right to organize. If they don't, we shouldn't endorse them. If they do, we should hold them accountable" to stand with workers during specific organizing drives.

"We have to educate our own members on organizing and politics and remind them that organizing is not just about numbers and dues but human dignity and social justice," Sweeney said.

Acuff told BNA that at its next meeting in February, the AFL-CIO Executive Council will be presented for discussion some proposed steps that unions can take in their organizing efforts, based on the discussions that took place at the summit. He said, however, that there will not be a totally new plan presented. It is not realistic to expect the labor movement to change overnight, he said, adding, it has to be done in steps.

LANGUAGE: ENGLISH

Copyright 2003 The Bureau of National Affairs, Inc.,

DAILY LABOR REPORT

January 14, 2003, Tuesday

09 DLR C-1 (2003)

LENGTH: 3272 words

SECTION: SPECIAL REPORT

TITLE: Organizing;

AFL-CIO CONVENES ORGANIZING SUMMIT TO FIND NEW WAYS TO EXPAND MEMBERSHIP

AUTHOR: By Michelle Amber

TEXT:

Acknowledging that the labor movement will not survive unless it finds new, more successful strategies for organizing, labor leaders and key union organizers convened in Washington, D.C., Jan. 10-11 to brainstorm about ways to win more organizing campaigns and expand the labor movement.

At the end of the day-and-a-half-long "organizing summit" convened by the AFL-CIO, Stewart Acuff, the federation's organizing director, told BNA that the top organizers in America were in "remarkable agreement" about some things that labor needs to do in order to organize at a faster pace. These actions include:

-- being "much more aggressive and indignant" about the erosion of the fundamental right to organize;

-- having a much more strategic approach to organizing;

-- being much more aggressive in efforts to persuade unions to change the way they operate in order to organize more successfully; and

-- "trying to figure out how to win together" through unions cooperating, not competing with each other.

The summit, attended by some 200 organizers and leaders from 39 of the AFL-CIO's 66 affiliated unions, was the first AFL-CIO-sponsored conference in more than 40 years to convene top organizers to discuss what they have been doing wrong and what needs to be changed, according to AFL-CIO President John J. Sweeney. The most recent similar gathering was called in 1959, when then-AFL-CIO President George Meany convened a meeting of union presidents and top organizers to discuss organizing, he said.

Labor Has Done Many Things Wrong.

In opening the summit, Sweeney acknowledged that the labor movement has been doing many things wrong in its organizing program. "We're not spending enough money on organizing, not near enough," he said. "We haven't retooled our organizations [international unions, local unions, central labor bodies, and state federations] from top to bottom to support organizing. We've been developing and implementing tactics, but not strategies. We've been practicing 'situational solidarity' -- developing our own initiatives, but not sharing and coordinating" to build a national program.

Although the AFL-CIO began a "Voice at Work" campaign several years ago to spotlight employer interference in organizing campaigns and involve community activists, religious leaders, and elected officials, Sweeney said that the labor movement hasn't been "working hard enough, if at all, at generating community and political support. The public has

no idea about what employers are doing to destroy the freedom to form and join unions, or, frankly what our unions do to make workers' lives better in the first place," he said. "Even our own members don't have a clue about how employers destroy workers' hopes and campaigns of organizing for a better life."

Sweeney called on the organizers to come up with ways to correct these deficiencies.

During the summit, participants heard from union leaders about ways that some unions have changed their approach to organizing as well as some broad strategies to be considered.

Terry O'Sullivan, the president of the 800,000-member Laborers International Union of North America, told the summit that in 1997 his union decided to decentralize the organizing program with the creation of regional organizing funds (ROF). The ROFs, which are funded through hourly membership contributions of between 5 cents and 15 cents per member, generated $18 million for organizing in 2002, with the international contributing another $11 million.

O'Sullivan said that LIUNA is focusing on expanding the union's market share in its organizing. He noted that at the union's convention in 2002, delegates approved an effort to increase market share 20 percent in every industry where LIUNA represents workers before its next convention in 2006. Each local is held accountable for obtaining its market share goal, which is what is driving the union's organizing. "We have to have significant market share in order to negotiate good wages and benefits," he asserted.

O'Sullivan said the market share focus has caused the ROFs to be more strategic in their organizing. Now, before a campaign is contemplated, the ROF must look at what its effect will be on market share.

Part of strategic organizing, O'Sullivan said, is using the structure of the AFL-CIO. "We never interacted with the state federations or the central labor councils to pull all of labor into our organizing campaigns," he said, nor did the union ask for support from other unions. Now there is a commitment from LIUNA to work with these other bodies in organizing, he said.

Tom Woodruff, executive vice president of the Service Employees International Union, the largest union in the AFL-CIO, said that prior to 1996 fewer than 10 SEIU locals had active organizing programs because they saw organizing as the job of the international union. That changed, he said, when at the union's 1996 convention locals were asked to commit at least 20 percent of their revenues to organizing. In 2000, delegates to the union's convention approved the creation of a special Unity Fund into which locals will pay $1 per member per month for organizing. This year that fund will generate between $45 million and $50 million. Added to what the international and the local unions will be spending on organizing, SEIU will be spending a total of $150 million on organizing in 2003, he said. The union will have some 1,000 full-time organizers and 5,000 member organizers, he added.

Unions Need to Pressure Employers.

The labor movement will not be able to organize workers unless it can find ways to pressure employers so employees don't put their jobs on the line when they try to organize, according to Bruce Raynor, president of the Union of Needletrades, Industrial and Textile Employees.

Politicians Receive Wellstone Award

To honor two politicians for their support of workers' rights to organize, the AFL-CIO presented the inaugural Wellstone award during the organizing summit to former Gov. Howard Dean (D-Vt.) and State Sen. John Burton (D-Calif.). The award is named in honor of the late Sen. Paul Wellstone (D-Minn.), who was killed in a plane crash last year.

Dean received the award for supporting nurses at Fletcher Allen Health Care in Burlington -- Vermont's largest hospital system -- when they were trying to join an affiliate of the American Federation of Teachers (194 DLR A-1, 10/7/02). According to the AFL-CIO, Dean wrote a letter to the nurses saying if he were a nurse he would vote to unionize. He also appeared at a rally with nurses and urged the hospital to honor their choice on whether to join a union. Dean worked as a physician at that hospital before becoming governor.

Burton was honored for his support of legislation in California that provides mediation to resolve contract disputes after a grower recognizes a union representing its workers (191 DLR C-1, 10/2/02). Burton is the president pro tem of the California Senate.

As an example, Raynor said that after a 16-month fight to organize some 1,000 workers of Brylane, a catalog company in Indianapolis, the parties reached an agreement to allow workers at the company's Indiana distribution centers to vote on representation by UNITE in a secret mail-in card/ballot procedure (see related story in this issue). If a majority sends in cards to a third-party neutral, the company will recognize the union, he said.

Raynor said that the only way UNITE was able to get this card-check recognition agreement was because of the pressure the union put on Brylane, which is owned by a French conglomerate. He said the union picketed Gucci stores in the United States, which are owned by the same conglomerate; recruited French unions to put pressure on the company; published a sweatshop catalog; and put on a sweatshop fashion show.

Raynor told the conference participants that labor's failure to organize workers is having a profound effect on America's working families -- "we're letting them down." He laid out a number of things unions need to do in order to grow.

Unions need to allocate resources to organizing, knowing that many projects never will be financially advantageous, he said. Raynor noted that UNITE spent 10 years organizing a group of 100 workers in Atlanta. What that says to employers, he said, is that unions do not make business decisions. What it says to workers is that labor will fight for them as long as it takes.

Labor also has to figure out how to be strategic, Raynor said. "We have failed to make the right to organize a national issue," he said, adding that labor needs to make the issue a "national disgrace." Unions also have to take on large fights with employers, he said, maintaining that there are "not enough fights going on."

UNITE to Begin Large Campaign.

In the next few days, Raynor said that UNITE would be launching a nationwide organizing drive among some 30,000 workers at Cintas Corp., a large supplier of corporate logo uniforms, based in Cincinnati. Raynor called the company the "largest, most anti-union employer" in the industry, adding that it has won 39 decertification elections against unions. UNITE has assigned 50 organizers to the coordinated campaign, he said, which will involve putting pressure on the company, suing them, getting sued, picketing them, and picketing their customers, he said. He added that UNITE would be asking other unions for help in persuading their employers not to use uniforms from Cintas.

The campaign could take many years and UNITE will spend millions of dollars, Raynor said, but the union will continue the campaign until at some point the company will agree to card-check recognition, he said.

"This will be a financial loser," he said, but added that it's the kind of fight unions have to take on. "It's the right thing to do for workers in that industry -- to break the back of this employer," he said.

"We've left alone the most vicious anti-union employers in the country," Raynor said. "Now we have to take on these companies," he added.

Raynor said that unions also have to change the way they operate. He said his union is laying off people in its headquarters as it hires organizers. By the end of the next 12 months, the union will be spending 50 percent of its budget on organizing. "Organizing will be the central theme of our union," he said.

He also said that unions need to develop a renewed sense of solidarity, and workers in one part of the country need to fight for those in other parts of the country. "We have to put our relationships at risk with our employers" in order to organize workers of the same employer in other parts of the country, he said. "We have to insist that our affiliates support each other when called upon to do so. We have to get back to that notion that if you take on one of us you fight all of us." If unions don't use their collective power, they won't have collective power not so many years down the road, he warned.

Collective Bargaining as a 'Public Good.'

Another idea for participants to consider was suggested by Larry Cohen, executive vice president of the Communications Workers of America, who said the labor movement needs to push collective bargaining as a "public good." Whenever people talk about health care or retirement security, labor needs to point out that unions fought for those benefits and won them through collective bargaining, he said. It was because unions fought for pensions that employers started providing them, he said. Twelve million workers have retirement plans at work because of collective bargaining, he added.

Unions need to communicate with their own members about this message that collective bargaining is a public good, Cohen said. Members need to know that because unions represent only 9 percent of the private sector and 35 percent of the public sector, unions are having to strike to protect their health care benefits. "We have to talk to the workers in the shops," he said, adding there is no way to reverse labor's decline unless it takes that message to every workplace.

Cohen recommended that labor select a day to shut down every regional office of the NLRB through civil disobedience, similar to what it did in 1993. On Feb. 11, 1993, several unions staged demonstrations and engaged in civil disobedience at several regional offices around the country. Labor needs to show the public that the NLRB is broken, he said. When employees try to organize, employers tie the cases up, appeal them to the board in Washington, and workers who vote for a union wait for years before they get any answer.

Meanwhile, he said, NLRB is sending letters to governors in New York and New Jersey telling them that recently enacted state laws and executive orders are preempted by federal labor law. New York Gov. George Pataki (R) Sept. 30, 2002, signed legislation prohibiting state funds from being used to discourage or encourage workers from organizing and seeking union representation. The bill was supported by the state AFL-CIO. Earlier, on June 11, 2002, New Jersey Gov. James McGreevey (D) issued an executive order that established the Apparel Procurement Board to regulate the purchase of uniforms for state employees. The order requires vendors and their contractors to adopt a neutrality position in union organizing as well as card check recognition if a majority of workers sign union authorization cards.

Last month, an NLRB official asked the labor commissioners of New York and New Jersey to explain how the states plan to enforce their newly enacted labor neutrality laws and why the state officials think the new laws are not preempted by the National Labor Relations Act (236 DLR A-1, 12/9/02).

Cohen said that labor needs to figure out a solution to fix the rights of workers to organize. One way would be for labor to work to end federal preemption, he said, so laws can be passed state by state. In Canada, he said, individual provinces have passed legislation on first contract arbitration and card-check recognition. "In this country we're banned from doing that." We need to keep pushing governors who have supported us to continue passing laws, not one, not two, but 300, he said.

Acuff told BNA that the point behind Cohen's call for shutting down the NLRB is that labor needs to do something "dramatic" to call attention to the failure of the law in the area of organizing. "It should be dramatic and militant, and should include civil disobedience," he said.

Paul Booth, the executive assistant to the president of AFSCME, told the summit that it is important for organizers from different unions to talk with each other. Unions have a strong interest as competitors and are reluctant to support each other in campaigns. That has to change, he said. Booth also said unions have to stop interfering with each other's organizing drives. "It is inexcusable for any union to try to grow at the expense of another union," he said.

Strategies to Reduce Employer Opposition.

One of several breakout sessions during the conference developed the following recommendations for reducing employer opposition to organizing drives:

— Union members must be educated about what employers do when workers try to form unions.

— Unions need to work with coalitions, including community, religious leaders, and organizations such as Jobs with Justice.

— Unions need to force politicians to support the right to organize, to show up at rallies, and even agree to be arrested with workers.

Marilyn Sneiderman, director of the AFL-CIO's field mobilization department, told the participants they have "to build a strategy to build a movement. It has to be more than a short-term tactic around one campaign," she said. Everyone has to change the climate to build results in organizing. Unions have to build lasting ties with politicians and communities, she said, adding they can't wait until they are in the middle of a struggle to build these relationships.

Until Sweeney took over as president of the AFL-CIO, state federations and central labor councils were not directly involved in organizing campaigns. That is changing and it needs to continue to change, speakers said.

Miguel Contreras, executive secretary-treasurer of the Los Angeles County Federation of Labor, which consists of 350 locals, told the meeting how he changed his central labor council (CLC) to help support organizing in Los Angeles.

Contreras said about six years ago he convened a meeting of union leaders in Los Angeles to discuss the labor situation in the city. Many union leaders didn't know the leaders of other unions and had never worked together, he said. After the meeting, the leaders started working together creating committees for mobilization, organizing, and research, and the CLC assigned staff to the committees. The unions also began creating relationships with politicians -- including getting some of their own members elected -- and with religious leaders such as Cardinal Roger Mahony, the Archbishop of Los Angeles.

All this work paid off when the Service Employees International Union took some 8,000 janitors out on strike in April 2000, he said. The CLC marshaled all its resources, including all the relationships that had been built, adding that both Cardinal Mahony and the Republican mayor of Los Angeles marched with the strikers. Several councilmen that the union had helped get elected agreed to be arrested with the workers, he added.

When the employer threatened to bring in strikebreakers, all the unions pledged to mobilize thousands of members to "shut down downtown LA office buildings," he said. Also, the unions pledged to contribute $125,000 to the janitors because they didn't have a strike fund, he said. The strike was settled before the unions had to take any action.

Where to Go From Here.

In closing the summit, Sweeney said the meeting was just the start of creating a plan to grow the labor movement. "Now we have to figure out how to get the job done."

"We have to make the decision to work together. In many unions, things may have to be done differently. We have to commit to building relationships with our allies. We need to make every organizing campaign a referendum on human rights in America," he said.

Sweeney also said that unions have to challenge "every single politician in every election to support the right to organize. If they don't, we shouldn't endorse them. If they do, we should hold them accountable" to stand with workers during specific organizing drives.

"We have to educate our own members on organizing and politics and remind them that organizing is not just about numbers and dues but human dignity and social justice," Sweeney said.

Acuff told BNA that at its next meeting in February, the AFL-CIO Executive Council will be presented for discussion some proposed steps that unions can take in their organizing efforts, based on the discussions that took place at the summit. He said, however, that there will not be a totally new plan presented. It is not realistic to expect the labor movement to change overnight, he said, adding, it has to be done in steps.

LANGUAGE: ENGLISH

# EXHIBIT B

4 of 4 DOCUMENTS

Copyright 2003 PR Newswire Association, Inc.
PR Newswire

March 19, 2003, Wednesday

**SECTION:** FINANCIAL NEWS

**DISTRIBUTION:** TO BUSINESS, LABOR AND LEGAL AFFAIRS EDITORS

**LENGTH:** 853 words

**HEADLINE:** Class Action Lawsuit Says Laundry Giant Cintas Cheated Workers Out of Tens of Millions in Overtime Pay;
Violations of Federal Fair Labor Standards Act and State Laws in California, Illinois, Michigan and New Jersey Could Cost Company $75 to $100 Million

**DATELINE:** SAN FRANCISCO, Calif., March 19

**BODY:**

Attorneys for a group of Cintas employees this morning filed a lawsuit in federal district court charging that the company has deliberately withheld tens of millions of dollars in overtime pay from them over the last three years. The workers, drivers of delivery and route sales trucks, say Cintas deliberately misclassified thousands of workers as exempt employees in order to avoid paying overtime required by state and federal laws.

The lawsuit, which was filed in U.S. District Court for the Northern District of California, eventually may involve as many as 3,500 workers formerly or currently employed by the company and could cost Cintas $75 to $100 million dollars.

The drivers filing suit are delivery and service representatives who have been routinely required to work unpaid overtime for the industry behemoth. Cintas, based in Ohio, makes, rents and launders uniforms for a wide range of industries.

"Cintas has made millions of dollars in unearned profits at the expense of some of its hardest-working employees," said Bruce Raynor, president of the Union of Needletrades, Industrial and Textile Employees (UNITE,) which is assisting the drivers in filing the suit and in forming a union.

All workers are entitled to overtime premiums under the Fair Labor Standards Act (FLSA) unless they are specifically exempted. The FLSA contains narrow exemptions for executive, administrative, professional, and outside sales employees, who can be required to work more than 40 hours a week without being paid overtime. Whether a worker is exempt depends on the work performed, not the job title assigned by an employer. Most state statutes track the federal law, although some (like California and New Jersey) give workers even greater protections. The drivers argue that their jobs driving trucks, delivering uniforms and servicing existing contracts do not make them exempt, and that they should be paid at the legal rate for all hours worked.

The suit also charges that Cintas actions are in violation of California's Unfair Competition Act. In addition to California, the named plaintiffs include workers in Illinois, Michigan, and New Jersey. The suit is being brought on behalf of all Cintas drivers nationwide, including former drivers.

Cintas is the largest uniform rental provider and industrial launderer in North America. With 27,000 employees -- 17,000 of them non-managerial -- the company operates 170 laundry plants, 103 depots, 10 cleanroom laundries, 14 manufacturing facilities, seven distribution centers and 36 first aid facilities across the United States and Canada. A publicly traded company with 2002 profits of $234 million from $2.27 billion in sales, Cintas controls a 30 percent share of the uniform market.

A report recently released by the union shows that Cintas -- a publicly held company traded on the NASDAQ -- recorded its 33rd consecutive year of growth in 2002. The giant corporation's customers include Chevron, Delta Airlines,

Page 2

PR Newswire March 19, 2003, Wednesday

Exxon, Firestone, Ford Motor Company, General Motors, Hershey, Northwest Airlines, Kraft Foods, Sears, and UPS. Over 40 additional lawsuits have been filed against the company for racial, sexual, age and disability discrimination.

A union spokesperson said, "Cintas executives are the kind of business people who give corporate CEOs a bad name," noting that CEO Robert Kohlhepp received a $51,000 raise last year and his salary is now $490,000. COO Scott Farmer received a $71,000 raise, he said, and now makes $450,000, and gained an additional $1.3 million by selling company stock.

UNITE this year filed 80 charges against the company for violations of labor laws. Cintas has also come under attack for discriminating against employees. A jury in Kansas City found that Cintas had illegally paid Beth Merrill less than male employees and fired her for fighting back, awarding Merrill $224,000 in damages. Suits have been filed against the company for race and age discrimination.

Cintas founder and chairman Richard T. Farmer, the report says, is so opposed to unions that he makes hefty political contributions to counter those of unions. Between the 2000 and 2001 elections cycles, Farmer and his wife gave $1.3 million dollars to the Republican Party, the second largest donation to the GOP during that period.

The company, UNITE says, has a long history of anti-unionism. In 1999, Cintas bought out a heavily unionized competitor -- Unitog -- and promptly closed all but one of Unitog's unionized facilities, throwing thousands of union members out of work. In Hopewell, Virginia, Cintas acquired Metropolitan Uniform Services, where employees had been union for 28 years, and then tried to decertify the union by promising the workers higher wages and better benefits, unlawful conduct under U.S. labor laws.

SOURCE UNITE

CONTACT: Pat Lewis, +1-202-842-3100, for UNITE, or Jen Roitman of UNITE, +1-646-734-4054

URL: http://www.prnewswire.com

LOAD-DATE: March 20, 2003

**EXHIBIT C**

Copyright 2003 The Bureau of National Affairs, Inc.,

DAILY LABOR REPORT

August 1, 2003, Friday

148 DLR A-11 (2003)

LENGTH: 766 words

SECTION: NEWS

TITLE: Unions:

## UNITE DELEGATES APPROVE NEW CAMPAIGN TO GROW UNION THROUGH INCREASED ORGANIZING

AUTHOR: By Michelle Amber

TEXT:

Delegates to the second constitutional convention of the Union of Needletrades, Industrial, and Textile Employees the week of July 21 approved a "campaign for the future" plan that is aimed at expanding the union through increased organizing.

The goals of the campaign are to double organizing resources, increase coordinated bargaining in key industries, increase member mobilization in organizing and bargaining through solidarity actions, and defend the union's core industries, union officials said.

UNITE President Bruce Raynor told BNA July 31 that major components of the plan call for a substantial dues increase to be used almost exclusively for organizing; a commitment by the union's locals to engage in mobilization of members to support organizing and bargaining throughout the union through demonstrations, boycotts, and corporate campaigns; building alliances with community, civil rights groups, and others; and reducing the number of UNITE locals through mergers around industrial and/or geographical lines.

In addition, the 250,000-member union has committed to organizing 25,000 new members per year for each of the next four years, Raynor said. That goal represents a significant increase from the 56,000 employees organized during the last four years, he noted.

By the end of next year, the union plans to spend $24 million annually on organizing efforts, double the amount it currently spends, according to Raynor.

Dues Increase Approved.

To help finance the plan, delegates at the Las Vegas convention also approved a significant increase in dues. Beginning in October, members who pay monthly dues will pay $2 more per month in each of the next four years. Those who pay weekly dues will increase their dues by 50 cents a week, according to UNITE Vice President Susan Cowell. The dues increase will raise about $1.6 million by the end of the four-year period or about $400,000 each year, she said.

The full amount of the dues increase will be targeted to the new campaign and will be used not only for organizing but for corporate research as well as coordinated bargaining, she said. The international, which "leads organizing and corporate campaigns," will keep $1.30 of the increase, while the locals will keep 70 cents.

The portion that is kept by the affiliates will be dedicated to organizing and coordinated bargaining, as well as to internal organizing, particularly in right-to-work states where UNITE has a presence. "Every penny will be dedicated to the new program to build strength," Cowell said.

In order to increase the resources for organizing, the union is limiting expenditures in other areas such as reducing staff in administrative departments. Cowell added that the union also recently sold its headquarters building for $23 million (103 DLR A-11, 5/29/03).

According to Raynor, the union currently is organizing primarily in four sectors: laundries; distribution and retail apparel; apparel and textile manufacturing; and disability services. UNITE and the Teamsters June 25 announced they were launching a joint organizing effort to represent approximately 17,000 union-eligible employees at Cintas Corp., the Cincinnati-based supplier of uniforms (123 DLR A-12, 6/26/03).

In order to expand membership and get more power at the bargaining table, the union plans to engage in more coordinated bargaining, and will try to negotiate common expiration dates, Raynor said. If UNITE has good relationships with a company at 10 locations but the employer is fighting with the union at one, the employer will have to take on employees at all 11 locations, he said. Through coordinated bargaining, one group will be able to support fellow union members at another bargaining table, he added.

The union also is streamlining operations by combining locals. In New York, the union intends to reduce the 11 metropolitan area locals to five, organized along industrial lines, and in other areas, locals are merging along regional lines.

In other action at the convention, delegates voted to formally change the union's name to the acronym UNITE in recognition of its evolving jurisdiction in laundries and other industries.

Delegates also voted to establish a retiree organization that would be involved in politics as well as in the new organizing effort. The effort is aimed at building on the 250,000 retirees' loyalty to their union, Cowell explained. The organization would be funded through the payment of dues by the retirees.

LANGUAGE: ENGLISH

Copyright 2003 The Bureau of National Affairs, Inc.,

DAILY LABOR REPORT

August 1, 2003, Friday

148 DLR A-11 (2003)

LENGTH: 766 words

SECTION: NEWS

TITLE: Unions

UNITE DELEGATES APPROVE NEW CAMPAIGN TO GROW UNION THROUGH INCREASED ORGANIZING

AUTHOR: By Michelle Amber

TEXT:

Delegates to the second constitutional convention of the Union of Needletrades, Industrial, and Textile Employees the week of July 21 approved a "campaign for the future" plan that is aimed at expanding the union through increased organizing.

The goals of the campaign are to double organizing resources, increase coordinated bargaining in key industries, increase member mobilization in organizing and bargaining through solidarity actions, and defend the union's core industries, union officials said.

UNITE President Bruce Raynor told BNA July 31 that major components of the plan call for a substantial dues increase to be used almost exclusively for organizing; a commitment by the union's locals to engage in mobilization of members to support organizing and bargaining throughout the union through demonstrations, boycotts, and corporate campaigns; building alliances with community, civil rights groups, and others; and reducing the number of UNITE locals through mergers around industrial and/or geographical lines.

In addition, the 250,000-member union has committed to organizing 25,000 new members per year for each of the next four years, Raynor said. That goal represents a significant increase from the 56,000 employees organized during the last four years, he noted.

By the end of next year, the union plans to spend $24 million annually on organizing efforts, double the amount it currently spends, according to Raynor.

Dues Increase Approved.

To help finance the plan, delegates at the Las Vegas convention also approved a significant increase in dues. Beginning in October, members who pay monthly dues will pay $2 more per month in each of the next four years. Those who pay weekly dues will increase their dues by 50 cents a week, according to UNITE Vice President Susan Cowell. The dues increase will raise about $1.6 million by the end of the four-year period or about $400,000 each year, she said.

The full amount of the dues increase will be targeted to the new campaign and will be used not only for organizing but for corporate research as well as coordinated bargaining, she said. The international, which "leads organizing and corporate campaigns," will keep $1.30 of the increase, while the locals will keep 70 cents.

The portion that is kept by the affiliates will be dedicated to organizing and coordinated bargaining, as well as to internal organizing, particularly in right-to-work states where UNITE has a presence. "Every penny will be dedicated to the new program to build strength," Cowell said.

In order to increase the resources for organizing, the union is limiting expenditures in other areas such as reducing staff in administrative departments. Cowell added that the union also recently sold its headquarters building for $23 million (103 DLR A-11, 5/29/03).

According to Raynor, the union currently is organizing primarily in four sectors: laundries; distribution and retail apparel; apparel and textile manufacturing; and disability services. UNITE and the Teamsters June 25 announced they were launching a joint organizing effort to represent approximately 17,000 union-eligible employees at Cintas Corp., the Cincinnati-based supplier of uniforms (123 DLR A-12, 6/26/03).

In order to expand membership and get more power at the bargaining table, the union plans to engage in more coordinated bargaining, and will try to negotiate common expiration dates, Raynor said. If UNITE has good relationships with a company at 10 locations but the employer is fighting with the union at one, the employer will have to take on employees at all 11 locations, he said. Through coordinated bargaining, one group will be able to support fellow union members at another bargaining table, he added.

The union also is streamlining operations by combining locals. In New York, the union intends to reduce the 11 metropolitan area locals to five, organized along industrial lines, and in other areas, locals are merging along regional lines.

In other action at the convention, delegates voted to formally change the union's name to the acronym UNITE in recognition of its evolving jurisdiction in laundries and other industries.

Delegates also voted to establish a retiree organization that would be involved in politics as well as in the new organizing effort. The effort is aimed at building on the 250,000 retirees' loyalty to their union, Cowell explained. The organization would be funded through the payment of dues by the retirees.

LANGUAGE: ENGLISH

**EXHIBIT D**

Copyright 2003 The Bureau of National Affairs, Inc.,

DAILY LABOR REPORT

March 20, 2003, Thursday

54 DLR A-5 (2003)

LENGTH: 681 words

SECTION: NEWS

TITLE: FLSA:

## LAWSUIT ALLEGES CINTAS OWES PAY FOR OVERTIME WORKED BY DELIVERY DRIVERS

TEXT:

A lawsuit filed March 19 in federal district court in San Francisco alleges Cintas Corp., the Cincinnati-based corporate uniform supplier, withheld millions of dollars in overtime pay to delivery drivers over the past three years (Veliz v. Cintas Corp., N.D. Cal., No. 03-1180, complaint filed 3/19/03).

Karen Carnahan, vice president and treasurer of Cintas said company officials will not be able to comment on the lawsuit until they have had time to review it in detail, except to say that, "we feel very confident that we are paying our route drivers ... properly and fairly."

She said the lawsuit is a tactic by the Union of Needletrades, Industrial, and Textile Employees to influence Cintas employees. "The union is attempting again to pressure the company into unionizing our workforce against our employees' wishes," Carnahan said.

The suit claims Cintas violated the Fair Labor Standards Act and California's Unfair Competition Act by deliberately misclassifying its delivery drivers as exempt from the statutes' overtime requirements, according to Scott A. Kronland, an attorney for the plaintiffs, truck drivers who worked for Cintas.

Plaintiffs include former workers in California, Illinois, Michigan, and New Jersey, but it is being brought on behalf of all Cintas drivers nationwide, including former drivers, said Kronland, who is with Altshuler, Berzon, Nussbaum, Rubin & Demain in San Francisco.

The suit estimates at least 3,400 former and current Cintas employees could fall within the plaintiff class of delivery drivers employed by the company as "service sales representatives." Cintas has about 27,000 employees nationwide.

The suit is the largest of its kind involving laundry truck drivers, said Bruce Raynor, president of UNITE, which is assisting the drivers in filing the lawsuit. If the employees prevail in their lawsuit, he estimated, it could cost Cintas $75 million to $100 million.

"This company has saved millions and millions of dollars by cheating its own workers," Raynor said in a telephone press conference from San Francisco.

Raynor said Cintas drivers are typically required to work 60- to 70-hour weeks delivering Cintas products to clients. He added that they are denied rest periods and are paid a salary plus a commission, based on the amount of uniforms delivered. Such commission-based pay arrangements are typical in the uniform delivery business, Raynor said.

The suit is one volley in an organizing drive spearheaded by UNITE on behalf of the 17,000 laundry employees at Cintas. In January, Raynor outlined plans for the drive at an AFL-CIO "organizing summit" in Washington, D.C., saying that the union is prepared to spend millions of dollars over many years to accomplish its goal of representing the Cintas workers (9 DLR C-1, 1/14/03).

Rayner described Cintas as the, "largest, most anti-union employer" in the industry, claiming the company has threatened and fired pro-union employees, hired "an array" of security guards to stop employees from distributing pro-union leaflets, and engaged in "a campaign of fear and intimidation straight out of a 1930s novel."

He called on unions representing employees that work for companies using Cintas products to support the drive, and at the March 19 press conference, said UNITE has received "tremendous support" from other unions in its Cintas campaign.

At the same press conference, plaintiff Tade L. Wasner said he worked as a laundry truck driver for Cintas in Illinois from 1996 until 2002 and never worked less than 50 hours per week. He often worked much more than that, Wasner said, and was never paid for it.

"That's just four or five hours of personal time down the drain," Wasner said.

He typically started work at around 6 a.m. and ended after 5 p.m., with weekly take-home pay averaging $550, he said. He tried to get Cintas to pay him for his overtime hours, but, "they just refused to pay me, they just seemed to feel it was my job," Wasner said.

LANGUAGE: ENGLISH

Copyright 2003 The Bureau of National Affairs, Inc.,

DAILY LABOR REPORT

March 20, 2003, Thursday

54 DLR A-6 (2003)

LENGTH: 681 words

SECTION: NEWS

TITLE: FLSA:

LAWSUIT ALLEGES CINTAS OWES PAY FOR OVERTIME WORKED BY DELIVERY DRIVERS

TEXT:

A lawsuit filed March 19 in federal district court in San Francisco alleges Cintas Corp., the Cincinnati-based corporate uniform supplier, withheld millions of dollars in overtime pay to delivery drivers over the past three years (Veliz v. Cintas Corp., N.D. Cal., No. 03-1180, complaint filed 3/19/03).

Karen Carnahan, vice president and treasurer of Cintas said company officials will not be able to comment on the lawsuit until they have had time to review it in detail, except to say that, "we feel very confident that we are paying our route drivers ... properly and fairly."

She said the lawsuit is a tactic by the Union of Needletrades, Industrial, and Textile Employees to influence Cintas employees. "The union is attempting again to pressure the company into unionizing our workforce against our employees' wishes," Carnahan said.

The suit claims Cintas violated the Fair Labor Standards Act and California's Unfair Competition Act by deliberately misclassifying its delivery drivers as exempt from the statutes' overtime requirements, according to Scott A. Kronland, an attorney for the plaintiffs, truck drivers who worked for Cintas.

Plaintiffs include former workers in California, Illinois, Michigan, and New Jersey, but it is being brought on behalf of all Cintas drivers nationwide, including former drivers, said Kronland, who is with Altshuler, Berzon, Nussbaum, Rubin & Demain in San Francisco.

The suit estimates at least 3,400 former and current Cintas employees could fall within the plaintiff class of delivery drivers employed by the company as "service sales representatives." Cintas has about 27,000 employees nationwide.

The suit is the largest of its kind involving laundry truck drivers, said Bruce Raynor, president of UNITE, which is assisting the drivers in filing the lawsuit. If the employees prevail in their lawsuit, he estimated, it could cost Cintas $75 million to $100 million.

"This company has saved millions and millions of dollars by cheating its own workers," Raynor said in a telephone press conference from San Francisco.

Raynor said Cintas drivers are typically required to work 60- to 70-hour weeks delivering Cintas products to clients. He added that they are denied rest periods and are paid a salary plus a commission, based on the amount of uniforms delivered. Such commission-based pay arrangements are typical in the uniform delivery business, Raynor said.

The suit is one volley in an organizing drive spearheaded by UNITE on behalf of the 17,000 laundry employees at Cintas. In January, Raynor outlined plans for the drive at an AFL-CIO "organizing summit" in Washington, D.C., saying that the union is prepared to spend millions of dollars over many years to accomplish its goal of representing the Cintas workers (9 DLR C-1, 1/14/03).

Raynor described Cintas as the, "largest, most anti-union employer" in the industry, claiming the company has threatened and fired pro-union employees, hired "an army" of security guards to stop employees from distributing pro-union leaflets, and engaged in "a campaign of fear and intimidation straight out of a 1930s novel."

He called on unions representing employees that work for companies using Cintas products to support the drive, and at the March 19 press conference, said UNITE has received "tremendous support" from other unions in its Cintas campaign.

At the same press conference, plaintiff Tade L. Wasmer said he worked as a laundry truck driver for Cintas in Illinois from 1998 until 2002 and never worked less than 50 hours per week. He often worked much more than that, Wasmer said, and was never paid for it.

"That's just four or five hours of personal time down the drain," Wasmer said.

He typically started work at around 6 a.m. and ended after 5 p.m., with weekly take-home pay averaging $550, he said. He tried to get Cintas to pay him for his overtime hours, but, "they just refused to pay me, they just seemed to feel it was my job," Wasmer said.

LANGUAGE: ENGLISH

**EXHIBIT E**

# Workplace



**UNIONS**

# LABOR'S NEW ORGANIZATION MAN

Bruce Raynor is reinvigorating the troubled garment workers' union. Could he be the successor to AFL-CIO chief Sweeney?

Bruce S. Raynor was on a roll. On Mar. 19, the president of the Union of Needletrades, Industrial & Textile Employees (UNITE) held a conference call for reporters to announce an ambitious, $100 million lawsuit against Cintas Corp., the country's leading commercial laundry company. The class action charges that the largely nonunion Cintas fails to pay overtime to thousands of drivers who pick up laundry from hotels, restaurants, and other customers. Raynor let Cintas workers and UNITE organizers do most of the talking, only stepping in to blast Cintas for "dragging down standards in the industry by paying subpar wages." A Cintas official denies the overtime charge and insists the company pays competitive wages.

It's bold tactics like the Cintas lawsuit that are turning Raynor into a rising star in the labor movement and a potential successor to AFL-CIO President John J. Sweeney, whose term expires in two years. When Raynor became the president of UNITE in 2001 he took over a union that had been badly battered by the offshore exodus of more than a million garment and textile jobs.

But Raynor has reversed the decline with some aggressive tactics. The Cintas suit, for example, is part of a national recruitment drive he kicked off in January to sign up 17,000 Cintas workers. His approach: tapping the strength of UNITE's mostly minority and immigrant membership by getting them to reach out to recruits with similar backgrounds. By focusing on low-wage industries such as laundry and retail distribution that aren't subject to trade pressure, Raynor has reinvigorated the flagging union. "The laundry campaign offers a model of how unions can organize an entire industry," says former AFL-CIO Organizing Director Richard Bensinger, who has advised Raynor on recruitment.

<br/>

## LOOK FOR THE UNION WORKERS
Low-wage industries such as retail distribution are key for Raynor

Raynor's moves counter the view that unions lack relevance to American workers. They also stand as a sharp rebuke to most labor leaders, who have fewer troubles than UNITE, yet who still haven't taken the difficult steps needed to spur growth. In February, Raynor helped prod the adoption of a new AFL-CIO governing body with four other successful union leaders, including two other possible successors to Sweeney, hotel workers' President John W. Wilhelm and service employees' President Andy Stern. They all believe vigorous action can reverse labor's decline. "I'm convinced that the labor movement has the resources to grow," says Raynor.

If UNITE can sign up tens of thousands of members, Raynor reasons, so can other unions. UNITE lost more than 200,000 members through the late 1990s, cutting its ranks to 250,000, largely because of offshore competition. Raynor, 53, set out to reverse the trend well before he was elected president. A wire-thin, intensely driven man who got a BA in labor relations from Cornell University, he spent most of his career recruiting thousands of low-wage workers in the union-unfriendly South.

Then, in 1998, Raynor launched a national recruitment drive in commercial laundry. He saw that the industry couldn't be moved offshore and that outsourcing was creating thousands of jobs at fast-growing companies such as Cintas. Its workers also resemble UNITE members, who are 80% nonwhite and immigrant and typically earn $8 an hour.

Raynor prodded UNITE to focus more resources on recruitment and less on servicing current members. It now spends more than 40% of its budget on organizing, up from 20% in 1995, and Raynor vows to lift that above 50%. By contrast, many unions today still devote less than 5% to recruitment.

Using organizers who can speak to workers in their native language, UNITE has signed up 30,000 new laundry members since 1998. It now represents 27% of the industry, enough to lift members' wages by up to 25%, to about $9 an hour, and to give them medical benefits. It's a track record other unions will be studying.

*By Aaron Bernstein in Washington*



**REINVENTING A UNION**
*New recruits in laundry and distribution, which represented 14% of UNITE's 1998 membership, have offset big losses in apparel and textiles which totaled 64% in 1998.*

**2003 MEMBERSHIP**

MISCELLANEOUS 24%
DISTRIBUTION 16%
APPAREL & TEXTILES 42%
LAUNDRY 18%

Data: UNITE

PHOTOGRAPH BY MELCHIOR DiGIACOMO; CHART BY LAUREL DAUNIS-ALLEN/BW

# Workplace



**UNIONS**

# LABOR'S NEW ORGANIZATION MAN

**Bruce Raynor is reinvigorating the troubled garment workers' union. Could he be the successor to AFL-CIO chief Sweeney?**

B ruce S. Raynor was on a roll. On Mar. 19, the president of the Union of Needletrades, Industrial & Textile Employees (UNITE) held a conference call for reporters to announce an ambitious, $100 million lawsuit against Cintas Corp., the country's leading commercial laundry company. The class action charges that the largely nonunion Cintas fails to pay overtime to thousands of drivers who pick up laundry from hotels, restaurants, and other customers. Raynor let Cintas workers and UNITE organizers do most of the talking, stepping in to blast Cintas for "dragging down standards in the industry by paying subpar wages." A Cintas official denies the overtime charge and insists the company pays competitive wages.

It's bold tactics like the Cintas lawsuit that are turning Raynor into a rising star in the labor movement and a potential successor to AFL-CIO President John J. Sweeney, whose term expires in two years. When Raynor became the president of UNITE in 2001, he took over a union that had been badly battered by the offshore exodus of more than a million garment and textile jobs.

But Raynor has reversed the decline with some aggressive tactics. The Cintas suit, for example, is part of a national recruitment drive he kicked off in January to sign up 17,000 Cintas workers. His approach: tapping the strength of UNITE's mostly minority and immigrant membership by getting them to reach out to recruits with similar backgrounds. By focusing on low-wage industries such as laundry and retail distribution that aren't subject to trade pressure, Raynor has reinvigorated the flagging union. "The laundry campaign offers a model of how unions can organize an entire industry," says former AFL-CIO Organizing Director Richard Bensinger, who has advised Raynor on recruitment.

## LOOK FOR THE UNION WORKERS

**Low-wage industries such as retail distribution are key for Raynor**

Raynor's moves counter the view that unions lack relevance to American workers. They also stand as a sharp rebuke to most labor leaders, who have fewer troubles than UNITE, yet who still haven't taken the difficult steps needed to spur growth. In February, Raynor helped prod the adoption of a new AFL-CIO governing body with four other successful union leaders, including two other possible successors to Sweeney, hotel workers' President John W. Wilhelm and service employees' President Andy Stern. They all believe vigorous action can reverse labor's decline. "I'm convinced that the labor movement has the resources to grow," says Raynor.

If UNITE can sign up tens of thousands of members, Raynor reasons, so can other unions. UNITE lost more than 200,000 members through the late 1990s, cutting its ranks to 250,000, largely because of offshore competition. Raynor, 53, set out to reverse the trend well before he was elected president. A wire-thin, intensely driven man who got a BA in labor relations from Cornell University, he spent most of his career recruiting thousands of low-wage workers in the union-unfriendly South.

Then, in 1998, Raynor launched a national recruitment drive in commercial laundry. He saw that the industry couldn't be moved offshore and that outsourcing was creating thousands of jobs at fast-growing companies such as Cintas. Its workers also resemble UNITE members, who are 80% nonwhite and immigrant and typically earn $8 an hour.

Raynor prodded UNITE to focus more resources on recruitment and less on servicing current members. It now spends more than 40% of its budget on organizing, up from 20% in 1995, and Raynor vows to lift that above 50%. By contrast, many unions today still devote less than 5% to recruitment.

Using organizers who can speak to workers in their native language, UNITE has signed up 30,000 new laundry members since 1998. It now represents 27% of the industry, enough to lift members' wages by up to 25%, to about $9 an hour, and to give them medical benefits. It's a track record other unions will be studying.

*By Aaron Bernstein in Washington*



**REINVENTING A UNION**

*New recruits in laundry and distribution, which represented 14% of UNITE's 1998 membership, have offset big losses in apparel and textiles which totaled 64% in 1998.*

**2003 MEMBERSHIP**

MISCELLANEOUS 24%

DISTRIBUTION 16%

LAUNDRY 18%

APPAREL & TEXTILES 42%

Data: UNITE

PHOTOGRAPHS BY NELSON CHENAULT; CHART BY LAUREL DRAINS AU UNHAM

**EXHIBIT F**





Dear Cintas SSR

Since January [illegible] of you and your co-workers have been talking with UNITE organizers about addressing problems you face on the job. While some SSRs' concerns are specific to a bad manager or a certain location, all of you have continually expressed frustration over regularly working more than forty hours in a week without overtime pay. Overtime pay is a right, not a privilege. It's time that you were paid what the law says you deserve.

On Wednesday, March [illegible], UNITE assisted hundreds of Cintas SSRs in filing a national class action lawsuit against the company to collect unpaid overtime. Based on the information we have gathered, SSRs nationwide may be owed millions in overtime pay. If the court certifies this as a class action suit, any award resulting from this lawsuit will apply to all eligible drivers who choose to participate, not just the SSRs who filed it.

Cintas managers may have told you that you don't qualify for overtime because you are a salaried and commissioned outside salesperson. That may not be true. Cintas SSRs in California recently settled a lawsuit for $10 million in back wages over this issue, as did drivers at Pepsi Bottling in New Jersey. Pepsi [illegible] its drivers as salaried and commissioned outside salespeople [illegible] to pay $17 [illegible] million to its New Jersey drivers.

These [illegible] what is possible when working people act together to address problems they share. [illegible] hard time [illegible] a [illegible] billion company like Cintas. Working together [illegible] chance for success [illegible] UNITE has the experience and expertise to help [illegible] Cintas accountable.

Join with Cintas employees across North America in UNITE to create real solutions on the job with a union contract. For more information about the lawsuit or about how you can become involved in UNITE [illegible] fill out the form below.

Sincerely,

Bruce Raynor
President

| |
|---|
| You [illegible] more information about the overtime [illegible] against Cintas Corporation |
| An [illegible] |
| |

| | |
|---|---|
| *First Name | |
| *Last Name | |
| City | |
| *State | |
| ZIP | |
| Phone | |
| *Plant Location | |
| *Email | |

Dear Cintas SSR

Since January many of you and your co-workers have been talking with UNITE organizers about addressing problems you face on the job. While some SSRs' concerns are specific to a bad manager or a certain location all of you have continually expressed frustration over regularly working more than forty hours in a week without overtime pay. Overtime pay is a right, not a privilege. It's time that you were paid what the law says you deserve.

On Wednesday March 19 UNITE assisted hundreds of Cintas SSRs in filing a national class action lawsuit against the company to collect unpaid overtime. Based on the information we have gathered SSRs nationwide may be owed millions in overtime pay. If the court certifies this as a class action suit any award resulting from this lawsuit will apply to all eligible drivers who choose to participate not just the SSRs who filed it.

Cintas managers may have told you that you don't qualify for overtime because you are a salaried and commissioned outside salesperson. That may not be true. Cintas SSRs in California recently settled a lawsuit for $10 million in back wages over this issue as did drivers at Pepsi Bottling in New Jersey. Pepsi treated its drivers as salaried and commissioned outside salespeople and was ordered to pay $17.3 million to its New Jersey drivers.

These are examples of what is possible when working people act together to address problems they share. Alone one person will have a hard time affecting a $2 billion company like Cintas. Working together our chance for success grows tremendously. UNITE has the experience and expertise to help you hold Cintas accountable.

Join with Cintas employees across North America in UNITE to create real solutions on the job with a union contract. For more information about the lawsuit or about how you can become involved in UNITE contact us or fill out the form below.

Sincerely

Bruce Raynor
President

Yes I'd like more information about the overtime lawsuit against Cintas Corporation

An * indicates a required field

| | |
|---|---|
| *First Name | |
| *Last Name | |
| City | |
| *State | |
| ZIP | |
| Phone | |
| *Plant Location | |
| *Email | |

**EXHIBIT G**

Daily Review, The (Hayward, CA)

July 26, 2003
Section: Local & Regional News

Laundry contract is all washed up

Michelle Meyers, STAFF WRITER

HAYWARD — A uniform supplier that's the subject of the first legal challenge under
Hayward's 1999 living-wage law all but sev ered ties with the city by choosing not to
compete for its laundry services contract.

Two production workers at Cintas Corp.'s San Leandro facility filed a class-ac
tion lawsuit last month claiming the Cincinnati-based company, which used to have the
laundry services contract, was breaking the city's law by not paying them enough or
giving them enough days off. The suit also alleges Cintas violated its contract with the
city, in which it agreed to abide by Hayward's law. A couple of weeks after the filing,
Cintas notified the city that it would not be competing for the expired contract and
stopped providing its services somewhat abruptly, said Purchasing Manager Ralph Costa.

Cintas still provides the city with first-aid kit supplies, but not under a con tract
subject to the living-wage law, he added. This week, Cintas responded in Alameda
County Superior Court to the lawsuit, denying that it violated any laws, calling the living-
wage law "unconstitutional" and as serting that the plaintiffs are acting as agents of a
union campaign against the corporation.

Cintas spokesman Wade Gates said the company can't elaborate on the pending
litigation, but maintained that the company has a "long-standing practice of complying
with all laws and local ordinances" and that its actions "have been and continue to be
proper and legal."

Plaintiffs' lawyer Eileen Goldsmith, whose San Francisco firm also represents the
Union of Needletrades, Industrial and Textile Employees, or UNITE!, admitted that
union researchers discovered the alleged violation.

"So what?" she said. "It doesn't mean they weren't entitled to the wages they were
entitled to." Goldsmith added that her clients are pretty savvy, and are well aware of what
they're doing. "Cintas unilaterally terminated its $100,000 contract with the city rather
than pay its employees a living wage," she said.

Six other companies bid for the city's laundry contract, which pays about
$100,000 annually to wash floor mats, shop towels and soiled clothing worn by field
workers. Burbank-based Aramark, which has a distribution center in Hayward, was the
winner. Costa said that under normal circumstances, when a uniform contract changes
hands, there is usually about a three-week transition period in which services carry over
until the new provider gets employees measured. That didn't happen in this case, which
wreaked a bit of havoc on the 50-some city field workers whose clothes are
professionally laundered. They had to settle for loaner uniforms provided by Aramark. At
the city's wastewater treatment plant, for example, plant operator Sam Turner has had to
settle for long- sleeved coveralls while the cooler, custom-fit uniforms are on order.

"One day we came in and there were no uniforms," said Turner, shop steward for Service Employees International Union Local 790. "We just went about our business, but they kind of slapped us upside the head." Turner emphasized the importance of the laundry contract to plant workers who are constantly exposed to bacteria. "We can't take those clothes home and expose our families to that," he said.

Cintas, which had $2.3 billion in sales last year, had been providing Hayward with laundry services since at least 1997, Costa said. The business the city hired was called Unitog before Cintas bought it. Hayward's living-wage law, adjusted annually for the cost of living, requires wages of at least $9.26 per hour with benefits and $10.71 per hour without benefits. Plaintiffs Francisco Amaral and Nelva Hernandez allege that they get just $8.20 and $7.10 per hour, respectively. Michelle Meyers covers Hayward, Cherryland and Fairview. Call her at (510) 293-2463 or e-mail mmeyers@angnewspapers.com.

(c) 2003 The Daily Review. All rights reserved. Reproduced with the permission of Media NewsGroup, Inc. by NewsBank, Inc.

Daily Review, The (Hayward, CA)

July 26, 2003
Section: Local & Regional News

Laundry contract is all washed up

Michelle Meyers, STAFF WRITER

HAYWARD — A uniform supplier that's the subject of the first legal challenge under Hayward's 1999 living-wage law all but sev ered ties with the city by choosing not to compete for its laundry services contract.

Two production workers at Cintas Corp.'s San Leandro facility filed a class-ac tion lawsuit last month claiming the Cincinnati-based company, which used to have the laundry services contract, was breaking the city's law by not paying them enough or giving them enough days off. The suit also alleges Cintas violated its contract with the city, in which it agreed to abide by Hayward's law. A couple of weeks after the filing, Cintas notified the city that it would not be competing for the expired contract and stopped providing its services somewhat abruptly, said Purchasing Manager Ralph Costa.

Cintas still provides the city with first-aid kit supplies, but not under a con tract subject to the living-wage law, he added. This week, Cintas responded in Alameda County Superior Court to the lawsuit, denying that it violated any laws, calling the living-wage law "unconstitutional" and as serting that the plaintiffs are acting as agents of a union campaign against the corporation.

Cintas spokesman Wade Gates said the company can't elaborate on the pending litigation, but maintained that the company has a "long-standing practice of complying with all laws and local ordinances" and that its actions "have been and continue to be proper and legal."

Plaintiffs' lawyer Eileen Goldsmith, whose San Francisco firm also represents the Union of Needletrades, Industrial and Textile Employees, or UNITE!, admitted that union researchers discovered the alleged violation.

"So what?" she said. "It doesn't mean they weren't entitled to the wages they were entitled to." Goldsmith added that her clients are pretty savvy, and are well aware of what they're doing. "Cintas unilaterally terminated its $100,000 contract with the city rather than pay its employees a living wage," she said.

Six other companies bid for the city's laundry contract, which pays about $100,000 annually to wash floor mats, shop towels and soiled clothing worn by field workers. Burbank-based Aramark, which has a distribution center in Hayward, was the winner. Costa said that under normal circumstances, when a uniform contract changes hands, there is usually about a three-week transition period in which services carry over until the new provider gets employees measured. That didn't happen in this case, which wreaked a bit of havoc on the 50-some city field workers whose clothes are professionally laundered. They had to settle for loaner uniforms provided by Aramark. At the city's wastewater treatment plant, for example, plant operator Sam Turner has had to settle for long- sleeved coveralls while the cooler, custom-fit uniforms are on order.

"One day we came in and there were no uniforms," said Turner, shop steward for Service Employees International Union Local 790. "We just went about our business, but they kind of slapped us upside the head." Turner emphasized the importance of the laundry con tract to plant workers who are constantly exposed to bacteria. "We can't take those clothes home and expose our families to that," he said.

Cintas, which had $2.3 billion in sales last year, had been providing Hayward with laundry services since at least 1997, Costa said. The business the city hired was called Unitog before Cintas bought it. Hayward's living-wage law, adjusted annually for the cost of living, requires wages of at least $9.26 per hour with benefits and $10.71 per hour without benefits. Plaintiffs Francisca Amaral and Nelva Hernandez allege that they get just $8.20 and $7.10 per hour, respectively. Michelle Meyers covers Hay ward, Cherryland and Fairview. Call her at (510) 293-2463 or e-mail mmeyers@angnewspapers.com .

(c) 2003 The Daily Review. All rights reserved. Reproduced with the permission of Media NewsGroup, Inc. by NewsBank, Inc.

# EXHIBIT H



IN THESE TIMES    HOME

RADIO   THE ITT LIST   POLLS   NEWSLETTER   JOBS   STORE   ME

ARTICLE TO

Printable vers
Email to a frie
Discuss this a

Full contents
Past issues

MEMBERSH
TOOLS

New Registrat
Log In
Forgot Passw
Get your free mer
access discussio
exclusive content

ADVERTISE

FEATURES > AUGUST 11, 2003

# Hung Out To Dry

Unions fight back against antilabor laundry giant Cintas

By David Moberg

Hundreds of union activists, a few dressed as coffee cups emblazoned with "hypocrisy" and "cup of sweat," marched in front of a Starbuck's coffee shop on Chicago's fashionable North Michigan Avenue last May. They were protesting the decision by the image-conscious coffee shop chain, whose corporate code of conduct calls for respecting employees, to sign a contract for floor mats and other supplies with Cintas, the fast-growing, highly profitable, and historically anti-union company that dominates the industrial laundry and uniform business.





Last January, UNITE, the union born in the apparel and textile industry, launched a campaign to organize 17,000 workers at Cintas's 340 facilities across the country. When a union organizer called on Santa Ana Ventura, who hangs shirts on hangers at a suburban Cintas laundry, she and her husband decided it was a "good thing" to join the union. Ventura, a 49-year old immigrant from a poor, rural Mexican family, had worked at Cintas since 1997, and she had often spoken out against what she saw as management's lack of respect for workers. "I've seen the injustices at Cintas," she told the crowd at Starbuck's. "They fire workers unjustly. We want better pay, better benefits, and dignity. I am here today because I have no health insurance, and I want insurance."

The next day, instead of being given her usual three new boxes of hangers for her work, Ventura was given a larger-than-usual pile of old hangers that would have been much more difficult to use. When she questioned her supervisor, the plant manager sent her home. UNITE organizers filed a complaint with the National Labor Relations Board (NLRB)—one of at least 117 charges submitted since

January—and later brought U.S. Rep. Luis Gutierrez to protest at the plant. Ventura was permitted to return to work after three days without pay (unlike seven other workers around the country, whom UNITE charges Cintas has fired for their union activity). But Cintas managers subsequently organized anti-union meetings at work, threatened workers with layoffs, punished leaders like Ventura, and created an atmosphere of intimidation toward union supporters. "Many [employees] are very scared because they're terrorized," Ventura says. But she perseveres, she adds with a hearty laugh, "because I want the union to win."

Cintas founder and chairman Richard T. Farmer just as certainly wants the union to lose. After 33 years of continuous growth (the company made a profit of $249.3 million on sales of $2.69 billion in the fiscal year that ended in May), Cintas has taken over smaller companies that supply and launder uniforms, towels, mats, and related workplace supplies for giant companies like UPS, state and local government employees, and thousands of mom-and-pop businesses. As it has expanded, Cintas has selectively closed facilities already represented by unions. With the assistance of anti-union consultants, the company has mounted 49 successful—but often unlawful—campaigns to decertify unions (mainly Teamster locals representing drivers who are also salesmen), eliminating all but 700 unionists from the company. Farmer, the second largest individual contributor to the national Republican Party for each of the last two election cycles, has given the GOP almost $2.8 million since 1988—largely to counteract union influence in the Democratic Party, he told the *Columbus Dispatch*.

In a cutthroat industry that exploits new immigrant workers, Cintas has not always been the worst employer. But because of its size and aggressiveness, it has been a major obstacle to efforts to improve working conditions across the industry. Cintas has "every ailment you could look for in a company," says UNITE President Bruce Raynor. "[It is] viciously anti-union, treats workers like dogs, discriminates on the basis of race and sex, beats up small businesses who are customers, violates overtime and wage and human rights laws, trashes health and safety on the job. It is such a compelling case. Cintas will recognize the union or destroy itself as a company."

Since 1998 UNITE has quadrupled the number of unionized industrial laundry workers to 40,000. UNITE now represents about one-fourth of hourly employees in the industry. The union has boosted wages, won company-paid health insurance, expanded other benefits, and given workers a voice in the laundry industry through an aggressive organizing strategy. It has combined community pressure—mobilizing clergy, politicians, community groups, and customers—with vigorous employee organizing to demand "card check" recognition of the union. In other words, rather than go through the NLRB election procedures—which give employers greater opportunities to intimidate workers in anti-union campaigns and then to fight further over negotiating a contract if the union wins—UNITE typically fights to win promises of employer neutrality and, preferably, acknowledgement of

Ads by Goooooog

**Cintas Uniforn Rental**
Full-Service
Program - Laur
Repairs & Mor
Get Info on Cin
www.cintas.com

**Uniforms (in stock)**
Pants, shirts, s
ties, badges Sa
clothing, coats,
vests, hats
Firehouseinternatio

**Discount Cint: Uniform**
New & used
selection. aff C
Uniform for sale
www.ebay.com

**cutting linen c**
cost reduction
uniforms linens
laundry cleaner
www.denormandie.

**AUTHOR BIO**
David Moberg,
editor of *In Thes*
has been on the
the magazine si
began publishin
joining *In Thes*
he completed h
a Ph.D. in anthr
the University o
and worked for
*Newsweek*. Rec
has received fel
from the John D
Catherine T. Ma
Foundation and
Nation Institute

research on the
global economy

**STORE**



Order the Bush
poster today! N
Free shipping.

Enter your subsc
and get *In These*
delivered every t
for less than $1

the union on the basis of large majorities of employees signing union cards. Often workers strike, in conjunction with a comprehensive community support campaign, to win recognition. "The way you get a union is by acting like a union," argues Liz Gres, who oversees the 30 organizers now focused on seven major Cintas markets. "We're pushing people to do what they can," from distributing leaflets and protesting at work to bringing in a microwave oven plastered with UNITE stickers to a poorly equipped Cintas lunchroom.

Cintas employs 17,000 blue-collar workers, so organizing the company would have a major impact on the standards of the entire industry. Raynor says he hopes to organize the company nationally, not shop by shop. Cintas spokespeople insist that the union's demand for employer neutrality and a card check will "rob individuals of their rights to free elections," but the company has not taken up Raynor's proposal to discuss "a fair process" for decision-making, even though 90 members of Congress wrote to Farmer urging the company to be neutral and recognize the union through a card check. UNITE has proved to be a formidable foe in organizing showdowns. Last year the union won a neutrality agreement from Brylane executives in its campaign to organize the company's apparel distribution center. That followed a year-long, global pressure campaign in which union organizers sent Brylane customers lookalike Christmas catalogs featuring injured Brylane workers and sweatshop workers from around the world posing in Brylane products and telling their stories.

**YOUR INFO**

Full Name

Address

City

State

Zip

E-Mail Address

UNITE began organizing all Cintas workers in January and filed a $100 million lawsuit. It had already won a similar $10 million lawsuit in California on behalf of drivers who were improperly denied overtime pay. In late June the union and the Teamsters announced a joint effort to organize Cintas, with the Teamsters focusing on the drivers. Unlike the mostly female and new immigrant shop workers, who typically make $6.50 to $9.50 an hour, the mainly male drivers typically make at least $30,000 a year. But the two groups have compelling common interests. Mike Camiso, a 27-year old former Cintas driver now organizing for the Teamsters, says Cintas "treats you like robots and works you to death." Teamster national organizing director Jeff Farmer says, "Yes, the make-up of the workforce is different, but the common denominator is a company that chews up workers and spits them out."

**TERM**

○ 2-yr, 52-issu

○ 1-yr, 26-issu

**PAYMENT**

○ Credit Card

○ Bill Me



Martha Cuervo and Emperatriz Reyna, both veterans at a small uniform sewing plant in Chicago that Cintas took over, have felt the gnawing management style of their new bosses. When their small employer was bought out about five years ago, Cuervo says, Cintas reduced the quality of health insurance coverage, shifted insurance costs to workers, reduced piecework bonuses (both now make around $6 an hour), cut and more inconveniently scheduled vacations and holidays, eliminated the defined-benefit pension plan, and stopped providing free coffee. With the union and the employees working as a team, Reyna says, Cintas will have to take their demands, including a just wage, more seriously. "They've never

listened to us before," she says.

Now with Teamster cooperation, UNITE is hitting the company from many directions. The union cannot legally organize a formal boycott of Cintas by its customers, but it does inform them about the company's record and urges businesses—as well as public employers responsive to political pressure—to exercise their judgment. At least seven unions have agreed to use their influence to shift employers to unionized or less controversial, more law-abiding suppliers. Already a few big businesses—like Hart, Schaffner and Marx, Levi's of Canada, and the auto parts maker Lear Corp.—have used their discretion to sever ties to Cintas. The company recently dropped a bid to renew its contract with the city of Hayward, California, after UNITE helped launch a lawsuit charging that Cintas violated the city's living-wage law.

UNITE and the Teamsters are also stepping up pressure on Cintas by highlighting its public policy abuses, including the company's environmental and workplace safety violations and its failure to provide jobs promised in exchange for public financial and tax assistance. "We see widespread environmental violations everywhere," says UNITE health and safety director Eric Frumin. "They don't care what they pump into sewer systems. They have widespread OSHA violations as well. This is not a well-managed company when it comes to worker safety and the environment. They're reckless." Despite rising injury rates in the industry, including frequent problems with repetitive trauma injuries, Cintas lobbied to overturn the workplace ergonomic standards established at the close of the Clinton administration. To keep the pressure on the company, UNITE has organized protests when Cintas executives address business groups or corporate recruiters come to college campuses. It has also mobilized support for workers striking for recognition of an independent union at a Mexican plant that produces for Cintas.

The AFL-CIO and other unions have made major commitments to support the Cintas campaign, one of the larger quasi-industrial organizing efforts now underway and an unusual example of a cooperative drive involving two unions. It is an important test for UNITE, which underscored its commitment to organizing at its recent convention by raising dues and pledging within two years to spend 60 percent of its budget on organizing. UNITE has a history of fighting as long as it takes to win, as evidenced by the 25 years it took to organize Pillowtex in North Carolina. "I don't know how long it will take to bring Cintas down," Raynor says, "but mark my words: We will."

| permalink | email to a friend | printer friendly | subscribe |

**Reader Comments**

read this!

Posted by brian on August 11, 2003 at 2:42 PM

Teamsters organizer's are not in the union and will be fired if they tried. I bet the list list of union supporters is the same, non union organizers. Also the AFL-CIO biggest supporter SEIU. I dare you to track their record of charges filed by employees at the EEOC. Most Labor organization are not the way to go these day. Oh goodness don't be an africa american in the low wage work force thses day , Why? because unions now are supporting ilegal workers and targeting those low wage black workers jobs for ilegals that they feel won't chanlge their racist leadership. why don't unions organize white colar workers who are losing pensions and healthcare instead of people who need every dime.

Posted by Mr. Decal on August 11, 2003 at 5:40 PM

Three men I used to work with at the discount department store I work at (not Wal-mart, K-mart, Target) left the company to go work for Cintas. They are all driverds, and all appreciate the work much better then they're old job. All three of them we're managers at the store...a store in which managers non-union, salaried workers. At the store, they were only paid for 40 hours of work per week, but sometimes worked more than 60. The store is open 24 hours, so it was not uncommon. The most extreme I had seen, was on of them going in at 10 PM and not leaving till 10 AM. That's 12 hours of work...4 of which they were not paid for. Since moving to Cintas, they enjoy their work a great deal more. They do work hard, as is expected at such a job...and the 40 hours they are paid for is for the 40 hours they work. They do not work weekends...they have their birthday and all major holidays off. The store in which I work at, and which they used to work at only closes once a year...Christmas.

Posted by Franco Vitella on August 11, 2003 at 11:16 PM

What an abolutely biased piece of reporting. This is NOT a journalistic article. This is a editorial that borders on being a vendetta. Just another fine example of a liberal "journalist" giving the industry a bad name. As an educated man I am embarrased for the author.

Posted by alan on August 15, 2003 at 7:11 AM

I Support the Cintas workers in their effort to unionize and to seek better working conditions. If these big corporations had their way we would all go back to the bad old days of the sweatshops of the 20's and 30's. As a retired Teamster I understand throughly what a good union contract and decent wages and health care is all about. It appears that Cintas is taking the low road instead of treating their workforce fairly.

Posted by David wheeler on August 15, 2003 at 4:04 PM

While you are brining up the crimes of starbucks, maybe you could do an article about things they have done closer to home. I don't know if you remember Lemon Knot Cookies that used to be served there, but they were made by Judy's Bakery in Evanston IL. THey decided to back out of their contract with judy's fo the Lemon Knots, illegally, causing Judy and her bakery to go deep into debt, and now her dream is ruined, and she, her bakery and her husband are out of buisness.

Posted by Mike on August 17, 2003 at 9:50 PM

10/4/2004

Hi, This was a great article keep up the good work, in exposing this kind of slavery in the USA

Posted by christine on October 4, 2003 at 12:03 PM

Commenting is not available in this weblog entry.

Site Map | Contact Us | Jobs | Submissions | Advertising | Low Bandwidth / Mobile
© 2004 In These Times | Privacy Policy | Powered by Expression Engine | Syndicate / RSS

**EXHIBIT I**



**A joint effort of UNITE HERE and the Teamsters**

FOR IMMEDIATE RELEASE

Contact: Galen Munroe
(202) 624-6911

## OVER 1300 CURRENT AND FORMER CINTAS DRIVERS JOIN NATIONWIDE OVERTIME LAWSUIT

*--Cintas drivers may receive millions of dollars in unpaid overtime--*

Seeking restitution for unpaid overtime, over 1,300 current and former route drivers at Cintas – the nation's largest uniform rental supplier – have signed on to a class action lawsuit. The suit, filed in federal court in California in March 2003, charges that Cintas violated the Fair Labor Standards Act (FLSA) by failing to pay overtime to drivers working over 40 hours a week.

In April 2004, a federal judge ordered notification of thousands of current and former Cintas route drivers of their right to join the lawsuit. It is estimated that up to 10,000 drivers may have been misclassified as exempt from overtime in violation of federal law. To date, current and former drivers in over 40 states have joined the suit.

"When I found out about how we were short-changed on overtime, I signed onto the lawsuit right away. I worked too hard to make Cintas successful to let them get away with cheating on my pay" said Former Cintas SSR Wayne Lovitt from San Diego, California.

Cintas settled a similar overtime lawsuit filed by California drivers for $10 million in February 2003. The current suit, covering drivers nationwide, could cost Cintas up to $100 million. Drivers have until October 21, 2004 to sign on to the lawsuit.

For more information on the lawsuit go to www.cintasovertime.com or call 1-800-851-7783.

Uniform Justice is a joint effort of UNITE HERE and the International Brotherhood of Teamsters. UNITE HERE is the newly merged union of hospitality, gaming, apparel, textile and laundry workers. The new union represents nearly half a million workers in the U.S., Canada and Puerto Rico. The International Brotherhood of Teamsters represents more than 1.4 million members throughout North America. UNITE HERE and the Teamsters represent more than 1/3 of workers in the uniform and laundry industry.

-30-



**UNIFORM justice!**
www.uniformjustice.org
A joint effort of UNITE HERE and the Teamsters

FOR IMMEDIATE RELEASE

Contact: Galen Munroe
(202) 624-6911

## OVER 1300 CURRENT AND FORMER CINTAS DRIVERS JOIN NATIONWIDE OVERTIME LAWSUIT

*--Cintas drivers may receive millions of dollars in unpaid overtime--*

Seeking restitution for unpaid overtime, over 1,300 current and former route drivers at Cintas – the nation's largest uniform rental supplier – have signed on to a class action lawsuit. The suit, filed in federal court in California in March 2003, charges that Cintas violated the Fair Labor Standards Act (FLSA) by failing to pay overtime to drivers working over 40 hours a week.

In April 2004, a federal judge ordered notification of thousands of current and former Cintas route drivers of their right to join the lawsuit. It is estimated that up to 10.000 drivers may have been misclassified as exempt from overtime in violation of federal law. To date, current and former drivers in over 40 states have joined the suit.

"When I found out about how we were short-changed on overtime, I signed onto the law suit right away. I worked too hard to make Cintas successful to let them get away with cheating on my pay" said Former Cintas SSR Wayne Lovitt from San Diego, California.

Cintas settled a similar overtime lawsuit filed by California drivers for $10 million in February 2003. The current suit, covering drivers nationwide, could cost Cintas up to $100 million. Drivers have until October 21, 2004 to sign on to the lawsuit.

For more information on the lawsuit go to www.cintasovertime.com or call 1-800-851-7783.

Uniform Justice is a joint effort of UNITE HERE and the International Brotherhood of Teamsters. UNITE HERE is the newly merged union of hospitality, gaming, apparel, textile and laundry workers. The new union represents nearly half a million workers in the U.S., Canada and Puerto Rico. The International Brotherhood of Teamsters represents more than 1.4 million members throughout North America. UNITE HERE and the Teamsters represent more than 1/3 of workers in the uniform and laundry industry.

-30-

# EXHIBIT J




Register For Free Email / Log In

TOOLS     CAREER          BUSINESS     **NEWS**     COMMUNITY          FREETIME          EQUIPMENT

## Trucking Headlines

# Oct. 21 deadline for Cintas class action lawsuit

*By Jill Dunn*

**eTrucker POLL**
**Q. Owner-operators: I buy aftermarket parts...**
 Regularly
 Only for substantial price savings
○ Only for certain components or brands
○ Only if they won't void warranties
○ Rarely, if ever



Former and current Cintas drivers have until Oct. 21 to sign onto a nationwide class action lawsuit that alleges the uniform rental supplier violated overtime laws.

The lawsuit is assisted by UNITE HERE, a recently merged union of hospitality, gaming, apparel, textile and laundry workers. UNITE HERE and the Teamsters represent more than a third of all workers in the uniform and laundry industry, according to a Teamsters statement.

More than 1,400 people in 42 states who have worked as Cintas delivery truck drivers have joined the suit, according to the law firm of Lerach, Coughlin, Stoia & Robbins. The San Diego firm is one of three law firms representing the case.

The suit was filed March 2003 in the U.S. District Court for the Northern District of California.

The Ohio-based company stated on its website that the suit is meant only to discredit and harass Cintas and that the company's payment system is legal and fair.

"Recently, the Teamsters have been exaggerating the facts surrounding the lawsuit and approaching our service sales representatives while on their routes," Cintas said in a statement. "Their aggressive efforts are nothing more than an extension of their campaign to pressure the company into a 'Card Check/Neutrality' agreement."

The suit could cost Cintas $100 million, the Teamsters stated. Drivers who have worked for Cintas since March 19, 2000, can join the suit.

Drivers who drove trucks weighing more than 10,000 pounds or who regularly drove interstate routes for Cintas will not receive a consent to sue notice by mail, according to information posted on a website Lerach, Coughlin, Stoia & Robbins created to provide information about the case.

But those drivers may still be eligible for overtime pay and may file a consent to sue form to join this lawsuit. More information is available at www.cintasovertime.com.

<u>Send this page to a friend</u> 

**Recent Articles:**
10/5/2004- : Florida extends waivers for emergency trucks
10/5/2004- : New intermodal contract is kinder to carriers
10/4/2004- : Diesel rises another 4 cents
10/3/2004- : Goodyear seeks 2004 Highway Heroes
10/2/2004- : Washington state driver wins Harley in eTrucker sweepstakes
10/1/2004- : Year-long stay of hours rule becomes law
10/1/2004- : Freightliner to retrofit Detroit Diesel engines as needed
9/30/2004- : EPA lauds West Coast projects to cut emissions
9/29/2004- : Illinois lowers truck fee, restores sales tax exemption

More "Trucking stories:

High-tech manuf
Industries buys 1

Illinois Tollway tr
double or more ii

Transportation S
reaches record h

TA to buy Rip Gr
interstate travel c

Oct. 21 deadline
class action laws

Michigan conside
truck length

Florida extends v
emergency truck

New intermodal c
kinder to carriers

Diesel rises anot

Goodyear seeks
Heroes

Washington state
Harley in eTrucke
sweepstakes

Year-long stay of
becomes law

Freightliner to ret
Diesel engines a

EPA lauds West
to cut emissions

Driving school ov
probation for brit

**eTrucker**
**Q. If my truck**
**person, it wou**
○ A movie sta
○ An Olympic
○ A hopeless

e T r u c k e r - News - eTrucker.com is the online destination for everything trucking. For...   Page 2 of 2

○ An intensiv<br>
   patient<br>
○ My worst e

**Archived Stories:**

9/27/2004 $2 a gallon: Diesel surges 10 cents to new record
9/27/2004 U.S.-Mexico border stations to receive $44 million
9/27/2004 Ranked first in dealer service, International looks to market share
9/27/2004 Art Institute of Dallas wins cab redesign contest at GATS
9/25/2004 GATS continues to grow
9/24/2004 California toughens emission standards
9/24/2004 Crack about women drivers prompts GATS fund-raiser
9/24/2004 U.S. House votes against foreign truck exemptions
9/23/2004 Con-Way enlists in Highway Watch program
9/23/2004 ATA honors Con-Way safety director
9/22/2004 Kansas driver is ATA's Truck Driver of the Year
9/22/2004 ATA honors three fleets with top safety records
9/22/2004 Florida hopes to open U.S. 90 as I-10 detour
9/21/2004 FMCSA says stay of hours ruling is necessary
9/21/2004 Volunteers needed to haul relief supplies

**Also in News**

Business News

Top News Storie

New Products

Industry Briefs

Monthly Focus

Chaplain's Cor

Money for Miles

Any Questions?

Tire Tips

Fondly Faye

home | tools | career | business | news | community | free time | equipment |
about this site | magazine subscriptions | feedback | contact us | employment
privacy policy | our partners | advertise here | media kit | member benefits



© Copyright 2004 etrucker.com.
1-800-633-5953

**EXHIBIT K**

## You May Be Owed Thousands of Dollars In Back Pay

Cintas SSRs have filed a **nationwide** lawsuit to <u>claim tens of millions of dollars in unpaid overtime</u>. This is your chance to be paid for the long, hard hours you work.

If you worked more than 40 hours a week, you may have been underpaid.

Cintas settled a lawsuit for unpaid overtime with California SSRs for **$10 MILLION**. SSRs received up to **$15,000** each as a result of the lawsuit.

A United States District Court Judge has ordered that all current and former SSRs be notified of the federal overtime lawsuit and invited to 'opt in'. You **must** opt in to be eligible for overtime under federal law. You will NOT be personally responsible for any attorneys' fees.

This is your right. Federal law prohibits Cintas from punishing you in anyway for participating in this lawsuit.

**Don't wait another second! The chance to join the lawsuit is strictly time limited. Fill out the attached form & return immediately.**

For more information:
**800-851-7783**
www.cintasovertime.com



TEAMSTERS
ORGANIZING FOR POWER

---

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**PAUL VELIZ**, et al. On behalf of
Themselves and All Others Similarly
Situated

No. C 03-1180 SBA

**CONSENT TO SUE**

Plaintiffs,
Vs
**CINTAS CORPORATION**, et al.
Defendants.

I am a current or former employee of Cintas Corporation, and I hereby consent to sue Cintas Corporation for unpaid overtime premiums under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §216(b).

I worked in the position of _____ for Cintas Corporation in _____ (City) _____ (State)

from on or about _____ (Month) _____ (Year) to on or about _____ (Month) _____ (Year)
I hereby designate Altshuler, Berzon, Nussbaum & Demain, Traber & Voorhees, and Lerach, Coughlin, Stoia & Robbins, LLP, to represent me in this action.

Dated: _____ 2004  Signed: _____ (Signature)

Name (Print Legibly): _____

Address _____ (City) _____ (State) _____ (Zip Code)

Telephone: _____  Email Address: _____

Case 4:03-cv-01180-SBA    Document 292    Filed 10/08/2004    Page 43 of 53

Name

Address

City, State, ZIP

Please place
37 cents
postage here

Return to: Veliz – Overtime Lawsuit, Lerach, Coughlin, Stoia & Robbins, LLP,
401 B Street, Suite 1700
San Diego, CA 92101-4297

EXHIBIT L









**EXHIBIT M**



U.S. POSTAGE
0.37

SEP 27'04

URGENT!
Time is Running Out
For Overtime Lawsuit

Pierre J. Landry

REDACTED

7673-45220  02

NITEHERE!
Seventh Avenue
rk, NY 10001




**UNITE HERE!**
BRUCE RAYNOR
General President

**JAMES P. HOFFA**
General President

September 23, 2004

To all Current and Former Cintas Drivers:

By now you should be aware of the overtime lawsuit involving SSRs at Cintas facilities across the country. To date, over **1,300** current and former SSRs in over **40** states have joined the lawsuit.

Cintas settled a similar lawsuit for unpaid overtime with California SSRs for $10 million in February 2003. SSRs received up to **$15,000** each as a result.

You have a **legal right** to claim overtime payments that you are owed. Federal law **strictly prohibits** Cintas from punishing you in anyway for participating in this lawsuit.

It is time for you to enjoy the money that you have already earned. Plaintiffs in the class-action lawsuit will incur **no** legal fees.

There is only a short amount of time left for you to join this lawsuit. If you are interested in claiming your unpaid overtime wages, fill out the enclosed Consent to Sue form and return it immediately.

For more information, go to www.cintasovertime.com or call 1-800-851-7783.

In unity,

James P. Hoffa
General President

Bruce Raynor
General President

JPH/ig
Attachment

1

2

3                        UNITED STATES DISTRICT COURT

4                      NORTHERN DISTRICT OF CALIFORNIA

5

6   PAUL VELIZ, et al, On behalf of              No. C 03-1180 SBA
    Themselves and All Others Similarly
    Situated.                                     CONSENT TO SUE
7

8              Plaintiffs,

9        vs.

10  CINTAS CORPORATION, et al.

11             Defendants.                                    /

12       I am a current or former employee of Cintas Corporation, and I hereby consent to sue
    Cintas Corporation for unpaid overtime premiums under the federal Fair Labor Standards Act
13  ("FLSA"), 29 U.S.C. §216(b).

14       I worked in the position of _____ for Cintas Corporation in

15  _____, ____ from on or about _____, _____, to on or
           (City)                  (State)              (Month)         (Year)

16  about _____, _____.
             (Month)          (Year)

17

18       I hereby designate Altshuler, Berzon, Nussbaum, Rubin & Demain, Traber & Voorhees,
    and Lerach, Coughlin, Stoia & Robbins, LLP, to represent me in this action.
19

20  Dated: _____, 2004

21  Signed:      _____
                            (Signature)
22  Name (Print Legibly) _____
    Address              _____
23                       _____:
                            (City)              (State)         (Zip Code)
24

25  Telephone:           _____

26  Email Address:       _____

27  Return to: Veliz - Overtime Lawsuit, Lerach, Coughlin, Stoia & Robbins, LLP, 401 B Street,
    Suite 1700, San Diego, CA 92101-4297, to be received by _____ [date to be filled in
28  later].

PLAINTIFFS' PROPOSED REVISED ORDER ETC.; Case No. C 03-01180 SBA                          1

**EXHIBIT N**



June 18, 2004

John Doe
101 Circle Drive
Anytown, OH 45040

Dear John,

On March 27, 2003, you received a communication to all SSRs about a nationwide class-action suit filed in California by lawyers assisted by UNITE, a union that's been leading an all-out campaign to discredit, embarrass and harass Cintas and all of our partners. Recently, the Teamsters have been pushing this lawsuit by appearing at our locations and approaching SSRs on their routes. The Teamsters have been passing out flyers and other materials that alter a Notice of the lawsuit and Consent Form that were carefully worded by the Court and posted by Cintas at the locations on June 8, 2004. The Teamsters' aggressive efforts are an attempt to create dissension between the SSRs and Cintas for the unions' own purposes.

The suit alleges that the company's method of paying SSRs is illegal. However, we firmly believe that it is legal, fair, rewards good performance and offers opportunities to people with drive, ambition and spirit. The unions seem to oppose a pay system that, based on all the information we have, places our SSRs at or near the top of the pay scale for comparable jobs in the industry. We will continue to fight this suit vigorously.

We've achieved some great success in protecting the privacy of our partners during the course of our opposition to this lawsuit in the court system. The union-assisted lawyers asked the court to order Cintas to provide them the personal information of SSRs including social security number, home address and telephone number. The union-assisted lawyers wanted all of this personal information about you with no restrictions about who else would see it and how it could be used.

Cintas' legal counsel strongly objected to releasing your personal information because we respect your privacy and want to prevent unwanted intrusions into your personal life. I'm glad to say, we were successful in preventing access to the most sensitive personal information and in limiting both who will see it and what they can do with it. First, by the Court's order, the unions are not to have access to this information. Second, no one will have access to your social security number.

However, the Court did rule that Cintas will be forced to relinquish to the union-assisted lawyers the home mailing addresses for SSRs who are potential members of the class named in this suit. The potential members of the class do not include: (i) SSRs that as part of their duties cross state lines to make deliveries, (ii) SSRs that as part of their duties operate a vehicle with an average gross weight in excess of 10,000 pounds, or (iii) SSRs who work or worked as an STC (unless before being an STC they otherwise qualified as a potential class member). As a result, not all of the SSRs will receive the mailing or be eligible to participate in the suit. Of course, the decision of whether or not to participate in the suit as a plaintiff is a personal decision between an SSR and his or her family and Cintas assures you that decision will not result in any ill effects on an SSR's career.

The plaintiffs' lawyers are permitted to use the home mailing information of the potential members of the class for the sole and limited purpose of mailing, to those listed, a specific communication approved by the Court relating to this lawsuit. Access to telephone numbers is limited to very special cases where the mailing is returned to the lawyers by the Post Office as undeliverable.

If you think that your home mailing information is being used for other than this court approved limited purpose, feel free to let your GM know so that we can inform our attorneys and the Court. We hope our strong objections protect you from unwanted intrusions into your personal lives. We will continue to protect your personal information.

As the leadership of these unions continue to say and prove, they have no concern for our company or our customers. Union leaders have publicly stated that they will do anything, say anything and spend any amount of their members' dues money to harass companies that don't agree to their demands. As the unions' true motives come to light, we think everyone will see the allegations of this lawsuit for what they really are, baseless.

Over the years, Cintas has focused on building firm relationships with its partners – relationships that are based on mutual trust and respect. Together, we have built one of America's most successful and "Most Admired" companies – as determined by Fortune Magazine for the fourth consecutive year – with talented partners and loyal customers. We will continue to fight to preserve and enhance what together we have built.

Very truly yours,

Scott D. Farmer
President and Chief Executive Officer

# Exhibit 2

# ALTSHULER, BERZON, NUSSBAUM, RUBIN & DEMAIN

ATTORNEYS AT LAW

177 POST STREET, SUITE 300

SAN FRANCISCO, CALIFORNIA 94108

(415) 421-7151

FAX (415) 362-8064

www.altshulerberzon.com

FRED H. ALTSHULER
STEPHEN P. BERZON
BARBARA J. CHISHOLM
JEFFREY B. DEMAIN
REBECAH B. EVENSON
EILEEN B. GOLDSMITH
LAURA P. JURAN
SCOTT A. KRONLAND
DOROTHEA R. LANGSAM
DANIELLE E. LEONARD
STACEY M. LEYTON
LINDA LYE
PETER D. NUSSBAUM
DANIEL T. PURTELL
MICHAEL RUBIN
PEDER J. THOREEN
JONATHAN WEISSGLASS

SCOTT L. SHUCHART*
FELLOW

March 21, 2005

*Via Facsimile and U.S. Mail*
David Picker
Spector Gadon & Rosen
Seven Penn Center
1635 Market Street, 7th Floor
Philadelphia, PA 19103
Facsimile: 215/241-8844

    Re:    *Pichler v. UNITE*
           United States Dist. Ct., E.D. PA., Case No. 04-2841

Dear Mr. Picker:

    We received your March 17, 2005 letter concerning Altshuler, Berzon's objections to your third-party subpoena. We do not agree with the factual statements or legal conclusions asserted in your letter. Contrary to your assertions, our law firm has a long-standing attorney-client relationship with UNITE-HERE; and pursuant to that relationship, all communications with UNITE-HERE regarding the matters addressed in your subpoena are subject to the attorney-client privilege as well as work-product protection. Moreover, it would be unduly burdensome to search through all of our files and to prepare privilege logs concerning any such documents that might exist.

    In response to your previous request, we fully cooperated in providing redacted copies of our bills to UNITE-HERE pertaining to the *Veliz* litigation, which confirm that UNITE-HERE paid us to perform legal services in that litigation. We understood that you would be withdrawing your subpoena upon the production of those redacted documents. While you apparently do not agree with that position, for the reasons stated in our objections we do not believe a court would compel us to respond further to your subpoena duces tecum in light of the burden and the intrusion on the attorney-client relationship.

                                              Sincerely,

                                              Michael Rubin

MR/hlm
*ADMITTED IN MASSACHUSETTS ONLY

# Exhibit 3

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

---

| | |
|---|---|
| ELIZABETH PICHLER, KATHLEEN KELLY, RUSSELL CHRISTIAN, DEBORAH BROWN, SETH NYE, HOLLY MARTSEN, KEVIN QUINN, JOSE L. SABASTRO, DEBORAH A. SABASTRO, THOMAS RILEY, AMY RILEY, RUSSELL DAUBERT and CARRI DAUBERT, on behalf of themselves and those similarly situated, | |
| Plaintiffs, | Eastern District of Pennsylvania CIVIL ACTION NO. 04-CV-2841 |
| v. | |
| UNITE (UNION OF NEEDLETRADES, INDUSTRIAL & TEXTILE EMPLOYEES AFL-CIO), a New York unincorporated association; BRUCE RAYNOR, a New York resident; INTERNATIONAL BROTHERHOOD OF TEAMSTERS AFL-CIO; and DOES 1-10, | |
| Defendants. | |

---

## OBJECTIONS TO SUBPOENA DUCES TECUM
## ON BEHALF OF ALTSHULER, BERZON, NUSSBAUM, RUBIN & DEMAIN

Pursuant to Rule 45 of the Federal Rules of Civil Procedure, Altshuler, Berzon, Nussbaum, Rubin & Demain ( "Altshuler Berzon") hereby objects to plaintiffs' Subpoena Duces Tecum dated January 27, 2005 as follows:

GENERAL OBJECTIONS

The following general objections and statements apply to each of the particular requests listed in the Subpoena and are hereby incorporated within each response set forth below:

1. Altshuler Berzon objects to the Subpoena to the extent it calls for information and/or documents protected by the attorney-client privilege, the common interest privilege, the work product doctrine, or any other privileges, protections, or doctrines of similar effect. If Altshuler Berzon inadvertently produces any information or documents protected by the attorney-client privilege, the common interest privilege, the work-product doctrine, or any other privilege or

1

03/22/2005 11:58 FAX                                                     ☑ 006/017

protection, such production is not intended to and shall not operate as a waiver of any applicable privilege with respect to that document and/or information, or any other document and/or information.

2.    Altshuler Berzon objects to the Subpoena to the extent it calls for information and/or documents containing or constituting proprietary, confidential, and/or trade secret information.

3.    Altshuler Berzon objects to the Definitions and Instructions of the Subpoena to the extent they seek to impose obligations different from, or in excess of, those created by the Federal Rules of Civil Procedure and the Local Rules. To the extent Altshuler Berzon makes a response to this subpoena, such responses are made pursuant to, and as limited by, the Federal Rules of Civil Procedure and the Local Rules.

4.    Altshuler Berzon objects to the Subpoena to the extent it fails to describe the documents requested with reasonable particularity. In responding to the Subpoena, Altshuler Berzon does not waive any objections as to vagueness, ambiguity, undue burden, or invasiveness.

5.    Altshuler Berzon objects to the Subpoena to the extent it is overly broad as to time and that compliance would be unduly burdensome, expensive, annoying, or oppressive.

6.    Altshuler Berzon objects to the Subpoena on the grounds that plaintiffs waived any right to obtain production of the documents requested by agreeing with Altshuler Berzon upon a limited production by Altshuler Berzon and/or UNITE HERE in full satisfaction of the request, which Altshuler Berzon and/or UNITE HERE provided.

7.    Altshuler Berzon objects to the Subpoena to the extent it requires production of documents that are neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.

8.    Altshuler Berzon's responses herein are based on facts presently known to it and represent a diligent and good faith effort to comply with the Subpoena. Altshuler Berzon's investigation into the matters specified are continuing. Accordingly, Altshuler Berzon, reserves its right to supplement, alter or change their responses and objections to the Subpoena and to produce additional responsive information and/or documents, if any, that Altshuler Berzon has in its possession, custody, or control at the time the Subpoena was propounded.

9.    Altshuler Berzon's production of any information and/or documents is not a waiver of any of the objections set forth herein or an admission or acknowledgment that such information and/or documents are relevant to the subject matter of this action.

10.    Altshuler Berzon will not produce documents not currently in its possession, custody, or control. Consistent with applicable law, Altshuler Berzon construes the Subpoena as requiring it to engage in a reasonable and diligent search of its files most likely to contain responsive

2

documents or information about the specific matters at issue.

11.     Altshuler Berzon objects to the subpoena as unduly burdensome and oppressive in providing insufficient time for a response.

SPECIFIC OBJECTIONS

DOCUMENT REQUEST NO. 1
All documents relating to UNITE's and IBT's involvement in efforts to recruit employees of Cintas Corp. ("Cintas") to participate in the *Veliz* Lawsuit.

RESPONSE TO DOCUMENT REQUEST NO. 1:
In addition to each of the general objections set forth above that are incorporated by reference herein, Altshuler Berzon also objects to this Request on the grounds that it is vague, ambiguous and unintelligible. Altshuler Berzon specifically objects to this request on the grounds that documents identified by this request are protected from disclosure by the attorney client privilege and work product doctrine. Altshuler Berzon further objects to this request an unduly burdensome and oppressive in that the same documents can be requested from the parties to the *Pichler* action.

DOCUMENT REQUEST NO. 2:
All documents relating to UNITE's and IBT's support or assistance to the plaintiffs in the *Veliz* Lawsuit, or their attorneys in their prosecution of that case.

RESPONSE TO DOCUMENT REQUEST NO. 2:
In addition to each of the general objections set forth above that are incorporated by reference herein, Altshuler Berzon also objects to this Request on the grounds that it is vague, ambiguous and unintelligible. Altshuler Berzon specifically objects to this request on the grounds that documents identified by this request are protected from disclosure by the attorney client privilege and work product doctrine. Altshuler Berzon further objects to this request an unduly burdensome and oppressive in that the same documents can be requested from the parties to the *Pichler* action.

DOCUMENT REQUEST NO. 3:
All documents relating to UNITE's and IBT's involvement in the *Veliz* Lawsuit.

RESPONSE TO DOCUMENT REQUEST NO. 3:
In addition to each of the general objections set forth above that are incorporated by reference herein, Altshuler Berzon also objects to this Request on the grounds that it is overly broad, unduly burdensome and oppressive. Altshuler Berzon specifically objects to this request on the grounds that documents identified by this request are protected from disclosure by the attorney client privilege and work product doctrine. Altshuler Berzon further objects to this request an

3

unduly burdensome and oppressive in that the same documents can be requested from the parties to the *Pichler* action.

**DOCUMENT REQUEST NO. 4:**
All fliers, leaflets, pamphlets or other materials by UNITE or IBT concerning the *Veliz* Lawsuit, and documents relating to the preparation, production and/or distribution of such materials.

**RESPONSE TO DOCUMENT REQUEST NO. 4:**
In addition to each of the general objections set forth above that are incorporated by reference herein, also objects to this Request on the grounds that it is overly broad, unduly burdensome, vague and ambiguous, seeks documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Altshuler Berzon specifically objects to this request on the grounds that documents identified by this request are protected from disclosure by the attorney client privilege and work product doctrine. Altshuler Berzon further objects to this request an unduly burdensome and oppressive in that the same documents can be requested from the parties to the *Pichler* action.

**DOCUMENT REQUEST NO. 5:**
All documents relating to the payment of moneys by UNITE or IBT in connection with the *Veliz* Lawsuit, including but not limited to, payments made to the plaintiffs' attorneys in the *Veliz* Lawsuit.

**RESPONSE TO DOCUMENT REQUEST NO. 5:**
In addition to each of the general objections set forth above that are incorporated by reference herein, Altshuler Berzon specifically objects to this request on the grounds that documents identified by this request are protected from disclosure by the attorney client privilege and work product doctrine. Altshuler Berzon further objects to this request an unduly burdensome and oppressive in that the same documents can be requested from the parties to the *Pichler* action.

**DOCUMENT REQUEST NO. 6:**
All documents the plaintiffs' attorneys in the *Veliz* Lawsuit received from, or sent to, IBT or UNITE in connection with the *Veliz* Lawsuit.

**RESPONSE TO DOCUMENT REQUEST NO. 6:**
In addition to each of the general objections set forth above that are incorporated by reference herein, Altshuler Berzon also objects to this Request on the grounds that it is overly broad, unduly burdensome, expensive, annoying and oppressive, vague and ambiguous, seeks documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and seeks documents that are unreasonably cumulative or duplicative. Altshuler Berzon specifically objects to this request on the grounds that documents identified by this request are protected from disclosure by the attorney client privilege and work product doctrine. Altshuler Berzon further objects to this request an unduly burdensome and oppressive in that the same documents can be requested from the parties to the *Pichler* action.

4

**DOCUMENT REQUEST NO 7:**
All orders or stipulations entered in the *Veliz* Lawsuit concerning the confidentiality of the names or addresses of current or former employees of Cintas or potential class members in the *Veliz* Lawsuit.

**RESPONSE TO DOCUMENT REQUEST NO. 7:**
In addition to each of the general objections set forth above that are incorporated by reference herein, Altshuler Berzon also objects to this Request on the grounds that it is overly broad, unduly burdensome, expensive, annoying and oppressive, vague and ambiguous, and seeks documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence in this litigation. Altshuler Berzon further objects to this request on the ground that all orders or stipulations in the *Veliz* lawsuit are available from the Court's on-line docket.

**DOCUMENT REQUEST NO 8:**
All documents the plaintiffs or their attorneys in the *Veliz* Lawsuit gave to or shared with IBT or UNITE that reveal, disclose or identify the names or addresses of current or former employees of Cintas or potential class members in the *Veliz* Lawsuit.

**RESPONSE TO DOCUMENT REQUEST NO. 8:**
In addition to each of the general objections set forth above that are incorporated by reference herein, Altshuler Berzon also objects to this Request on the grounds that it is overly broad, unduly burdensome, expensive, annoying and oppressive, vague and ambiguous, and seeks documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence in this litigation. Altshuler Berzon specifically objects to this request on the grounds that documents identified by this request are protected from disclosure by the attorney client privilege and work product doctrine. Altshuler Berzon further objects to this request an unduly burdensome and oppressive in that the same documents can be requested from the parties to the *Pichler* action.

Dated: March 14, 2005                Michael Rubin
                                     Scott A. Kronland
                                     ALTSHULER, BERZON, NUSSBAUM,
                                        RUBIN & DEMAIN

                                     By: _____
                                          Michael Rubin

                                     Attorneys for Altshuler, Berzon, Nussbaum,
                                        Rubin & Demain

5

03/22/2005 18:01 FAX                                                      ☒ 010/017

## PROOF OF SERVICE

**CASE:**      *Pichler, et al. v. UNITE, et al.*

**CASE NO:**   N.D. Cal. No. _____ (E.D. Penn. No. 04-CV-2841)

    I am employed in the City and County of San Francisco, California. I am over the age of eighteen years and not a party to the within action; my business address is 177 Post Street, Suite 300, San Francisco, California 94108. On March 14, 2005, I served the following document(s):

### Objections to Subpoena Duces Tecum
### On Behalf of Altshuler, Berzon, Nussbaum, Rubin & Demain

on the parties, through their attorneys of record, by placing true copies thereof in sealed envelopes addressed as shown below for service as designated below:

**A.**   **By Federal Express:** I am readily familiar with the practice of Altshuler, Berzon for the collection of overnight courier mail and I caused each such envelope to be delivered to Federal Express Corporation at San Francisco, California, with whom we have a direct billing account, to be delivered to the office of the addressee on the next business day. I deposited this package at the <u>Kearny Street</u> location.

**B.**   **By First Class Mail:** I am readily familiar with the practice of Altshuler, Berzon for the collection and processing of correspondence for mailing with the United States Postal Service. I caused each such envelope, with first-class postage thereon fully prepaid, to be deposited in a recognized place of deposit of the U.S. Mail in San Francisco, California, for collection and mailing to the office of the addressee on the date shown herein.

| | **ADDRESSEE** | **PARTY** |
|---|---|---|
| A | James Bucci<br>Spector Gadon & Rosen, P.C.<br>1635 Market Street, 7th Floor<br>Philadelphia, PA 19103 | Plaintiffs |
| B | Mark Featherman<br>Willig Williams and Davidson<br>1845 Walnut Street, 24th Floor<br>Philadelphia, PA 19103 | Defendants UNITE and Bruce Raynor |
| B | Tom Kennedy<br>Kennedy, Schwartz & Cure, PC<br>113 University Place, 7th Floor<br>New York, NY 10003 | Defendants UNITE and Bruce Raynor |

6

| B | Joseph E. Kolick, Jr.<br>Dickstein, Shapiro, Morin & Oshinsky<br>2101 L Street, N.W.<br>Washington, D.C. 20037-1526 | Defendant International<br>Brotherhood of Teamsters,<br>AFL-CIO |
|---|---|---|
| B | Thomas Kohn<br>Markowitz and Richman<br>121 South Broad Street, Suite 1100<br>Philadelphia, PA 19107 | Defendant International<br>Brotherhood of Teamsters,<br>AFL-CIO |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this March 14, 2005, at San Francisco, California.

_Holly Miller_
Holly Miller

7

# Exhibit 4

03/22/2005 16.02 FAX                                                        012/017

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

ELIZABETH PICHLER, KATHLEEN KELLY,      :
RUSSELL CHRISTIAN, DEBORAH BROWN,       :
SETH NYE, HOLLY MARTSEN, KEVIN          :
QUINN, JOSE L. SABASTRO, DEBORAH A.     :
SABASTRO, THOMAS RILEY, AMY RILEY,      :
RUSSELL DAUBERT and CARRI DAUBERT, on   :
behalf of themselves and those similarly situated,   :
                                        :      CIVIL ACTION NO. 04-CV-02841
                     Plaintiffs,        :
                                        :
           v.                           :
                                        :
UNITE (UNION OF NEEDLETRADES,           :
INDUSTRIAL & TEXTILE EMPLOYEES AFL-     :
CIO), a New York unincorporated association;  :
BRUCE RAYNOR, a New York resident;      :
INTERNATIONAL BROTHERHOOD OF            :
TEAMSTERS AFL-CIO; and DOES 1-10,       :
                                        :
                     Defendants.        :
                                        :

## OBJECTIONS ON BEHALF OF DEFENDANTS UNITE AND RAYNOR TO PLAINTIFFS' SUBPOENA DUCES TECUM DATED JANUARY 31, 2005

Pursuant to Rule 45 of the Federal Rules of Civil Procedure, Defendant UNITE hereby objects as follows to Plaintiffs' Subpoena Duces Tecum, dated January 31, 2005 and served by hand on Altshuler, Berzon, Nussbaum, Rubin & Demain (hereinafter "the Altshuler firm") at 177 Post Street, San Francisco, California on January 31, 2005:

GENERAL OBJECTIONS

The following general objections and statements apply to the Subpoena's descriptions of Subject

Matter and to each of the particular requests listed in the Subpoena and are hereby incorporated within each response set forth below:

1. UNITE objects to the Subpoena to the extent it calls for information and/or documents protected by the attorney-client privilege, the common interest privilege, the work product doctrine, or any other privileges, protections, or doctrines of similar effect.

2. UNITE objects to the Subpoena to the extent it calls for information and/or documents containing or constituting proprietary, confidential, and/or trade secret information.

3. UNITE objects to the Definitions and Instructions of the Subpoena to the extent they seek to impose obligations different from, or in excess of, those created by the Federal Rules of Civil Procedure and the Local Rules.

4. UNITE objects to the Subpoena to the extent it fails to describe the documents requested with reasonable particularity.

5. Further, these document requests are unlikely to lead to the production of documents that are relevant to this action or reasonably calculated to lead to the discovery of admissible evidence. The *Veliz* matter concerns the alleged failure of Cintas to pay overtime as required by the Fair Labor Standards Act and any information relevant to that issue is wholly tangential to the alleged unlawful acquisition and misuse of motor vehicle information that is the issue central to the Pichler complaint.

**DOCUMENT REQUEST NO. 1:**

All documents relating to UNITE and IBT's involvement in efforts to recruit employees of Cintas to participate in the *Veliz* lawsuit.

**RESPONSE TO DOCUMENT REQUEST NO. 1:**

UNITE incorporates by reference each of the general objections set forth above. UNITE also objects to this Request on the grounds on the grounds that this request calls for documents protected by the common interest privilege, the work-product doctrine, or any other privileges, protections, or doctrines of similar effect.

**DOCUMENT REQUEST NO. 2:**

All documents relating to UNITE and IBT's support or assistance to the plaintiffs in the *Veliz* lawsuit or to their attorneys in their prosecution of that case.

**RESPONSE TO DOCUMENT REQUEST NO. 2:**

In addition to each of the general objections set forth above that are incorporated by reference herein, UNITE also objects to this Request on the grounds that this request calls for documents protected by the Attorney-Client privilege, the common interest privilege, the work-product doctrine, or any other privileges, protections, or doctrines of similar effect. In addition, UNITE has already produced responsive, non-privileged, non-duplicative documents, in redacted form, that are within its possession, custody or control in response to the identical demand included in Plaintiffs' Notice of Deposition and Request for Documents, sent pursuant to Rule 30(b)(6) and dated January 27, 2005.

**DOCUMENT REQUEST NO. 3:**

All documents relating to UNITE and IBT's involvement in the *Veliz* lawsuit.

**RESPONSE TO DOCUMENT REQUEST NO. 3:**

In addition to each of the general objections set forth above that are incorporated by reference herein, UNITE also objects to this Request on the grounds that this request calls for documents protected by the Attorney-Client privilege, the common interest privilege, the work-product doctrine, or any other privileges, protections, or doctrines of similar effect.

**DOCUMENT REQUEST NO. 4:**

All flyers, leaflets, pamphlets or other materials by UNITE or IBT concerning the *Veliz* lawsuit and documents relating to their preparation, production and/or distribution of such materials.

**RESPONSE TO DOCUMENT REQUEST NO. 4:**

In addition to each of the general objections set forth above that are incorporated by reference herein, UNITE also objects to this Request on the grounds that this request calls for documents protected by the Attorney-Client privilege, the common interest privilege, the work-product doctrine, or any other privileges, protections, or doctrines of similar effect.

**DOCUMENT REQUEST NO. 5:**

All documents showing or relating to payments of monies by UNITE or IBT in connection with the *Veliz* lawsuit, including, but not limited to, payments made to plaintiffs' attorneys in *Veliz*.

**RESPONSE TO DOCUMENT REQUEST NO. 5:**

In addition to each of the general objections set forth above that are incorporated by reference herein, UNITE also objects to this Request on the grounds that this request calls for documents protected by the Attorney-Client privilege, common interest privilege, the work-product doctrine, or any other privileges, protections, or doctrines of similar effect. In addition, in response to the identical demand included in Plaintiffs' Notice of Deposition and Request for Documents, sent pursuant to Rule 30(b)(6) and dated January 27, 2005, UNITE has already produced responsive,

non-privileged, non-duplicative documents in redacted form, that it identified from those within its possession, custody or control.

DOCUMENT REQUEST NO. 6:

All documents the Altshuler firm received from or sent to IBT or UNITE in connection with the *Veliz* lawsuit.

RESPONSE TO DOCUMENT REQUEST NO. 6:

In addition to each of the general objections set forth above that are incorporated by reference herein, UNITE also objects to this Request on the grounds that this request calls for documents protected by the Attorney-Client privilege, common interest privilege, the work-product doctrine, or any other privileges, protections, or doctrines of similar effect. . In addition, in response to the identical demand included in Plaintiffs' Notice of Deposition and Request for Documents, sent pursuant to Rule 30(b)(6) and dated January 27, 2005, UNITE has already produced responsive, non-privileged, non-duplicative documents in redacted form, that it identified from those within its possession, custody or control.

DOCUMENT REQUEST NO 7:

All orders or stipulations entered in the *Veliz* lawsuit concerning the confidentiality of the names and addresses of current or former employees of Cintas or potential class members in *Veliz*.

RESPONSE TO DOCUMENT REQUEST NO. 7:

In addition to each of the general objections set forth above that are incorporated by reference herein, UNITE also objects to this Request on the grounds that this request calls for documents protected by the common interest privilege, the work-product doctrine, or any other privileges, protections, or doctrines of similar effect.

03/22/2005 18:05 FAX                                                    ☒ 017/017



**DOCUMENT REQUEST NO 8:**

All documents the Plaintiffs or their attorneys in the *Veliz* lawsuit gave to or shared with IBT or UNITE that reveal, disclose, or identify names and addresses of current or former employees of Cintas or potential class members in the *Veliz* lawsuit.

**RESPONSE TO DOCUMENT REQUEST NO. 8:**

In addition to each of the general objections set forth above that are incorporated by reference herein, UNITE also objects to this Request on the grounds that this request is unlikely to lead to the production of documents that are relevant to this action or reasonably calculated to lead to the discovery of admissible evidence. Further, this request calls for documents protected by the Attorney-Client privilege, the common interest privilege, the work-product doctrine, or any other privileges, protections, or doctrines of similar effect.

Dated: March 14, 2005

By:

Dennis Terreggiani
Kennedy, Schwartz & Cure
113 University Place
New York, NY 10003
(212) 358 1500
(212) 358 0207 (fax)

Attorneys for UNITE and Bruce Raynor

# Exhibit 5

Letter from Claimants' Counsel

---

## Dosker, Mark C.

**From:**   Bruce Meyerson [brucemeyerson@msn.com]
**Sent:**   Wednesday, March 29, 2006 7:17 PM
**To:**     Dosker, Mark C.; ktaylor@adr.org
**Cc:**     Meckes, Joseph A.; Kelly, Michael W.; spepich@lerachlaw.com; 'Eileen Goldsmith';
            jimc@lerachlaw.com; 'Theresa Traber'; mrubin@altshulerberzon.com

**Subject:** RE: Veliz arbitration -- Veliz v. Cintas -- AAA Case No. 11 160 01323 04

I'd like to avoid the exchange of letters if we can. I am taking no action on Mike's letter, nor on this letter; I am putting them in the file.

Mike, if you think the case is different than set out in the demand, I think the understanding we reached on our last call was that you should move to amend the claim.

Bruce.

> -----Original Message-----
> **From:** Dosker, Mark C. [mailto:MDosker@SSD.com]
> **Sent:** Wednesday, March 29, 2006 6:51 PM
> **To:** Brucemeyerson@msn.com; ktaylor@adr.org
> **Cc:** Meckes, Joseph A.; Kelly, Michael W.; spepich@lerachlaw.com; Eileen Goldsmith;
> jimc@lerachlaw.com; Theresa Traber; mrubin@altshulerberzon.com
> **Subject:** Veliz arbitration -- Veliz v. Cintas -- AAA Case No. 11 160 01323 04
> **Importance:** High
>
> **To Arbitrator Bruce Meyerson**
>
> **Dear Bruce:**
>
> **We request until April 7th to more fully respond to Michael Rubin's letter attached to his e-mail below, and we request that neither you nor the American Arbitration Association take any action on it in the meanwhile.**
>
> **By way of preliminary response, we observe as follows:**
>
> 1.   **The letter Michael Rubin sent you today is not what he says it is. It is an attempt to make an improper and unlawful end-run around, among other things:**
>
>> a.    **the Rule requiring a motion if there is to be an amendment to a Demand in Arbitration (which includes new potential parties demanding to join the arbitration);**
>>
>> b.    **your confirmation in the January 2, 2006 teleconference that the operative arbitration demand in this matter presently is the original one; and**
>>
>> c.    **your confirmation in the most recent teleconference, several weeks ago, that if claimants wanted to amend they would have to make a motion under the appropriate Rule.**

2.      As Michael Rubin knows (because we have told him a week ago and we have given him the text of the papers), and indeed as Michael Rubin is quoted commenting upon to the <u>Wall Street Journal</u> this morning – but he chose not to mention to you – the vast majority (nearly 1850) of the persons on the lists he sent you this afternoon are and have been, since March 10th, Respondents in 70 separate cases Cintas has filed to enforce its rights under Section 4 of the Federal Arbitration Act in the 70 District Courts encompassing the counties where each such person last worked for Cintas.

Attached for your information is a copy of the text of one such Petition (the substantive text of them are all the same), and a copy of this morning's article from the <u>Wall Street Journal</u>.

As the Petition readily shows, Judge Armstrong rejected and was -- very appropriately -- highly critical of what Michael Rubin and his colleagues tried to do in this regard in her Court (as the transcripts reflect).  Now he is re-attempting it before you.

We respectfully request that you and the American Arbitration Association take no action on Michael Rubin's letter of today at this time, and that we have until April 7th to more fully respond to it.  Respectfully, and as previously observed in our prior papers and oral submissions, we also note that neither you nor the American Arbitration Association has jurisdiction to do what Michael Rubin's letter requests today anyway.

Very truly yours,

Mark C. Dosker

---

**From:** Michael Rubin
[mailto:mrubin@altshulerberzon.
**Sent:** Wed 3/29/2006 4:51 PM
**To:** Brucemeyerson@msn.com
**Cc:** Dosker, Mark C.; Meckes,
Joseph A.; Kelly, Michael W.;
spepich@lerachlaw.com; Eileen
Goldsmith;
jimc@lerachlaw.com; Theresa
Traber
**Subject:** Letter from Claimants'
Counsel

Dear Bruce:

Attached please find a letter from claimants' counsel, clarifying the status and providing a list of the *Veliz* plaintiffs who are arbitrating their claims.

Sincerely,

Letter from Claimants' Counsel

Michael Rubin

<<Arbitration Letter.pdf>>  <<Exhibit 1.pdf>>  <<Exhibit 2.pdf>>

---

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient. Any review, reliance or distribution by others or forwarding without express permission is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies.

4/26/2006